**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN SECTION OF TENNESSEE**

SEAN MURPHY and DENISE PAGELS,
V.M., A.M., E.M., A.M., by next friend
and parents, SEAN MURPHY and DENISE PAGELS,
and all other similarly situated residents,

      Plaintiffs,

v.                                   Civil Action No.: _____
                                           **JURY DEMANDED**

TOWN OF FARRAGUT, KNOX COUNTY, TENNESSEE, INC.,
MAYOR RON WILLIAMS, in both official and individual capacities,
VICE-MAYOR LOUISE POVLIN, in both official and individuals
capacities, REPUBLIC NEWSPAPERS, INC. dba
FARRAGUT PRESS ENTERPRISE, J.A. FIELDEN, INC., J.A. FIELDEN,
KIRK SWOR, FARRAGUT BUSINESS ALLIANCE, INC., BIDDLE FARMS RESIDENTIAL
LLC and all other unknown coconspirators,

      Defendants.

## COMPLAINT

Comes Now the Plaintiffs, by and through under-signed counsel, and for their complaint for injunctive and declaratory relief, as well as damages, included but not limited to mental and emotional anguish, attorney's fees, statutory damages, punitive damages and the like, and would state unto this Honorable Court the following:

## PARTIES

1. Plaintiff, Sean Murphy, is a resident and citizen of The Town of Farragut, Knox County, Knoxville, Tennessee. During all times relevant to the complaint, he owned a home in the Brixworth subdivision.

2. Plaintiff, Denise Pagels, is a resident and citizen of the Town of Farragut, Knox County, Knoxville, Tennessee. During all times relevant to the complaint, she co-owned a home with her husband, Sean Murphy.

3. Plaintiffs, V.M., A.M., E.M., A.M., are the minor children of Plaintiffs Sean Murphy and Denise Pagels and are residents and citizens of the Town of Farragut, Knox County, Knoxville, Tennessee.

4. Defendant, Ronald Williams, both in his individual and official capacity, is the current Town of Farragut Mayor and is believed to be a resident of Knox County, Tennessee.

5. Defendant, Louise Povlin, both in her individual and official capacity, is the current Vice-Mayor of the Town of Farragut.

6. Defendant, Joe A. Fielden, is a resident and citizen of Knox County, Knoxville, Tennessee.

7. Defendant, J.A. Fielden Co., Inc., is a Tennessee corporation and can be served through its registered agent, Corporation Service Co., 2908 Poston Avenue, Nashville, Tennessee 37203.

8. Defendant, Republic Newspapers, Inc., parent company of the assumed name Farragut Press can be served through its registered agent, Douglas Horne, 11863 Kingston Pike, Knoxville, Tennessee 37934.

9. Defendant, Farragut Business Alliance, Inc., (hereinafter referred to as "FBA"), is a nonprofit corporation and can be served through its registered agent, Tony Cox, 958 Harvest Drive, Seymour, Tennessee 37865.

10. Defendant, Kirk Swor, is a resident and citizen of the Town of Farragut, Knox County, Knoxville, Tennessee.

11. Defendant, Biddle Farms Residential, LLC, (hereinafter referred to as "Biddle Residential") is a Tennessee limited liability company and can be served through its

registered agent, Lee Popkin, 1111 N. Northshore Drive, STE S700, Knoxville, Tennessee 37919.

**JURISDICTION**

12. Jurisdiction and venue are proper before this Honorable Court pursuant to federal question jurisdiction - 28 U.S.C. § 1331 regarding the 42 U.S.C. § 1983 claims, as well as other federal claims sought herein. Further, this Honorable Court has supplemental jurisdiction over any state law claims raised herein pursuant to 28 U.S.C. § 1367.

**INTRODUCTION**

This lawsuit centers around a small-town local government body, acting at all times relevant herein ultra vires with its authority to act, entering into a grand conspiracy with multiple developers to grossly exceed its jurisdictional authority and in doing so acting unlawfully, arbitrarily and fraudulently in violation of the Tennessee Open Meetings Act, as well as, in a conspiracy to violate 42 U.S.C. §1983. The Town of Farragut, (hereinafter referred to as, "TOF"), also disregarded the statutory and procedural safeguards and limits of authority the Tennessee General Assembly mandated the localities to follow to protect residents from spot zoning, as well as unlawful enacting and/or amending town ordinances. The TOF has not been, and presently continues not to be, forthright with the concerned residents of the TOF. The TOF's modus operandi regarding their fraudulent activity was to enter into a conspiracy to spread false press releases using the Farragut Press Enterprise and Farragut Business Alliance regarding the true intent of the Biddle Farm project, as well as other projects, modifications of zoning drawings, developments and land purchases noted herein. Moreover, the TOF has failed to conduct detailed impact studies concerning construction, such as the Biddle Farm's project. The TOF unlawfully removed the residents of Farragut rights' to petition the government for

grievances concerning the Biddle Farm's Project, as well as other projects, land purchases, developments, etc., vitiated by conducting closed meetings concerning matters of public concern, which impact civil rights. The unlawful Biddle Farm's Project fraudulently ignores and exacerbates existing problems with traffic, parking, stormwater infrastructure and school crowding, just to name a few, all in violation of the Farragut residents' First Amendment and the Fourteenth Amendment due process rights guaranteed by the United States Constitution.

Plaintiff, Sean Murphy, (hereinafter referred to as both "Plaintiff" and "Plaintiff Murphy"), raised too many very important questions and was speaking out against the unlawful activity set forth herein. In order to silence the Plaintiffs, and in violation of their First Amendment Rights, Defendants collectively entered into a conspiracy with Kirk Swor, President of the Brixworth Homeowner's Association (hereinafter referred to as, "BHOA"), where the Plaintiffs reside with their three minor children, to terminate the Plaintiffs' property rights as a BHOA member to be able to use the BHOA clubhouse and pool in violation of his substantive due process rights. Indeed, the BHOA was well aware of the fact that Plaintiff Murphy conducted political think group meetings at the BHOA clubhouse and in doing so was exercising his right to free speech, to meet and gather with like-minded citizens to discuss matters of public concern and possible solutions for the same and to otherwise gather to petition the BHOA and the TOF for grievances given their conspiracy to silence the Plaintiffs.

To further part of the conspiracy herein to violate the Plaintiffs' civil rights and to harass and intimidate Plaintiffs in order to silence the Plaintiffs, the TOF dispatched an armed Knox County Sheriff's Officer to the Plaintiffs' home to cite Plaintiffs Murphy and Pagels for a sign ordinance violation, which they were not in violation of. The municipal ordinance is unconstitutional for reasons set forth herein. In continuing, the conspiratorial goal to strip the

Plaintiffs of their civil rights under color of law, the conspirators herein, and more specifically the TOF's ordinance officer drove by Plaintiff Murphy's family home over sixty (60) times and now Mr. Murphy and his family are in fear of the safety of their minor children and that of themselves, as someone, not yet known, but soon to be discovered, mailed a death threat letter in the Plaintiffs' United States Postal Mailbox – clearly an unlawful act that falls squarely within the jurisdiction of the federal government.

The Defendant conspirators herein and others yet unknown continued their civil rights violations by bringing Plaintiff Murphy before the Town of Farragut Municipal Court to face the citation regarding his placement of his yard art representing his political beliefs with regard to the TOF's governance, which is displayed on his private property at his Brixworth's residence. When Plaintiff Murphy appeared before the Town of Farragut Municipal Court to defend the allegations in the citation, the TOF changed the municipal code it was seeking relief under during the pendency of the hearing– a gross violation of the Plaintiffs due process rights and fined the Plaintiffs approximately $1,800.

Obviously dissatisfied with their unlawful efforts, the named conspirators herein and those yet unknown, but soon to be discovered, decided to also conduct a character assassination of the Plaintiffs, including, but not limited to, false allegations of aggravated assault by false statements of Plaintiff Murphy's vehicle trying to run down Mayor Williams. This patently false statement by Mayor Williams was eviscerated when the video camera footage of the Farragut Town Hall proved him to be an abject liar. Nonetheless, this knowing false statement by Mayor Williams was published to the citizens of the TOF to unlawfully cast the Plaintiffs in a false light as violent individuals. The conspirators, undaunted by being caught red-handed defaming the Plaintiffs, decided to place Plaintiffs' license plate number on the Internet so that individuals,

who do not agree with Plaintiffs' constitutionally protected political opinions, could target the Plaintiffs while out driving around Farragut. Continuing, and most certainly not exhaustive of the deplorable conduct by the named Defendants herein and those yet unknown, but soon to be discovered, the conspirators accused Plaintiff Murphy of being convicted of a crime in Connecticut and published the same to residents of Farragut. Once again, the Defendants and unknown coconspirators sought to assassinate the Plaintiffs' character by publishing abject lies about Plaintiff Murphy and his family. Mr. Murphy was charged with a crime in Connecticut under an unconstitutional statute, which thereafter, was nolle prosequi by the district attorney on its own motion. Plaintiff Murphy has never been convicted of a crime and Defendants knew this to be a fact yet used it to accomplish their goal of violating the Plaintiffs' civil rights to force them to move away from their home in Farragut.

This attack upon the Plaintiffs was never really about an unconstitutional sign ordinance it was always about Plaintiff Murphy closing in on the unlawful conduct surrounding the Biddle Farms Project as more fully set forth below. This abhorrent conduct by the Defendants herein, and other coconspirators not yet known, strikes directly at the heart of retaliation against an individual that was uncovering unlawful constitutional violations against the residents of Farragut, Tennessee.

The result is that the Plaintiffs dreamt of moving to Farragut has been destroyed by the Defendants, the Plaintiffs live in fear in their own home, are terrified to go out of the home for simple things such as going to the grocery store, and the Plaintiffs have suffered significant mental and emotional damages as a result of the Defendants and unknown conspirators unlawful conduct.

This lawsuit follows …

## FACTUAL BACKGROUND GIVING RISE TO CAUSES OF ACTION

13. In September 2020, Plaintiff Murphy, a self-made entrepreneur and self-acclaimed refugee from Connecticut, moved his family to Tennessee, the Volunteer State, hoping to find like-minded individuals and an open and transparent government.

14. Plaintiff Murphy had been previously been elected in his hometown in Connecticut to serve on the zoning commission, where he provided invaluable service and became fully versed in zoning laws.

15. During Plaintiff Murphy's tenure as a zoning commission member in his previous home state of Connecticut he uncovered shocking examples of underhanded unlawful conduct with regard to zoning modifications by committee members.

## THE BRIXWORTH HOMEOWNER'S ASSOCIATION
## FARRAGUT, TENNESSEE

16. Plaintiff Murphy located and purchased a home for sale in the Brixworth residential neighborhood in Farragut, Tennessee. The Town of Farragut is located in Knox County, Tennessee.

17. Brixworth offers many amenities for its residents including a community pool, community clubhouse, and community basketball courts with the average home costing $825,000. https://www.brixworth.org.

18. The BHOA is a registered Tennessee nonprofit corporation. While Condominium associations are subject to the Tennessee Condominium Act, Tennessee does not currently have an act for homeowner's associations and by registering as a non-profit corporation, the BHOA is subject to all regulations outlined in T.C.A. § 48-51-100.

19. In order to incorporate in an incorporated common interest community, the initial board of directors must file the community charter with the secretary of state that will describe

all rules and regulations set forth by a homeowners association (hereinafter referred to as, "HOA") along with the rights of the homeowners. Since HOAs in Tennessee have no standardized regulations, the charter is the best source of information regarding HOA regulations.

20. The BHOA's covenants, conditions and restrictions (hereinafter referred to as, "CC&Rs") and Bylaws were filed on December 29, 1989. **Collective Exhibit A**.

21. The BHOA's current, fatally flawed, restriction on signs is contained in Article XVIII. It states in pertinent part:

> No sign of any kind shall be displayed to the public view on any lot except one professional sign of not more than one square foot, one sign of not more than five square feet advertising the property for sale or rent, or signs of no larger size used by the builder to advertise the property during the construction and sales period.

*Id. at page 21, Article XVIII.*

22. The primary purpose of a homeowners' association is to provide maintenance for common elements and protect property values within the community. Additionally, a HOA is to create a budget for costs associated with the maintenance and management of the community and the HOA has the right to collect regular assessments from homeowners. The HOA board of directors may also impose additional fines on homeowners if they violate any regulations within the community charter.

23. It is the responsibility of the HOA board of directors to keep detailed community records. These records should include but not limited to the following;

- Minutes of all meetings.

- Accounting and financial records.

- Record of members including names, addresses, and number of votes allocated.

- Charter, bylaws, and any amendments.

- Most recent annual report delivered to the secretary of state.

24. Homeowners are entitled to vote during HOA board member elections and when adopting amendments to the community bylaws and charter. All voting is to take place during member meetings. The formula determining the number of votes allocated to each member should be found within the charter and all amendments to the charter must be filed with the secretary of state as articles of amendment to take effect.

25. Defendant Kirk Swor, (hereinafter "Defendant Swor") is the current President of BHOA Board and Mr. Murphy Ford is the Treasurer.

26. Although an HOA has the authority to enforce CC&Rs, certain rules are unenforceable, such as HOA CC&Rs that fly in the face of codified law. It is therefore axiomatic that HOAs may not create covenants that are contrary to federal and state laws. In addition, unenforceable HOA rules may be defined as rules that are:

- Enforced Selectively.
- Enacted Incorrectly.
- Enforced With No Authority.

27. According to Tenn. Code Ann. § 2-7-143, otherwise known as the Tennessee Freedom of Speech Act, HOAs may not adopt a rule or covenant that prohibits homeowners from displaying political signs on private property. However, HOAs may enforce *reasonable restrictions* when it comes to the placement and size of signs. Despite this, Mr. Murphy's political yard art is not prohibited.

## THE INCORPORATED TOWN OF FARRAGUT, TENNESSEE ("TOF")

28. The TOF was incorporated on January 16, 1980 following a referendum vote by community members 1,020 yeas and 303 nays. The Town is named after Admiral David Glasgow

Farragut, the first Admiral of the United States Navy, who was born in the Farragut area and was chartered under Tennessee's General Law Mayor-Aldermanic municipal charter provisions. The first Human Resource Manager was hired in 2008. The TOF's Policies and Procedures are attached as **Exhibit B** .

29.  The TOF encompasses 16.2 square miles. The TOF is bound to the north by Interstate 40/75, except at Campbell Station Road, Snyder Road, and the Outlets Drive area; to the south by Turkey Creek Road and the Norfolk Southern Railroad line; to the west at the at the Loudon County line; and to the east by Lovell Road (on the north side of Kingston Pike and Thornton Heights) and Concord Hills subdivisions (on the south side of Kingston Pike). **Exhibit C**.

30. The TOF is one of multiple cities in Tennessee that does not levy property taxes. These cities that do not levy them are limited in the amount of own-source revenue they are able to generate. These cities are also generally more dependent on state-shared taxes to maintain their current level of spending and they provide fewer services to citizens.

31. The principal water sources affecting the TOF's potential for flooding located in Farragut are Little Turkey Creek, North Fork Truckey Creek, Tennessee River, and Turkey Creek. Although the Tennessee River is not in the corporate limits of the TOF, it impacts the TOF though backwater flowing up Turkey Creek and Little Turkey Creek. (FEMA, 1984).

32. The TOF has approximately 30 miles of streams within its political borders including Turkey Creek, the North Fork of Turkey Creek and Little Turkey Creek.

33. The 2020 population of the TOF was 23,506 with a medium age of 48.6 with eighty-seven percent of Farragut residents owning a home and a median value of owner-occupied housing units in Farragut being $370,900.

34. The Knox County Board of Education provides educational services to Knox County students, within the TOF. The county school system is a part of the government body of Knox County. Further, the Knox County Sheriff's Department provides law enforcement and the Rural/Metro Corporation, a private subscription fire department, provides fire and rescue protection.

35. Tennessee added "Home Rule" amendments to the state constitution in 1953, providing cities who adopt "home rule" the ability to pass and change their own charter through local referendum elections without approval from the Tennessee General Assembly. However, the TOF did not adopt "Home Rule." Therefore, Tennessee uses what is known as "Dillon's Rule" as a canon of statutory construction when determining the authority of a municipality.

36. The classic statement of a municipality's relationship to its state legislature was made by Judge John F. Dillon speaking for the Iowa Supreme Court in the famous case of *City of Clinton v. Cedar Rapids and Missouri Railroad Company*:

> Municipal corporations owe their origin to, and derive their powers from,
> The breath of life, without which they cannot exist. As it created, so may
> it destroys. If it may destroy, it may abridge the control. Unless there is
> some constitutional Limitation on the right, the legislature might, by a
> single act, if we can Suppose it capable of so great a folly and a great wrong, sweep from
> existence all of the municipal corporations of the state, and the corporations could not
> prevent it. We know of no limitation on this right
> so far as corporations themselves are concerned. They are, so to phrase it,
> the mere tenants at will of the legislature.

*Clinton v. Cedar Rapids and Missouri Railroad Company,* 24 Iowa 455 (1868).

37. The Mayor-Aldermanic General Law Charter, T.C.A. §§6-1-101, et seq., provides for a board of mayor and two to eight aldermen. Newly incorporated cities must have at least one ward, and two aldermen must be elected from that ward. The Powers of Municipalities with the Mayor-Aldermanic Charter fall under T.C.A. § 6-2-201.

38. The TOF's first Board of Mayor & Aldermen (hereinafter referred to as, "BOMA") were elected on April 1, 1980, with Robert "Bob" Leonard, serving as the TOF's first Mayor.

39. The chief legislative body of any municipality, whether designated board of alderman, board of commissioners or by other title, may create and establish a municipal planning commission. Said planning commission shall consist of not less than five (5) members and not more than ten (10) members, with the number of members within the limits to be determined by the chief legislative body. T.C.A. § 13-4-101 et seq.

40. In 2001, the TOF's Farragut Municipal Planning Commission, (hereinafter referred to as "FMPC"), adopted The Farragut Land Use and Transportation Policy Plan. The primary objective of the Plan, as outlined in Tenn. Code Ann. § 13-4-203, served as a guide for "accomplishing a coordinated, adjusted and harmonious development of the municipality, which will, in accordance with existing and future needs, best promote efficiency and economy in the process of development." **Exhibit D**.

41. Local planning and land use regulation rest on powers granted to cities and counties by the state constitution, but state legislation shapes the manner in which these powers are exercised. Basically, cities and counties draw upon two board categories of legal powers in their planning programs: corporate powers and police powers. Corporate power is the authority to collect money though bonds, taxes, fees, and assessments, and to spend it to provide services and facilities, such as streets, water, sewage disposal, facilities, parks, recreation, and libraries. Police power, reserved to the states by the United States Constitution and delegated to cities and counties by the state, is the authority to regulate a citizen's behavior-including the use of private property-to promote the health, safety, and welfare of the public.

42. The Tennessee Planning Commissioner explains that Municipal Planning Commissions powers and duties are to prepare & adopt a general plan which may cover any service which the municipality might provide, as well as guidance for many private activities. It may make advisory reports and recommendations. The commission may advise anybody, public or private, whether a project or activity is in agreement with the general plan; may also request and obtain information from various public agencies; said powers are advisory only and abide by the mandatory referral. See Tennessee Planning Commissioner Handbook, Section II, Page 9. **Exhibit E** .

43. Title 13, Chapters 3, 4, and 7, Tennessee Code Annotated, contain all of the authority delegated to local governments to develop planning and land use regulatory programs.

44. A planning commission may:

- Make reports and recommendations to the governing body about community development. T.C.A. § 13-4-103.

- Recommend building and financing programs for public improvements. T.C.A. § 13-4-103.

- Require public officials to furnish requested information. T.C.A. § 13-4-103.

- Adopt an official general plan for the municipality's physical development. §§ 13-4-201-203.

- Before construction, approve the location and extent of streets, parks, public spaces, public buildings and structures, and public and private utilities, T.C.A. § 13-4-104.

- Adopt and administer subdivision regulations. T.C.A. §§ 13-4-301-310.

- Certify a zoning plan (both text and map) to the governing body. T.C.A. § 13-7-202.

45. Tennessee Code Annotated § 13-7-201 empowers the chief legislative body of a municipality to adopt a zoning ordinance and also specifies the broad areas that may be regulated by zoning. However, T.C.A. § 13-7-202 specifies that before the legislative body may exercise these powers, the planning commission must make and certify to the legislative body a zoning plan which includes the full text of a zoning ordinance and zoning maps.

46. A proposed zoning amendment should be able to meet several tests before the planning commission approves it:

- Is the proposed change in agreement with the general plan?

- Does the change violate the legal purposes of zoning?

- Has it been determined that there will be no adverse impact upon adjoining property or that or that any adverse impact can be justified by the overwhelming public good or welfare?

- *Has it been determined that no one property owner or small group of property owners will benefit materially from the change to the detriment to the general public?*

47. In 2011, in accordance with T.C.A. §13-4-202, TOF's FMPC commissioned a Comprehensive Land Use Plan (hereinafter "CLUP") Leadership Team (hereinafter "CLUP Team") compromised with a professional planning consultant MIG/Winston member of FMPC, Town Staff, and general public to execute the public planning process in coordination. The CULP Team and MIG/Winston held several public forums, digitally and in person, over the course of a year to collect information and the capture the TOF's collective vision and on December 20, 2012, the TOF's FMPC called and held a public hearing to solicit public comments regarding the adoption of the CLUP. **The CLUP was voted on by TOF's FMPC and then certified**.

48. CLUP called for the TOF's Town Center to be constructed with horizontal and vertical mixed-use property, which allegedly encourages pedestrian activity. Mixed-use real estate has been a central theme in urban development going back to the Roman Empire, where apartment units were built over city marketplaces. Many city zoning authorities have returned to the policy of encouraging (or requiring) the combination of store frontage on the ground floor with residential units above in an effort to make areas "walkable." The objective of this requirement was to create a high-street atmosphere where pedestrians are shopping and enhancing neighborhood environment. It would also have the effect of increasing the TOF's long-term economic sustainability by diversifying the retail tax base through the creation of a traditional downtown with a variety of shops, restaurants, businesses and residences.

49. A municipality's "chief legislative body" is empowered to adopt and amend a zoning ordinance. The adoption process requires a public hearing preceded by a newspaper notice of at least 15 days. T.C.A. § 13-7-201, zoning ordinance may "regulate the location, height, bulk, number of stories, and size of buildings and other structures; the percentage of the lot that may be occupied; the sizes of yards, courts, and other open spaces; the density of population; and the uses of buildings structures, and land for trade, industry, residence, recreation, public activities, and other purposes …" and establish special districts or zones "subject to seasonal or periodic flooding . . . and such regulations may be applied therein as will minimize danger to life and property." Zoning regulations may provide for the transfer of development rights under procedures and restrictions set out in T.C.A. § 13-7-201(a)(2). Any regulations authorizing the transfer of development rights shall provide conveyances of development rights, which shall be in writing and shall be recorded in the office of the

register of deeds and that whenever transferred development rights are allocated to any property, such allocation shall not become effective until the transferred development rights are noted in an instrument or on a plat and recorded in the office of the register of deeds.

50. Local governments lack the authority to control the use of private property within their boundaries because such authority to control the use of private property within their boundaries is derived only from the State of Tennessee. *Smith County Regional Planning Commission v. Hiwassee Village Mobile Home Park*, 2010 WL 252285, at *6 (Tenn. Ct. App. Jan. 22, 2010); *Lafferty v. City of Winchester*, 46 S.W.3d 752,757 (Tenn. Ct. App. 2000).

51. In *KLN Associates v. Metro Development & Housing Agency*, 797 S.W.2d 898 (Tenn. Ct. App. 1990), the court noted:

> The General Assembly has not limited local governments' authority to control the private use of property to the enactment of zoning ordinances. The counties and cities were first empowered to adopt zoning ordinance in 1935. However, ten years later, the General Assembly granted them the power to redevelop blighted areas. In order to initiate a "redevelopment plan" that "indicate[d] proposed land uses and building requirements in the area."

*Id*. at 902.

The statutory authorization for redevelopment plans and urban renewal plans required preparation of plans containing zoning and planning changes. *Id*. The court noted, however, that simply because the plan contains zoning changes "does not transform it into a *zoning ordinance*." *Id*. at 903.

52. In order for the redevelopment plan to be effective herein, the plan approved by the governing body, among other things, must be "sufficiently complete" to "indicate its relationship to definite local objectives as to appropriate *land uses*" and "indicate proposed *land uses*" in the area. T.C.A. § 13-20-203.

53. The TOF pursuant to the provisions of T.C.A. § 13-4-101 created a municipal planning commission, which shall consist of nine members; two of these shall be the mayor and another member of the governing body selected by the governing body; the other seven members shall be appointed by the mayor. All members of the planning commission shall serve as such without compensation. Except for the initial appointments, the terms of the seven members appointed by the mayor shall be for two years each. With respect to the initial appointments, of the seven members first appointed, three shall be appointed for a term of one year, and four shall be appointed for a term of two years, so that the expiration of the terms of the appointed members will not all occur in the same year. The terms of the mayor and member selected by the governing body shall run concurrently with their terms of office. Any vacancy in an appointive membership shall be filled for the unexpired term by the mayor. *The Town of Farragut Code 1985* § 11-101; Code 2007, § 2-101.

54. Defendant, FBA, is a Tennessee nonprofit corporation with the mission "to advocate for the TOF business community in both political aspects and other applications and promote those businesses and the Town through "Shop Farragut" marketing and branding and community events. The FBA offers numerous special events throughout the year, including Art in the Park for Kids, Taste of Farragut and Light the Park. The TOF signed a memorandum of understanding (hereinafter referred to as, "MOU") with the FBA in October of 2019 for a one-year period during fiscal year 2020, which renewed automatically in subsequent years for a total of $70,000 paid per fiscal year. **Exhibit F**.

55. The FBA does not meet the definition of a charitable organization under T.C.A. § 6-54-111, therefore, it would had to publish in a newspaper of general circulation the TOF's intent to

make the contribution. The newspaper publishing should have included the amount and the purpose for which the money would be spent. **Id.**

56. The Board of Directors during this time include the following;

- Candace Viox, Water into Wine (President) – Farragut resident
- James H. Nixon II (Secretary), First Commercial Real Estate (Secretary)
- Keven Morrison, (Treasurer) – Turkey Creek Medical Center of Tennova Healthcare
- Herc Ligdis (Past President), Southeast Bank
- Tony Cox, Republic Newspapers, Inc./Home Radio LLC
- Debbie Funk, Embroidery Boutique
- Darren Tallent, Hampton Inn
- Defendant Povlin, Anytime Fitness
- Michell Austin, JC Penny
- Defendant Williams, Town of Farragut
- David Smoak, Town of Farragut (non-voting, ex-officio)
- Stephen F. Krempasky, Executive Director

57. Defendant Republic Newspapers Inc. is a registered Tennessee company and in 2022 registered the assumed name, Farragutpress, hence The Farragut Press was created as the local TOF newspaper, which was formerly known as The Farragut Press Enterprise.

## PROBLEMS BEGIN SURFACING WITH THE TOF'S GOVERNANCE

### The Municipal Budget Law of 1982

58. Allison Myers, wife of Farragut Municipal Planning Commission, (hereinafter "FMPC"), Noah Myers and serves as the TOF's Recorder/Treasurer and was appointed by the TOF's

city manager, Mr. David Smoak. All of the TOF's funds are deposited into a "operating account" with TN Bank. Indeed, banking services must be evaluated at least every four years and proposals must be from at least two banks. This requirement is a "shall" not a "may" and is the result of Public Chapter 277, which was signed into law on May 2, 2019.

59. Municipalities in Tennessee, in order to provide a safe temporary medium for investment of idle funds, are authorized to invest in the following:

    (1) Bonds, notes or treasury bills of the United States;

    (2) Nonconvertible debt securities of the following federal government sponsored enterprises that are charted by the Unted States congress;  provided, that such securities are rated in the highest category by at least two (2) national recognized rating services;

    (A) The federal home loan bank;

    (B) The federal national mortgage association;

    (C) The federal farm credit bank; and

    (D) The federal home loan mortgage corporation;

    (3)  Any other obligations not listed in subdivision (a)(1) and (2) that are guaranteed as to principal and interest by the United States or any of its agencies;

    (4) Certificates of deposit and other evidences of deposit at state and federally chartered banks, and savings and loan associations.

    (5) Obligations of the United States or its agencies under a repurchase agreement for a shorter time than the maturity date of the security itself if the market value of the security itself is more than the amount of funds invest; provided, that municipalities may invest in repurchase agreements only if the comptroller of the treasury or the comptroller's designee approves repurchase agreements as an authorized investment, and if such investments are made in accordance with procedures established by the state funding board;

    (6) The local government investment pool created by title 9, chapter 4, part 7;

(7) The municipality's own bonds or notes issued in accordance with title 9, chapter 21.

T.C.A. § 6-56-106.

60. The TOF shall publish the annual operating budget and budgetary comparisons of the proposed budget with the prior year's actual figures and the current year's estimated;

1. Revenues and expenditures for the following governmental funds; general, streets/public works, general purpose school and debt service.

2. Revenues for each fund shall be listed separately by local taxes, state of Tennessee federal government and other sources.

3. Expenditures for each fund shall be listed separately by salaries and other costs.

4. Beginning and ending fund balances shall be shown for each fund; … Certain fund types are legally required to be appropriated, such as the general fund, debt service funds and special revenue funds.

61. Upon information and belief, the TOF keeps all funds, except for TOF employee designated funds, mixed into one account at TN Bank.

62. The TOF adopted the following under T.C.A. § 6-2-103.- Annual operating budget and budgetary comparisons; publication;

(a) Notwithstanding any other law to the contrary, the governing body shall publish the annual operating budget and budgetary comparisons of the proposed budget with the prior year's actual figures and the current year's estimated figures, which information shall include the following:

(1) Revenues and expenditures for the following governmental funds: general, streets/public works, general purpose school and debt service

(2) Revenues for each fund shall be listed separately by local taxes, state, federal government and other sources;

(3) Expenditures for each fund shall be listed separately by salaries and other costs;

(4) Beginning and ending fund balances shall be shown for each fund; and

(5) The number of full-time equivalent employee positions shall be shown for each fund; and

(6) The publication shall be in a newspaper of general circulation and shall be published not less than ten days prior to the meeting where the governing body will consider final approval of the budget.

(Acts 1991, ch. 484, § 8; Acts 1992, ch. 760, § 2).

63. Municipalities in Tennessee must amend their budgets prior to increasing spending for any appropriation. Tennessee Constitution Art. 2 § 24, Tenn. Code Ann. § 9-1-116, Municipal Budget Law of 1982 (Tenn. Code Ann. §§ 6-56-203 & 6-56-208).

64. TOF's budgets for FY2019-2020, FY2020-2021, FY2021-2022, FY2022-2023 and FY2023-2024 are attached as **Collective Exhibit G**.

65. Signed into law by President Biden on March 11, 2021, the American Rescue Plan Act, (hereinafter referred to as, "ARPA"), provided $350,000,000,000 in additional funding for state and local governments. According to David Smoak, the TOF's Town Administrator, the TOF received a total of $7,055,252 issued in two tranches[1], November 2021, and November 2022. https://www.townoffarragut.org/DocumentCenter/View/6261/FY2023-Budget?bidld.

66. However, the TOF falls under the non-entitlements units of local government ("NEUs"), defined in § 603 (g)(5) Social Security Act, as added by § 9901 of the American Rescue Plan Act of 2021, and consist of local governments typically serving populations of less than 50,000. NEUs would receive Coronavirus Local Fiscal Recovery Fund payments through their state governments. State governments will receive a specific allocation of these funds from the United States Treasury for this purpose and are responsible for distributing these funds to NEUs within their state. Award amounts are based on the population of the particular NEU.

---

[1] In French, *tranche* means "slice." Cutting deeper into the word's etymology, we find the Old French word *trancer*, meaning "to cut." *Tranche* emerged in the English language in the late 19th century to describe financial appropriations. Tranche Definition & Meaning - Merriam-Webster

67. The United States Treasury guidance provided that each NEU's total award was also to be

capped at 75 percent of its total annual budget including both **operating and capital budgets**

in effect as of January 27, 2020.

68. The TOF's FY2018-2019 Annual Budget including operating budget or "Expenditures" and

the capital budgets or the "Capital Projects Fund" follows;

**GENERAL FUND**

The total General Fund budget is $7,011,751, which represents a decrease of $194,028 or
3% decrease over last year's budget of $7,205,779. The Town of Farragut budget
maintains its current level of service and is balanced without dipping into the Rainy-Day
Fund, which equals 30% of total expenditures.

**EXPENDITURES**

Proposed General Fund expenditures in FY2018-2019 is projected to be $7,011,751. The
budget adequately covers he operational needs of all departments and investments in
equipment, technology, etc. that allow staff to delivery services effectively. Also included
in the FY19 budget are transfers to other funds. This includes a $150,000 transfer to the
Equipment Replacement Fund, a $3,500,000 transfer to the Capital Investment Fund, and a
$100,000 transfer to the State Street Aid Fund.

**CAPITAL PROJECTS FUND**

**The Capital Projects Fund is used to consolidate the acquisition, design and
construction of major capital improvements of the Town**. The FY2019-2020 proposed
budget of **$10,717,700** provides funding for a variety of projects of in program areas such
as transportation, parks and recreation and general facility/equipment. The CIP long-term
budget includes expenditures of $23,872,700 for roadway improvements and park projects
through the year 2023.

There are 12 capital projects proposed for funding in FY2019. Several of the largest
projects include land acquisition ($500,000); Union Road Improvements engineering
($500,000), Campbell Station Road & Smith Road Greenway ($225,000); and park
improvements at Anchor Park & McFee Park expansion (4,000,000). More information on
the FY19 projects is provided in the detail budget for the Capital Projects Fund.

69. The Fiscal Year 2019 budget's fund balances as of June 30, 2019 provides that the General

Fund had a balance of $9,494,873, with the Capital Investment Program (CIP) fund balance

totaling $5,363,012, State Street Aid fund balance $1,116,528, and Other Governmental

Fund balance of $983,995 for a total sum of $16,958,408. The total revenue was listed at

$12,609,420.

70. The Fiscal Year 2020 budget provided by the TOF's website, sets forth the following:

**GENERAL FUND**

The total General Fund budget is $7,436,187, which represents an increase of $424,436 or 6% increase over last year's budget of $7,011.751  The Town of Farragut budget maintains its current level of service and is balanced without dipping into the Rainy-Day Fund, which equals 30% of total expenditures.

**REVENUES**

The FY[2]20 General Fund budget will be balanced with projected revenue collections during the fiscal year.  Projected revenue for FY20 is $11,352,072, up $432,752 or 4% from the FY19 budget of $10,919,320.

**EXPENDITURES**

The General Fund expenditures in FY20 are $7,436,187.  The budget adequately covers the operational needs of all departments and investments in equipment, technology, and other resources that allow staff to deliver services effectively.  Also included in the FY20 budget are transfers to other funds.  This includes a $175,000 transfer to the Equipment Replacement Fund, a **$7,250,000** transfer to the Capital Investment Fund, and a $150,000 transfer to the ADA Capital Fund.

**CAPITAL PROJECTS FUND**

The Capital Projects Fund is used to consolidate the acquisition, design and construction of major capital improvements of the Town.  The FY20 budget of **$21,345,000** provides funding for a variety of projects in program areas such as transportation, parks and recreation and general facility/equipment.  The CIP long-term budget includes expenditures of $35,330,000 for roadway improvements and park projects through the year 2024.

There are 10 capital projects proposed for funding in FY20.  Several of the largest projects include McFee Park Expansion ($8,000,000);  Union Road Improvements engineering ($5,000,000), Smith Road Sidewalk construction ($650,000); and stormwater improvements ($750,000).  More information on the FY20 projects is provided in the detail budget for the Capital Projects Fund.

71. As of June 30, 2020, the fund balance for the TOF's General Fund was **$13,440,199**, the CIP

Fund had a balance of **$942,719**, State Street Fund had a balance of **$1,228,415**, and Other

Governmental Funds balance was **$1,002,470** for a total sum of **$16,613,503**.  The projected

TOF's revenues were listed at $11,352,072 and Under Revenues:  The Revenue in the Grant

Column showed that the TOF did receive a grant for $7,399,000.  To the contrary, the fund

balances as of July 1, 2020 were reported by the TOF that the General Fund had a balance of

---

[2] FY20 – meaning fiscal year 2020.

**$19,330,170**, CIP Fund Balance of **$11,046,347**, Street Aid Fund balance was listed at **$1,228,415**, Other Government Fund balance was listed at **$1,009,370** for a total sum of **$32,614,302**.

72. Other reporting discrepancies concerning the TOF's accounting practices include, but are not limited to, the Fiscal Year 2019 Multi-Year Fund Summary total fund balance for the Fiscal Year 2018-2019 Fund as of July 1, 2019 was $11,440,829. To the contrary, the Fiscal Year 2020 Multi Year Fund Summary lists the fund balance for the 2018-2019 Fund as having $16,999,177 and not $11,440,829, an unsubstantiated increase of $5,558,348.

73. The TOF stopped sharing any purported financial reports after 2021 on their website. https://www.townofffarragut.org/522/Town-Financials.

74. NEUs were not required to provide budget documents supporting the total annual budget to request payment from the state; however, they will be required to submit supporting budget documents to the United States Treasury as a part of the initial mandatory reporting requirement.

75. The Coronavirus State and Local Fiscal Recovery Funds (SLFRF), a part of American Rescue Plan ("ARP") delivered $350 billion to state, local, territorial, and Tribal government across the country to support their response to and recovery from the COVID-19 public health emergency. The final rule for the SLFRF program went into effect on April 1, 2022. In August 2023, The United States Treasury released an interim final rule that addressed the new eligible uses added to the SLRF program by the Consolidated Appropriations Act, 2023. When the program was first passed, recipients were required to obligate eligible funds by December 31, 2024. Recipients were then required to appropriately expend funds by September 30, 2026. The Surface Transportation projects and Title 1 projects, and by

December 31, 2026, for all other eligible uses. SLFRF-Final-Rule-Overview.pdf
(treasury.gov), 2022-00292.pdf (govinfo.gov), Overview-of-the-2023-Interim-Final-Rule.pdf
(treasury.gov), and 2023-Interim-Final-Rule.pdf (treasury.gov.com).

76. The 2022 Final Rule Eligible Uses set forth the following:

- Support Public Health Response

- Expand Public Sector Capacity

- Address Negative Economic Impacts

- Premium Pay for Essential Workers

- Replace Lost Sector Revenue

77. The New Eligible Uses set forth the following:

- Emergency Relief from Natural Disasters

- Title I Projects

- Surface Transportation Infrastructure

Id.

78. On October 26, 2022, the WBIR News reported that the TOF had secured a $1,700,000 grant
to fund a variety of stormwater improvement projects. The funds for the project are being
distributed by the Tennessee Department of Environment and Conversation (TDEC) from the
state's American Rescue Plan Act (ARPA) fund. *American Rescue Plan Act of 2021*, 15
U.S.C. 9001 (aka, Cares Act).

79. However, Defendant Williams told the citizens of the TOF on February 1, 2023 that, "The
Town already funded multi-year stormwater improvements in current and future budgets,
funds which can now be reallocated to other key projects.

80. On May 24, 2023, Defendant Williams told the Defendant Farragut Press that the TOF received a settlement for $789,183.00, Defendant Williams was quoted "Since we are located in the appropriate watershed (TVA) and have our MS4 permit as a stormwater program, we were eligible for this settlement," Defendant Williams added "Our understanding at this time is that this money is not designated for a specific purpose, so we are placing in the General Fund reserve to be used *as (BOMA) deems appropriate*. **Exhibit H**.

81. The FY2023-24 Revenue listed in the TOF Budget, is absent of a line item for these monies received under the class action settlement.

82. The money was meant to be used to protect local waterways and mitigate of PCBs, while also monitoring for other contamination. For instance, Knox County received $2,000,000 and the Knox County Commissioners said they set up a Stormwater Fund for the money to be used on education, monitoring and the implementation of projects to protect local waterways not to be used for whatever purpose Defendant Williams decided to use it on.

83. On June 21, 2023, Defendant Williams announced that the TOF "received a $7,000,000 grant to upgrade the redlight system, and they plan to upgrade the redlight system, and they plan to upgrade twenty-six traffic lights on the road starting from the Town Hall." Defendant Williams continued, "They'll tap in a new program for that light. When they see a traffic backup, they'll hit 'domino,' and it will take care of all the lights so that you can flush the system to help move the traffic, part of the upgrades includes installing cameras on the traffic lights, which help collect data about the flow of traffic in real-time." The TOF's inter-office memo must not have been received on this new traffic light tech because the traffic in the TOF is getting worse by the day and the Biddle residents have not even moved in yet … Domino!

84. On October 5, 2023, it was announced that TDEC had awarded the TOF $1,365,000 for improvements at Mayor Bob Leonard Park and McFee Park. The project includes replacing the synthetic turf on Fields 1 and 2; renovating the path from the west parking lot to Field 1 to be ADA compliance; the addition of a concrete pad to the players benches for ADA-compliance; the addition of landscaping - shrubs; resurfacing and regrading walking paths to for ADA compliance; reconstruction of the sand volleyball courts and drainage; for construction of a 1.2- acre dog park with a restroom facility (approx. 11'4''x10'8'') at McFee Park.

85. Tennessee has many general laws that govern purchasing by municipalities including the 1993 Municipal Purchasing Law, the Competitive Sealed Proposals provisions under T.C.A. § 12-3-1207, the Contracts for Professional Services provision under T.C.A. § 12-3-1209, T.C.A. § 12-4-107, the Interlocal Cooperation Act, and the Iran Divestment Act, to name a few.

86. The TOF's public advertisement and competitive bidding is required for the purchase of all goods and services exceeding an amount of $10,000 except for those purchases specifically exempted from advertisement and bidding by the Municipal Purchasing Law of 1983 (T.C.A. § 6-56-301 et seq.). All such purchases shall be made in accordance with the Municipal Purchasing Law of 1983 (T.C.A. § 6-56-301 et seq.), this division and purchasing policies and procedures approved by the governing body. (Code 2007, § 5-202; Ord. No. 11-02, § 1,3-10-2011.)

**BOMA and FMPC**

87. In 2011, the TOF unlawfully adopted the following "ordinance" to change the terms of office and when the elections would be held regarding BOMA, to wit, "At the elections held in

April 2011, two aldermen (one from the ward made up of the territory lying within the town south of Kingston Pike (the "South Ward") and one from the ward made up of the territory lying within the town lying north of Kingston Pike (the "North Ward")), shall be elected for a term to extend until the general election for *Knox County held in August 2016*. Continuing, it states, "At the elections held in August 2014, and each successive fourth year anniversary thereof, a mayor and two other aldermen (one from the South Ward and one from the North Ward) shall be elected for a four-year term."

https://library.municode.com/tn/farragut/codes/code_of_ordinances?nodeId=Coortofate .

88. The TOF initially incorporated over a decade prior to June 30, 1991. Therefore, T.C.A. § 6-3-102 applies allowing the TOF by ordinance to do the following: establish wards, increase or decrease the number of wards, increase or decrease the number of aldermen to no fewer than two (2) and no more than eight (8) in accordance with T.C.A. § 6-3-101, which states in pertinent part that all increases and reductions in the number of wards and aldermen under this section shall be accomplished only by ordinance passed by a two-third (2/3) vote of the entire membership to which the board is entitled.

89. Municipalities in Tennessee that were incorporated under the Mayor-Aldermanic Charter before June 30, 1991, may establish wards, increase or decrease the number of aldermen and switch to staggered terms in accordance with T.C.A. §§ 6-3-101-102. On the other hand, Municipalities in Tennessee with non-staggered two-year terms may change by ordinance to non-staggered four-year terms. T.C.A. §§ 6-3-101-102

90. Further, the Tennessee Constitution provides that the people have an unalienable and indefeasible right to alter, reform, or abolish the government in such manner as they may think proper. It further establishes such a municipality may establish term limits for the

mayor and board of mayor and alderman of such municipality in such manner as shall be designated by ordinance. The operation of the ordinance shall be subject to approval of the voters as required in TN. Const. art. I, § 1 (b).

91. Defendant Williams served two terms on the Farragut Board of Zoning Appeals (hereinafter "FBZA"), in 2016 was elected to serve as an alderman for Ward 2 (South Ward) and in 2018 Defendant Williams was elected mayor of the TOF. Thereafter, Defendant Williams ran again for the TOF Mayor's office in 2022 winning by only 58 votes. Defendant Williams also purportedly served five (5) separate terms on the Sugarwood Homeowner's Association Board and is its past Board President. https://www.townoffarragut.org/554/Mayor-Ron-Williams.

92. Defendant, Louise Povlin, (hereinafter "Defendant Povlin"), purportedly was appointed to the TOF's FMPC in 2013 and then appointed to fill a vacant alderman seat for Ward 1 (North Ward) that opened in January 2016. Defendant Povlin was elected to a full term in August 2016 and again in August 2020. Defendant Povlin and her husband, Jay Povlin, (hereinafter "Mr. Povlin"), opened an Anytime Fitness in Farragut in 2013 and served on the Fox Run Homeowner's Association. https://www.townoffarragut.org/239/Vice-Mayor-Louise-Povlin.

93. In 2017, the TOF unlawfully *"Recodified"* their Code of Ordinances, https://library.municode.com/tn/farragut/codes/code_of_ordinances?nodeId=Coortofate.

94. Both Defendant Williams and Defendant Povlin are listed as the "OFFICIALS of AT THE TIME OF THIS RECODIFICATION" of The Town of Farragut's Ordinances. https://library.municode.com/tn/farragut/codes/code_of_ordinances?nodeId=Coortofate.

95. The current TOF BOMA consists of 5 members, Defendant Williams, Mayor, Defendant Povlin, Vice-Mayor and Alderman of Ward 1 (North Ward), Alderman David White, Ward 2

(South Ward), Alderman Scott Meyer, Ward 1 (North Ward), and Alderman Drew Burnette,

Ward 2 (South Ward).  https://www.townoffarragut.org/87/Board-of-Mayor-Alderman.

96. The TOF BOMA meets at 6:00 pm the second and fourth Thursday of each month at the

TOF's Town Hall.

97. The TOF's FMPC meets at 7:00 pm, the third Thursday of each month at the TOF's Town

Hall, 11408 Municipal Center Drive, Farragut, Tennessee 37934.

https://www.townoffarragut.org/97/Municipal-Planning-Commission

98. In direct violation of the TOF's adopted Charter, the TOF FMPC's current members, Mr.

Noah Myers and Ed St. Clair have been members since at least 2012 when the TOF's FMPC

adopted its CLUP. Betty Davis also served on the TOF's FMPC as far back as 2012 until

stepping down in 2021. Continuing with these amazing political tenures, Defendant Povlin

unlawfully served two and half terms before being elected alderman, and the current

alderman, Scott Russ, has been a member since 2019…?

99. The general rule is that courts should not interfere with the exercise of the zoning power and

hold a zoning enactment invalid, *unless* the enactment, in whole or in relation to any

particular property, is shown to be clearly arbitrary, capricious, or unreasonable, having no

substantial relation to the public health, safety, or welfare, or is plainly contrary to the zoning

laws.

100.    "Spot zoning[3]," as properly known and understood, and "spot zoning" ordinances, as

properly identified, are invalid on the general ground that they do not bear a substantial

---

[3] "Spot zoning," is the process of singling out a small parcel of land for use classification totally different from that
of the surrounding area, for the benefit of an owner of such property and to the detriment of other owners, and, as
such, is the very antithesis of planned zoning. The law is well settled that "spot zoning," as properly known and
understood, and "spot zoning" ordinances, as properly identified, are invalid on the general ground that they do not
bear a substantial relationship to the public health, safety, morals and general welfare and are out of harmony and in
conflict with the comprehensive zoning ordinance of the particular municipality. It is, therefore, universally held that
a "spot zoning" ordinance, which singles out a parcel of land within the limits of a use district and marks it off into a

relationship to the public health, safety, morals and general welfare and are out of harmony and in conflict with the comprehensive zoning ordinance of the particular municipality.

101.     In *Grant v. McCullough, supra*, this Court invalidated an ordinance, which amended a general zoning ordinance to permit the owner of a single city lot to apply her property to commercial uses, whereas, the property surrounding it was restricted to residential uses, on the ground that it constituted "spot zoning" and, as such, violated Art. XI, Section 8, of the Constitution of Tennessee.  The Appellate Court upheld the Chancellor's decision finding that the ordinance was enacted solely for the personal benefit of the owner of the subject lot and that the rezoning of the lot was inconsistent with the general ordinance on the subject and gave to the owner a privilege withheld by the general ordinance on the subject and gave to the owner a privilege withheld by the general ordinance on the subject and gave to the owner a privilege withheld by the general law from others in a similar situation.  The Court concluded:

> "No basis for this action can be conjured other than that it emanated from a strong desire to help this good lady."

> *McCollough,* 270 S.W.2d at 319.

In reaching this conclusion, the Court cited as authority and quoted from *Rodgers v. Village of Tarrytown,* 302 N.Y. 115, 96 N.E.2d 731 (1951), as follows:

> ""Spot zoning" is process of singling out a small parcel of land for use classification totally different from that of surrounding area, for benefit of owner of such property and to the detriment of other owners, and, such, is very antithesis of planned zoning."

> *Grant,* 270 S.W.2d at 319.

102.     An example of "spot zoning" can be found by viewing the TOF's zoning map.  **Exhibit I.**

---

separate district for the benefit of the owner, thereby permitting a use of that parcel inconsistent with the use permitted in the rest of the district, is invalid if it is not in accordance with the comprehensive zoning plan and is merely for private gain. *Grant v. McCullough*, 196 Tenn. 671, 270 S.W.2d 317, 319 (Tenn.1954) (quoting *Cassel v. Mayor & City Counsel of Baltimore*, 195 Md. 348, 73 A.2d 486, 489 (Md.Ct.App.1950)).

103.    Noah Myers, a member of the TOF's FMPC, has the only parcel of land for the use "Business District Four Story," for private gain to the detriment of other land owners in the TOF.

104.    The TOF's FMPC members have acted and continue to act unlawfully by preparing and passing ordinances, such as Ordinance 22-14. **Exhibit J.**

105.    The TOF's BOMA may appoint a city administrator who shall be under the control and direction of BOMA, which by ordinance may require the city administrator to perform any or all of the following duties:

(1)  Administer the business of the municipality.

(2)  Make recommendations to the board for improving the quality and quantity of public services to be rendered by the officers and employees to the inhabitants of the municipality.

(3)  Keep the board fully advised as to the conditions and needs of the municipality.

(4)  Report to the board fully advised as to the condition of all property, real and personal, owned by the municipality and recommend repairs or replacements as needed.

(5)  Recommend to the board and suggest the priority of programs or projects involving public works or public improvements that should be undertaken by the municipality.

(6)  Recommend specific personnel positions, as may be required for the needs and operations of the municipality, and propose personnel policies and procedures for approval of the board, and

(7)  Perform such other duties as may from time to time be designated or required by the board.

Tenn. Code Ann. § 6-4-101.

106.    In February of 2010, The TOF's BOMA appointed David Smoak, as the Town Administrator.

**The TOF Municipal Court**

107.    The Tennessee municipal courts, sometimes called "city courts," hear cases involving violations of municipal ordinances.  A fine for a municipal ordinance violation may not

exceed $50 unless the fine is "remedial." See *City of Chattanooga v. Davis* and *Barrett v. Metropolitan Government of Nashville and Davidson County*, 54 S.W. 3rd. 248 (Tenn. 2001). Examples of fines that are remedial include those that recover administrative expenses, disgorge ill-gotten gains, provide restitution, or are prospectively coercive. As noted herein, the TOF fined the Plaintiffs over $1,800 for placing political expression yad art on his private property.

### The Tennessee Open Meetings Act Violations

108.    The TOF, prior to the COVID-19 Pandemic, was constantly violating the Tennessee Open Meetings Act, however, despite citizens proving these past violations to the TOF's BOMA, these violations are continuing by the TOF as set forth herein.

109.    The Tennessee Supreme Court has determined that Tennessee Open Meetings Act applies to "any board, commission, committee, agency, authority may be traced to State, City or County legislative action and whose members have authority to make decisions or recommendations on policy or administration affecting the conduct of business of the people in the governmental sector" *Dorrier*, 537 S.W.2d at 892.

110.    Public hearings and public meetings are both considered meetings of the governing body under the Tennessee Open Meetings Act;  however, public hearings additionally require that the public have the ability to comment on proposed governmental actions. Any action taken by a governing body at a meeting in violation of the Tennessee Open Meetings Act is void and of no effect.  T.C.A. § 8-4-105.

111.    The adoption or amendment of zoning regulations are government actions required to take place at *public* hearings under Tennessee law.  T.C.A. §§ 13-7-104 and 105, T.C.A. §

13-7-203.  Likewise the adoption of a redevelopment plan must be provided to the public for comment.  T.C.A. § 13-20-203.

112.    During the height of the Covid-19 Pandemic, Tennessee Governor, The Honorable Bill Lee, issued Executive Order No. 60, which extended remote meetings and implementing best practices.  The following provisions shall apply to meetings of governing bodies conducted on or after October 1, 2020.

> 1. As a reasonable measure to protect the safety and welfare of Tennesseans while ensuring that government business may continue in a manner that is open and accessible to the public, the provisions of Tennessee Code Annotated, Title 8,  Chapter 44, Part 1, are hereby suspended to the extent necessary to allow a governing body, as defined in Tennessee Code Annotated, Section 8-44-102, to meet and conduct its **essential business by electronic means as provided herein, rather than being required to gather a quorum of members physically present at the same location, if the governing body determines that meeting electronically is necessary to protect the health, safety and welfare** of Tennesseans in light of the COVID-19 outbreak, subject to the following conditions: …
>
> f.  This Order does not in limit, preempt, or repeal any local requirement permitting public comment during meetings, except that compliance with such requirements may be accomplished by allowing timely and appropriately submitted written public comments to be read into the record by a member or staff of the governing body during the meeting of the governing body; and
>
> g.  The provisions of Tennessee Code Annotated, Section 8-44-108(c), apply to all state and local governing bodies; and
>
> h.  All such meetings shall be conducted in a manner consistent with Article I, Section 19 of the Tennessee Constitution.

*Governor Lee Executive Order No. 60* is attached as **<u>Exhibit K</u>.**

113.    Counsel for the Office of Open Records stated that if the technology used by the governing body will not permit public comment or lacks the ability to mute and unmute members of the public, the *public hearing should be postponed* until adequate technology can be acquired or an in-person public hearing can be held.

https://www.jdsupra.com/legalnews/conducting-public-meetings-during-the-71043/ .

114.    In violation of the Tennessee Open Meetings Act, during the October 22, 2020 closed zoom hearing, David Smoak "announced that there would be a special called meeting of the

board on Monday, October 26 at 2:00 PM and Friday October 30 is the Freaky Friday even that is by reservation." **Exhibit L** .

**What is Really Going on with Biddle Farms?**

115.     In 2008, a Final Plat was approved for the subdivision of Campbell Station Exchange; the plat was 83.80 acres of land divided into a total of 9 lots.  Lot 9 was 53.556 acres and is the site of the Biddle Farms Project.  The property lies within a Special Hazard Area as shown on "FIRM" Mapping of Knox County, (Reference:  47093C0244F, dated 5/2/2007 and 47093C0243F, Dated 5/2/2007.   The public walking trail was to be located within twenty (20) Foot of the Greenway/Walking Trail Easement and Shall be in Favor of the TOF's residents and therefore *reserved* for public use, and there shall be no clearing, grading, construction, or disturbance of soil and or native vegetation within the Aquatic Buffer Except as permitted by the TOF.  The public **walking trails in lot 9 shall be designed and installed at the time of the future development of Lot 9**.  The walking trail along the Aquatic Buffer located on LOT 9 shall be designed and installed at the time of the future development of Lot 9.  The protective covenants governing Aquatic Buffers are recorded in Instrument Number 200808200012683 in the Knox County Register of Deeds Office.  It is signed by the Secretary of the TOF's FMPC at the time and property owner, James M. Biddle, signed certifying the common area dedication.  Knox County Register of Deeds office Plat reference 200809110017704.  **Exhibit M.**

116.     As previously noted herein, the principal flooding sources affecting the communities located in the TOF are Little Turkey Creek, North Fork Truckey Creek, the Tennessee River, and Turkey Creek.  Although the Tennessee River is not in the corporate limits of Farragut, it

impacts the community though backwater up Turkey Creek and Little Turkey Creek (FEMA, 1984).

117.    In September 2011, Knox County, the City of Knoxville, and the TOF prepared a local hazard mitigation plan to guide hazard mitigation planning to better protect the people and property of the planning area from the effects of hazard events.  The plan was prepared pursuant to the requirements of the *Disaster Mitigation Act of 2000* (Public Law 106-390) and implementing regulations set forth by the Interim Final Rule published in the *Federal Register* on February 26, 2002 (44 CFR §201.6) and finalized on October 31, 2007. (Hereinafter these requirements and regulations will be referred to as the *Disaster Mitigation Act*.)  While the act emphasized the need for mitigation plans and more coordinated mitigation planning and implantation efforts, the regulations established the requirements that local hazard mitigation plans must meet in order for the local jurisdiction to be eligible for certain federal disaster assistance and hazard mitigation funding under the *Robert T. Stafford Disaster Relief and Emergency Act* (Public Law 93-288).

118.    Flood maps are usually used by communities to plan development and make infrastructure improvements, which is clearly prudent as a community cannot build on a flood zone due to the high risk involved and the risk of losing FEMA insurance if a flood were to occur and destroy property or take life.  With accurate flood risk data and maps available, communities can decide how to better reduce said risk, if feasible.

119.    Regarding the TOF Biddle Farm Project, FEMA shows that Lot 9 is zoned Special Flood Hazard Area ("SFHA"), Zone AE[4], Regulatory Floodway and Zone A[5], Without Base Flood

---

[4] Zone AE - The base floodplain where base flood elevations are provided.
[5] Regulatory Flood Way and Zone A - Areas with a 1% annual chance of flooding and a 26% chance of flooding over the life of a 30-year mortgage. Because detailed analyses are not performed for such areas; no depths or base flood elevations are shown within these zones.

Elevation ("BFE").

https://msc.fema.gov/portal/search?AddressQuery=133%20Concord%20Farragut%20TN .

Areas of special flood hazard is the land in the flood plain within a community subject to a 1% or greater chance of flooding in any given year. The area may be designated as Zone A on the TOF's FMPC map. After detailed ratemaking has been completed in preparation for publication of the flood insurance rate map, Zone A is usually refined into Zones A, AO, AH, A1-30, AE, A99, AR, AR/A1-30, AR/AE, AR/AO, AR/AH, AR/A, VO, or V1-30, VE, or V.

120. On August 5, 2013, FEMA designated two Regulatory Floodways in the TOF, therefore FEMA regulates filling and construction in floodways to allow flood waters to be discharged without raising surface water levels beyond a designated height. **Exhibit N.**

121. A "Regulatory Floodway" means the channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than a designated height. Communities must regulate development in these floodways to ensure that there are no increases in upstream water. Floodway | FEMA.gov.

122. The TOF's Code of Ordinance defines Floodway as "… that channel of a river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot." Code 2007, § 14-207; Ord. No. 05-15,3-2005.

123. On February 23, 2023, the TOF experienced a devastating flood. Multiple pictures of the devastation have been attached as **Collective Exhibit O**.

124.    Upon information and belief, a No-Rise certification[6] was not properly issued.  The TOF employee, community official responsible for floodplain management, Mark Shipley and CDM Smith Inc.[7], (hereinafter "CDM"), conspired and submitted fraudulent documentation including but not limited to a faulty hydraulics, and knowing false representations of a map regarding the actual Biddle construction location and what was being proposed to be constructed at the project to FEMA.

125.    Upon information and belief, the TOF is also using CDM to certify the sewage system. In a similar circumstance, the Town of Shreveport, Louisiana filed suit regarding CDM's supervision of their sewar system, which included but was not limited to the following;

- Service lines from homes or businesses that needed to tie into replaced main lines were installed capped off, leaving the household or business with nowhere for its sewerage to go and causing backups and/or cave-ins.
- No hole was cut in the lined pipes after cure-in-place liners were installed, leaving the home or business with nowhere for its sewerage to go.
- Specific point repairs that were required to be made under the relevant contract plans and specifications were in many instances not done.

126.    The purpose of the Endangered Species Act (ESA) is to conserve threatened and endangered species and the ecosystems upon which they depend.  Conditional Letter of Map Revision (CLOMR) and a CLOMR with proposed fill have to be submitted to FEMA prior to construction.  CDM submitted a CLOMR to FEMA stating the following:

---

[6] A "No- Rise" certification simply states that the proposed project meets the requirements of 44 CFR Section 60.3(d)(3) and will not increase flood levels.
[7] In mdi-2017, the U.S. Government found CDM Smith, paid bribes to government officials in India to get contracts on a project that lasted from 2011 to 2015.  In October 2018, a civil lawsuit and federal criminal charges were brought against CDM for bribes paid to obtain contracts in Weslaco, Texas for a project that lasted from 2008 to 2016.  On August 31, 2020, CDM Smith Inc. and CDM Federal Programs Corporation, located in Fairfax, agreed to pay approximately $5.6 million to settle False Claims Act allegations and other civil claims related to inaccurate certified cost of pricing data submitted to the U.S. Navy.  In October 2022, the Town of Shreveport filed suit zeroing in on the main defendants, CDM, alleging the company was grossly negligent in their oversight review program management, project management, testing, inspections, work approval, pay approval and other obligations imposed by their contracts with the city, causing or contributing to the many ongoing sewerage problems the city was still facing hoping to recoup monetary damages that could top more than $300,000 Million.  Lastly, in regard to CDM and the program manager, the city paid in excess of $43 million through September 2019 and received little or nothing of value in return, rending their work on the project essentially worthless and useless to the city.

"The Farragut Town Center at Biddle Farms are being proposed by Cullom, LLC at the corner of Kingston Pike and Brooklawn Street. The project consists of a shopping center adding fill within the existing floodplain. The project will redevelop approximately 57 acres on both sides of the North Fork. There will be no structures crossing the creek. The location is within the city limits of **Lebanon**, TN at 36 11 '35" West (Figure 1). Construction is planned within FEMA-designated Zone AE and A special flood hazard area."

**Exhibit P** .

127.    CHM LLC is a Tennessee limited liability company with three members, Mr. Edward "Budd" Cullom (hereinafter "Defendant Cullom") a Tennessee licensed Real Estate Agent, Mr. Jim Harrison and Mike McGuffin.

128.    Defendant J.A. Fielden CO., INC. is a Tennessee corporation and holds an unlimited contractor's license with its principal office located at 814 E Woodland Ave, Knoxville, TN 37917. **Exhibit Q**.

129.    Mr. Joseph Fielden (hereinafter referred to as, "Defendant Fielden") is the President and CEO of J.A. Fielden CO., Inc., and owns the apartment complex Reserve at Third Creek, 3910 Middlebrook Pike, Knoxville Tennessee 37919.

130.    Blaise Burch, Executive Vice President of J.A. Fielden Co., Inc., ironically also served on the Knox County Industrial Development Board, CAC Senior Center, and Three Ridges Committee and is a US EPA-Approved Professional for Storm Water Pollution Protection during the relevant periods of the Biddle Farm Project herein.

131.    CHM Farragut Commercial LLC was formed on May 14, 2021 and is a Tennessee limited liability company with three members. **Exhibit R.**

132.    Biddle Farms Commercial, LLC was formed on May 14, 2021 and is a Tennessee limited liability company with two members. **Exhibit S.**

133.    CHM Farragut Residential LLC was formed on August 13, 2021 and is a Tennessee limited liability company with three members. **Exhibit T.**

134.    Defendant BFR, LLC was form on July 29, 2021 and is a Tennessee limited liability company with one member.  **Exhibit U**.  Mr. Joseph A Fielden (hereinafter referred to as, "Defendant Fielden") is the single member of this limited liability company and its principal place of business is located at 814 E Woodland Ave., Knoxville, Tennessee 37917.

135.    Biddle Farms TH, LLC was formed on October 26, 2022 and is a Tennessee limited liability company with one member.  **Exhibit V**.  The principal place of business is Defendant Fielden's, 814 E Woodland Ave, Knoxville, TN 37917.

136.    At some point, and under the color of law, Defendants and co-conspirators, Collum, Fielden and the TOF, along with other conspirators not yet unknown, agreed to enter into a conspiracy to defraud the TOF's residents by using Defendant Farragut Press and Defendant FBA to spread false media propaganda regarding both the Plaintiffs and the Biddle Farm Project in a concerted effort to cover up the real truth regarding the Biddle Farm Project in direct violation of the TOF's residents' substantive and procedural due process rights.

137.    Tennessee requires subdivision plats to be submitted to the planning commission by the owner of the property, or a governmental entity.  Owner is defined as the legal owner, the holder of a written option or contract to purchase, or the attorney or agent of any of these persons. T.C.A. § 13-4-302 (b).

138.    On June 18, 2020, the TOF's FMPC Agenda, Item number 9, set forth the following:

> (9) Discussion on the development of an aesthetic plan for new vertical utility
> infrastructure within public rights of ways (Town of Farragut, Applicant).

**Collective Exhibit W**.

139.    The term, vertical construction, primarily consists of projects that are built vertically and rely heavily on a design by an architect. Further, horizontal construction involves structures that are longer and wider than they are tall such as infrastructure & transit, roads, railways

and bridges, power & communications, electric lines and fiber optics. There is no a definition for the term vertical *utility* infrastructure, however, there is for horizontal and vertical mixed-use property, which is a means of creating communities of experiences. Having multiple types of real estate nearby encourages pedestrian activity in the area. There has been a resurgence in mixed-use, especially retail under residential apartments in urban areas. Many city zoning authorities have returned to the policy of encouraging (or requiring) the combination of store frontage on the ground floor with residential units above in an effort to make areas "walkable." The objective of this requirement is to create a high-street atmosphere where pedestrians are shopping and enhancing the neighborhood environment.

140.    On July 16 2020, the TOF's FMPC Agenda, item number five, set forth the following:

> 5. Discussion on using the Planned Commercial Development (PCD) Zoning District for the redevelopment of the old Kroger property – Farragut Town Center at Biddle Farms, Parcels 3.02, 3.03, a portion of 3.18, and a portion of 3.19, Tax Map 143, 45 Acres (SITE Incorporated, Applicant). <u>For discussion purposes only.</u>

   **Exhibit X.**

141.    The Biddle Farm Project's 286 apartments, pool, gym and new vertical housing project has not been planned properly and is beyond the TOF's infrastructure authority and capacity. The existing TOF's infrastructure was not planned to be upsized as part of a street reconstruction project and will have disastrous results, which are already manifesting themselves.

142.    However, on July 16, 2020, disregarding the statutory and procedural safeguards of the Tennessee General Assembly mandated by law and in violation of the Tennessee Open Meetings Act, the TOF's FMPC, acting ultra vires and without adequate public notice in direct violation of the TOF's residents' civil rights and summarily approved Defendants Collum's and Fielden's plan:

Due to the complexity of the project, the additional design work required and the planned land use revie, staff noted that any approval of this conceptual master plan would need to be conditional upon and subject to obtaining any <u>modifications of the Town's existing regulations that are inconsistent with the plan</u> or what would be required in order to make the project buildable, as well as obtaining approvals of other governmental entities with jurisdiction over certain aspects of the land use related to this project, including but not limited to federal and state regulations of surface water.

In general discussion ensued. A motion was made by Commissioner Myers to approve the conceptual master plan with the stipulations noted by staff. Motion was secured by Mayor Williams and motion passed 8-0 through a roll call vote.

**Exhibit Y.**

143. Shortly after the TOF's FMPC July 16, 2020 closed door meeting, as promised in the hearing and ratified in the minutes of the TOF's FMPC records the TOF's FMPC began to make unlawful *modifications to the TOF's existing regulations that were inconsistent with Defendants Collum's and Fielden's plan or what would be required in order to make the plan buildable.*

144. On September 17, 2020, the TOF's FMPC Agenda, Item 8, stated the following:

8. Discussion and public hearing on amendments to the text of Comprehensive Land Use Plan Update as it relates to the Mixed-Use Town Center land use descriptions (Town of Farragut, Applicant)

Staff reviewed this item and recommended approval of Resolution PC-20-14 which recommends approval of Ordinance 20-20.

*A short discussion ensued. Commissioner Povlin suggested some amendments to the language proposed by staff. The amended language is included as an exhibit to the minutes. After some additional discussion, a motion was made by Commissioner Povlin to approve Resolution PC-20-14 subject to the suggested amendments. Motion was seconded by Commissioner St. Clair and motion passed 9-0 through a roll call vote.*

**Exhibit Z.**

145. Mark Shipley, member of the TOF's FMPC, in violation of the authority that the Tennessee General Assembly provided to the TOF's FMPC, certified Ordinance 20-20 on September 17, 2020, which in pertinent states:

An Ordinance To Amend The Text Of the Mixed-Use Town Center Land Use Descriptions In Chapter Three Of The Comprehensive Land Use Plan Update

> **WHEREAS**, the Tennessee Code Annotated, Section 13-4-202 seq, provides the Municipal Planning Commission and the chief legislative body may adopt parts of the Comprehensive Land Use Plan Update the correspond generally with one (1)
>
> **WHEREAS,** the Board of Mayor and Alderman of the Town of Farragut that the Farragut that the Farragut Comprehensive Land Use Plan Update, Chapter Three, Future Land Use Plan, Land Use Descriptions Section, Description 1, Mixed-Use Town Center, is hereby amended by replacing it in its entirety with the following:

**Exhibit 1.**

146.    However, T.C.A. § 13-20-203(a)(1)(B) required the local legislative body to approve a "redevelopment plan" that indicates proposed land uses and building requirements in the area and simply because the plan contains zoning changes in no way transforms the plan into a zoning ordinance. *Lamar Tenn., LLC v. Metro. Bd. of Zoning Appeals*, 2010 Tenn. App. LEXIS 173.

147.    On October 8, 2020, Defendant Povlin, along with her co-conspirators, in violation of Tennessee Open Meetings Act and in direct conflict with the power bestowed to the TOF under the Tennessee General Assembly, made an unlawful amendment:

> Amend the language of the ordinance to insert the 5th bullet point, under uses, insert "Mixed-Use" in front of "Town Center Development" and in the 6th bullet, under Uses, insert "Mixed-Use" in front of "Town Center Development." Motion was made by Alderman Povlin, seconded by Alderman Meyer; voting yes, on the amendment, Alderman Meyer, yes; Alderman Pinchok, yes; Alderman Povlin, yes; Alderman Burnette, yes; Mayor Williams, yes; no nays; motion passed.

**Exhibit 2.**

148.    In further violation of the Tennessee Open Meetings Act, and multiple other State and Federal laws, during the October 8, 2020 TOF BOMA meeting, the TOF BOMA approved multiple unlawful actions, including but not limited to the following;

- Ordinance 20-18 to Rezone the Property at 1013 McFee Road from Agriculture (A) to Open Space Residential Overlay (R-1/OSR). 24.85 Acres (Rackley Engineering, Applicant).[8]

---

[8] On December 31, 2020 1013 McFee Road, Knoxville Tennessee was sold for 1,400,000.

- For approval of a $218,305 "change order" on McFee Park Phase 3.

149. In further violation the Tennessee Open Meetings Act, the TOF, on October 22, 2020, disregarded the Tennessee General Assembly's statutes and violating both the Tennessee and United States Constitutions unanimously passed Ordinance 20-20. **Exhibit 3.**

150. At the aforementioned TOF BOMA meeting, the TOF Alderman, Scott Myer, stated the following:

> "My decision on this vote is not based on any plan by a developer. I have not seen Mr. Horne's plan. I am vaguely familiar with the other plan, but the basis of my vote is the CLUP itself and the strategies included in it."

151. The language in the general law Mayor-Aldermanic Charter requires personal voting by members of boards of mayors and aldermen of Tennessee municipalities operating under that chapter as the TOF conducts on a regular basis. However, shockingly, in yet another violation of Tennessee Open Meetings Act, the TOF Alderman, Drew Burnette, did not attend the TOF BOMA hearing due to his son's middle school football playoff game and instead had Defendant Smoak vote for him by reading the following statement:

> "This [Ordinance will limit the HDR[9] impact to this area, and require it be part of a MUTC[10] development"… "It protects our current residential areas, and puts limits on future HDR in MUTC areas."

152. During the unlawful closed zoom hearing, a letter from Michael Wilson and another letter from Mike Mitchell were read into the record and Town Attorney Tom Hale volunteered to respond into the record and state:

> "I have spoken at the last two meetings, about suggestions by citizens who have made a point of suggesting that somehow the process used by the town in dealing with this comprehensive land use plan amendment was illegal, unlawful or somehow inappropriate. I have reviewed the circumstances [and believe it has been] I think we completely handled this in the appropriate way – and feel no differently about it tonight."

---

[9] High Density Residential Zone District is intended to accommodate all housing types, including higher density townhouses and apartment units.

[10] Mixed use can include, but is not limited to, mixed use buildings with retail or office uses on the lower floors and residential above, or uses which mix commercial and residential.

… "What I want people to understand, is the Town doesn't have the luxury of telling people – without studying what their proposal is – 'You can't develop your property the way you want to.' It doesn't mean the Town has to approve what they propose, but for elected officials to ignore, and not deal with in a serious way, proposals that are presented, that are presented , that is what will get the Town in a serious lawsuit."

153.    On November 9, 2020, the TOF's FMPC stated the following:

"Are there measures that could be taken to make the building look more like a mix use building to blend in with the Town Center concept."

**Exhibit 4.**

154.    On November 12, 2020, Michelle Hollenhead, reporter for the Defendant Farragut Press wrote an "article" entitled, *A 'Biddle' bit of Center detail*;

"Developer Budd Cullom with CHM LLC, presented a submittal package associated with the Zoning Map and future Land Use Map amendments he is requesting for the expansive 40-acrea- plus project, which would be located on the "old" Kroger site, and extend down Brooklawn Road to South Campbell Station Road.  His plans include an anchor store and as many as 10 small retail/commercial buildings that would be located directly across the street from Farragut High School.

The back portion of the development would offer multi-family housing-between 200 and 300 upscale multi-family housing units, which would be split by a "great lawn" multi-purpose area and also include walking trails and other amenities shared with the Town.

**A concept plan for the development has been approved by Farragut Municipal Planning Commission,** which will be considering the latest additional documents and amendments at its upcoming Thursday, Nov. 19, 2020 meeting.

In a separate interview Monday, Nov. 9, Cullom said his company "has performed extensive and complete hydrology studies, not only for the site but including a larger area, to make sure there will be no drainage or flooding problems

On the connector road to Concord, for example, Cullom said plans call for a new bridge to be constructed over Turkey Creek, vastly improving drainage issues."

Defendant Farragut Press, further depicted drawings, picturing a large amount of open/green space to be maintained by the developer, open/green space to be dedicated and maintained by the town to be pedestrian paths.  **Collective Exhibit 5.**

155.    The November 19, 2020 TOF's FMPC Agenda was *amended in December* to list numbered items, 10 and 11;

10.  Discussion and public hearing on a request to amend to future land use map   in the Comprehensive Land Use Plan Update for a portion of Parcel 003.19, Tax Map 143 (a

portion of the property referenced as 133 Concord Road) associated with the Farragut Town Center at Biddle Farms project from Medium Density Residential to Town Center (CHM, LLC, Applicant)

11. Discussion and public hearing on a request to amend the Zoning Map in association with the Farragut Town Center at Biddle Farms project, 11230 and 11240 Kingston Pike and 133 Concord Road, Parcels 3.02, 3.03. 3.10., and a portion of 3.19, Tax Map 143, from General Commercial (C-1) and General Single-Family Residential (R-2) to Planned Commercial Development (PCD), 43.63 Acres (CHM LLC, Application)

**Exhibit 6.**

156.    The November 19, 2020 TOF's BOMA Minutes state that the staff recommended

approval of Resolution PC-20-18, which recommends Ordinance 20-26:

*A motion was made by Commissioner Povlin to follow staffs' recommendation. Motion was made by Commissioner Povlin to follow staffs' recommendation. Motion was seconded by Commissioner Dick and motion passed 8-0 through a roll call vote.*

It also stated that the staff recommended approval of Resolution PC-20-19, which

recommends approval of Ordinance 20-27.

*A motion was made by Commissioner St. Clair follow staffs' recommendation. Motion was seconded by Commissioner Greene and motion passed 7-1 through a roll call vote with Commissioner Bellamy voting in opposition due to traffic related concerns.*

**Exhibit 7.**

157.    The December 17, 2020, TOF's FMPC Agenda, item number 5, sets forth the following:

5. Discussion and public hearing on zoning ordinance text amendments associated with the Farragut Town Center at Biddle Farms project, 11230 and 11240 Kinston Pike and 133 Concord Road, Parcels 3.02, 3.03, 3.10, and portion of 3.19, Tax Map 143, 43.63 Acres (Budd Cullom, Applicant).

**Exhibit 8.**

158.    Co-conspirator, Cullom was allowed to attend the December 17, 2020 hearing and speak

although the TOF's residents were not allowed to attend in person to be heard and voice their

objections.  At the closed-door meeting, Mark Shipley read three letters into the record from

concerned Farragut residents that opposed the text amendments because it would change the

feel of the town center from commercial on the bottom floor and residential on the top floor.

Mr. Cullum responded that he already answered the issues of the three citizens during the *closed* Staff/Development Meetings. Mr. Myers did ask Collum:

> "I have a question for you that might help the community understand the rational between the vertical mix use and we will call it the horizontal mix use would you maybe help explain the financial ramification of trying force feed a retail shop under apartments, I have a pretty decent background in this but I like to hear it from you and I think the community would like to hear from you."

40:06-40:59.

> … a market for the Town of Farragut's vision and the towns vision would add tremendously to his cost to build and in order to get parking he would most likely have to build a parking garage which would cost him too much and that he could get more rent from retail vs residential, Farragut was still suburban type location and people who tend to gravitate to a more suburban area do not like parking garages and finally which he says was not on the radar when he first started discussing doing the development with Farragut[11] was the COVID environment which purported produced a buzz in the real estate world for horizontal mix use development.

40:55- 42:04.

**Exhibit 9**.

159. During the hearing, Michael Bellany[12], dared to question the TOF's traffic study, which the authoring engineer of the report was either negligent or intentionally deceitful when completing, and Defendant Povlin interjected and told Mr. Bellany that he needed to have a sit down with TOF's engineer, Darryl Smith.

160. Suburban Areas are lower density areas, which separate residential and commercial areas from one another. They are either part of a city or urban area, or exist as a separate residential community within commuting distance of a city. As cars became the dominant way for people to get to work, suburbs grew. Tennessee is rich in suburban communities, each with their successes and struggles at mixing development and health.

---

[11] Upon information and belief, Cullum started working with Farragut in 2019 prior to the Covid-19 Pandemic.

https://www.tn.gov/health/cedep/environmental/healthy-places/healty-places/land-use/lu/subirban-areas.html.

161. Thereafter, and during the December 17, 2020 "hearing," it was clear that there had been multiple meetings between the TOF's BOMA, including both Defendant Williams and Defendant Povlin and Collum with persons that had a direct interest in the Biddle Farm Project.

162. On January 15, 2021 at 10:23 AM, Farragut resident, Mike Mitchell emailed Mr. Krempasky with the Defendant FBA and advised that Collum had previously stated that Defendant FBA recruited him to build the apartments on the Biddle Farm Project during a TOF BOMA hearing. **Exhibit 10.** At 11:13 AM, the same day , Mr. Krempasky emailed Defendant Povlin, "Can I talk to you about this?" At 7:14 pm, Defendant Williams contacted Candace Viox (hereinafter referred to as, "Ms. Viox") the owner of Water 2 Wine (hereinafter "W2W") located in Farragut to have her contact "Michelle at the Press ASAP, she is in the process of doing a correction article in next week's Press." Defendant under the color of law signed, Mayor Williams", Ms. Viox for some **yet** unknown reason emailed Defendant Williams back:

> "I have also received a threatening email to my business claiming that I was personally involved in secret deals associated with this. I have already reached out to Mayor Williams and Louise Pavlin to discuss my concerns. I will also be writing a comment to the Farragut Press, on behalf of my business, addressing these allegations."

**Exhibit 11.**

163. Tony Cox (hereinafter referred to as, "Mr. Cox"), with the Defendant Farragut Press, replied to Defendant Williams at 8:07 PM:

> "Mayor Williams, I am replying to you privately", Mayor Williams responded, "It was David Purvis & Jim Nixon who reached out to Budd Cullom concerning the Biddle property prior to any of us ever meeting him. My suggestion was to get in touch with Michelle as soon as possible to see if she could help set the record straight."

**Exhibit 12.**

164. Vexing as it is, on January 21, 2021, the Defendant Farragut Press published an article, *Pinpointing Recommending Source*: In the article, Cullom stated the following:

> "The late David Purvis, long-time Farragut businessman and one of the founders of Shop Farragut/Farragut Business Alliance, was key in bringing together developer Budd Cullom and the property on which he plans to build Farragut Town Center at Biddle Farms."

https://www.farragutpress.com/articles/2021/01/10333 .

165. On February 4, 2021, Defendant Farragut Press reported "*A last-minute push by Farragut Citizens for Responsible Growth and Development*, (hereinafter "FCRGD"), which discussed a deluge on the TOF's Board of Mayor and Alderman's Thursday, January 28, 2021 meeting with 244 e-mails from concerned Farragut residents asking, or demanding, the TOF's BOMA table a second-reading vote on final approval the Farragut Town Center at the Biddle Farms Project.

166. Farragut residents Michael Wilson, Patrick Lee and Mike Mitchell, with the FCRGD group held a rally Sunday afternoon, January 24, 2021 at Mayor Ralph McGill Plaza asking the January 28, 2021 vote be tabled, accusing TOF's BOMA of "not listening to residents," "not conducting significant public outreach," and asking officials to meet with them to discuss changes to the Town's CUP instead of voting to approve the Ordinance amendments.

167. In a reported marathon meeting on January 28-29, 2021, the TOF's BOMA approved three unlawful "land use regulations", clearing the way for the Farragut Town Center at the Biddle Farms Project, proposed by CHM LLC. Defendant Povlin stated the following:

> "This development will be an asset to our community … in a way a typical car-centric development would not."

Farragut Biddle Farms News - Biddle Farms in Farragut, Tennessee(biddlefarmsfarragut.com)

168. The TOF's BOMA, under the color of law, and without authority under T.C.A. § 13-4-201, passed the following three "zoning ordinances," which are void ab initio which also renders void ab initio any future ordinance's amended or based on the prior unlawful ordinances, to wit:

- Ordinance 21-01, amending the Future Land Use Map in the Comprehensive Land Use Plan Update for a portion of Parcel 003.19, Tax Map 143 (a portion of the property referenced as 133 Concord Road) associated with the Farragut Town Center at Biddle Farms project from Medium Density Residential to Town Center (CHM, LLC, Applicant).

- Ordinance 21-02, amending the Farragut Zoning Map in association with the Farragut Town Center at Biddle Farms project, 11230 NS 11240 Kingston Pike and 133 Concord Road, Parcels 3.02, 3.03, 3.10, and a portion of 3.19, Tax Map 143, from General Commercial (C-1) and General Single-Family Residential (R-2) to Planned Commercial Development (PCD), 43.63 Acres.

- Ordinance 21-0, amending the Farragut Zoning Ordinance, Chapter 3, Section XII. F. Mixed Use Town Center, associated with the Farragut Town Center at Biddle Farms project, 11230 and 11240 Kingston Pike and 133 Concord Road, Parcels 3.02, 3.03, 3.10, and a portion of 3.19, Tax Map 143, 43.63 Acers.

169. The Farragut Press published an unlawful 2021 updated CLUP. **Exhibit 13** .

170. On September 6, 2022, Defendant BFR LLC submitted a plat to the Knox County Register of Deeds. The unlawful plat said the development consisted of 2 lots containing 28.49 acres total. The original plat was issued in August of 2022, Site Project #: 1994, File: 190076-FP3. On August 18, 2022, Mr. Howard T. Dawson, a Tennessee registered land surveyor certified the following;

> "I certify that this plot qualifies under the provisions of Section 13-3-401 of the Tennessee Code Annotated and is exempt from the requirements of the Knoxville/Knox County Minimum Subdivision Regulations, because (A) no new street or utility construction is

required and (B) all resultant tracts are over (5) acres in size. Reg. No. 1301. Further the
property according to the plat was zoned: "C-1"; "PCD" & "R-2."

**Exhibit 14.**

171.    Town of Farragut Plats are reviewed by Knoxville-Knox County Planning for addressing
only and there is not the required the certification of approval of Public Sanitary Sewar
System, Certification of Approval of Public Water System, no signatures from engineering,
etc.

172.    Any change to a plat (regardless of whether it is designated as an amendment,
modification, correction, etc.) must also receive approval of the planning commission in the
same manner as described above for the original plat before it can be recorded. The only
exception to this rule is that an easement or survey attached to an easement is not considered
to be a change to the plat when the grantee is the state, a county, municipality, metropolitan
government, metropolitan government, or any entity of such government.

173.    Indeed, the two lots containing 28.49 acres mentioned above are zoned C-1, 0-1, and R-2
and have two deeded walking trails, as well as an aquatic buffer. However, today the
walking trails have uncompleted apartment buildings built on top of them. The trail
easement was signed by the grantor, James Biddle, and the grantee, the TOF was notarized
and recorded in the Knox County Registry of Deed on August 21, 2008 with the ability for
the land to be transferred or sold. The trail easement is perpetual with the land.

174.    The Tennessee Code Annotated defines what constitutes a subdivision: no plat map may
be recorded until it is approved by the planning commission; provides procedures for the
adoption of regulations and submission of plats; and provides penalties for transfer or sale of
lots in unapproved subdivisions. T.C.A. § 13-3-403 and  T.C.A. § 13-4-303.

175.     On July 28, 2022, the TOF's Community Development Director, Mark Shipley, prepared an inaccurate report in order to deceive the TOF's residents regarding the future Biddle Farm *Townhomes*. **Exhibit 15**.

176.     T.C.A. §§ 13-3-401 and 13-4-301 define subdivision as:

- Dividing any tract or parcel into two or more lots, site, or other division requiring new street or utility construction, or
- Any division less than five acres for sale of building development Hence any development meeting this definition will be subject to municipal or regional planning subdivision regulations.

177.     Once a plat has been approved, subdivision regulations place additional restrictions on property within a municipality and can often drastically affect the character of the surrounding lands.  It therefore necessary to give citizens an opportunity to comment, on the proposed regulations in a public hearing before approval by the planning commission T.C.A. § 13-4-305.

178.     Defendants in violation of the Tennessee Open Meetings Act, and disregarding the statues put in place by the Tennessee General Assembly,  on September 7, 2022 Defendant BFR registered Plat number 20220907001554 with Knox County Register of Deeds.  **Exhibit 16** .

179.     Defendants in violation of the Tennessee Open Meetings Act and continuing with the ongoing conspiracy, on October 22, 2022 the Defendant BFR LLC quick claimed 7 acres of the 28.49-acre tract to Biddle Farms TH LLC.  Biddle Farms TH LLC, unknown to the TOF's residents was the future home of the Biddle *Townhomes*.  **Exhibit 17** .

180.     On May 11, 2023, the TOF's Building Official, Karl Sirzko, somehow "amended the copy-righted International Building Code (IBC), Section 105-20 (s)" from the following;

"Guards shall be located along open-sided walking surfaces, including mezzanines, equipment platforms, aisles, stairs, rams and landing located more than 30 inches (762 mm) measured vertically to the floor or grade below at any pointe within 36 inches (914 mm) horizontally to the edge of the open side. Guards shall be adequate in strength and attachment in accordance with Section 1607.8"

To Section 1015.2 where required, of the IBC, is amended by deleting the first sentence and substituting in lieu thereof the following:

"Guards shall be located along open-sided walking surfaces or ground surfaces, mezzanine, equipment platforms, retaining walls, stairways, ramps, landings and any other locations that are located more than 30 (thirty) inches (762 mm) above floor or grade below."

The Farragut Municipal Code, Chapter 105, Article 3. – International Residential Code (IRC), Section 105-53 (h) is amended and renumbered afterwards as follows:

(h) Section R303.4 Mechanical ventilation of the IRC, is amended by adding the phrase "or approved air exchanger on the HVAC system which will make up the required ventilation."

(i) Section R313.1 Townhouse automatic fire sprinkler systems, of IRC, is amended and deleted …

**Exhibit 18**.

181.    In Defendant Farragut Press' October 4, 2023 publication, Defendant Williams was quoted "currently, the Town Center area at the old Kroger's, owned by the Biddle family, who sold a portion of their property to developer Budd Cullom to develop Farragut at Biddle Farms Town Center." Defendant Williams continues "That area will have a road coming in from Concord Road," he added. "Brooklawn will be widened and have public parking along it, across from Kroger." **Exhibit 19**.

182.    Other curious and questionable actions taken by others regarding the TOF's ultra vires Biddle Farm Project, include, but are not limited to, the Knox County Commission, in violation of the Tennessee Open Meetings Act, passed a $7,000,000 + Tax Increment Financing (TIF) package for the Biddle Farm Project in Farragut.

183.    Before this could be done, the TOF would have to falsely designate Lot 9 of Campell Station Exchange, owned and developed by a very wealthy family, a TIF district.

184. In paragraph 4.7 of the Knox County Industrial Development Board (hereinafter referred to as "KCIDB" as guidance states, "In the absence of unusual or extenuating circumstances acceptable to the board, Projects that are substantially residential will not qualify for tax increment financing under the Board's TIF Program." **Exhibit 20.** There can be no doubt that Biddle Farms Project is substantially residential with 286 Class A apartments with attached garages, seven 4-story buildings totaling 425,000 s/f, large saltwater pool, state-of-the-art fitness center, dog park and outdoor game area along with 49 two-and three-story townhomes. In fact, out of the approximately 40 acres, approximately 5 of those acres will be *commercial* property.

185. When concerned TOF resident, Michael Wilson, asked Commissioner Schoonmaker, how it was possible to fund apartments and townhomes with TIFS he was directed to Knox County Resolution R-21-5-903.

186. The KCIDB is acting in violation of the Tennessee Open Meetings Act as the court held in *Oliver Wood et al. v. Jefferson County Economic Development Oversight Committee Inc.* The court ruled that because EDOC as does KCIDB has a significant role in making decisions and recommendation to local government entities "of enormous economic importance to the people of Jefferson County," it is subject to the Tennessee Open Meetings Act. *Wood v. Jefferson County Econ. Dev. Oversight Comm., Inc.* April 18, 2017, Session; September 26, 2017.

187. Upon Information and Belief, Pinnacle Bank and KCIDB entered into an unlawful Loan Agreement to give Biddle Farms Residential, LLC approximately $5,000,000 against the $7,100,000 unlawfully granted in TIFs.

188.    Former reporter at Shopper News, Wendy Wright Smith, Communications Manager, in attempt to explain why the Biddle Farm Project was qualified for TIF in order to de-fraud the residents of the TOF wrote, "Urban blight is not something you would typically associated with the Town of Farragut, home to some of Knox County's most affluent Census tracts and priciest real estate." She continued unknown to the Farragut residents, "The Town of Farragut has also agreed to invest about $500,000 in improvements to the public greenspace at the heart of the development, which would include sidewalks, roads and a public restroom."

**Exhibit 21**.

**The TOF-Scott Brothers Cover-up**

189.    In December of 2020, Timmothy C. Scott and Todd M. Scott (hereinafter "Scott Brothers") purchased roughly 376 acres for $6,127,500, which made the cost approximately $17,000 per acre.  The land is located in the TOF intersecting the Loudon County, Tennessee line. (hereinafter "Scott Property").

190.    On April 10, 2023, the Tennessee Open Meeting Act was amended by adding the following as a new section:

> (a)(1)  At least forty-eight (48) hours prior to a meeting, a local government legislative body shall make available to the public, at no charge, the agenda for the upcoming meeting in a place accessible to the public.  The agenda must reasonably describe the matters to be deliberated or acted upon the public meeting.

  T.C.A. § 8-44-1.

191.    On April 13, 2023, the TOF held what it calls a "Budget Workshop" in violation of the Tennessee Open Meetings Act. At the fatally flawed closed-door meeting, Mr. Smoak presented a "budget draft."  The "budget draft" included a line item for $5,500,000 to purchase at a $100,000 per acre, 55 acres of the 376 acres of the Scott Property.

192.    The TOF unlawfully and without authority adopted the TOF's Fiscal Year 2024 Budget, which was submitted on June 1, 2023 by Mr. Smoak which included the following unlawful fund categories:

**Capital Investments Funded**

The Twon's FY24 Capital Investment Program (CIP) is **$17,592,500**. The CIP budget emphasizes that the continuation of investing in the design and construction of capital projects and major infrastructure. Some areas of focus are the purchase of land for expansion of our parks, park enhancements, road improvements and new pedestrian connections- all **essential to future growth and development**.

**Expenditures**

The General Fund expenditures in FY24 are $10,379,296. The budget adequately covers the operational needs of all departments and investments in equipment, technology, and other resources that allow staff to deliver services effectively. Also included in the FY2004 budget are transfers to other funds. This includes a $215,000 transfer to the Equipment Replacement Fund, **$7,500,000** transfer to the Capital Investment Fund, $500,000 to the State Street Aid Fund and a $150,000 transfer to the ADA Capital Fund.

**Capital Projects Funded**

**The Capital Projects Fund is used to consolidate the acquisition, design, and construction of major capital improvements of the Town**. The F24 budget of **$17,592,500** provides funding for a variety of projects in program areas such as transportation and general facility/equipment. The CIP long-term budget includes expenditures of $44,780,000 for roadway improvements and park projects through the year 2009.

**ARPA FUND**

Signed into law on March 11, 2021, The American Rescue Plan Act of 2021 ("ARPA") provides $350 billion in additional funding for state and local governments. The Town of Farragut receives a total of $7,055,252,00 issued in two trenches, November 2021, and November 2022.

**TOURISM FUND**

The Tourism Fund is to promote Farragut. The Tourism Fund was first established in FY21. The Hotel/Motel tax began September 1, 2020. The FY24 budget of $501,936 provides for funding for the Farragut Folklife Museum, personal and operating costs, promotions, and advertising.

The total grant funding for TOF's FY 2024 Budget is $7,651,566.

**Exhibit 22**.

193. A letter of intent was signed at some time in June of 2023 between the TOF and the Scott Brothers to purchase the 55 acres for $5,500,000 and also received a donation of 15 acres valued for the Scott Brothers tax write off in the amount of $1,500,000.

194. The idea seems like the perfect marriage of environmentalism and capitalism: Landowners give up their right to develop a piece of property, and exchange they receive a special tax deduction. Nature is preserved and everybody benefits. A conservation easement, also called a conservation agreement, is voluntary and legally binding agreement between a landowner and a land trust or government agency. When a landowner donates an easement to a land trust or public agency, she or he is giving away some of the rights associated with the land. The easement permanently limits uses of the donated parcel in order to protect its conservation values, as specified in the Internal Revenue Code (IRC) 170 (h).

195. Conservation easement donations must comply with "conservation purposes" as defined in IRC 170(h). A donated easement must be a *true* gift. It must protect a significant natural, agricultural or historic resource that public agencies or land trusts want to have conserved. A donated easement cannot serve to simply prevent development on a property or be part of a "quid pro quo" agreement in exchange for a government action, such as the issuance of a building permit or a zoning change.

196. On or about August 3 2023, the TOF entered into a "Letter Agreement for Professional Services for Fiber Optic Cable Implementation using ARPA (SLFRF) Funds Farragut, Tennessee with the engineering firm of Kimley-Horn for a lump sum of $281,000. The secret contract not presented to the TOF's residents, stated in pertinent part:

- Client has previously received funding through the Congestion Mitigation and Air Quality (CMAQ) Improvement Program. This project is currently under construction and will prove 144-strand single mode fiber optic cable

along segments of Kinston Pk., Campbell Station Rd., Parkside Dr, Concord Rd., and Municipal Center Dr.

- Client has received funding though the American Rescue Plan Act of 2021 (ARPA), specifically the Coronavirus State and Local Fiscal Recovery Funds (SLFRF) program. Client intends to use this funding for fiber optic cable implementation throughout the Town of Farragut (the "Project"), expanding upon the CMAQ-funded fiber optic cable implementation throughout the Town of Farragut (the "Project"), expanding upon the CMAQ-funded fiber optic cable implantation that is currently under construction.

The TOF requested new fiber optic cable connections between the CMAQ funded project and locations, such as, a "Future Park (near ALDI at 170 Brooklawn St.).

197.    It should be noted that some of the TOF's requests for the new fiber optic cable includes a purported Future Park near Aldi at 170 Brooklawn Street (The Biddle Project). However, there is currently nowhere for a future park to be placed unless it is in the parking lot of the Aldi grocery store. The contract amount was for a lump sum of $281,000 to Kimley-Horn total project $1,200,000, Account Number:  316-41992-9450.  **Exhibit 23** .

198.    The TOF's Fiscal Year 2016 lists a State Grant for the amount of $1,205,000.  **Exhibit 24**.

199.    The TOF already received a total of $6,945,000 from the Federal Government, Transportation Improvement Program FY 2017-2020 to upgrade Farragut's closed loop signal system.  The limits of the project include all 26 signals in Farragut's signal system on Kingston Pike, Campbell Station Road, Concord Road, and Parkside Drive.  The upgrades include new central traffic signal control software, new signal series controllers, ethernet communication upgrades, bringing pedestrian infrastructure up to current Public Right of Way Accessibility Guidelines (hereinafter referred to as, "PROWAG[13]") standards, cabinet

---

[13] Public Right of Way Accessibility Guidelines ("PROWG"): means The guidelines ensure that sidewalks, pedestrian street crossings, pedestrian signals, and other facilities for pedestrian circulation and use constructed or altered in the public right-of-way by state and local governments are readily accessible to and usable by pedestrians with disabilities. R306.2: Public Right-of-Way Accessibility Guidelines (PROWAG) | FHWA (dot.gov)

upgrades, detection upgrades, and replacing span wire signals at fine intersections with mast arms. **Exhibit 25** .

200.     On August 10, 2023, Allison Myers, Finance Director and Town Recorder, in a hidden report for TOF's BOMA, included the following:

> **INTRODUCTION:**  In March 2021, the Federal Government approved the American Rescue Plan Act of 2021 (ARPA) which established the Coronavirus State and Local Fiscal Recover Funds (SLFRF) to provide state, local, and Tribal governments with the resources needed to response to the pandemic and its economic effects and to build a stronger, more equitable economy during the recovery.  The U.S. Department of the Treasury issued the funding on two tranches.  The Town received $3,527,626 in November 2021 and November 2022 totaling $7,055,252.

> **DISCUSSION:**  In 2016 the Town was awarded grant funding from the CMAQ grant program for a Town-wide signal system upgrade which included a fully interconnected traffic signal system connected through 144-strand single mode fiber optic cabling.  The construction of this project began in August 2022.  The expansion of the project using ARPA funding would include the connectivity of all Town parks and facilities.  The attached contract lists the addresses of all new location for the fiber connectivity.

   **Exhibit 26** .

201.     The Congestion Mitigation and Air Quality Improvement (hereinafter referred to as, "CMAQ") program provides federal funding to the States' Departments of Transportation for projects that improve air quality and reduce congestion to help meet the requirements of the Clean Air Act (hereinafter referred to as, "CAA") and its amendments and is codified at 23 U.S.C. § 149.  The funds are available for any purpose described in Section 133 (b).

202.     The Agenda for the August 24, 2023 TOF's BOMA hearing contained the following Ordinance to be voted on:

> **B.  First Reading**

> **1.**   Ordinance 23-13, Ordinance to amend the Capital Investment Program Budget for Fiscal Year 2023-2024, passed by Ordinance 23-07.

**Exhibit 27**.

203.     During the TOF's August 24, 2023 BOMA hearing, Defendant Williams dictates that the TOF has adopted the following rules in violation of the Tennessee Open Meetings Act for the

TOF's residents of who wished to speak at the "Citizen Forum," "We ask you address all your questions to the mayor and in his absence the Vice Mayor". Williams continues, "do not direct the questions to the Alderman or Staff members, if necessary, the mayor may call an Alderman or Staff Member concerning your question or comments, once you've given your input please return to your seat so we can continue, we ask that every speaker avoid improper language, profanity, address issues not individuals or personalities with malicious comments speakers should strive to avoid redundancy, they should have their own original view point, we also ask that you also stay on topic of that agenda item." Defendant Williams ends his lecture by stating, "We are here tonight doing the Peoples business a very important responsibility for all of us." 2:50-3:56.

204. Defendant Williams then stated that the next agenda is the First Reading of Ordinance 23-13 an Ordinance to amend the Capital Investment Program Budget for Fiscal Year 2023-2024, passed by Ordinances 23-07 and starting at 12:17 Mrs. Myers unlawfully states "Yes sir, the Capital Investment Program will be amended by increasing the appropriate expenditures from $17,200,000 to 23,100,000, which is an increase of $5,800,000 this is for the CMAQ Town Wide Signal System Upgrade, this amendment is needed to budget for the expenditure in the current fiscal year the budget for the CMAQ was budgeted in the previous fiscal year the original project budget was $6, 800,000, which included the Town of Farragut appropriating $100,000 for ADA improvements and $100,000 for the estimated cost of the fiber strand upgrade to the project an additional $15,000 is needed from the CIP reserves to completely fund the fiber strand upgrade the amendment budget for the CMAQ project will be $6,825,000 the Town's cost share, cost for this project is $215,000 for the overall project with the remaining $6.6 M being 100% funded through the Congestion Mitigation Air

Quality Grant, the motion is to approve Ordinance 23-13 on first reading." 13:20. Defendant

Povlin then comments, "I am thrilled we decided to upgrade our fiber, I think that's going to

serve us well in the future, that's all I got." 13:38. Alderman Burnette comments, "I agree

with the Vice Mayor going from 72 to 144 strands of fiber, we I do not even think we know

all the benefits that's it is going to provide now but 5 to 10 years people will be very, very

glad we did "13:50. Defendant Povlin then jumps in "well worth the cost." 13:58.

205. The TOF resident, Pat Lee was allowed to speak at the meeting. During Mr. Lee's

allocated time he asked questions of Alderman David White which exposed that the

Defendants had committed multiple unlawful actions regarding the purchase/donation of the

Scott Brothers' property, including but not limited to the fact that TOF's BOMA had deleted

the existing sink-hole from the plat. The following conversation ensued when Alderman

White tried to respond to Mr. Lee's questions:

> Alderman David White begins "well I think I was asked a question ah about a sink hole, I've never I do not have any knowledge of the sink hole on the property, it could be, if someone has that information that's good information that's prudent to buying any piece of property if it has a sink hole it certainly makes it less desirable and if there was another question, I do not know what it was, was there another question of me?"

> Mr. Lee states from the audience "there is multiple questions but it appears that the Board of Mayor and Alderman aren't prepared to answer them and I think they owe the citizens an answer" continuing Mr. Lee asks "can I asks that if they will take another crack at talk to the people to see if they want this before they vote again?"

> Defendant Williams buts in and states "You have had your chance to speak" Mr. Lee and I want an answer." Defendant Williams "they will get back to you." 43.15.

> Alderman White, "I will agree with that Mayor, I don't think we have enough citizen input on a lot of things but this one in particular is a lot of money this is anybody does not think 5.5 million dollars is a lot of money has a better job than me and I am getting paid nothing right now but that's a lot of money and I think we should get all the citizen input that we can. I asked David [Smoak] for a "Work Shop"[14] on this item and he said the "Work Shop" was really not a good place for it and I agree because it is just between the Board and the citizens don't get to talk but were having apparently, we are having a simulation of a town meeting for the Town Center where people can come and talk and why can't we have the same thing for this land and get more peoples opinion on what we ought to do?" 44:28

---

[14] TOF "holds" multiple "Work Shops" in which the Farragut residents do not get to participate in violation of OMA.

Defendant Williams continues the charade and lies to Alderman White by stating the following, "Well I can answer that for you, we did have a "Workshop" and we had numerous "Workshops" where for that end of town, that end of town and the citizens were able to come and we had the room set up over there with maps on it and we have questionaries for them and everybody wants . . ." 44:47

Defendant Povlin jumps to the rescue, "In 2019 we updated the McFee Road" Alderman White, "Oh 2019", Defendant Povlin continues, "the McFee Road corridor um the plan for the Future Land Use Map and the feedback we received overwhelming was the residents in that area uh did not want ah any more housing development course we are kind of restricted with what the constitution allows us to do with regards to peoples private property and the point was made repeatedly over the last several years appears the only way we can um control property is to purchase it." 45:21.

Alderman White continues, "Well excuse me this may sound a little tacky but I apologize but are we going to buy every piece of land over there so that no body to build a house on it, I mean. . ."

Defendant Povlin interjects with "this one was offered, the property owner came to us after this deal fell through and asked us if we are interested, he has no timeline on, ah ah, all he requires is an easement access, no timeline", Alderman White interjects, "All I am asking for is a meeting that will be" Defendant Povlin speaking over Alderman White, "your welcome to go talk to your", Alderman White, "Will you not interrupt please, I mean", Defendant Williams then wrongly interjects, "She has the floor, okay", Defendant Povlin, continues "I apologize, I believe you're the South Ward Alderman (pointing to Alderman Burnette) you're the South Ward Alderman (motioning to Alderman White) go talk to the residents out there go talk to them they came and talked to us about what they are seeing, I am hearing from the residents on McFee Road that this is important to them" An inaudible question from the audience, Defendant Povlin, " I am not having a conversation with you Mr. Lee", Mr. Lee continues, "I want to respond to Alderman White's question please" 46:19.

Defendant Povlin continues, "Oh Lord! Defendant Williams, "Mr. Lee you have had your chance to speak" Mr. Lee, "May I respond to Alderman White's question, no, no, we are having a discussion ourselves please go sit back down, "Mr. Lee, "The schoolboard pulled out of this for a reason." Defendant Povlin jumps back in and lies yelling, "They had to build a road we don't have to!" Alderman White, "You don't have the floor now, well if we're going to do it do it for everybody", Defendant Williams, "She's, she got the floor." 46:46.

Defendant Povlin continues, "I'm worn out, I thought this would be a no brainer for this community to take this land, these heavily wooded area and preserve it, what have we been hearing on Next Door[15] for the last three years, oh you taking away, chopping down trees, you're taking away everyone environment we have an opportunity to preserve this land in its current state for a very long time and then decide with the community in a future time line when all of this (pointing to the citizens) **crap** goes away um to talk about what we can do with that land but we have a golden opportunity to control how that access easement is designed, that we won't have control if it and regardless of whatever people say and **fear mongering** um when the school was making this deal the school was going to have the far west property, Saddlebrook was going to have the inner property and 55 acres[16] and they were going to develop it as a neighborhood that has been confirmed with me by a number

---

[15] Defendant Povlin created a censorship group on Nexdoor, better known as the censorship squad, the group have reported other residents of the TOF for speaking out in the group in hopes of forever silencing their speech.
[16] The 55 acres is heavily wooded with a large sinkhole and upon information and belief undevelopable.

of parties, that is the option, I'm hearing from the residents McFee Road that this has been, that it is a struggle, McFee Road is a struggle, I think that this is an opportunity to expand what we have going on with are, are trees, trails out there the residents will find very enjoyable, it's an opportunity, (slamming her arm down) It, It does not affect me either way but I am not hearing this ground swell from the residents, from McFee telling us not to this and they're the ones that are impacted when whatever neighborhood Saddlebrook builds" (slams her hand down again). 48:32

Defendant Povlin continues, "I am just so tired of this, everything is drama, everything is a controversy." Defendant Williams calls on Alderman White, however, Defendant Povlin breaks back in "I do talk to the people, I do talk, I talk to more people, here is my list, here is my list of neighborhoods, Defendant Povlin continues "I am so tired of this, here is the list I made up the other day to demonstrate how many people I talk to all over this community here is my neighborhood list," Defendant Povlin goes through a large list of neighborhoods including Mr. Murphy's subdivision, **Brixworth**. 49:51. "I have relationships with the HOA members or I have contacts with members who are former members of HOA that I can talk to in each one of these they understand they can **reach out to me and talk to me because I have helped people in these neighborhoods where they struggle**, (slamming her hand down) I am so tired of this division created in this town over silliness we have a history we have principles that this town was founded on and I am doing my darndest to understand and remember them and stay true to them are community is special it did not happen overnight it happened over a course from 1984 forward with the decisions they made and staying true to those decisions and staying true to our founding which honors um good storm water infrastructure, good roads, parks, sidewalks and trails are history, arts and culture, **sign ordinances** these were things established early on and taking care of residents **I have advocated so many things behind the scenes** that you guys have any clue how hard I have worked to establish these relationships and advocate for my residents, I meet with them, I reach out to them when there are things that are impacting them, **I send them proactive e-mails**, Fox Den it worked out well for them because I set in front of them and said these are the issues in front of us, what's going on and having that relationship with them we were able to redirect that neighborhood to go unto Kinston Pike as opposed into their neighborhood that's just example, I have targeted, my, my reputation is constantly assaulted by this group you just get on social media about it is the Vice Mayor Povlin show, I am tired of it (starring down the Farragut residents) I don't do this for anything but I love my community, this community is amazingly special were going to build out it's going to happen if we follow the plans put together long time ago we build out and stay consistent with what this community envisioned when it was built in 1980 if we ignore the principles our foundational principles you end up with a lot of (shaking her head back and forth) development we don't want this is a decision, I support the South Ward Alderman if they want if the residents in the South Ward don't want this then I am fine taking that money back in, the residents on McFee Road say you know what just go ahead (shaking her hand) just let a neighborhood come in (shrugging) I'm fine, I really am, I am laying this in you guy's lap, I am fine with either way, (slamming her book closed) I am so sick of this." 52.30

Alderman White addressing Defendant Povlin, "Are we sure …" and continues, "All that's interesting but what I, the only thing I ask for the people I represent on the South Side is to have a meeting if 10 people come, 10 people come if 100 people come, 100 people come but at least a representative from the South Side will know what are people want over there that's all I am asking, is more citizen input because I don't think we have had enough and I want to know what they think, if they think someone is going to build houses there and they do not want them, great, I am for what they want, if they want a Park there on that piece of property, I personally I don't I particularly don't like it, it's not a piece of property that I would want to build anything on but that's beside the point I want to know what the South Side citizens want and I want some kind of meeting where we can advertise and say

here it is this is what we want to do come in and tell us what you think, that's what I was
saying, I was not saying let's not do it, I mean." 53:54.

https://www.google.com/search?q=farragut+tn+mayorer+august+23%2C+2023+p
at+lee+speaks+at+boma

206.    David Smoak prepared the following for TOF's BOMA on August 28,

2023:

> "The American Rescue Plan Act (ARPA) Fund includes funding from the U.S.
> Government to all local governments bases on population.  The Town has received two
> equal payments totaling $7,055,252.  The Town also received additional TDEC grant funds
> in FY23 of $1,791,566 to utilize on stormwater infrastructure projects.  **Funds up to $10
> million may be spent on any local government service or project**.  For FY24, the town
> will be allocating $7,400,000 on broadband infrastructure, town hall building
> improvements, additional parking at McFee Park and stormwater improvements.  Funding
> from ARPA must be obligated by December 31, 2024 and spent by December 31, 2026."

207.    Defendant Povlin in her official capacity started the Blog, Farragut FYI.  On June 9,

2021, Defendant Povlin posts the introduction: Navigating how our Town works can be

daunting.  This blog is here to help dispel some of the rumors and correct some of the

misinformation circulated on social

https://www.blogger.com/profile/18631710271027006922081.

208.    Navigating how our Town works can be daunting.  This blog is here to help dispel some

of the rumors and correct some of the misinformation circulated on social media."

https://www.blogger.com/profile/18631710271027006922081.

> "There's a lot of misleading, incomplete and sometimes inaccurate information
> circulated on social media regarding growth and development in the Town of Farragut and
> general operation of the Town of Farragut.  It is not always easy to delineate the truth and
> the facts because, while local governments have a very similar responsibilities, each local
> government generally adopts its own ordinances, subdivision regulations, comprehensive
> land use plan, architectural design, guidelines, building code specifics, processes etc.
> Navigating how our Town works can be daunting.  This blog is here to help dispel some of
> the rumors and correct some of the misinformation circulated."

https://www.farragutfyi.com

209.    Alderman's requested meeting did not happen and on September 1, 2023, yet in an

additional OMA violation and without authority, Defendant Williams and Treasurer, Mrs.

Myers signed a $5,500,000 real estate purchase and donation agreement between the Scott Brothers and the Defendant TOF to purchase 55 acres and to except a purported **donation** of 15 acres off McFee Road.  The closing is to take place on November 15, 2023.

**Exhibit 28**.

210.    The void or voidable purchase contract states the following:

> Purchaser **shall** construct the Road Improvements in the Access Easement at its expense to the point reasonably determined by the Purchaser as required to provide access for such park improvement to McFee Road.  The owner of the Retained Tract may at its option and expense, construct the Road Improvements in the Access Easement to connect to the Road Improvements constructed by Purchaser, or in the event that Purchaser has not constructed any Road Improvements, the owner of the Retained Tract may construct the Road Improvements through the entire Access Easement to McFee Road at its expense.  Upon completion, the Road Improvements shall be maintained by the Purchaser as a public road.

**Exhibit 29**.

211.    However, on Farragut FYI, Defendant Povlin posted, in her official capacity as Vice Mayor, "The Town is not required to build a road in the access easement, we are only required to provide an access easement."  While quoting the language of the void purchase contract but leaving out the most important sentence, "Purchaser *shall* construct the Road Improvements in the Access Easement."  **Exhibit 30** .

212.    If this Court does not enjoin TOF from this fraudulent and illegal purchase, TOF as required will pay for and build a road for the Scott Brothers to be able to develop their other 300 acres in which those residents will exit the subdivision from McFee Road.

213.    Upon information and belief the Scott Brothers bank note of $5,525,000 was coming due on November 25, 2023.  Further, Defendant Povlin and Defendant Williams knew that the Plat map had been altered that was given to the Farragut citizens was altered and did not show the sink hole.  **Collective Exhibit 31**.

214.    On September 21, 2023, to defraud the TOF'S residents, Defendant Povlin posted:

Sinkholes are as natural to our landscape as our ridges, our valleys and streams. Given that East Tennessee has karst geology, it should surprise no one that there is a possible sinkhole located on the land the Town is considering purchasing. Sinkholes are the most common karst land feature and are prevalent across East Tennessee.

Many subdivisions in the Town have sinkholes. Bridgemore has 11 sinkholes. Bridgemore has some of the most expensive homes in Farragut. The Cottages at Pryce Farm has a 2.4-acre sinkhole. There're a few sinkholes in Meadows on McFee and the Grove at Boyd Station, as well.

The presence of one sinkhole on a 70-acre property does not devalue the property not does it make the property **undevelopable** . Our sinkhole ordinance protects sinkholes and our Open Space Residential Overlay zoning districts specifically allow for flexibility to accommodate sinkholes without materially impacting the ability to construct a low-density residential subdivision.

There was no cover up, the existence of a sinkhole is commonplace, expected. Protect it and design around it, as our ordinances allow for. The Letter of Intent was approved so the Town could begin its due diligence regarding the land including the depression.

Farragut FYI**.**

## **SILENCING A POTENTIAL WHISTLE BLOWER**

215. 42 U.S.C. § 1983 provides a cause of action when federal rights are violated by someone acting "under color of any statute, ordinance, regulation, custom, or usage, of any State." 42 U.S.C. § 1983. Courts have interpreted this language to mean that a defendant must be acting in a state capacity to be liable under the statute. *West v. Atkins*, 487 U.S. 42, 48 (1988). This is known as the "state action" requirement, and it turns on whether a defendant's actions are "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

216. In 2021, Plaintiff Murphy co-founded Uncontrolled Opposition™, and in 2022 started the Farragut Free Press. Thereafter, Plaintiff Murphy launched a podcast for both ventures, which he also co-hosts. https://farragutfreepress.substack.com/ and https://uncontrolledopposition.substack.com/.

217. The Farragut Free Press has uncovered local corruption and illegal activity by the Defendants and co-conspirators. It has also covered numerous stories that have embarrassed local TOF government officials and others acting in concert with them for bad and/or

unlawful acts impacting the TOF's residents.  It also included numerous parodies including: He-Ron and the Masters of Incompetence, a parody of Defendant Williams.

218.    On August 7, 2021, Defendant Williams responds to Farragut resident, Adam Miller, questioning why Plaintiff Murphy and other TOF residents, like Mike Mitchell, were banned from the local social media platform, Next Door.  Defendant Williams responded, "Another one to be aware of;  he's been brainwashed into being a mouthpiece for whoever has been kicked off of Nextdoor:  either Sean or Mike Mitchell. . ."  **Exhibit 32**.

219.    Mr. Murphy was also banned from the censorship group and on August 6, 2021, Defendant Povlin published multiple false stories regarding Mr. Murphy to the censorship squad.  **Exhibit 33**.

220.    On June 13, 2022, Farragut Free Press published the article, "The Truth Behind the Farragut Business Alliance Part 1" exposed the fact Defendant Povlin sits on the BOMA and voted to give FBA money in which she is also a Board member of and further getting free advertisement for her and her husband's Anytime Fitness.  **Exhibit 34**.

221.    On the platform Next Door, June 24, 2022, Defendant Povlin announced "A capital project to produce a design to add an additional left turn lane to northbound and southbound Campbell Station Road at Kingston Pike has been budgeted for Fiscal Year 2023."  In which, Mr. Murphy credited Defendant Povlin for her "word Ju-Jitsu" and correctly interpreted that TOF was going to do a study to have 10-foot-wide lanes despite Tennessee requirement of 12-foot-wide roads.  Mr. Murphy wrote "The Povlin Administration has a problem with too many vehicles on Kingston Pike from Lovell Road to Campbell Station Road.  This is because of years of overbuilding.  The Biddle Farms Project is going to make the traffic between these two roads worse.  **Exhibit 35**.

222.     In the 2022 TOF's elections, Bill Johns ran against Defendant Williams for Mayor, David White ran for Alderman, Ward 2 (South Ward), and Adam Atherton challenged Alderman Noah Meyer Ward 1 (North Ward).  Plaintiff Murphy interviewed Mr. Johns, Mr. White and Mr. Alderman on both Uncontrolled Opposition™ and the Farragut Free Press.

223.     On June 29, 2022, candidates Mr. Bill Johns running for TOF's Mayor against Defendant Williams and Mr. David White running for alderman held a town hall forum at the Farragut Community Center in which Mr. Murphy was the forum moderator.

224.     Jay Povlin, Defendant Povlin's husband, then posted the following regarding Plaintiff Murphy:

"You know that Sean is managing Johns, Atherton & White.  His infantile behavior reflects on all of you, but especially men that are asking for women's vote."

"These candidates are tied to each other and Sean.  They must publicly distance themselves from him and clearly state that they will no longer accept any endorsement or promotion of their campaign on his "press" site.  The lot of them (including their minions that repost his nonsense on social media) are insulting everyone in Farragut, especially women."

"Those that choose not to disavow themselves from him insult every voter in Farragut, and they will take note."

Jay Povlin then, attacks another TOF resident, Michael Wilson, for not Agreeing:

"Sorry, you're not skating away from this.  You've appointed yourself a thought Leader in Farragut.  You are either with the nonsense or you're not.  Real Simple to everyone but you, apparently."

Michael Wilson then posted the following in response to Jay Povlin's vitriol:

"I have provided you my answer 4 times now; you just don't like it.  I don't answer to you so continuing to ask won't get you anything more than what has been provided already.  I get you don't like the comments he makes about your wife; what I don't understand from you and Eric is you believe Sean is rude and a no one will listen to him, correct?  So, why don't you let his POD cast do their thing and allow it to bring down all the candidates you oppose?  I can't figure out why you want him shut down when his presence on the scene seems to help your candidates (according you you).  Seems you would be using his material to show how bad he is;  not trying to shut down his commentary.  Just a thought . . ."

**Exhibit 36**.

225.    On Saturday July 23, 2022, Mr. Murphy received a text message showing a SUV with

Defendant Williams for Mayor magnets on the side of the vehicle which was parked right in

front of the side entrance to Farragut Town Hall where early voting was taking place.

**Exhibit 37.**

226.    Mr. Murphy called the Knox County Election Commission (hereinafter "KCEC") to

report the election violation, it turned out it was a poll worker's van and after getting a phone

call from KCEC the poll worker removed Defendant Williams magnets.  At or around 1 pm,

Mr. Murphy drove over to the Farragut Town Hall to confirm that the election violation was

resolved which it was and while exiting the back parking, Mr. Murphy saw Defendant

Williams walking out the back of the Farragut Town Hall even though the sign on the door

clearly stated "Candidates If You Are Not Voting Do Not Enter the Polling Place."

**Collective Exhibit 38.**

227.    Mr. Murphy confronted Defendant Williams regarding the clear election violation,

however, in attempt to cover his own unlawful conduct and clear act of malicious retaliation

drove to his home and called 911 and falsely reported to Captain Brad Hall of the Knoxville

Sherriff's Office (hereinafter "KCSO") that while he and his wife were at the Farragut Town

Hall purportedly "visiting the Farragut Museum", Mr. Murphy "The suspect pulled his gold-

colored van near to the complainant and began yelling at him over political differences, and

the complainant's access to the Town Hall building".  **Exhibit 39.**

228.    On July 23, 2022, Defendant Farragut Press's reporter, Mr. Alan Sloan published the

article "Blogger 'yells' at Mayor?  No Polling violations found" which included Defendant

William's false narrative of the incident and that Mr. Murphy "drove toward us, very quickly

and very closely.  It was almost vehicle assault.  While driving toward us, he had his window

down and was screaming at me that I was "breaking the law." Defendant Williams continues, "He threw the car in park, jumped out and continued to yell at me, flailing his arms, and said he was going to have me arrested for being in Town Hall during voting hours," Defendant Williams continues "I told him, 'Go ahead,' and then (Murphy) got even more upset, yelled at my wife to 'move out of the way,' Further, Defendant Williams maliciously and fraudulently stated that, "My wife is still upset, and even had a nightmare about what happened just last night,". **Exhibit 40.**

229. Shockingly on Friday June 29, 2022, the Defendant Farragut Press's article was posted on the bulletin board where citizens entering the building to vote would see Defendant Williams false narrative regarding Mr. Murphy. **Exhibit 41.**

230. Although, Mr. Murphy did an Open Records request for the video of the Farragut's Town Hall parking lot, TOG withheld the video encounter for eight days and released it only on Election Day. The video conclusively shows Mayor William's accusations were nothing less than abject lie in order to maliciously destroy the Murphy's family's reputation. Defendant Williams won the election by a mere 58 votes.

231. In 2022-2023, the Farragut Free Press and Uncontrolled Opposition™ covered numerous accusations of unlawful behavior regarding matters of public interest, concern and public comment during the application process, misrepresenting major components of a project such as sinkholes, using the Defendant FBA to conduct Biddle Farms related work outside of Tennessee Sunshine laws, and colluding with Defendant Farragut Press to misrepresent how the Biddle Farms Project came about.

232. On March 31, 2023, Defendant Povlin, a non-attorney, in an attempt to mislead the public, posts "Farragut Files Follies - #1:

"Further, while FBA board meetings are considered public meetings due to the fact that Town of Farragut funds constitutes more than 30% of the FBA's funding. TN Supreme Court case law brings into question into question whether the FBA board is considered governing body, as the FBA board members have no authority to make decisions for or recommendation to a public body on policy or administration. *Dorrier v. Darl*, S.W.2d 888 (Tenn. 1976).

**Exhibit 42**.

233. In April 2023, after two years of repeated abuse by local officials and their loyalists, Mr. Murphy decided to erect political yard art, consisting of 3 memes parodying and criticizing the Defendant Williams, Defendant Povlin and Alderman Scott Meyer. **Exhibit 43**.

234. Since posting the political yard art display, Mr. Murphy and his family has received support from numerus Farragut residents, including Brixworth, who share the Plaintiffs' views concerning the TOF leadership.

235. Mr. Murphy helped organize and start a political action group that met monthly at the Brixworth Clubhouse regarding matters of public concern including TOF as well as business matters concerning his field of expertise.

236. On May 2, 2023, an armed KCSO officer served a "Notice of Violation" from the TOF's Office of Code Enforcement, in violation of Farragut Municipal Code Chapter 109: Section 109-12. Sign regulations by land use and/or zoning districts. All signs shall comply with the following regulations. Any sign that is not specifically permitted shall be prohibited.

(b)**Signs permitted on land for residential uses**. The following signs are permitted on land used for residential purposes. Recreational facilities developed as part of a residential development shall also follow these regulations:

(b) **Temporary parcel sign**. Each individual house lot shall be permitted one temporary sign not to exceed six square feet in area and six feet in overall height. This may include a sign where the owner consents and the property are being offered for sale or lease. A temporary parcel sign shall be removed within two days of the termination of the event/activity for which the sign was used . Where the termination of an event/activity for which the sign was used. Where the termination of an event/activity is questioned by the

sign administrator, the burden shall be on the sign holder to verify that the even/activity has not terminated.

**Exhibit 44**.

237.     In *Reed v. Town of Gilbert*, the Court ruled that the Town of Gilbert's sign ordinances

violated the First Amendment.  Gilbert's ordinances differentiated between different types of

signs including "ideological signs." "Political signs," and "temporary directional signs

relating to a qualifying event."  These types of signs (along with other categories) were

restricted to various size limits and were only allowed to be displayed for various lengths of

time.  As a result, the time and size limit of signs varied with the category of sign, or, as the

Supreme Court ruled, with the content of speech. *Reed v. Town of Gilbert*, Supreme Court of

the United States, 576 U.S. 155.

238.     On May 5th, 2023, Defendant Povlin wrote the following message on Nextdoor:

> The Town of Farragut values sidewalks, trails and greenways.  The Town of Farragut values connecting those sidewalks, trails and greenways.  The Town of Farragut values parks and a community center and community gathering opportunities.  The Town of Farragut values improved roads and a connected transportation network.  The Town of Farragut values conservative fiscal policy.  The Town of Farragut values planning to retain the residential quality of our Town.  The Town of Farragut values planning to retain the residential quality of our Town.  The Town of Farragut values conservative fiscal policy. The Town of Farragut is unique and special because of the values.  All of these values are reflected in our current budget and have been reflected in every budget this community has ever approved.  We thrive without a property tax, we save our money, we pay as we go, we loathe debt If a person is considering moving to Farragut, they should be aware that these are long held values.  If one disagrees with these values, they probably should move elsewhere.

**Exhibit 45**.

239.     After Plaintiff Murphy criticized the fact that Defendant Povlin was wanting to spend

additional money on extending the sidewalk, Defendant Povlin wrote:

> Dana, another aspect of this which is more insidious is the continued effort to represent Mayor Williams, Alderman Meyer and I as caricatures.  It is dehumanizes us.  There's a lot of violent behavior in our world.  My fear is that their continued efforts make us targets.
>
> Jay was so concerned he insisted that we purchase a weapon for me.  It's not funny.

**Exhibit 46**.

240.    On May 8, 2023, Mr. Murphy discovered a letter in his United States Post Office Mail

Box.  The letter was not signed and there was no return address.  The letter threatened Mr.

Murphy and his family with bodily harm.  "Your family is not safe.  You're in the south, pal

and people have and use guns ...".  Defendant Povlin's ill-advised possible admission against

interest above, could not have come at a worse time.

**Exhibit 44** .

241.    On May 19, 2023, Defendant Swor and Plaintiff Murphy conversed by email regarding

his political yard art.  Mr. Swor stated that he is aware of T.C.A. § 2-7-143.  Defendant Swor

continued "I have also highlighted the relevant language that speaks to our ability as an HOA

to regulate these types of signs."  There is also language that speaks to a specific time period

someone can display political signs on private property, even if our HOA didn't have specific

language in our C&Rs."  **Exhibit 45** .

242.    On May 22, 2023, in attempt to further harass and intimidate the Plaintiffs, Defendant

Swor had Mrs. Julie Ford, wife of Brixworth's HOA treasurer Maury Ford, show up

unannounced and uninvited to the Murphy's family home claiming she was afraid to come

talk to him because she was told he might shoot her but because she knew that there were

neighborhood teenagers who were discussing entering Mr. Murphy's property with the intent

to damage his political yard art, she felt compelled to do so.

243.    On May 25th, 2023, Plaintiff Murphy again asked Defendant Swor in an email for the

CC&Rs.  Mr. Murphy stated, "I will need the following from you sent via email., to wit; 1.

The full copy of the C&Rs.  In writing which of them you feel I am violating. 3.  Any

supporting documentation.  Please either provide them or let me know when you are going

to." In response, Defendant Swor emailed back, "My email sent to you on May 19, 2023 cited the C&R violation, and also had attached the TCA law you referenced. You are well aware of the HOA's stance at this point, and the deadline as previously emailed is EOD today. I've been lenient as I can, given the situation, for over a month now. I'm honestly trying to avoid further and unnecessary escalation over this simple matter. Let's just knock this out and move on to bigger and better things." **Exhibit 46** .

244. Thereafter, Plaintiff Murphy received a letter dated the 8th day of June 2023 from Attorney, Adam Russell, stating that if the displays were not removed by June 9th, his family's access to the clubhouse, pool, basketball court, and clubhouse would be removed. Mr. Russell cited Article XVIII and Article XIV as justification for taking the action threatened. In addition, Mr. Russell cited to T.C.A. § 2-7-143 as validation of BHOA's actions. Further, Mr. Russell cited Article IV, Section 3 of the Brixworth CC&Rs to support the cancellation of the Plaintiffs' property rights. **Exhibit 47** .

245. On June 9, 2023, in order to silence Mr. Murphy, Maury Ford, BHOA's Treasurer, texted Mr. Murphy cancelling his planned political meetings;

> "I was going to send you and Sharin a note later tonight advising that you will need to make other plans for your meetings on June 29[th] and & July 6th as you will not have access to the clubhouse at that time. Hope this can be resolved soon and we can resume enjoyment of our awesome neighborhood!"

**Exhibit 48**.

246. Defendant Swor following posted the following:

> It's hard not to address the elephant in the room, but we are all very well aware of the neighbor with the sign(s) on **Brookstone**. You can call the Town of Farragut for more detailed information, but he was unsuccessful in his hearing with Town of Farragut last month. Because of his failed attempt to defend signs, he is being fined by the Town; and my understanding is that at some point the signs will have to be removed. A new sign is up now that rehashes grievances, berates the Brixworth HOA, etc., so I am unsure If that will result in a new fine and hearing. Our neighborhood sanctions against him have been effect since June, and will remain in place until the sign(s) are gone. I wish there was more that we could do. The Town of Farragut is really the only one with teeth in the matter. I hate it

for all of us, and I just wish that this neighbor would find another way to express himself that didn't selfishly involve soiling the neighborhood.  It is clearly stated in our Brixworth C&R's that cannot have signs in your yard, and there was a 2021 Amendment to an existing TN bill that gives a private HOA the right to regulate even political signs in private yards.  This neighbor was made aware of all of this back in April when I was talking to him offline about it, but he chose to believe his own reality …

**Exhibit 49**.

247.    On June 13, 2023, Allison Myers, the Town of Farragut's, Town Recorder, emailed Mr. Travis Ramsey, requesting the IP addresses for Mr. Murphy, Kimberlie Parks, and Mike Mitchell.  **Exhibit 50** .

248.    Mr. Murphy applied to be on the Ethics Commission for Knox County, Tennessee.

249.    On October 16, 2023, Jay Povlin, Defendant Povlin's husband, emailed the commissioners and falsely accused Mr. Murphy of multiple accusations including below:

> Demonstrated a pattern of aggression and abusiveness toward those he views as his political opponents.  This indicates an inability to separate his personal views from the issues that may be before the Ethics Commission.

The email goes on to accuse Plaintiff Murphy of being aggressive and had committed multiple crimes. **Exhibit 51** .

**COUNT I**
**UNDER THE COLOR OF LAW THE TOWN OF FARRAGUT, AND  BOTH DEFENDANT WILLIAMS AND POVLIN IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES,  VIOLATION OF PLAINTIFFS', AND ALL SIMILARLY SITUATED PLAINTIFFS',  SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS UNDER THE FOURTEENTH AMENDMENT BY VIOLATING THEIR FIRST AMENDMENT RIGHT TO FREE SPEECH AND PROPERTY INTEREST RIGHTS**
**(42 U.S.C. § 1983)**

250.    Plaintiffs, and all other similarly situated TOF residents, restate Paragraphs 1-250 in support of Count I.

251.    Freedom of speech is perhaps the most cherished and most important protection provided by the United States Constitution.  The delegates to the Constitutional Convention viewed

citizens' right to speak their minds without fear of government retribution as so important that "freedom of speech" is enshrined in the very First Amendment of the Constitution.

252.    No State shall make or enforce any law which shall . . . deprive any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1.

253.    There are two main components of the Fourth Amendment's due process clause: procedural due process and substantive due process. Procedural due process ensures a state will not deprive a party of life, liberty, or property without employing fair procedures to reach a decision. Whereas, substantive due process ensures the state will not deprive a party of certain, important fundamental rights at all, regardless of the procedures used; and, where fundamental rights are not at issue, substantive due process protects against arbitrary and oppressive government action. *Hyde Park Co. v. Santa Fe City Council*, 226 F.3d 1207, 1209 (10th Cir. 2000).

254.    The phrase "any person" in the Fourteenth Amendment's due process clause has been defined to include natural persons, such as individuals, and legal persons such, as business entities; thus, corporations and companies are entitled to Fourteenth Amendment due process protections as well.

255.    At all times relevant herein, Plaintiffs, as a well as all other similar situated TOF residents, possessed, by virtue of our forefathers, a cognizable liberty interest – the fundamental right of Freedom of Speech.

256.    Plaintiffs exercised this well recognized fundamental right of free speech regarding the TOF's government and areas of contention he had with the way in which they were not only conducting meetings, but enforcing unconstitutional municipal codes regarding signage and

other areas, violating its Charter and that of the laws of Tennessee and especially the Tennessee General Assembly.

257.    Defendants herein conspired with one another to silence the Plaintiffs protected speech protected by the Fourteenth Amendment thereby vitiating the Plaintiffs substantive due process rights with malicious intent, such as the death threat letter sent through the United States Mail a few days after Defendant Povlin announced to the public that she had purchased a gun!

258.    At all relevant times herein the Plaintiffs, as a well as all other similar situated TOF residents, exercise of their right to free speech regarding the Defendants concerned issues, which would fall squarely within the meaning of matters of public concern, more specifically, concerning the TOF's politicians and the decisions that they make in secret from the TOF residents, i.e. "The Work Shop."

259.    As a direct result of the unlawful conduct of the Defendants and co-conspirators the Plaintiffs and all another similarly situated TOF residents have been damaged by being retaliated against and having their grievances silenced by the deprivation of their Frist Amendment Rights.

**COUNT II**
**UNDER THE COLLOR OF LAW ALL DEFENDANTS CONSPIRED TO VIOLATE**
**DEFENDANT PLAINTIFF MURPHY'S PROCEDURAL DUE PROCESS RIGHTS**
**UNDER FOURTEENTH AMENDMENT AND IN VIOLATION OF FIRST**
**AMENDMENT RIGHT TO FREE SPEECH**
**(42 U.S.C. §1983)**

260.    Plaintiffs restate Paragraphs 1-250 in support of Count II.

261.    The BHOA President, Kirk Swor and the TOF along with the named conspirators herein, and others not yet known, conspired to deprive Plaintiff Murphy of not only his right to free speech by placing political yard art on his private property but by also

removing his BHOA privileges as punishment for exercising free speech concerning matters of public concern.

262.     Plaintiff Murphy was afforded no opportunity to be heard and provide his defenses to the removal of his property rights by the BHOA despite requests for the same.

263.     Defendant, Farragut Press, published false information regarding Mr. Murphy trying to run down Mayor Williams in his mini-van, which was proved false by the Town Hall Security cameras is but one example of the retaliation by the Defendants herein to not only assassinate Plaintiff Murphy's character but to silence him and all other similarly situated TOF residents.

264.     The Defendants went even further and cited Plaintiff Murphy for exercising his right to freedom of speech on matters of public concern. The Defendants conspired and had an armed Knox County Sheriff's Officer serve Mr. Murphy at his home with the citation rather than having a private process server serve the citation.

265.     The TOF did not stop there it cited Plaintiff Murphy under one section of its sign ordinance then changed gears in the middle of the hearing on July 21, 2023 and fined Plaintiff Murphy over $1,800 for exercising his right to free speech on matters of public concern. Moreover, Plaintiff Murphy was not able to confront witnesses against him at the hearing because the TOF conveniently did not have them present nor have their names.

266.      As a direct result of the Defendants unlawful conduct in violating Plaintiff Murphy's procedural due process rights, Plaintiff Murphy has suffered damages.

## COUNT III
## UNDER THE COLOR OF LAW THE TOWN OF FARRAGUT, DEFENDANT WILLIAMS AND DEFENDANT POVLIN VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHTS IN VIOLATION OF; A PUBLIC OFFICIAL'S RETALIATION AGAINST AN INDIVIDUAL EXERCISING HIS OR HER FIST AMENDMENT RIGHTS
## (42 U.S.C. §1983)

267.     Plaintiffs restate Paragraphs 1-250 in support of Count III.

268.     Defendants herein conspired to silence Plaintiff Murphy regarding his exercising his right to free speech on matters of important public concern by unlawfully doing the following:

   a.  Running press releases in the Farragut Press that Mr. Murphy tried to run down Mayor Williams in his mini-van;

   b.  Publishing to the public that Plaintiff Murphy was convicted of a crime in Connecticut.

   c.  Mailing death threats to Mr. Murphy's United States Postal Mailbox in short telling his family to leave his home.

   d.  Publishing to social media cites, such as Next door, false and negative comments regarding Mr. Murphy through inuendo or otherwise to cast Mr. Murphy and his family in a false light.

   e.  Publishing Mr. Murphy's Tennessee license plate online, otherwise known as doxing.[17]

---

[17] Doxing is the action or process of searching for and publishing private or identifying information about a particular individual on the internet, typically with malicious intent.

f.   Conspiring to remove Plaintiffs property rights by having the BHOA through Defendant, Kirk Swor, unlawfully strip Plaintiffs' rights to use the BHOA amenities.

269.   These outrageous attacks by the Defendants also impact and have damaged and continue to damage the Plaintiffs' minor children.

270.   As a direct result of the Defendants unlawful conduct the Plaintiffs have suffered damages.

## COUNT IV
## UNDER THE COLOR OF LAW THE TOWN OF FARRAGUT, DEFENDANT WILLIAMS, DEFENDANT POVLIN, DEFENDANT SWOR CONSPIRED TO VIOLATE PLAINTIFFS SUBSTANTIVE AND PROCEDURAL RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT WHEN TAKING PROPERTY RIGHTS WITHOUT A HEARING
## (42 U.S.C. §1983)

271.   Plaintiffs restate Paragraphs 1-250 in support of Count IV.

272.   The BHOA President, Kirk Swor and the TOF along with the named conspirators herein, and others not yet known, conspired to deprive Plaintiff Murphy of not only his right to free speech by placing political yard art on his private property but by also removing his BHOA privileges as punishment for exercising free speech concerning matters of public concern.

273.   Plaintiff Murphy nor his family were afforded any opportunity to be heard before the BHOA Board and provide his defenses to the removal of Plaintiffs' property rights by the BHOA, despite his requests for the same.

274.   The Plaintiffs BHOA rights remain suspended to date and Plaintiffs have had t sue the BHOA to seek the return of their BHOA rights unlawfully stripped from them costing them thousands of dollars in attorney's fees and expenses.

275.     As a direct result of the Defendants unlawful conduct the Plaintiffs have suffered damages.

## COUNT V
### UNDER THE COLOR OF LAW THE TOWN OF FARRAGUT, DEFENDANT WILLIAMS, DEFENDANT POVLIN, DEFENDANT SWOR VIOLATED PLAINTIFFS' SUBSTANTIVE AND PROCEDURAL RIGHTS UNDER THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENTS IN RETALIATION AGAINST MR. MURPHY EXERCISING HIS FIRST AMENDMENT RIGHTS

276.     Plaintiffs restate Paragraphs 1-250 in support of Count V.

277.     The BHOA President, Kirk Swor and the TOF along with the named conspirators herein, and others not yet known, conspired to deprive Plaintiff Murphy of not only his right to free speech by placing political yard art on his private property but by also removing his BHOA privileges as punishment for exercising free speech concerning matters of public concern.

278.     Plaintiff Murphy was afforded no opportunity to be heard and provide his defenses to the removal of his property rights by the BHOA despite requests for the same.

279.     Defendant, Farragut Press, published false information regarding Mr. Murphy trying to run down Mayor Williams in his mini-van, which was proved false by the Town Hall Security cameras is but one example of the retaliation by the Defendants herein to not only assassinate Plaintiff Murphy's character but to silence him and all other similarly situated TOF residents.

280.     The Defendants went even further and cited Plaintiff Murphy for exercising his right to freedom of speech on matters of public concern. The Defendants conspired and had an armed Knox County Sheriff's Officer serve Mr. Murphy at his home with the citation rather than having a private process server serve the citation.

281.    The TOF did not stop there it cited Plaintiff Murphy under one section of its sign ordinance then changed gears in the middle of the hearing on July 21, 2023 and fined Plaintiff Murphy over $1,800 for exercising his right to free speech on matters of public concern. Moreover, Plaintiff Murphy was not able to confront witnesses against him at the hearing because the TOF conveniently did not have them present nor have their names.

282.    Defendants herein undertook this conspiracy amongst themselves, and others not yet known, in retaliation for the Plaintiffs exercising their right of raising matters of public concern, as well as voicing their protected opinions as to the TOF governance and its rulers.

283.    As a direct result of the Defendants unlawful conduct in violating Plaintiffs first amendment rights by retaliating to silence them, Plaintiffs have suffered damages.

## COUNT VI
## THE TOWN OF FARRAGUT ABUSED ITS POWER BY CHARGING MORE THAN ALLOWED BY LAW FOR AN ORDINANCE VIOLATION

284.    Plaintiffs restate Paragraphs 1-250 in support of Count VI.

285.    Plaintiffs respectfully request that this Honorable Court declare that the following ordinances are void due to either the Town of Farragut violated OMA and/or they acted ultra vires by not abiding by the laws and statues the Tennessee General Assembly put in place to protect the residents of Farragut:

    a.  TOF Ordinance 21-01.

    b.  TOF Ordinance 21-02.

    c.  TOF Ordinance 21-03.

    d.  TOF Resolution PC-2014.

286.     In addition for a declaratory judgment that any amendments to these ordinances are equally void and or that any ordinance that relies on the above-mentioned ordinances also be declared to be void in whole or part.

## COUNT VII
## INTENTIONAL INFLICTION OF MENTAL AND EMOTIONAL DISTESS

287.     Plaintiffs restate Paragraphs 1-250 in support of Count VII.

288.     Defendants outrageous actions set forth here including but not limited to the following:

   a.  Running press releases in the Farragut Press that Mr. Murphy tried to run down Mayor Williams in his mini-van;

   b.  Publishing to the public that Plaintiff Murphy was convicted of a crime in Connecticut.

   c.  Mailing death threats to Mr. Murphy's United States Postal Mailbox in short telling his family to leave his home or face bodily harm.

   d.  Publishing to social media cites, such as Next door, false and negative comments regarding Mr. Murphy through inuendo or otherwise to cast Mr. Murphy and his family in a false light, e.g. violent people.

   e.  Publishing Mr. Murphy's Tennessee license plate online, otherwise known as doxing.[18]

   f.   Conspiring to remove Plaintiffs property rights by having the BHOA through Defendant, Kirk Swor, unlawfully strip Plaintiffs' rights to use the BHOA amenities.

---

[18] Doxing is the action or process of searching for and publishing private or identifying information about a particular individual on the internet, typically with malicious intent.

289.     These outrageous attacks by the Defendants also impact and have damaged and continue to damage the Plaintiffs' minor children.

290.     The Plaintiffs herein live in fear in their own home. This is the United States of America and the Plaintiffs live in fear in their home where they are supposed to feel safe – disgraceful. These facts would make the great Thomas Jefferson roll over in his grave and have King George III hosting a banquet in his King's court with the ale flowing freely!

291.     The mental and emotional stress has manifested itself with sleepless nights, constant fear, anxiety, fear in leaving the residence, fear in public, nausea, inability to eat complete meals, etc. Plaintiff Murphy how has worn on his shoulders the majority of the weight of the unlawful attacks by the Defendants and other unknown conspirators which has required him to seek medical counseling for the manifestations named above.

292.     As a direct result of the Defendants unlawful conduct the Plaintiffs have suffered damages.

### COUNT VIII
### VIOLATION BY THE TOF BOMA AND TOF FMPC FOR VIOLATING THE RESTRICTIONS OF ARPA WHICH WAS GRANTED UNDER THE SPENDING CLAUSE OF ART. I, § 8 OF THE UNITED STATES CONSTITUTION WHICH CONFERRED INDIVIDUAL, UNAMBIGUOUS RIGHTS.
### (42 U.S.C. § 1983)

293.     Plaintiffs, as well as other similarly situated TOF Residents restate Paragraphs 1-250 in support of Count VIII.

294.     Defendants conspired with one another, as well as other conspirators not yet known, to violate the eligible uses set forth by ARPA which was established by the Spending Clause of Art. I, § 8.

295.    The United States Supreme Court has now held that individuals may bring claims

for violations of Acts brought under the Spending Clause pursuant to 42 U.S.C. § 1983.

*Health and Hosp. Corp. of Marion County. v. Talevski*, 143 S. Ct. 1444 (2023).

296.    Specifically, Defendants conspired to defraud the Plaintiffs and similarly situated

TOF residents by publishing false information regarding the Biddle Farm Project to

mesmerize the Plaintiffs and the TOF residents into believing they were acting within the

law and were providing walking trails and the like as plans initially showed.

297.    In addition, and not exhaustive of all examples noted herein, the Defendants

conspired to defraud Plaintiffs and the TOF residents by supplying false impact studies as

to vehicle traffic with the Biddle farm Project adding several thousand people to the

center of the TOF.

298.    The Defendants misappropriated the funds which were to go to walking trials and

to improve the volume the roadways can handle with several thousand people added to

the center of the town of Farragut all the while lying to the Plaintiffs and the TOF

residents for their own personal gain.

299.    Plaintiffs and other similarly situated TOF residents have been damaged by the

Defendants conspiracy to misappropriate the eligible uses of the ARPA funds.

**COUNT IX**
**VIOLATION OF THE TENNESSEE OPEN MEETINGS ACT – THE SUNSHINE LAW**

300.    Plaintiffs, as well as other similarly situated TOF Residents restate Paragraphs 1-

250 in support of Count IX.

301.    The Tennessee Open Meetings Act known collectively as the Sunshine Law,

meaning transparency,  was enacted by the Tennessee General Assembly which declared

it to be "the public policy of the state that the formation of public policy and decisions is public business and *shall* not be conducted in secret." T.C.A. § 8-44-101.

302.     The Tennessee Court of Appeals has opined that the Tennessee Open Meetings Law is one of the most comprehensive and extensive in the Country.

303.     The Defendants herein and other unknown coconspirators held closed meetings concerning the Biddle Farm Project, as well as other TOF matters and in said meeting rubber stamped actions without allowing the Plaintiffs and the TOF residents to have proper notice of a hearing on the matter to voice their concerns prior to it being rubber stamped.

304.     Under the Tennessee Open Meetings Act, any citizen may bring an action in circuit court, chancery court, or any court of equity to enforce the Sunshine Law. These courts are given broad authority to issue injunctions, impose penalties, and otherwise enforce the purposes of the act. T.C.A. § 8-44-106.

305.     Plaintiffs, as well as all other similarly situated TOF residents, seek equity injunctive relief from this Honorable Court enjoining any further work or progress on the Biddle Farm Project, as well as the Scott Brother's property acquisition which were held in secret in violation of the Act, until such time that a resolution can be reached, if it can be at this point, to correct the numerous violations of the Act by the Defendants and their co-conspirators.

## COUNT X
## NEGLIGENCE

306.     Plaintiffs, as well as other similarly situated TOF Residents restate Paragraphs 1-250 in support of Count IX.

307.     Defendant TOF owes the Plaintiffs and the TOF residents a duty of reasonable care not to intentionally cause harm to its residents.

308.     Defendants has woefully failed in its duty owed to the Plaintiffs and the TOF residents in preventing unsafe conditions, such as the road conditions which will not be able to withstand the addition of several thousand more residents at the Biddle Farm Project, placing all of the TOF's funds into one slush fund rather than keeping funds obtained from the federal government in separate designated accounts, allowing construction at Biddle Farms to be performed on FEMA controlled flood ways which endangers TOF residents' properties to catastrophic flooding and a loss of the TOF's FEMA insurance in the event of a disaster, allowing the construction at Biddle Farms to be conducted in violation of the Clean Water Act for failing to remediate the PCB contamination with the funds received from the class action settlement on the same.

309.     The Plaintiffs and the TOF's residents have been damaged by the negligence of the TOF and its directors, staff and political hierarchy as a direct result of the acts and omissions set forth above.

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS PRAY FOR JUDGMENT AS FOLLOWS, FOR AN AWARD OF MONETARY DAMAGES IN THE AMOUNT OF $ 25,000,000 IN DAMAGES FOR THE UNLAWFUL ACTS OF THE DEFENDANTS AND CONSPIRATORS BOTH JOINTLY AND SEVERALLY, FOR PUNITIVE DAMAGES IN THE AMOUNT OF $250,000,000, FOR ATTORNEY'S FEES, REASONABLE COSTS AN EXPENSES ANS INJUNCTIVE RELIEF BOTH PRELIMINARY AND PERMANENT, FOR A FEDERAL CONSENT DECREE APPOINTING A RECEIVER OVER THE TOF GOVERNMENT TO CORRECT AND**

END THE UNLAWFULLY ACTIVITIES ONGOING, REIMBURSE FEDERAL FUNDS

USED UNLAWFULLY AND PROVIDE A FORENSIC ACCOUNTING TO THIS

HONORABLE COURT, ALONG WITH OTHER QUARTERLY REPORTS

CONCERNING THE TOF AND FINALLY FOR A JURY TO BE EMPANELED TO

TRY THIS CAUSE.

Respectfully submitted,

**THE EGLI LAW FIRM**

s/Russ Egli
Russ Egli, BPR#24408
The Egli Law Firm
Attorney for the Plaintiffs
11109 Lake Ridge Drive, FL3
Knoxville, TN 37934
865-304-4125
theeglilawfirm@gmail.com