

**FARRAGUT MUNICIPAL PLANNING COMMISSION**
**AGENDA**

**June 18, 2020**
**7:00 p.m.**

This meeting can be viewed live on Charter channel 193 and TDS channel 3. There is no public access to Town Hall due to Governor Lee's orders and the Knox County Health Department's orders regarding the COVID-19 pandemic.

Meeting comments may be emailed to comments@townoffarragut.org and must be received by 12:00 pm on June 18 to be included in the record of the meeting. Anyone that wishes to provide comments must include their name and address. For questions please e-mail Mark Shipley at mshipley@townoffarragut.org or Bart Hose at bhose@townoffarragut.org

1. **Approval of agenda**

2. **Approval of minutes – May 21, 2020**

3. **Appointment of a youth representative for the next fiscal year**

4. **Discussion and public hearing on a request for a variance from the distance between driveways requirement for arterial streets as provided for in the Driveways and Other Accessways Ordinance in relation to a conceptual site plan for 13036 and 13038 Kingston Pike, two Acres, Zoned C-1 (MBH, Inc., Applicant)**

5. **Discussion and public hearing on a request to rezone Parcel 019, Tax Map 162, 1013 McFee Road, 24.85 Acres, from Agricultural (A) to Open Space Mixed Residential Overlay (R-1/OSMR) (Rackley Engineering, Applicant)**

6. **Discussion and public hearing on an ordinance to amend the Farragut Municipal Code, Appendix A – Zoning, Chapter 2., Definitions, and Chapter 3., Specific District Regulations, to define and establish development criteria associated with drug treatment clinics or facilities and pain management clinics or facilities (Town of Farragut, Applicant)**

7. **Discussion and public hearing on an ordinance to amend the Farragut Municipal Code, Chapter 109 – Signs, by replacing it in its entirety (Town of Farragut, Applicant)**

8. **Discussion on a request to amend Appendix A – Zoning, Chapter 3., Specific District Regulations, Section XII., General Commercial District (C-1), B., 3., as it relates to the outdoor display and or storage of general farm implements and lawn care**

*It is the policy of the Town of Farragut not to discriminate on the basis of race, color, national origin, age, sex, or disability pursuant to Title VI of the Civil Rights Act of 1964, and other applicable state and federal laws. If you require accommodations due to a disability or special communication needs due to disabilities, please call 865-966-7057 in advance of the meeting.*

Case 3:23-cv-00402-TRM-JEM Document 6-23 Filed 11/11/23 Page 1 of 156 PageID #: 818

**equipment, riding lawn mowers, and related accessories (Farragut Lawn and Tractor, Applicant)**

9. **Discussion on the development of an aesthetic plan for new vertical utility infrastructure within public rights of ways (Town of Farragut, Applicant)**

10. **Approval of utilities**

11. **Citizen Forum**



**MINUTES**
**FARRAGUT MUNICIPAL PLANNING COMMISSION**

**May 21, 2020**

| **MEMBERS PRESENT** | **MEMBERS ABSENT** |
|---|---|
| Rita Holladay, Chairman | Noah Myers |
| Ed St. Clair, Vice-Chairman | |
| Ron Williams, Mayor | |
| Louise Povlin | |
| Scott Russ | |
| Jon Greene | |
| Rose Ann Kile | |
| Betty Dick | |
| Melanie Cionfolo | |

**Staff Representatives:** Mark Shipley, Community Development Director
Bart Hose, Assistant Community Development Director
David Smoak, Town Administrator
Trevor Hobbs, Assistant to the Town Administrator
Tom Hale, Town Attorney

This meeting was conducted through a remote Webex session due to Governor Lee's orders and the Knox County Health Department's orders regarding the COVID-19 pandemic.

Chairman Holladay called the meeting to order at 7 p.m. and provided background on why the meeting was being conducted through Webex and where it may be viewed.

1. **Approval of agenda**
   Staff recommended approval of the agenda as submitted.

   *A motion was made by Commissioner St. Clair to follow staffs' recommendation. Motion was seconded by Commissioner Kile and motion passed 8-0 through a roll call vote.*

2. **Approval of minutes – April 16, 2020**
   Staff recommended approval of the minutes as submitted.

   *Commissioner Povlin noted that she had seconded the motion on Agenda Item #3 and this action would need to be added to the minutes. With this correction, Commissioner Povlin moved to approve the minutes. Motion was seconded by Commissioner St. Clair and motion passed 8-0 through a roll call vote.*

It is the policy of the Town of Farragut not to discriminate on the basis of race, color, national origin, age, sex, or disability pursuant to Title VI of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990. Anyone requiring special accommodations due to disabilities, please call 865-966-7057 in advance of the meeting.

3. **Discussion and public hearing on a request for 5G fiber installation along portions of N. Campbell Station Road, Herron Road, Cottage Creek Subdivision, and portions of the Cove at Turkey Creek, Stonecrest, and Sweet Briar Subdivisions, and West End Avenue (Mastec, Contractor)**

Staff reviewed this item and recommended the following:
The fiber installation project being considered be divided into the following phased areas that will each require a separate right of way permit from the Town:

1. Herron Road and the Sweet Briar Subdivision
2. Stonecrest Subdivision and the Cove at Turkey Creek Subdivision
3. N. Campbell Station Road, Kingston Pike, Parkside Drive, and West End Avenue

Staff also recommended the following additional conditions for approval:

1. The requirement for a pre and post construction review of the phase area to identify potential conflicts, ensure one-calls have been completed, discuss locations for potholing, and review finished areas to ensure that they are restored to their pre-fiber installation condition.
2. Providing the Town and affected residents and businesses with the contact number for the supervisor in charge of the fiber installation.
3. Providing the Town staff and the Planning Commission with a copy of the public notification that will be given to affected residents and businesses, including an indication of when the project will begin and end and how the notification will be provided.
4. The posting of a letter of credit for the three project areas – the amount of the letter of credit will be determined by the Town Engineer.
5. Ensuring that Town staff is on site when work is initiated across the frontage of the Campbell Station Inn and Outdoor Classroom properties.
6. The approval of the fiber installation shall not constitute or imply approval of future small cell support tower sites. These tower sites will require a separate review and approval from the Planning Commission.
7. Ensuring that all street names and locations are correct. There are some errors in the documents noted on Pages 32, 53, and 56.
8. As-built locations for installed fiber shall be provided to the Town prior to Certificates of Completion being issued.

A long discussion ensued. Due to remaining incomplete field items, *Commissioner Povlin moved to postpone action on the request. Motion was seconded by Mayor Williams.* Comments were then made by the applicant and staff read comments into the record from citizens.

Based on statements made by the applicant and changes that would be needed to the applications under review, Town Attorney Tom Hale recommended that commissioners deny the application so that a new application and updated documents could be re-filed. *Commissioner Povlin moved to amend the original motion and to deny rather than postpone*

*action on this agenda item. Motion was seconded by Mayor Williams and motion passed 8-0 through a roll call vote.*

4. **Discussion and public hearing on a request for a text amendment to Appendix A – Zoning, Chapter 2. – Definitions, to define Art and Fitness Studio, and Chapter 3. – Specific District Regulations, Section XVII. – Office District (O-1), to modify permitted uses (Matthew McClanahan, Applicant)**
   Staff reviewed this item and recommended approval of Resolution PC-20-04 which recommends approval of Ordinance 20-06.

   *Motion made by Commissioner Povlin to follow staffs' recommendation. Motion was seconded by Commissioner Greene and motion 8-0 through a roll call vote.*

5. **Discussion on a request to rezone Parcel 019, Tax Map 162, 1013 McFee Road, 24.85 Acres, from Agricultural (A) to Open Space Mixed Residential Overlay (R-1/OSMR) (Rackley Engineering, Applicant)**
   For discussion purposes only.

6. **Discussion on a conceptual review of exterior building elevations and a typical street profile for the redevelopment of the old Kroger property, 11238 Kingston Pike (SITE Incorporated, Applicant)**
   For discussion purposes only.

7. **Discussion on a conceptual review of a site plan for 13036 and 13038 Kingston Pike, two Acres, Zoned C-1 (MBH, Inc., Applicant)**
   For discussion purposes only.

8. **Discussion on the development of zoning provisions governing pain management clinics and methadone treatment and similar drug/alcohol treatment clinics or facilities (Town of Farragut, Applicant)**
   For discussion purposes only.

9. **Discussion and public hearing on an ordinance to amend the Farragut Sign Ordinance (Town of Farragut, Applicant)**
   Staff reviewed this item and recommended approval of Resolution PC-20-02 which recommends approval of Ordinance 20-04. Commissioners identified a couple of clarifications that would be needed to the ordinance in relation to political signs and signs hanging within auto oriented business bays that are visible to the public. In addition, it was noted that the ordinance would be going to the Visual Resources Review Board (VRRB) the following week for their input.

   *A motion was made by Commissioner St. Clair to postpone action on Ordinance 20-04 so that staff could make the requested changes to the ordinance and incorporate input received from the VRRB. Motion was seconded by Mayor Williams and motion passed 8-0 through a roll call vote.*

10. **Approval of utilities**

No utilities were submitted for review.

**11. Citizen Forum**
No comments were provided for items not on the agenda.

The meeting was adjourned at 11:10 p.m.

_____
Rose Ann Kile, Secretary

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**　　Mark Shipley, Community Development Director

**SUBJECT:**　　Appointment of a youth representative for the next fiscal year

**INTRODUCTION AND BACKGROUND:**  This is the last Planning Commission meeting in the fiscal year.  Consequently, it is once again time to consider candidates that have applied to be the Youth Representative.

We have been very fortunate to have had Melanie Cionfolo as our representative the past twelve months.  Her attendance has been outstanding, and she has provided valuable insight on matters that have come before the Commission.  We greatly appreciate Melanie and the service she has provided and wish her much success as she pursues her professional career.

**DISCUSSION:**  This year, we have received applications from four candidates.  Three of the four have listed the Planning Commission as their top committee choice.  The applications are included in the packet.  A candidate will need to be selected so that they can begin their term in July.

**Print**

**Youth Representative Committee Application - Submission #5336**

**Date Submitted: 4/9/2020**

## Town of Farragut Youth Representative Committee Application

**First Name**

Austin

**Last Name**

Strobel

**Address1**

██████████

**Address2**

**City**

Knoxville

**State**

TENNESSEE

**Zip**

37922

**Phone Number**

████████

**Email**

██████████████

**Briefly describe your life goals/aspirations:**

Right now I am pursuing a college preparatory program at Farragut High School so that I can enter the Honors Program at University of Tennessee at Knoxville to obtain a Civil Engineering Bachelors degree. I will also minor in Spanish, as already as a Sophomore (10th grade) this year, I am in Advanced Placement (5th year) of Spanish. I think it will be important to be bilingual, so that I can do business with everyone. After my undergraduate, I am planning to obtain an MBA, but am not ruling out law school.

At Farragut, I am in the Math Honors Society, National Honor Society, National Spanish Honor Society, History Bowl/Geography Bee, Teens for Christ, and more. In order to prepare for an engineering degree, I plan on taking both semesters of Calculus in my junior year, and to complete all four college Physics courses offered before I graduate. I was doing very well in my Physics course before the school closure this year. I have done many sports, but these days, mostly do martial arts, fitness boxing, running and lifting.

Thanks very much for your consideration of my application. Respectfully, - Austin Strobel

## Which committees are you interested in serving:

Please select your first choice and second choice from the list below.

Youth Representatives serve a one-year term on the Arts and Beautification Committee, Farragut Museum Committee, Farragut Tourism / Visitor Advisory Committee, Parks and Athletics Council, Planning Commission, Stormwater Advisory Committee and the Visual Resources Review Board; Youth Representatives serve a two-year term on the Farragut Education Relations Committee.

**First Committee Choice:**

Planning Commission (3rd Thursday of each month at 7pm)                    ▼

**Second Committee Choice:**

Stormwater Advisory Committee (2nd Thursday of each month at 3:45pm)       ▼

**School**                                    **Grade level for the 2020-2021 School Year**

Farragut High School                          Junior                      ▼

**School Official or Sponsor Name**           **Phone Number**

Jake Gulledge                                 865-363-5675

**Please upload a letter of recommendation***

Austin Strobel Mr G Letter.pdf

# Farragut High School

**Principal**
Dr. John Bartlett

**Curriculum Principal**
Laicee Hatfield

*Established 1904*
11237 Kingston Pike, Knoxville, TN 37934
Phone 865.966.9775
Fax 865.671.7120

**Grade Level Administrators**

Steve Killian
Ryan Milani
Karey Lowdermilk
Brad Smith

April 1, 2020

To Whom It May Concern:

I am so pleased to recommend Austin Strobel as the youth representative for the Town of Farragut. Austin was in my Honors Geometry in the spring of 2018, and he is in Mu Alpha Theta, a math honors society, of which I am the head sponsor. He is one of the most well-rounded students I have had the pleasure of teaching, and I am always interested to hear about what Austin has discovered or is exploring next. He is respectful, well-spoken, and genuine. Austin is someone who truly loves learning for the sake of learning, and consequently has a broad exposure to many disciplines. I believe this would serve him well as the youth representative for the Town of Farragut, and I would be happy to answer any further questions you may have. I strongly encourage the selection committee to consider Austin as I know he will represent Farragut well.

Best,

Jake Gulledge
Math Teacher
Farragut High School
jakob.gulledge@knoxschools.org

**Print**

**Youth Representative Committee Application – Submission #5335**

**Date Submitted: 4/7/2020**

## Town of Farragut Youth Representative Committee Application

**First Name**
Dylan

**Last Name**
Carroll

**Address1**
███ ██ ███

**Address2**

**City**
Knoxville

**State**
TN

**Zip**
37934

**Phone Number**
████████

**Email**
███ █████████

**Briefly describe your life goals/aspirations:**

Throughout high school, I have contemplated many career fields from genetics to politics, but in every consideration, there has been one underlying goal: helping people. I have grown up in an Air Force family, witnessing both of my parents work tremendously hard so that I could enjoy my childhood and have opportunities they never had in their families. They have set me up for success in my life, but as a seventeen-year-old, now is the time for me to take on life by myself and prepare for what lies ahead. I want to succeed in life as they have, which is why I am seeking out opportunities such as the Town of Farragut Youth Representative Committee to better myself and my understanding of the world around me. I want to be able to enter the workforce one day, no matter my career choice, fully adept and experienced, ready to take on any challenge. As of now I hope to attend a university such as Vanderbilt, Clemson, Wake Forest, or Duke, among a few others and major in a topic such as Political Science, which will prepare me best for Law School. I wish to take that degree and use it to improve the community around me, perhaps in politics. There is no one path to success for me, but that in no way means I will not work tirelessly to pursue my main goal in life: helping people.

## Which committees are you interested in serving:

Please select your first choice and second choice from the list below.

Youth Representatives serve a one-year term on the Arts and Beautification Committee, Farragut Museum Committee, Farragut Tourism / Visitor Advisory Committee, Parks and Athletics Council, Planning Commission, Stormwater Advisory Committee and the Visual Resources Review Board; Youth Representatives serve a two-year term on the Farragut Education Relations Committee.

### First Committee Choice:
Planning Commission (3rd Thursday of each month at 7pm)                                          ▼

### Second Committee Choice:
Parks and Athletics Council (2nd Tuesday of each month at 7pm)                          ▼

### School
Knoxville Catholic High School

### Grade level for the 2020-2021 School Year
Senior                                          ▼

### School Official or Sponsor Name
Trish O'Brien

### Phone Number
8659196467

### Please upload a letter of recommendation*
Town of Farragut YR Committee
.docx



**KNOXVILLE CATHOLIC HIGH SCHOOL**
9245 Fox Lonas Road
Knoxville, Tennessee

P: (865)560-0313   F: (865)560-0314
knoxvillecatholic.com

---

**LETTER OF RECOMMENDATION FOR DYLAN CARROLL**
**TOWN OF FARRAGUT YOUTH REPRESENTATIVE COMMITTEE**

Dear Esteemed Colleague:

I have had the distinct pleasure of teaching Dylan Carroll for the past two years. Dylan is one of the most enthusiastic and involved members of my class, and his participation and contributions to our daily lessons are invaluable.

When I first met Dylan in his sophomore year in my Spanish 3 Honors class, he was the outspoken young man among a group of mostly quiet young ladies. However, it didn't take long for him to become the leader of the group adding so much excitement and humor to our 8am class. This year in Spanish 4 Honors, Dylan has continued to be the constant motivator, uplifter, and comic relief. Dylan is well known in our student population and is a friend to all and a leader among his peers. He balances his time amazingly well among his academics, sports, school life and social life and is a delightful, well-rounded young man.

Dylan's desire to learn is astounding and inspiring. He is learning Spanish at an incredible pace and speaks only Spanish with me most of the time. He often spends his breaks with me asking questions about more advanced grammar concepts or topics of Latin American history. I couldn't be more pleased to have the opportunity to teach Dylan again in the coming school year in my Advanced Placement Spanish class. I am confident that Dylan will again be at the top of his class. I also have the opportunity to be the monitoring teacher of Dylan's study hall class in which I observe him daily helping his peers. He is the go-to Calculus tutor for so many students. If he's not tutoring in Calculus or Spanish, he is leading the study group for his AP US History class or proofreading his peers' English essays. Dylan has a kind, helpful heart and never shies away from an opportunity to learn something new or help someone in need.

Dylan would be a wonderful addition to your board. He is self-motivated and determined with a ready eagerness to learn and serve. Dylan is a joy to teach and I am confident he will serve you well in the duties of the Town of Farragut Youth Representative Committee.

Sincerely,

*Trish O'Brien*

Trish O'Brien
Spanish Teacher
trish.o'brien@knoxvillecatholic.com
(865)919-6467

**Print**

**Youth Representative Committee Application – Submission #5355**

**Date Submitted: 5/22/2020**

## Town of Farragut Youth Representative Committee Application

**First Name**

Jack

**Last Name**

Hollis

**Address1**

██████████████

**Address2**

**City**

Knoxville

**State**

Tennessee

**Zip**

37934

**Phone Number**

████████

**Email**

███████████████

**Briefly describe your life goals/aspirations:**

I always try to do my best to help others and make sure they are well. I'm a friend who people can count on and trust with practically anything. When I'm older I want to graduate The University of Tennessee with a Nursing Degree. After that I want to join either the US Navy it US Air Force after college. I would love to serve the country that i respect and love so much.

## Which committees are you interested in serving:

Please select your first choice and second choice from the list below.

Youth Representatives serve a one-year term on the Arts and Beautification Committee, Farragut Museum Committee, Farragut Tourism / Visitor Advisory Committee, Parks and Athletics Council, Planning Commission, Stormwater Advisory Committee and the Visual Resources Review Board; Youth Representatives serve a two-year term on the Farragut Education Relations Committee.

**First Committee Choice:**

Planning Commission (3rd Thursday of each month at 7pm)                                                ▼

**Second Committee Choice:**

Parks and Athletics Council (2nd Tuesday of each month at 7pm)                    ▼

**School**                                              **Grade level for the 2020-2021 School Year**

Farragut High School                                    Senior                                          ▼

**School Official or Sponsor Name**                     **Phone Number**

Angela Breeding

**Please upload a letter of recommendation**

Choose File   No file chosen

**Print**

**Youth Representative Committee Application - Submission #5358**

**Date Submitted: 5/28/2020**

## Town of Farragut Youth Representative Committee Application

**First Name**

Audrey

**Last Name**

Richards

**Address1**

██████ ████

**Address2**

**City**

Lenoir City

**State**

Tennessee

**Zip**

37772

**Phone Number**

██████

**Email**

████████████

**Briefly describe your life goals/aspirations:**

My ultimate goal in life is to live in alignment with the popular quote by Gandhi stating " The best way to find yourself is to lose yourself in the service of others." Although I am not certain of what the future holds, I know that I want my life to be centered around service.

In the future, I hope to become a trauma surgeon for Doctors Without Borders. Doctors Without Borders allows for the experience of a lifetime as it facilitates hands on help to those who need it most internationally. I would love to have the opportunity to help the amazing people that live in this world that don't have consistent access to health care.

Additionally, I hope to research how to make the health care industry more environmentally friendly. The health care industry is said to contribute to 10% of the United States's carbon emissions. I think the situation surrounding Covid-19 has brought light to the necessity of disposable products in medical facilities (disposable gloves, disposable masks, disposable sterilization pouches, and more). This showcases the need for alternative solutions that provide inexpensive, excellent patient care while not producing landfill waste and greenhouse gas emission.

Although I aspire to be a trauma surgeon helping the environment and people, I know the future is uncertain. Overall, my goals and aspirations in life are to help people and the world whether this be on the large- international scale or the simplicity of every day act of kindness.

## Which committees are you interested in serving:

Please select your first choice and second choice from the list below.

Youth Representatives serve a one-year term on the Arts and Beautification Committee, Farragut Museum Committee, Farragut Tourism / Visitor Advisory Committee, Parks and Athletics Council, Planning Commission, Stormwater Advisory Committee and the Visual Resources Review Board; Youth Representatives serve a two-year term on the Farragut Education Relations Committee.

### First Committee Choice:

Stormwater Advisory Committee (2nd Thursday of each month at 3:45pm)                                          ▼

### Second Committee Choice:

Planning Commission (3rd Thursday of each month at 7pm)                                                                ▼

### School

Farragut High School

### Grade level for the 2020-2021 School Year

Senior                                                                                                                                          ▼

### School Official or Sponsor Name

Elizabeth Blankenship

### Phone Number

8659669775

### Please upload a letter of recommendation

Audrey Richards letter 2.docx

**Principal**
**Dr. John Bartlett**

**Curriculum Principal**
**Laicee Hatfield**



**Established 1904**
**11237 Kingston Pike, Knoxville, TN 37934**
**Phone 865.966.9775**
**Fax 865.671.7120**

**Grade Level Administrators**

**Steve Killian**
**Ryan Milani**
**Karey Lowdermilk**
**Brad Smith**

May 12, 2020

To Whom It May Concern:

Audrey Richards has asked me to write to you on her behalf for Town of Farragut Storm-water Advisory Committee position and I am happy to comply. I am aware that Audrey held this position this past year and am excited for her to continue with this program which she so enjoyed.

I have had the pleasure of knowing Audrey throughout her life and have had the opportunity to watch her grow and mature into the amazing young lady she is today. Audrey is an amazing leader, she has served as a class representative to secretary of the eighty-member organization as a sophomore, and this past year as a junior, she served as president of the organization and the student body. Audrey is only the second junior to hold this position in the history of the organization. This speaks volumes that her peers who elected her see and value her leadership skills. To watch Audrey work is really something special, she is confident without being arrogant, she is kind, she is open to ideas and leads by example. She has learned this year the importance of dividing tasks and sharing responsibility and that asking for help is not a sign of weakness but one of leadership. Whatever Audrey is doing others want to be a part of and willing extend their service to the cause. Audrey was just recently re-elected for a second term by her peers, she is just that good!

Audrey, is very driven to do her best not just for herself but for Farragut High School and our community. She realizes that there is more FHS SGA can do than just serve the school. She encourages our student body to look outside of just our needs and to give to others as evidence in our annual food drive for the Love Kitchen. She desires there to be greater connection between the school and our community and is already working on ideas for this fall for us to reach out after this most trying time we are all experiencing.

Audrey is a student leader in every way possible. I urge you to give her your utmost consideration for this experience, to expand what are already amazing skills into unbelievable skills.

Sincerely,


Elizabeth Blankenship
Instructor of Social Studies
Sponsor of Farragut High Student Government Association

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**      Bart Hose, Assistant Community Development Director

**SUBJECT:**      Discussion and public hearing on a request for a variance from the distance between driveways requirement for arterial streets as provided for in the Driveways and Other Accessways Ordinance in relation to a conceptual site plan for 13036 and 13038 Kingston Pike, two Acres, Zoned C-1 (MBH, Inc., Applicant)

**INTRODUCTION AND BACKGROUND:**  This item involves a variance request from the Town's Driveways and Other Accessways Ordinance.   Specifically, the applicants are requesting an approximately 214-foot variance from the typical 400-foot separation requirement for driveways along Arterial Streets.  As you know, the Planning Commission discussed a development concept plan and related access issues for the property at its last meeting.  The property in question consists of two existing lots located immediately to the east of the Dixie Lee Wines & Liquor property and to the north of the Cool Sports Icearium property.  The lots front on Kingston Pike and the developers are proposing one main shared entrance drive off Kingston Pike with cross-lot connectivity to both the Dixie Lee Liquor site and the Icearium property.  The cross-lot access provisions will provide indirect vehicular and pedestrian access to S. Watt Road through each of those sites.

**DISCUSSION:**  The applicants have been discussing the proposed access plan with the Town Engineer and have now provided a revised concept that includes a right-out only turn concept (see attached illustration).  The right-out only turn concept is intended to lessen the potential for stacking and turning movement conflicts in the existing center turn lane along Kingston Pike.  The Town Engineer supports the change as an improvement to the original proposal.

The applicants also note that they are attempting to align the proposed shared access drive with the access to a flag lot that they own and control on the north side to Kingston Pike.  They propose that the location of the flag lot access is the most logical location for a future access point for the three lots located across from the subject property, but they also note that these lots are owned by unrelated parties.  As previously noted by staff, this could present future access issues for the two lots located on either side of the flag-lot.  In effect, all three of the lots on that side of Kingston Pike would have to share the same common access point without there being additional variances granted for the two other lots.  This issue should be discussed with those property owners and appropriate easement provisions made to support it.

Finally, it should be noted that the request only involves the requested access variance.  The owners/developers will need to submit and obtain approval for full site plan before any development can take place.

**RECOMMENDATION:** The Town Engineer has reviewed the proposal, and while not recommending the variance and access plan (per se), views it as a workable compromise given the situation. The staff would also recommend that the applicants be required to coordinate with the lots on either side of their flag lot across Kingston Pike to ensure that any future driveway is properly aligned with the proposed driveway and is accessible to all three lots. This would include the provision of appropriate shared access easements to facilitate said alignment.



SHOPS
7,000 SF
23 SPACES

HORNE PROPERTIES, INC.

SHOPS
6,400 SF
36 SPACES

KINGSTON PIKE

WALLER PROPERTIES, LLC

COOL SPORTS, LLC

CONCEPTUAL SITE PLAN
Scale: 1" = 30'-0"

GRAPHIC SCALE

( IN FEET )
1 inch = 30 ft.

GBS engineering

1313 Kalmia Road
Knoxville, TN 37909
Phn: 865.566.0185
Fax: 888.485.7005

| REV | DESCRIPTION | BY | DATE |
|-----|-------------|-----|------|
| A | Revised per TOF Comments | THF | 06/05/2020 |
| - | -- | - | - |
| - | -- | - | - |
| - | -- | - | - |
| - | -- | - | - |

PROJECT NAME: 13036 & 13038 Kingston Pike
DRAWING TITLE: Conceptual Site Plan
LOCATION: 13036 & 13038 Kingston Pike
Farragut, TN 37934
CLT Map 151, Parcel No. 084.01 & 085

Owner: Myers Bros. Holdings

| DRAWN BY: | THF |
| CHECKED BY: | MAB |
| FILE NAME: | FileName |
| JOB NUMBER | JobsNo |
| ISSUE DATE: | 06/04/2020 |

SHEET NO:
CSP1

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**     Mark Shipley, Community Development Director

**SUBJECT:**     Discussion and public hearing on a request to rezone Parcel 019, Tax Map 162, 1013 McFee Road, 24.85 Acres, from Agricultural (A) to Open Space Mixed Residential Overlay (R-1/OSMR) (Rackley Engineering, Applicant)

**INTRODUCTION AND BACKGROUND:** This was discussed as a workshop item last month and involves the Gibson farm property that is south of the parcel that is immediately south of McFee Park on the west side of McFee Road. The property is currently zoned Agricultural (A). Due to the presence of a major overhead transmission line easement that runs horizontally through the property and a drainageway along the western portion of the property, the applicant is asking for a rezoning to the Open Space Mixed Residential Overlay (R-1/OSMR) Zoning District. This is the same zoning district as the Cottages at Pryse Farms on the east side of McFee Road just north of McFee Park.

**DISCUSSION:** As discussed last month, the OSMR District permits both attached and detached single family but the overall density is the same as the standard Open Space Residential (OSR) District which permits only detached single family. The density is based on the Rural Residential (R-1) Zoning District, which provides for a 20,000 square foot minimum lot size. The OSR is a much more common district and includes a number of newer developments throughout the Town, including Bridgemore, Sheffield, Brass Lantern, and Brookmere – all of which are located in the general area.

In the case of the Gibson farm property, the total number of permitted dwelling units (attached and detached) would be 54. From the applicant's perspective, the large overhead utility line and associated 100-foot easement divides the property and makes it more beneficial to be able to cluster the attached portion of the development in a smaller area that can be separated from the detached portion of the development. Though not part of the rezoning consideration, staff will recommend that any development on this property provide for walking trail and vehicular connections to abutting properties. Unlike the Brass Lantern property north of McFee Park, the tracts abutting the Gibson farm property have not yet been developed and there are opportunities for cross parcel pedestrian and vehicular connections.

A few months ago, the McFee Road corridor south of McFee Park was the subject of a public workshop where input was provided with regards to the future of this portion of Town. The predominant recommendation was that the future land use map show most of the area, including the property that is the subject of this rezoning request, as Open Space Cluster Residential. Both the OSR and the OSMR Districts would be consistent with this land use designation.

During the workshop session, staff noted that a consideration concerning the OSR vs. the OSMR is that this is generally a rural area (hence the current zoning of Agricultural) and is the more-dense form of an attached development appropriate for this area or would an OSR Zoning District be a better fit? If this property were rezoned to OSMR, would it make it more likely that other properties in the area would also

be rezoned for attached single-family developments?  Again, the density would not be affected.  It would be more of a form-based or bulk consideration and whether this is appropriate for the general area.

**RECOMMENDATION:**   Staff has prepared Resolution PC-20-06 which recommends approval of Ordinance 20-10, an ordinance to rezone the property at 1013 McFee Road from Agricultural (A) to Open Space Mixed Residential Overlay (R-1/OSMR).

**RESOLUTION PC-20-06**

**FARRAGUT MUNICIPAL PLANNING COMMISSION**

**A RESOLUTION TO APPROVE AN AMENDMENT TO THE FARRAGUT ZONING MAP, ORDINANCE 86-16, TO RECOMMEND THE APPROVAL OF THE REZONING OF PARCEL 019, TAX MAP 162, 1013 MCFEE ROAD, FROM AGRICULTURAL (A) TO OPEN SPACE MIXED RESIDENTIAL OVERLAY (R-1/OSMR)**

   **WHEREAS**, the <u>Tennessee Code Annotated</u>, Section 13-4-201et seq, provides that the Municipal Planning Commission shall make and adopt a general plan for the physical development of the municipality; and

   **WHEREAS**, the Farragut Municipal Planning Commission has adopted various elements of a zoning plan as an element of the general plan for physical development; and

   **WHEREAS**, a public hearing was held on this request on June 18, 2020;

   **NOW, THEREFORE, BE IT RESOLVED** that the Farragut Municipal Planning Commission hereby recommends approval of Ordinance 20-10 to the Farragut Board of Mayor and Aldermen, an ordinance amending the Farragut Zoning Ordinance and Map, Ordinance 86-16, by rezoning the above noted property.

   ADOPTED this 18th day of June 2020.


_____
Rita Holladay, Chairman


_____
Rose Ann Kile, Secretary

| | |
|---|---|
| **ORDINANCE:** | **20-10** |
| **PREPARED BY:** | **Hose/Shipley** |
| **REQUESTED BY:** | **Town of Farragut** |
| **CERTIFIED BY FMPC:** | **June 18, 2020** |
| **PUBLIC HEARING:** | _____ |
| **PUBLISHED IN:** | _____ |
| **DATE:** | _____ |
| **1ST READING:** | _____ |
| **2ND READING:** | _____ |
| **PUBLISHED IN:** | _____ |
| **DATE:** | _____ |

**AN ORDINANCE AMENDING THE ZONING ORDINANCE OF THE TOWN OF FARRAGUT, TENNESSEE, ORDINANCE 86-16, AS AMENDED, PURSUANT TO SECTION 13-4-201, <u>TENNESSEE CODE ANNOTATED</u>.**

**BE IT ORDAINED** by the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, that the Farragut Zoning Ordinance, Ordinance 86-16, as amended, is hereby amended as follows:

**SECTION 1.**

The Farragut Zoning Ordinance, Ordinance 86-16, as amended, is hereby amended by rezoning Parcel 019, Tax Map 162, said property being located at 1013 McFee Road and including approximately 24.85 acres, from Agricultural (A) to Open Space Mixed Residential Overlay (R-1/OSMR (See Exhibit A).

**SECTION 2.**

This ordinance shall take effect from and after its final passage and publication, the public welfare requiring it.

_____
Ron Williams, Mayor


_____
Allison Myers, Town Recorder

Case 3:23-cv-00402-TRM-JEM   Document 6-23   Filed 11/11/23   Page 25 of 156   PageID #: 842

Certified to the Farragut Board of Mayor and Aldermen this _____ day of _____, 2020, with approval recommended by the Farragut Municipal Planning Commission (FMPC).


_____
Rita Holladay, Chairman


_____
Rose Ann Kile, Secretary



**Exhibit A**
**Ordinance 20-10**

**Rezone**
**Parcel 19**
**Tax Map 162**
**1013 McFee Road**

From
A  (Agricultural)

to

R-1/OSMR (Rural Single-Family
Residential/Open Space Mixed
Residential Overlay)

**Legend**

| | |
|---|---|
| ▢ | Subject Property |
| ▬▬ | Town Limit |
| — | Streets |
| ▢ | Parcels |
| ▢ | A, Agricultural |
| ▢ | OS-P, Open Space/Park |
| ▢ | R-1, Rural Single-Family Residential |
| ▢ | R-2, General Single-Family Residential |
| ▨ | R-1/OSR, Open Space Residential Overlay |
| ▨ | R-1/OSMR, Open Space Mixed Residential Overlay |



1 in = 400 ft



OSR

OSMR

OS-P

R-2

A to R-1/OSMR

McFEE RD

R-1

A

BOYD STATION RD

Document Path: G:\Farragut\Map Documents\2020\Rezoning map McFee Rd.mxd

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**    Bart Hose, Assistant Community Development Director
                    Trevor Hobbs, Assistant to the Town Administrator

**SUBJECT:**    Discussion and public hearing on an ordinance to amend the Farragut Municipal Code, Appendix A – Zoning, Chapter 2., Definitions, and Chapter 3., Specific District Regulations, to define and establish development criteria associated with drug treatment clinics or facilities and pain management clinics or facilities (Town of Farragut, Applicant)

**INTRODUCTION AND BACKGROUND:**  As you know and in response to community concerns, staff has been asked to prepare zoning amendments for the regulation of pain management clinics and outpatient (office based) drug treatment clinics.  Separating such uses from schools, parks, and other places where children are likely to congregate is a particular concern within the community.

The Town's current zoning ordinance does not specifically define such uses or make any distinction between types of medical facilities.  Because of this, pain management clinics and drug treatment clinics would fall within the broader "Medical, dental, and veterinary facilities" use category listed as a permitted use within most of the Town's commercial, business, and office related zoning districts.  In addition, there are no additional location or separation requirements applied to these uses under the current zoning ordinance.

The issue and proposed regulatory approaches have been discussed with the Board of Mayor and Aldermen in March and with the Planning Commission at both its April and May meeting.  These discussions have addressed treatment facility type definitions, separation distances from identified community facilities, and the most appropriate zoning district(s) location for both pain management and drug treatment clinics within the Town.

Based on the input received, staff has prepared Ordinance 20-08 and Planning Commission Resolution 20-05 to amend the Town's Zoning Ordinance and better address the regulation of pain management clinics and drug treatment facilities (see attached).  The proposed ordinance provides specific definitions for both a Drug Treatment Clinic or Facility, and a Pain Management Clinic or Facility.  It also clarifies the Town's existing zoning definition for a Medical, Dental, or Veterinary Clinic or Facility.  The ordinance also restricts both drug treatment and pain management clinics or facilities to the C-2, Regional Commercial District, and it provides for a number of related development criteria that must be met before any such facility is established.  This includes a minimum 1000-foot separation requirement from any public or private school, zoning regulated child-care facility, public library, and community center or public park.

**RECOMMENDATION:** Consider adoption of Resolution PC-20-05 which recommends approval of Ordinance 20-08, an ordinance to amend the text of the Farragut Zoning Ordinance, Ordinance 86-16, as amended, pursuant to authority granted by Section 13-4-201, Tennessee Code Annotated, by amending Chapter 2., Definitions, to define Drug Treatment Clinic or Facility, Medical, Dental, or Veterinary Clinic or Facility, and Pain Management Clinic or Facility, and amending Chapter 3., Specific District Regulations, Section XV. – Regional Commercial District (C-2) to add, as permitted uses, Drug Treatment and Pain Management Clinics or Facilities.

**RESOLUTION PC-20-05**


## FARRAGUT MUNICIPAL PLANNING COMMISSION


**A RESOLUTION TO AMEND THE TEXT OF THE FARRAGUT ZONING ORDINANCE, ORDINANCE 86-16, AS AMENDED, PURSUANT TO AUTHORITY GRANTED BY SECTION 13-4-201, TENNESSEE CODE ANNOTATED, BY AMENDING CHAPTER 2., DEFINITIONS, TO DEFINE DRUG TREATMENT CLINIC OR FACILITY, MEDICAL, DENTAL, OR VETERINARY CLINIC OR FACILITY, AND PAIN MANAGEMENT CLINIC OR FACILITY, AND AMENDING CHAPTER 3., SPECIFIC DISTRICT REGULATIONS, SECTION XV. – REGIONAL COMMERCIAL DISTRICT (C-2) TO ADD, AS PERMITTED USES, DRUG TREATMENT AND PAIN MANAGEMENT CLINICS OR FACILITIES.**



**WHEREAS**, the <u>Tennessee Code Annotated</u>, Section 13-4-201et seq, provides that the Municipal Planning Commission shall make and adopt a general plan for the physical development of the municipality; and

**WHEREAS**, the Farragut Municipal Planning Commission has adopted various elements of a zoning plan as an element of the general plan for physical development; and

**WHEREAS**, a public hearing was held on this request on June 18, 2020;

**NOW, THEREFORE, BE IT RESOLVED** that the Farragut Municipal Planning Commission hereby recommends approval to the Farragut Board of Mayor and Aldermen of an ordinance, amending Ordinance 86-16, of the Farragut Zoning Ordinance, by adding Ordinance 20-08.

ADOPTED this 18st day of June 2020.


_____
Rita Holladay, Chairman


_____
Rose Ann Kile, Secretary

| ORDINANCE: | **20-08** |
|---|---|
| **PREPARED BY:** | **Hobbs/Hose** |
| **REQUESTED BY:** | **Staff** |
| **1ST READING:** | |
| **2ND READING:** | |
| **PUBLISHED IN:** | _____ |
| **DATE:** | _____ |

**AN ORDINANCE TO AMEND THE TEXT OF THE FARRAGUT ZONING ORDINANCE, ORDINANCE 86-16, AS AMENDED, PURSUANT TO AUTHORITY GRANTED BY SECTION 13-4-201, TENNESSEE CODE ANNOTATED, BY AMENDING CHAPTER 2., DEFINITIONS, TO DEFINE DRUG TREATMENT CLINIC OR FACILITY, MEDICAL, DENTAL, OR VETERINARY CLINIC OR FACILITY, AND PAIN MANAGEMENT CLINIC OR FACILITY, AND AMENDING CHAPTER 3., SPECIFIC DISTRICT REGULATIONS, SECTION XV. – REGIONAL COMMERCIAL DISTRICT (C-2) TO ADD, AS PERMITTED USES, DRUG TREATMENT AND PAIN MANAGEMENT CLINICS OR FACILITIES.**

**WHEREAS,** the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, wishes to amend Chapter 2, Definitions, and Chapter 3, Specific District Regulations, of the Farragut Zoning Ordinance, Ordinance 86-16,

**NOW, THEREFORE, BE IT ORDAINED** by the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, that the Farragut Zoning Ordinance is hereby amended as follows:

**SECTION 1.**

The Farragut Municipal Code, Appendix A, Zoning, Chapter 2, Definitions, is amended by adding the following definitions:

*Drug Treatment Clinic or Facility:* A facility licensed by the State for the counseling of patients and/or the issuing of a prescription for methadone, suboxone, or similar medications, in the treatment, maintenance, and/or detoxification of persons, for outpatient, non-residential purposes only.

*Medical, Dental, or Veterinary Clinic or Facility*: A facility operated by one or more physicians, dentists, chiropractors, psychiatrists, physiotherapists, other licensed practitioners of the healing arts, or veterinarians for the examination and treatment of persons solely on an outpatient basis, or for the examination and treatment of their pets and animals. Medical/dental offices/clinics also include alternative medicine clinics, such as acupuncture and holistic therapies, and physical therapy offices for physical rehabilitation. Urgent care facilities, and "minute clinics" are considered medical/dental offices/clinics. This term shall not include drug treatment or pain management clinics or facilities, as defined herein.

*Pain Management Clinic or Facility:* A privately-owned facility in which a medical doctor, an osteopathic physician, an advanced practice nurse, and/or a physician assistant provides pain management services to patients, a majority of whom are issued a prescription for opioids, benzodiazepine, barbiturates, or carisoprodol, or similar medications, for more than ninety (90) days in a twelve (12) month period. A pain management clinic does not include:

1. A medical or dental school, an osteopathic medical school, a nursing school, a physician assistant program or an outpatient clinic associated with any of the foregoing schools or programs;
2. A hospital as defined in T.C.A § 68-11-201, including any outpatient facility or clinic of a hospital;
3. Hospice services ad defined in T.C.A. § 68-11-201;
4. A nursing home as defined in T.C.A. § 68-11-201;
5. A facility maintained or operated by the state government; or
6. A hospital or clinic maintained or operated by the federal government.

**SECTION 2.**

The <u>Farragut Municipal Code</u>, Appendix A, Zoning; Chapter 3, Specific Zoning Regulations; Section XV, Regional Commercial District (C-2); Subpart B, Permitted Principal and Accessory Uses and Structures, is amended by adding item 18 as follows:

18. Drug Treatment, and Pain Management Clinics or Facilities, provided the following development criteria are met:

    1. The approval by the Town of a pain management or drug treatment clinic or facility shall be contingent upon the receipt of the appropriate license and certificate of need by the State of Tennessee Department of Health or Department of Mental Health and Substance Abuse.

    2. Applicants seeking approval of a pain management or drug treatment clinic or facility shall provide written documentation that the Knox County Sheriff's Department has been notified in writing regarding the facility's proposed location, hours of operation, programs and treatment methods offered, and staffing levels and qualifications.

    3. The clinic or facility shall not be located within one thousand (1,000) feet of any public or private school, child-care facility as regulated in Chapter 4, public library, community center or public park, as measured from property line to property line.

    4. For newly constructed free-standing facilities, off-street parking shall be provided for the facility at a rate of five (5) spaces per one thousand (1,000) square feet of clinic floor area.

    5. The facility shall see patients on the basis of appointments only.

6. The clinic or facility shall have its own separate and exclusive exterior public entrance to the building.

**SECTION 3.**

This ordinance shall take effect from and after its final passage and publication, the public welfare requiring it.

_____
Ron Williams, Mayor


_____
Allison Myers, Town Recorder


Certified to the Farragut Board of Mayor and Aldermen this _____ day of _____, 2020, with approval recommended.

_____
Rita Holladay, Chairman


_____
Rose Ann Kile, Secretary

**FARRAGUT MUNICIPAL PLANNING COMMISSION**

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**     Mark Shipley, Community Development Director

**SUBJECT:**     Discussion and public hearing on an ordinance to amend the Farragut Municipal Code, Chapter 109 – Signs, by replacing it in its entirety (Town of Farragut, Applicant)

**INTRODUCTION AND BACKGROUND:**  This item was reviewed last month, and Commissioner Greene asked that the ordinance more specifically reference how campaign signs were being address and Commissioner Dick asked about addressing signs mounted internal to the bays at auto oriented businesses. In addition, staff noted that the ordinance would be going to the Visual Resources Review Board (VRRB) for their consideration on May 26.

As a result, the Commission voted to postpone action on the ordinance so that the staff could make the requested changes and address any comments provided by the VRRB.

**DISCUSSION:**  At the VRRB meeting on May 26, the Board recommended approval of Ordinance 20-04 with a request that the staff re-visit the sign height provisions for primary permanent ground mounted signs for single-use non-residential developments.  Specifically, unlike the provisions for multiple-use non-residential developments, the overall height for single-use development ground mounted signs was not changed from the six-foot maximum even though such signs would also be required to have a minimum two-foot visible base to enhance compatibility with the associated building.

Staff noted that the overall height was increased for multiple-use developments due to the additional information that could be included on such signs.  The VRRB asked that the height provisions be more consistent between single-use and multiple-use developments with the sign area still being larger for the multiple-use developments to accommodate tenant listings.

As a result, in addition to the changes requested by the Planning Commissioners on May 21, staff has modified the height related provisions for primary permanent ground mounted signs for single-use non-residential developments to follow the same language used for multiple-use non-residential developments. This would mean that if such signs were at a 20-foot setback, both single-use and multiple-use ground mounted signs could be up to 7.66 feet (92 inches) in overall height with an additional 18 inches permitted to include required address numbers and their framing.

The changes requested by the Planning Commission and the VRRB are shown in BLUE on the "Sign Ordinance Copy June 18 FMPC" document which shows where all changes have been made. Ordinance 20-04 has also been updated to reflect the suggested changes.

**RECOMMENDATION:**  Staff recommends approval of Resolution PC-20-02 which recommends approval of Ordinance 20-04.

# General Framework for Content Neutral Sign Ordinance
## (Version 7 – Sign Ordinance Copy June 18 FMPC)

Review legend:    Areas highlighted in blue represent changes that were made in response to input provided at the May 21 Planning Commission meeting and the May 26 Visual Resources Review Board meeting. Areas in red reflect new or otherwise modified provisions from earlier drafts that have now been vetted through previous reviews.

## Section 109-1.  Authority.

*Remain the same as currently worded but moved to the beginning of the ordinance.*

This chapter shall be known as the "Sign Ordinance of the Town of Farragut, Tennessee." This chapter is adopted under the authority granted by T.C.A. § 6-2-201.

## Section 109-2.  Purpose, Intent, and General Scope.

*This section is proposed to be replaced with the following that specifically addresses content.  The section has also been moved to the second section of the ordinance:*

(a) The purpose and intent of this chapter is the following:

   (1) Regulate the number, location, size, type, illumination, and other physical characteristics of signs within the Town in order to promote the public health, safety and welfare.
   (2) Maintain, enhance, and improve the aesthetic environment of the Town by preventing visual clutter.
   (3) Improve the visual appearance of the Town while providing for effective means of communication, consistent with constitutional guarantees.
   (4) Avoid signage that is a threat to safety due to its placement and other physical characteristics.
   (5) Ensure the safe construction and maintenance of signs, and
   (6) Support businesses in the Town by providing for fair and consistent sign allocations and enforcement of the sign regulations set forth herein.

(b) This ordinance is not intended to regulate the message on any sign, any building design, any display not defined as a sign, or any sign which cannot be viewed from outside a building.

## Section 109-3.  Provisions declared to be minimum requirements.

1

*Remain the same as currently worded.*

The provisions of this chapter are considered to be minimum requirements. Wherever there is a discrepancy between the minimum standards noted in this chapter and those contained in any other lawfully adopted regulation or ordinance of the town, the strictest standard shall apply.

## Section 109-4. Severability.

*This section has been added in the event that some aspect of the sign ordinance is challenged and found invalid.*

If any section, subsection, sentence, clause, or phrase of this chapter is for any reason held to be invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance.

## Section 109-5. Substitution.

*This section has been added to avoid claims that an ordinance favors commercial signs over noncommercial messages.*

Signs containing noncommercial speech are permitted anywhere that advertising or business signs are permitted, subject to the same regulations applicable to such signs.

## Section 109-6. Definitions.

*Many of the terms in the current sign ordinance are content based. As a result, this section has been mostly replaced. This section has also been moved from the beginning of the ordinance to a more logical location.*

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Abandoned sign* means any sign, including its supporting structure, erected in conjunction with a particular use, for which the use has been discontinued for a period of 90 days or more, or a lawfully erected temporary sign for which the time period allowed for display of the sign has expired.

*Architectural compatibility* means visual harmony and consistency with regard to color, building/sign materials, style, mounting, and illumination.

*Athletic field* means a piece of land designed, approved, and dedicated for playing a game.

2

*Banner sign* means any sign of flexible lightweight material that allows movement caused by wind. A flag, as defined herein, shall not be considered a banner sign.

*Changeable copy sign* means any sign where letters or numbers displayed on the sign are designed to be changed frequently to display different messages.

*Dilapidated sign* means a sign that is in a bad, unsafe, or unsightly condition due to neglect or misuse.

*Flag* means a fabric sign of a non-commercial nature with a distinctive color and design that is used as an emblem, standard, decoration, or symbol and that is hoisted on a permanent freestanding flagpole or mounted with a pole attached to a building.

*Freestanding sign* means a sign that is either anchored in the ground or secured so that it is not subject to being moved by wind and that is independent of any building.

*Freestanding building frontage sign* means a non-illuminated sign of a solid material with copy that is meant to be readable only to a pedestrian and that is placed near the front of a building.

*Gas pump signs* means permanent signs, including Federally required safety information, adhered to a gas pump island and reviewed through a sign permit process.

*Ground-mounted sign* means a sign erected on a freestanding frame and not attached to any building. Such signs may be two-sided, provided that both sides cannot be seen simultaneously from any point. Such signs have a solid base with no exposed poles.

*Interior accessory freestanding sign* means a sign permitted interior to a development and not meant to be readable from a public street, public access easement, or adjacent property.

*Interstate/interchange pole sign* means a sign permitted near the interstate interchange as stipulated in this ordinance.

*Legibility* means how easy a sign is to read. This is based on the characteristics of letters, numbers, and characters that make it possible to differentiate one from another.

*Manual on Uniform Traffic Control Devices (MUTCD)* means the manual produced by the Federal Highway Administration that addresses three specific types of signs: guide, warning, and directional. The manual includes minimum size, height, and placement standards to achieve readability and prevent traffic accidents.

*Non-commercial* means not naming, advertising, or calling attention to a business or commercial product, service, or activity.

*Normal maintenance* means replacing lights, painting, staining, repairing a damaged element of a sign, or replacing a sign face that has faded over time with

3

exposure to the elements with an identical sign face. Normal maintenance shall not include any other modifications to a sign.

*Peripheral accessory freestanding sign* means a sign permitted near the entrance and exit points to a development.

*Permanent ground mounted subdivision sign* means a permanent sign permitted near the entrance to a subdivision.

*Permanent parcel sign* means a wall mounted sign permitted on a principal dwelling unit.

*Portable sign means* a sign not permanently attached to the ground or a building and is easily removable using ordinary hand tools.

*Primary permanent ground mounted sign* means the primary sign permitted for a single-use or multiple use non-residential development.

*Primary permanent wall mounted sign* means the primary wall sign for a development or tenant.

*Prohibited sign* means any sign not specifically permitted in this ordinance or that is not compliant with the applicable provisions of this ordinance.

*Projecting sign* means a sign, other than a wall mounted sign, which is affixed to and projects from a building, wall, or support structure such as a column, forming an angle between said building or wall and the face of the sign.

*Public access easement* means a recorded access easement that runs with the land and that provides direct two-way public access to at least two parcels.

*Roof sign* means any sign attached to a building which projects in part or in whole above the top edge of a building wall.

*Sandwich board sign* means a freestanding temporary sign, with no moving parts or lights, displayed outside a business during business hours. It is not intended as permanent business signage.

*Sign* means any letter, number, figure, symbol, trademark, graphic, logo, design, or device mounted or otherwise placed and intended to be visible from outside of a building, used to attract attention in order to advertise, identify, announce, notify, direct, or communicate. Sculptures, artwork, and architectural accents shall not generally be considered a sign unless they would otherwise be used as outlined in this definition.

*Sign area* means the entire face of a sign, including the advertising surface and any framing, trim, or molding but not including the supporting structure.

*Snipe sign* means a sign affixed to trees, utility poles, light poles, fences, or other objects.

*Temporary* means related to an event or activity that has a limited amount of time.

4

*Temporary freestanding subdivision entrance sign* means a sign permitted on a temporary basis near the entrance to a subdivision.

*Temporary parcel sign* means a sign permitted on a parcel for a temporary event or activity.

*Temporary freestanding subdivision sign* means a sign permitted on a temporary basis for a subdivision.

*Under-canopy sign* means a sign that is hung perpendicular to a building under a canopy which projects over the public entrances into a building.

*Visibility obstruction* means a sign that by virtue of its placement has created a visibility obstruction harmful to the public safety.

*Wall sign* means a sign attached parallel to and projecting not more than 12 inches from the wall of a building and does not project in part or in whole above the top edge of a building wall.

*Window sign* means a sign that is painted on, attached to, or suspended directly behind or in front of a window or the glass portion of the door.

## Section 109.7. Administration.

*Remains largely the same with proposed changes in red. Most updates reflect addressing issues with past application submittal requirements and acknowledging the Town's transition from a paper to an electronic application process.*

(a) *Sign administrator to enforce chapter.* The Town administrator or his/her designee shall act as the sign administrator and shall enforce and carry out all provisions of this chapter. In the event there is a question concerning the general intent or meaning of any provision of this chapter, the sign administrator shall have the authority to make such administrative decisions and interpretations. Administrative interpretation shall in no way be construed as permitting or granting an exception to the provisions of this chapter. When the definition of a sign or an issue concerning architectural compatibility, illumination, or some unique physical characteristic of a sign are questioned by the sign administrator, the sign administrator may consult with the Visual Resources Review Board about such question.

(b) *Application and permit process.* Unless otherwise provided by this chapter, permits are required for all types of signs. It shall be unlawful for any person, agency, firm, or corporation to erect, structurally repair (other than normal maintenance), replace, alter, relocate, change the panels of, change the establishment being advertised on a sign, as defined in this chapter, without first obtaining a permit to do so from the Town.

(1) *General application requirements and fees.* Applicants shall submit a completed sign application and the required fee to the Town prior to

5

commencing any work on installation of a new or replacement sign. The required fee is per the schedule approved by the Town Board of Mayor and Aldermen. Per the approved fee schedule, an additional penalty fee shall be paid if work is commenced prior to receiving a permit from the Town. Government or government sponsored entities are waived from the fee requirement.

(2) *Application required for each sign.* A separate application must be completed and submitted for each new or replacement sign.

(3) *Wall mounted sign application reviews.* Wall sign applications shall be reviewed by the sign administrator for conformance with the requirements. The sign administrator shall approve or deny the application within 15 working days of submittal. When architectural compatibility, illumination, or some unique physical characteristic of a sign are questioned by the sign administrator, the sign administrator may consult with the Visual Resources Review Board about such matter.

(4) *Wall mounted sign application submittal requirements.* All wall sign applications shall include the following:

    a. A dimensioned schematic drawing of the building showing the proposed sign location.

    b. A photograph of the businesses located on either side which demonstrates the color, material, and illumination of these adjacent signs.

    c. The width of the building wall or lease space upon which the sign is to be mounted.

    d. A dimensioned colored drawing (or simulated photograph) of the sign showing the copy on the sign face, and

    e. An indication of how the sign is to be mounted and illuminated.

(5) *Ground-mounted sign application reviews.* Ground-mounted sign applications shall be reviewed by the Visual Resources Review Board for conformance with the requirements of this chapter and any overlapping regulations, including the Architectural Design Standards, as amended, prior to the issuance of a sign permit.

(6) *Ground-mounted sign submittal deadlines.* Ground-mounted sign applications shall be submitted in accordance with the deadlines established by the Town for the meeting at which the ground mounted sign is to be considered by the Visual Resources Review Board.

(7) *Ground-mounted sign coordination with site and landscape plans.* As part of a site plan and landscape plan review process with the Planning Commission and Visual Resources Review Board, applicants for new developments or redevelopments shall take into account anticipated locations

6

for ground mounted signs. These should be shown on both the site and landscape plans in order to help lessen conflicts with landscaping, utilities, and other site development components.

(8) *Ground-mounted sign application submittal requirements.* All ground-mounted sign applications shall be accompanied by complete sets of plans which include the following:

    a. A dimensioned site plan of the parcel showing the proposed sign location in relation to property lines and platted easements.
    b. A proposed landscaping plan for the area around the sign base.
    c. A detail of the sign lighting, including lighting placement, type, and lumens.
    d. A detail of the materials and colors used for the sign structure.
    e. A dimensioned colored drawing of the sign showing the copy on the sign face, height and length of the sign face and sign structure, overall height of the sign, and size of the address numbers required at the top of the sign.
    f. Information that may be requested by the sign administrator to help verify compliance with the Architectural Design Standards, and
    g. An acknowledgment that an as-built survey may be required by the sign administrator to verify compliance with applicable provisions associated with ground-mounted signs.

(9) *Expiration of sign permits.* A sign permit shall become null and void if installation of the sign has not been initiated within 180 days of issuance. If work authorized by such permit is suspended or abandoned for 180 days any time after the work has been initiated, the sign permit shall be void and a new permit shall be first obtained to resume work. After a permit expires, a partially completed sign structure must be removed within 30 days if no new permit is issued.

(10) *Changes to an approved sign permit*. A new permit may be required, as determined by the sign administrator, where changes have been made to an approved sign that would alter the physical characteristics of the sign.

(11) *Temporary parcel sign application reviews.* Temporary parcel signs provided for in Section 109-12 (c)(2) and 109-12 (d)(2) and that are restricted to a total of 40 calendar days per year shall be permitted through a Town of Farragut Temporary Sign Permit Application. The application shall cover a ten-day period and an applicant is permitted to apply for four applications per calendar year. Each application shall be reviewed and approved by the sign administrator and shall include the following:

    a. Verification that the entity has a valid Certificate of Occupancy.
    b. An indication of the dates when the sign will be installed and removed.

7

     c.  A dimensioned drawing showing the height and length of the sign face and the overall height of the sign.

     d.  A verification that the material used is a minimum of ten millimeters (.39 inches) in thickness and will be supported by metal t-posts.

     e.  A verification that the sign will be set back at least 20 feet from the back of the public street curb or edge of street where curbing is not provided.

     f.  An acknowledgment that banners, pennants, streamers, and similar flexible or wind activated signs shall not be used.

(c)  *Text amendment process.* Amendments to the text of this chapter shall first be reviewed by the Visual Resources Review Board and the Town Municipal Planning Commission with recommendations regarding the proposed change forwarded to the Town Board of Mayor and Aldermen.

## Section 109-8. Enforcement.

*Remain the same as currently worded.*

(a)  *Sign enforcement process.* Noncompliance with this chapter shall be deemed a violation. When the sign administrator finds violations of the provisions of this chapter, the administrator shall document such findings and take the appropriate action to correct said violations. A citation to municipal court may be issued to the owner, agent, or employee for violations of this chapter.

(b)  *Separate offense.* Each day a violation continues shall be considered a separate offense. The owner or tenant of any building, sign, premises, or sign thereon, and any architect, builder, contractor, agent, or other person who commits, or participates in, assists in, or maintains any violation hereunder may be found responsible for a separate offense. Nothing herein contained shall prevent the town from taking such lawful action as is necessary to prevent or remedy any violation of this article.

## Section 109-9. Appeals.

*Remain largely the same with a minor change that acknowledges the Town's transition from a paper to an electronic application process.*

(a)  The Town Board of Zoning Appeals shall have the following responsibilities:

(1)  *Interpretations/General Appeals.* To hear and decide appeals where it is alleged by the appellant that there is an error in any order, requirement, permit, decision, or refusal made by the sign administrator and/or the Visual

8

Resources Review Board in the carrying out or enforcement of any provision of this chapter, and

    (2) *Variances.* To authorize, upon an appeal relating to said property, a variance from such strict application so as to relieve such difficulties or hardship. Variances shall not be granted to allow a larger sign or a sign which is otherwise not permitted in this chapter. Variances shall be granted only whereby special physical characteristics of the lot, parcel, or tract exist, that the strict application of the provisions of this chapter would deprive the applicant of an otherwise permitted sign.

(b) Appeals procedure.

    (1) *Denial required.* After a written denial of a sign permit from the sign administrator, a party may make an application for an interpretation or a variance.

    (2) *General application requirements and fees.* The application shall be submitted to the Town in accordance with the deadlines established by the Town for the meeting at which the application is to be considered by the Board of Zoning Appeals. The required fee associated with the application is per the schedule approved by the Town Board of Mayor and Aldermen. The Board of Zoning Appeals shall consider and decide all appeals within 30 days of first hearing the appeal, and

    (3) *Minutes.* The minutes of the Board of Zoning Appeals shall fully set forth such circumstances or conditions warranting the granting of a variance.

## Section 109-10. Legal nonconforming signs.

*Remain largely the same with proposed changes in red.*

(a) *Definition.* Existing signs which were legally in existence prior to the adoption of the ordinance from which this chapter is derived which do not conform to the specific provisions of this article are declared legal nonconforming signs.

(b) *Continuance.* Any legal nonconforming sign may be continued in operation and maintenance after the effective date of the ordinance from which this chapter is derived, provided:

    (1) The sign is not relocated or replaced.

    (2) The structure or size of the sign is not altered in any way except toward compliance with this chapter.

    (3) No new or additional signs are added to the premises, and

    (4) Other than changing the text of changeable copy signs or normal maintenance, no other existing permanent signs are changed or replaced on the premises.

9

(c) *Maintenance/damage/deterioration.* A legal nonconforming sign is subject to all requirements of this chapter regarding safety, maintenance, and repair. However, if the sign suffers more than 50 percent damage or deterioration, as based on a certified appraisal, it must be brought into conformance with this chapter or removed.

**Section 109-11. General restrictions.**

*The existing section "signs not requiring permits" is heavily content based and inconsistent with the purpose and intent of this chapter. The proposed list below is more limited and content neutral.*

(a) All signs erected, replaced, reconstructed, expanded, or relocated on any property within the Town shall conform with the provisions of this section.

  (1) *Signs not requiring permits.* The following types of signs are exempted from permit requirements but must be in conformance with all other requirements of this chapter:
      a. Signs authorized in accordance with the Manual of Uniform Traffic Control Devices (MUTCD), as amended.
      b. Signs placed by or on behalf of a governmental entity.
      c. Street or address identification numbers/letters as stipulated in the adopted building and/or fire code.
      d. Permanent parcel signs.
      e. Signs governing campaigns, as provided for in TCA, Title 2, Chapter 7, Section 143. Tennessee Freedom of Speech Act.
      f. Temporary signs of any kind, unless a permitting process is specifically required in association with specific events, programs, or community objectives promoted by the Town of Farragut.
      g. Flags, and
      h. Window signs.

*Modify the "prohibited signs" section as follows (proposed language is shown in red):*

  (2) *Prohibited signs.* The following types of signs are prohibited within the Town:
      a. Abandoned or dilapidated signs, which shall be removed by the property owner or responsible entity.
      b. Any sign placed on public property or right-of-way without the written consent of the public authority having jurisdiction over the property.
      c. Any sign which bears or contains statements, or words of an obscene, pornographic, or immoral character, as defined by the United States Supreme Court.
      d. Any signs with flashing, chasing, pulsating, twinkling, dancing, scintillating, and/or oscillating lights or any other rotating, revolving, or otherwise moving part or the appearance of moving parts or motion. This

10

includes individuals holding signs not otherwise provided for in accordance with the United States Constitution.

e. Off-premises signs, unless required by and in accordance with the MUTCD or placed by or authorized on behalf of or by a governmental entity.

f. Off-premises outdoor advertising (billboards).

g. Banners, feather flags, pennants, ribbons, festoons, buntings, streamers, spinners, balloons, or other types of lighter-than-air or wind-activated signs and attention getting devices.

h. Advertisement displays hung internal in an automobile service bay where such display is visible from a street or a public access easement.

i. Bollard covers, tire stack covers, and similar signs.

j. Portable signs that do not comply with the location, size, or use restrictions of this chapter.

k. Search lights.

l. Signs attached to, suspended from, or painted on any vehicle or similar mobile structure which is regularly parked or situated on any street, parking lot, or private property when one of the purposes of so locating such vehicle or similar mobile structure is to display, demonstrate, advertise, or attract the attention of the public.

m. Signs imitating or resembling official traffic or government signs or signals.

n. Roof signs, or signs extending beyond the main roof line, provided that signs may be mounted on an architectural feature extending beyond the roof line if such feature is fully enclosed and considered an integral part of the occupied space, such as an atrium or high ceiling.

o. Snipe signs, and

p. All other signs not specifically permitted or that are not a lawful nonconforming sign.

*Modify the "criteria in determining sign area" section as follows:*

(3) *Criteria in determining sign area.*

a. Ground Mounted and Other Non-Wall Mounted Signs.
   (1) The sign area for all ground mounted (and other non-wall mounted) signs shall include and encompass the entire sign face, framing, trim, and associated moldings. The area shall not include the supporting sign structure.
   (2) For a sign with two parallel faces, only the area of a single face shall be considered. If the faces of a sign are not parallel, then the total sign area shall be the sum of the areas of the individual, non-parallel faces.
   (3) Where a ground mounted sign is mounted on a larger ornamental wall structure, such as on a subdivision entrance wall feature, its area shall be measured in the same fashion as a wall mounted sign (see part b. below).

11

b. Wall Mounted Signs.
    (1) For cabinet type/style signs, the sign area shall include the external perimeter of the entire cabinet measured to include all sign elements, including any internal spaces where such sign includes cut-out areas.
    (2) For signs that include channel letters and/or other individual elements (letters, logos, etc.) mounted on raceways or directly on a wall, the sign area shall be measured by drawing an imaginary single, regular geometric shape of a rectangle, circle, or equilateral triangle around and encompassing all sign elements. The text and other graphics (sign elements) do not have to be physically, visually, or topically related, or physically connected to be included in the measured area.
    (3) For window signs, the sign area shall be calculated separately for each window sign and, for each sign, shall include all background, framing, or other supporting material that forms the physical extent of the sign.

(4), (5), (6), and (7) - *Remain generally the same as currently worded.*

(4) *Criteria in determining sign height for ground-mounted signs.* Unless provided for otherwise in this chapter, the sign height shall be measured by the vertical dimension from the ground level at the base of the sign, **including the supporting structure, to the top most point of the sign** and/or its associated framing/support, exclusive of the additional 18 inches permitted to accommodate address numbers. Unless otherwise specified in this chapter, if the ground level at the base of the sign is lower than the adjacent street grade, the height shall be computed from the adjacent street grade, excluding elevated bridges or interchanges.

(5) *Criteria in determining setback for ground-mounted and pole signs.* The setback shall be measured from the farthest most protrusion of the sign to the nearest point of a property line. All signs shall be located outside of the visibility triangle. For the purposes of this article, the interstate highway right-of-way shall be considered a side or rear lot line.

(6) *Construction specifications.* All signs shall be installed in compliance with all building and fire codes adopted by the Town. All electrical service to ground-mounted and pole signs shall be under ground. Any lighting of signs shall be installed to prevent any glare upon adjoining properties or rights-of-way.

(7) *Sign maintenance and removal.*
    a. All signs shall be properly maintained. Exposed surfaces shall be clean and painted if paint is required. Defective parts shall be replaced. The sign administrator shall have the right to order the repair or removal of any sign which is defective, damaged, or substantially deteriorated.
    b. When any sign is removed, all structural components shall be removed with the sign and such removal shall be in compliance with all building and fire

12

codes adopted by the Town. All structural components of ground-mounted and pole signs shall be removed to ground level. The structural components of all other signs, including painted wall signs, shall be removed back to the original building configuration. All visual remains of the sign shall be removed.

**Section 109-12. Sign regulations by land use and/or zoning districts.**

All signs shall comply with the following regulations. Any sign that is not specifically permitted shall be prohibited.

*This section was heavily content based and has been replaced with the following:*

(a) *Signs permitted in all zoning districts.* The following signs are permitted in all zoning districts subject to compliance with all applicable provisions of this chapter or other applicable Town regulations, standards, or requirements:
  (1) Flags.
  (2) Signs authorized in accordance with the Manual of Uniform Traffic Control Devices (MUTCD), as amended.
  (3) Signs governing campaigns, as provided for in TCA, Title 2, Chapter 7, Section 143. Tennessee Freedom of Speech Act.
  (4) Signs placed by or on behalf of a governmental entity.
  (5) Street or address identification numbers/letters as stipulated in the adopted building and/or fire code.
  (6) Temporary parcel sign, and
  (7) Temporary signs specifically authorized by the Town to promote specific events, programs, or community objectives.

*The existing section governing "Signs permitted on land for residential uses" should be replaced with the following so that reference to content is removed:*

(b) *Signs permitted on land for residential uses.* The following signs are permitted on land used for residential purposes. Recreational facilities developed as part of a residential development shall also follow these regulations:
  (1) *Permanent ground mounted subdivision sign.* Once a preliminary plat or a site plan has been approved in relation to a subdivision, a permanent ground mounted subdivision sign shall be permitted as follows:

   a. *Sign area.* A subdivision is permitted a total of 40 square feet per single-family or multi-family development entrance, with either one ground-mounted sign not to exceed 40 square feet or two ground mounted signs not to exceed 20 square feet each.
   b. *Sign placement.* Such signs and the structures/walls on which they are affixed shall be out of any platted drainage or utility easements and shall

13

be set back a minimum of ten feet from any front property line(s) and five feet from any side or rear property line. Such signs and the structures/walls on which they are affixed shall be located on either a platted open space lot or within a platted sign easement. Any signs or structures proposed within the public right of way as part of a streetscape plan submittal, shall be recommended for approval by the Planning Commission and Visual Resources Review Board before being presented to the Board of Mayor and Aldermen for approval.

c. *Sign height*. Permanent freestanding subdivision signs, excluding the supporting structure, shall not exceed six feet in height.

d. *Sign illumination*. If such sign or its supporting structures are to be illuminated, external illumination shall be used and such illumination shall be directed only onto the sign face. Each individual light fixture shall not exceed 850 lumens per fixture and shall be shielded so that no glare is created, and

e. *Sign landscaping*. Each sign shall be landscaped with at least six shrubs that are a minimum of 12 inches in height and/or an evenly distributed area of seasonal or perennial flowers with such area being not less than 50 square feet. All qualifying landscaping shall be within seven feet of the sign base.

(2) *Temporary freestanding subdivision entrance sign*. One hard surface (minimum of one inch in thickness) non-illuminated temporary sign is permitted per public street entrance into a new subdivision development, provided the following criteria are met:

a. The sign shall not exceed 32 square feet.
b. The sign shall not exceed ten feet in overall height.
c. The sign shall be set back a minimum of 20 feet from the back of street curb.
d. The sign shall not be erected until a preliminary plat or site plan has been approved, and
e. The sign shall be removed within 15 days of the installation of the permanent freestanding subdivision sign.

(3) *Temporary freestanding subdivision sign*. One hard surface (minimum of one inch in thickness) non-illuminated temporary sign is permitted per new subdivision development provided the following criteria are met:

a. The sign shall not exceed 32 square feet.
b. The sign shall not exceed ten feet in overall height.
c. The sign shall be set back a minimum of 20 feet from the back of street curb.
d. The sign shall not be erected until a preliminary plat or site plan has been approved, and

14

e. The sign shall be removed when at least 75% of the units/lots within the development, as based on the approved preliminary plat, have received Certificates of Occupancy.

(4) *Permanent parcel sign*. Each individual house lot shall be permitted one non-illuminated permanent wall mounted sign not to exceed two square feet.

(5) *Temporary parcel sign*. Each individual house lot shall be permitted one temporary parcel sign not to exceed six square feet in area and six feet in overall height. This may include a sign where the owner consents and the property is being offered for sale or lease. A temporary parcel sign shall be removed within two days of the termination of the event/activity for which the sign was used. Where the termination of an event/activity is questioned by the sign administrator, the burden shall be on the sign holder to verify that the event/activity has not terminated.

(6) *Flag*. Each single-family house lot with an occupied dwelling unit shall be permitted one freestanding flagpole not to exceed 25 feet in height with up to two flags not to exceed 15 square feet each being permitted on such pole. The flagpole shall meet the setbacks that apply to the principal building (the dwelling unit).

In lieu of a freestanding flagpole, one house mounted flagpole shall be permitted provided the pole does not exceed six feet in length and the flag does not exceed 15 square feet.

(7) *Subdivision exit sign*. One non-illuminated ground-mounted sign not to exceed six square feet in size and four feet in height shall be permitted per single-family or multi-family development entrance. Such sign shall be placed at the rear of the permanent subdivision sign so that it is only visible to vehicles exiting the development.

Where a single-family or multi-family development does not have a permanent subdivision sign at its egress point or because of the setback or angle of the permanent subdivision sign is such that the message area would not be readable; one non-illuminated single-faced freestanding homeowner association notification sign shall be permitted per egress point. Such freestanding sign shall be set back a minimum of five feet from all property lines and shall be located on property which is part of the subdivision and which is zoned the same as the subdivision.

Where such sign is proposed on property which is not owned by the homeowners' association, an appropriate easement shall be recorded as a condition for approval of the sign. Such signs shall be landscaped per this

15

chapter and the sign face shall be oriented so that it is only visible to vehicles exiting the development. The back of the sign face shall be constructed of material which is non-reflective and the sign shall be generally compatible with other entrance features in the immediate area.

*The existing section governing "Signs permitted on land for freestanding commercial purpose, office, country club, golf course, school or government-owned facilities" should be replaced with the following:*

(c) *Signs permitted for developments being used for single-use non-residential purposes, including freestanding churches and schools*, are as follows:

(1) *Primary permanent ground mounted sign*. Unless provided for otherwise in this chapter, one primary permanent ground mounted sign shall be permitted provided the following criteria are met:

    a. *Sign area and setback determination*. The sign area is based on its setback from the front property line. The minimum setback from a front property line is ten feet with the maximum permitted sign face area being 20 square feet. For each additional foot that the sign is set back from the ten-foot minimum, the sign face area may be increased by two square feet with the maximum sign face area being 40 square feet at a 20-foot setback. Sign structures shall also be outside of any platted easements and at least ten feet from any side or rear property line.

    b. *Corner lot*. If a property accesses two different public streets, a primary permanent ground mounted sign shall be permitted for each street provided the signs are at least 150 feet apart, as measured from a straight line connecting the closest points of each sign structure. Each sign shall face, in a perpendicular manner, the nearest public street from which the access is provided.

    c. *Signs on same frontage*. If a property fronts the same public street for at least 400 feet, a second primary permanent ground-mounted sign shall be permitted along such frontage provided the structure of such sign is at least 350 feet from the structure of the other sign permitted along the same frontage.

    d. *Height Determination*. Permitted sign height is based on the setback from the front property line. Unless otherwise provided for in Section 109-11. (4), where the sign is set back the minimum of ten feet from the front property line, the maximum permitted height shall be six feet. Beyond this point, two inches of increased allowable sign height shall be permitted for each additional one foot of setback from the front property line up to a maximum of 7.66 feet (92 inches) in overall height (exclusive of addressing) at a 20-foot setback from the front property line.

16

e. *Addressing*.  An additional 18 inches of overall sign height is permitted to enclose or otherwise provide for address numbers.  Address numbers shall be at the top of the sign and shall be eight inches in number height.  Where a property abuts two public streets and has a sign facing each street, the address numbers shall be required on the sign that is perpendicular to the street with the assigned address.

f. *Landscaping*.  Each sign shall be landscaped with at least six shrubs that are a minimum of 12 inches in height and/or an evenly distributed area of seasonal or perennial flowers with such area being not less than 50 square feet.  All qualifying landscaping shall be within seven feet of the sign base.  Ground-mounted sign placement and site landscaping shall be coordinated to the greatest extent possible as part of the site plan and landscape plan review processes.  Landscaping proposed around a ground mounted sign shall also be specifically evaluated in terms of ensuring that the copy on a sign face is not obstructed.

g. *Illumination*.  If external illumination is used, such illumination shall be directed only onto the sign face and shall be shielded so that no glare is created. Each individual light fixture shall not exceed 850 lumens per fixture, and

h. *Sign base and architectural compatibility*.  Each new primary permanent ground mounted sign, regardless of permitted height and sign face area, shall have a minimum two-foot above grade base below the sign face.  The sign base shall be solid with no exposed poles.  The base and other elements of the support structure of the sign shall be constructed of material that is compatible with the primary exterior material(s) used on the principal building(s).

(2) *Temporary parcel sign*.  Unless provided for otherwise in this chapter, one temporary parcel sign shall be permitted for the development provided the following criteria are met:

a. Such sign does not exceed 20 square feet in area and six feet in overall height and is placed at least 20 feet from the back of the public street curb or edge of street where curbing is not provided.  Temporary parcel signs shall be a minimum of ten millimeters (.39 inches) in thickness and supported by metal t-posts. Banners, pennants, streamers, and similar flexible or wind activated signs shall not be permitted.

b. A temporary parcel sign shall be permitted for no more than 40 calendar days per year with such time tracked through a temporary sign permitting process.  During any period when a parcel is offered for sale or property within the parcel is offered for lease, one additional temporary parcel sign shall be permitted on the parcel.  Such additional sign shall not be subject to the 40-day limitation but shall be subject to all other physical

17

requirements associated with temporary parcel signs and shall be removed within two days of the termination of the event/activity for which the sign was used. Where the termination of an event/activity is questioned by the sign administrator, the burden shall be on the sign holder to verify that the event/activity has not terminated.

(3) *Primary permanent wall mounted sign*. Unless provided for otherwise in this chapter, each principle building shall be permitted one wall mounted sign which may be installed on any single building elevation subject to the following criteria:

a. *Sign area*. The sign area, unless provided for otherwise in this chapter, shall be based on the width of the building wall (same horizontal plane) on which the sign is to be mounted with one square foot of sign area being permitted for each one linear foot of building width, as measured from exterior wall edge to exterior wall edge. Such signs shall not exceed 350 square feet, unless provided for otherwise in this chapter.

b. *Corner lot*. Where a principle building directly faces more than one public street or public access easement that provides access to the property, one wall mounted sign shall be permitted for up to two frontages. One of the permitted signs shall be limited to .75 square feet of sign area for each one (1) linear foot of building wall on which the sign is to be mounted.

c. *Buildings exceeding 300 linear feet of wall length*. If a building has more than 300 linear feet of wall length, there shall be a maximum of one sign per principal building entrance. Such signs shall be located within the entrance vicinity. One additional sign may be located anywhere on the building wall. All such signs shall be spaced a minimum of 50 feet apart. Each sign shall be calculated separately with the total sign area of all signs combined not exceeding a ratio of one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted. No individual sign shall exceed 350 square feet. Such signage shall be limited to one wall.

d. *Developments with no paved surfaces in front yard*. If a building has no paved surfaces located in the front yard between the building and the street, one wall mounted sign shall be permitted on the side of the building which fronts upon a public street(s) and one wall mounted sign shall be permitted on the side of the building which faces upon a customer parking area. One of the permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted. In the case of a corner lot, the owner is permitted a total of two wall mounted signs. The owner may choose between placing the sign on any two of the three qualifying elevations. One of the two permitted signs

18

shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

e. *Developments abutting the Interstate.* Within the C-2, Regional Commercial District, one wall mounted sign shall be permitted on the building elevation that faces the interstate, provided such elevation is at least 100 linear feet in length. Such building elevation is permitted one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted not to exceed 350 square feet, and

f. *Compatibility.* All wall signs shall be architecturally compatible with the principal building and shall be consistent in terms of sign material, general color, mounting style, and illumination with the other signs on the same building.

(4) *Interior accessory freestanding sign.* For each public street or public access easement that provides direct access to the property, one interior accessory freestanding sign shall be permitted provided the following criteria are met:

a. Such sign shall not exceed six square feet in sign area and four feet in overall height.

b. Such sign shall be at least 60 feet from any property line.

c. Such sign shall be at least five feet from any parking lot or accessway curb.

d. Such sign shall not create a visibility obstruction, and

e. Such sign shall have a base constructed of material that is compatible with the primary exterior material used on the principal building(s).

(5) *Peripheral accessory freestanding sign.* For each public street or public access easement that provides direct access to the property, one peripheral accessory freestanding sign shall be permitted provided the following criteria are met:

a. Such sign shall not exceed two square feet in sign area and 30 inches in overall height.

b. Such sign shall have a base that is architecturally compatible with the building it is associated with, and

c. Such sign shall be at least 15 feet from the back of the public street/access easement curb and at least five feet from any parking lot or accessway curb.

(6) *Window sign.* On each first-floor building elevation, window signage shall be permitted provided the following criteria are met:

19

a. Window signage shall not exceed 25% of the total window area of a building elevation or 20 square feet (as measured by the cumulative total of all window signs on the same building elevation), whichever is less, and
b. Up to six square feet of window signage may be internally illuminated but shall not have any moving, blinking, or flashing message.

(7) *Freestanding building frontage sign.*  Along one building elevation, one non-illuminated freestanding building frontage sign shall be permitted, provided the following criteria are met:

a. Such sign shall be placed within 10 feet of the building.
b. Such sign shall not obstruct pedestrian facilities.
c. Such sign shall not interfere with or cause the removal of landscaping.
d. Such sign shall not exceed six square feet in sign area and four feet in overall height.
e. Such sign shall only be readable by pedestrians at the building frontage of the development.
f. Such sign shall be removed during non-business hours, and
g. Such sign shall be of a solid (non-flexible) material, such as a sandwich board sign.  Banners, pennants, streamers and similar flexible or wind activated signs shall not be permitted.

(8) *Interstate/interchange pole sign.*  Establishments located within the C-2 Regional Commercial District shall be permitted one internally illuminated interchange pole sign, subject to the following criteria:
a. The existing lot of record (at the time of this ordinance adoption) for the establishment shall be located within 200 feet of the right of way of the Campbell Station Road/I40 Interchange.
b. Such sign shall not exceed 400 square feet.
c. Such sign shall be set back a minimum of 20 feet from the front property line and ten feet from the side and rear property lines.
d. Such sign shall have a maximum of two sides provided both sides cannot be seen simultaneously from any point, and
e. The maximum height for such sign relative to mean sea level shall be 1,030 feet or 60 feet above the centerline elevation of the interstate road at the point nearest the sign, whichever is less.  A certified survey which verifies the sign height shall be submitted to the sign administrator within ten days after the sign is installed.

(9) *Athletic fields.*  Athletic field signage on non-government property shall not be visible from public rights of ways and adjacent properties.

20

(10) *Flag*. Two flags shall be permitted on one freestanding flagpole per 400 feet of property frontage on a public street. Such flags shall not individually exceed 25 square feet in size and 25 feet in mounted height. Flag poles shall meet the setback requirements for principal buildings in the corresponding zoning district.

In lieu of a freestanding flagpole, one building mounted flagpole shall be permitted on the principal building provided the pole does not exceed six feet in length and the flag does not exceed 15 square feet.

(d) *Signs permitted on land for multiple use buildings or multiple building complexes for commercial purposes, offices, or government facilities*. The following signs are permitted on land used for multiple use buildings (including schools and churches with multiple buildings) used for commercial purposes, offices, or government facilities or land used for multiple building complexes used for commercial purposes, offices, or government facilities:

(1) *Primary permanent ground mounted sign*. Unless provided for otherwise in this chapter, one primary permanent ground mounted sign is permitted provided the following criteria are met:

  a. *Sign area and setback determination*. The sign area is based on its setback from the front property line. Signs with only one entity represented on the sign face shall be subject to the provisions for primary permanent ground mounted signs that govern freestanding establishments in Section 109-12 (c)(1).

   i. Where a building has more than one tenant and more than one entity represented on the sign face, the minimum setback from a front property line is ten feet with the maximum permitted sign face area being 20 square feet. Beyond this minimum, for each additional one foot the sign is set back from the ten foot minimum setback, the sign face area may be increased by four square feet up to a maximum permitted sign face area of 60 square feet at the 20 foot setback from the front property line.

   ii. Where a development fronts the same public street for at least 400 feet, the above provided 60 square foot sign may be substituted with two smaller signs along this 400 feet of street frontage. Each smaller sign shall not exceed 40 square feet and shall be at least 150 feet apart, as measured from a straight line connecting the closest points of each sign structure. Such signs shall be set back a minimum of 15 feet from the front property line. This sign option shall be permitted for each 60

21

square foot sign that would otherwise qualify for the property based on its public street frontage.

    iii. In addition to the setback from the front property line, all primary permanent ground-mounted signs and the structures on which they are mounted shall be placed outside of any platted easements and set back at least ten feet from any side or rear property line.

    iv. An applicant may use the allocated sign face area to distribute tenant listings in any manner desired, provided the sign administrator and the Visual Resources Review Board approve the arrangement in terms of its legibility, compatibility, and general appearance. As a general guide, the outer dimension of an individual tenant panel should be at least eight inches in height to provide for the space necessary to improve legibility.

b. *Corner lot.* If a property accesses two different public streets, a primary permanent ground mounted sign shall be permitted for each street provided the signs are at least 150 feet apart, as measured from a straight line connecting the closest points of each sign structure. Each sign shall face, in a perpendicular manner, the nearest public street from which the access is provided.

c. *Signs on same frontage.* If a property fronts the same public street for at least 400 feet, a second primary permanent ground-mounted sign shall be permitted along such frontage, provided the structure of such sign is at least 350 feet from the structure of the other sign permitted along the same frontage.

    i. Should a development qualify, as provided for in Subsection a. ii., above, for two smaller primary permanent ground-mounted signs in lieu of one larger 60 square foot primary permanent ground-mounted sign, each 400 feet of public street frontage may have two smaller signs, provided these smaller signs are at least 150 feet apart. Should an owner with the qualifying frontage mix a 60 square foot sign with two smaller 40 square foot signs, the sign nearest the 60 square foot sign shall be at least 350 feet from such sign.

d. *Height Determination.* Permitted sign height is based on the setback from the front property line. Unless otherwise provided for in Section 109-11. (4), where the sign is set back the minimum of ten feet from the front property line, the maximum permitted height shall be six feet. Beyond this point, a sign with more than one tenant shall be permitted two inches of increased allowable sign height for each additional one foot of setback from the front property line up to a maximum of 7.66 feet (92 inches) in overall height (exclusive of addressing) at a 20-foot setback from the front property line.

e. *Addressing*. An additional 18 inches of overall sign height is permitted to enclose or otherwise provide for address numbers. Address numbers shall be at the top of the sign and shall be eight inches in number height. Where a property abuts two public streets and has a sign facing each street, the address numbers shall be required on the sign that is perpendicular to the street with the assigned address.

f. *Landscaping*. Each sign shall be landscaped with at least six shrubs that are a minimum of 12 inches in height and/or an evenly distributed area of seasonal or perennial flowers with such area being not less than 50 square feet. All qualifying landscaping shall be within seven feet of the sign base. The placement of landscaping should be evaluated as part of the sign permit review process to ensure that selected landscaping will not block the sign message.

g. *Illumination*. If external illumination is used, such illumination shall be directed only onto the sign face and shall be shielded so that no glare is created. Each individual light fixture shall not exceed 850 lumens per fixture.

h. *Sign base and architectural compatibility*. Each new primary permanent ground mounted sign, regardless of permitted height and sign face area, shall have a minimum two-foot above grade base below the sign face. The sign base shall be solid with no exposed poles. The base and other elements of the support structure of the sign shall be constructed of material that is compatible with the primary exterior material(s) used on the principal building(s), and

i. *Legibility*. All written and numerical information included on a multiple tenant permanent ground mounted sign shall be legible for a person driving the posted speed limit on the corresponding street. Individual letters or figures used within a logo or emblem are not required to be legible. However, the logo or emblem, as a whole, must be legible. The background color shall be consistent on all tenant panels so that the sign in its entirety has a general cohesion and no single tenant panel appears out of place.

(2) *Temporary parcel sign*. Unless provided for otherwise in this chapter, each tenant is permitted one temporary parcel sign provided the following criteria are met:

a. Such sign does not exceed 20 square feet in area and six feet in overall height and is placed at least 20 feet from the back of the public street curb or edge of street where curbing is not provided. Temporary parcel signs shall be a minimum of ten millimeters (.39 inches) in thickness and supported by metal t-posts. Banners, pennants, streamers, and similar flexible or wind activated signs shall not be permitted.

b. A temporary parcel sign shall be permitted for no more than 40 calendar days per year with such time tracked through a temporary sign permitting

23

process. During any period when a parcel is offered for sale or property within the parcel is offered for lease, one additional temporary parcel sign shall be permitted for the entire development (not each tenant). Window signage may be used for individual tenant spaces for lease. Such additional sign shall not be subject to the 40-day limitation but shall be subject to all other physical requirements associated with temporary parcel signs and shall be removed within two days of the termination of the event/activity for which the sign was used. Where the termination of an event/activity is questioned by the sign administrator, the burden shall be on the sign holder to verify that the event/activity has not terminated.

(3) *Primary permanent wall mounted sign*. Unless provided for otherwise in this chapter, each separate use within a building which has its own separate and exclusive exterior public entrance to the building shall be permitted one wall mounted sign provided the following criteria are met:

a. *Sign area*. The sign area shall be based on the width of the tenant space on the exterior building wall (same horizontal plane) on which the sign is to be mounted with one square foot of sign area being permitted for each one linear foot of tenant space width as measured from the centers of the exterior wall where the tenant separations occur. If a tenant is on the end of the building, the recognized tenant space would terminate at the end of the building. Such signs shall not exceed 350 square feet, unless provided for otherwise in this chapter. Such wall mounted sign shall be limited to the side of a building which fronts upon a public street/public access easement, faces upon a customer parking area, faces upon a pedestrian mall, or is the point of the principal public access into the establishment.

b. *Corner lot*. Where a tenant directly faces more than one public street or public access easement that provides access to the property, one wall mounted sign shall be permitted for up to two frontages. One of the permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

c. *Tenant space exceeding 300 linear feet*. If an individual tenant has more than 300 linear feet of building wall of lease space, there shall be a maximum of one sign per principal building entrance. Such signs shall be located within the entrance vicinity. One additional sign may be located anywhere on the building wall. All such signs shall be spaced a minimum of 50 feet apart. Each sign shall be calculated separately with the total sign area of all signs combined not exceeding a ratio of one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted. No individual sign shall exceed 350 square feet. Such signage shall be limited to one wall.

24

d. *Development with no paved surfaces in front yard.* If a building has no paved surfaces located in the front yard between the building and the street, an individual tenant space which is located in the building and fronts upon a public street and faces upon a customer parking area shall be permitted one wall mounted sign on the side of the building which fronts upon a public street(s) and one wall mounted sign on the side of the building which faces upon a customer parking area. One of the permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

In the case of a corner lot, the owner is permitted a total of two wall mounted signs. The owner may choose between placing the sign on any two of the three qualifying elevations. One of the two permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

e. *Shared entrance building.* With the exception of the O-1-3 and O-1-5 Zoning Districts, a building with multiple uses that all share the public exterior entrances into the building shall be allowed to distribute wall mounted signage from an overall square footage determined by applying one square foot of sign area for each linear foot of building wall on which the sign(s) is(are) to be mounted. Such signs may be calculated separately provided the cumulative total square footage of all signs does not exceed the overall square footage permitted. Such signs shall be limited to the side of the building which fronts a public street or faces upon a customer parking area and shall be compatible in terms of sign material, general color, mounting style, and illumination;

f. *Pedestrian mall.* In the case where a building has a pedestrian mall, the property owner may opt for a different wall signage alternative. When a wall has a pedestrian mall access, each separate use which faces upon such wall shall be permitted one wall sign not to exceed 25 square feet. In addition, each separate use which faces upon the pedestrian mall shall be permitted one wall sign not to exceed 25 square feet with the total signage for mall uses not to exceed 100 square feet. In no case shall a use have more than one sign. Such signs shall be placed on the wall that has the pedestrian mall access and which fronts upon a public street or faces upon a customer parking area. The maximum sign area allowed on such wall shall be one square foot per linear foot of building wall length;

g. *Development abutting the interstate.* Within the C-2, Regional Commercial District, one wall mounted sign shall be permitted on the building elevation that faces the interstate, provided the individual tenant space has at least 100 linear feet of building wall abutting the interstate. Such building elevation is permitted one square foot of sign area for each one linear foot

25

of building wall on which the sign is to be mounted not to exceed 350 square feet; and

h. *Compatibility.* Wall mounted signage within a multiple tenant development shall be compatible in terms of sign material, general color, mounting style, and illumination. Where a center has an existing mixture of different types of signs, the property owner shall submit to the sign administrator and the VRRB a plan for ensuring compatibility as individual tenant signs transition. The objective is that over time the center will have wall mounted signs that are compatible with each other.

(4) *Interior accessory freestanding sign.* For each public street or public access easement that provides direct access to the property, one interior accessory freestanding sign shall be permitted, provided the following criteria are met:

a. Such sign shall not exceed 12 square feet in sign area and six feet in overall height.
b. Such sign shall be at least 60 feet from any property line.
c. Such sign shall be at least five feet from any parking lot or accessway curb.
d. Such sign shall not create a visibility obstruction, and
e. Such sign shall have a base constructed of material that is compatible with the primary exterior material used on the principal building(s).

(5) *Peripheral accessory freestanding sign.* For each public street or public access easement that provides direct access to the property, one peripheral accessory freestanding sign shall be permitted provided the following criteria are met:

a. Such sign shall not exceed two square feet in sign area and 30 inches in overall height.
b. Such sign shall have a base that is architecturally compatible with the building it is associated with, and
c. Such sign shall be at least 15 feet from the back of the public street/access easement curb and at least five feet from any parking lot or accessway curb.

(6) *Window sign.* On each first-floor building elevation, window signage shall be permitted provided the following criteria are met:

a. Window signage shall not exceed 25% of the total window area of an individual tenant or 20 square feet (as measured by the cumulative total of all window signs on the same lease space elevation), whichever is less, and
b. Up to six square feet of window signage may be internally illuminated but shall not have any moving, blinking, or flashing message.

26

(7) *Freestanding building frontage sign – Mixed-Use Town Center and Mixed-Use Neighborhood*. Due to its emphasis on the pedestrian, within the Mixed-Use Town Center and Mixed-Use Neighborhood land use areas, each tenant within a multiple tenant development shall be permitted one non-illuminated freestanding building frontage pedestrian-oriented sign, provided the following criteria are met:

a. Such sign shall be placed within ten feet of the building.

b. Such sign shall not obstruct pedestrian facilities and shall only be permitted where the sidewalk along a frontage is at least eight feet in width.

c. Such sign shall not interfere with or cause the removal of landscaping.

d. Such sign shall not exceed six square feet in sign area and four feet in overall height.

e. Such sign shall only be readable by pedestrians at the multiple tenant development.

f. Such sign shall be removed during non-business hours, and

g. Such sign shall be of a solid (non-flexible) material, such as a sandwich board sign. Banners, pennants, streamers and similar flexible or wind activated signs shall not be permitted.

(8) *Projecting sign – Mixed-Use Town Center and Mixed-Use Neighborhood*. Due to its emphasis on the pedestrian, within the Mixed-Use Town Center and Mixed-Use Neighborhood land use areas, an individual tenant may be permitted one non-illuminated projecting sign near the principal entrance not to exceed four square feet in size. Such sign shall comply with adopted building code clearance requirements and shall be hung perpendicular to the building.

(9) *Under canopy sign*. When the roof of a building is extended as a canopy over the public entrances in the building, one non-illuminated sign per principal entrance shall be permitted. Such signs shall not exceed four square feet in size, shall comply with adopted building code clearance requirements, and shall be hung perpendicular to the building.

(10) *Athletic fields*. Athletic field signage on non-government property shall not be visible from public rights of ways and adjacent properties.

(11) *Flag*. Two flags shall be permitted on one freestanding flagpole per 400 feet of property frontage on a public street. Such flags shall not individually exceed 25 square feet in size and 25 feet in mounted height. Flag poles shall meet the setback requirements for principal buildings in the corresponding zoning district.

27

In lieu of a freestanding flagpole, one building mounted flagpole shall be permitted on the principal building provided the pole does not exceed six feet in length and the flag does not exceed 15 square feet.

*Sections (5)-(11) below are mostly existing. Staff has removed from these sections language that refers to content. These provisions are related to specific types of zoning districts or developments with unique signage needs. The sign provisions do not stipulate what content must be included on the permitted signs.*

(e) *Wall signs in the Office District, Three Stories (O-1-3) and Office District, Five Stories (O-1-5); shared entrance building.*

(1) A building with multiple uses that all share the public exterior entrances into the building and that has more than 225 feet of building wall facing a public street shall be permitted four wall signs. Each sign shall be roughly proportional in size and general appearance. Such signs may be calculated separately provided the cumulative total square footage of all four signs shall not exceed one square foot of sign area for each linear foot of building wall which faces a public street. The cumulative square footage of all four wall signs shall not exceed 350 square feet. Such wall signs shall be limited to two on the side of a building which fronts upon a public street and shall be a minimum of 50 feet apart. Building elevations that do not face a public street shall be limited to one wall sign per elevation and shall be centered on said elevation, and

(2) All such wall signs shall be architecturally compatible with the principal structure and shall be consistent in terms of style, color, and illumination with the other signs in the complex. All wall signage shall be limited to two colors on all building elevations.

(f) *Signs permitted on land for banks and other lending institutions.* In addition to the applicable regulations above, the following additional signs are permitted on land used for banks and other lending institutions:

(1) *Automatic teller machines.* One sign which shall not exceed two square feet in sign area, and which is posted at the machine. One sign, which shall not exceed two square feet in sign area, and which is posted above the drive-thru lane on the overhead canopy, and

(2) *Drive-thru teller lanes.* One sign which shall not exceed two square feet in sign area, and which is posted at the service window. One sign which shall not exceed two square feet in sign area per drive-thru lane, and which is posted above the lane on the overhead canopy.

(g) *Signs permitted on land for theaters.* In addition to the applicable regulations above, the following additional signs are permitted on land used for theaters:

28

(1) *Marquee sign.* A marquee sign shall be limited to the side of the theater building with the principal public entrance. Such sign shall not exceed one square foot of sign area for each linear foot of building wall on which the sign is to be mounted, not to exceed 350 square feet, and

(2) *Poster case signs.* One poster case sign is permitted per movie screen or stage, which shall each not exceed 16 square feet in sign area, including frames. Illumination shall be in such a manner as to light the poster for readability only. Poster case signs shall be used in lieu of any temporary window signs. Such signs shall be mounted on the building wall with the principal public entrance.

(h) *Signs permitted on land for other businesses with drive-thru windows.* In addition to the applicable regulations above, the following additional signs are permitted on land used for other businesses with drive-thru windows:

(1) *Wall signs.* One sign per drive-thru lane which shall not exceed two square feet in sign area, and which shall be posted at the ordering point. One sign per drive-thru lane which shall not to exceed two square feet in sign area, and which shall be posted at the pick-up point, and

(2) *Canopy signs.* One sign per drive-thru lane which shall not exceed two square feet in sign area, and which shall be posted above the lane on the overhead canopy.

(i) *Signs permitted on land for restaurants with drive-thru windows.* In addition to the applicable regulations above, the following additional signs are permitted on land used for restaurants with drive-thru windows:

Menu board signs <span style="color:red">(outside of the Mixed-Use Town Center land use area)</span>:

(1) *Generally.* One sign per drive-thru lane which shall not exceed 30 square feet in sign area and six feet in overall height, and

(2) *Order box signs.* One sign per drive-thru lane which shall not exceed one square foot in sign area and 30 inches in overall height.

(j) *Signs permitted for gasoline stations/convenience stores.* For the purposes of this chapter, gasoline service stations/convenience stores shall be considered single-use non-residential and such sign regulations shall apply. If such establishments also have a restaurant with a drive-thru window, such drive-thru window sign regulations shall apply. In addition to these signs, the following additional signs are permitted:

(1) *Canopy signs.* Two signs which shall each not exceed nine square feet in sign area, and which shall be posted on two different sides of the canopy over the gas pumps.

(2) *Gas pump signs.* Any number of signs calculated separately, and which shall not exceed a cumulative sign area of eight square feet per side of each gas pump

29

island. Only one sign permit shall be required for all the gas pump islands on the site.

(3) *Car wash signs.* In addition to the wall signs permitted elsewhere in this chapter, one additional wall sign shall be permitted on the wall of the vehicle entrance at a car wash. Such wall sign shall be permitted one square foot of sign area for each linear foot of building wall on which the sign is to be mounted, and

(4) *Car wash order box signs.* One sign per car wash entrance which shall not exceed one square foot in sign area and 30 inches in overall height.

(k) *Signs permitted on land for large medical campuses on tracts of land ten acres or larger.* For the purposes of this chapter, large medical campuses shall be considered multiple use/multiple building complexes. In addition to the applicable regulations provided for in association with multiple use/multiple building complexes, the following additional signs are permitted on land used for large medical campuses located on tracts of land larger than ten acres:

(1) *Parking lot directory signs.* Parking lot directory signs shall be located at key decision-making locations within the parking lot in relation to building entrances. The physical layout of the campus shall determine the total number of signs needed. Such signs are not intended to be legible from adjacent streets and shall meet the following criteria:

   a. Such signs shall be set back a minimum of 35 feet from side and rear property lines, 60 feet from front property lines, and five feet from the edge of driveway pavement.
   b. The entire sign structure shall not exceed 30 square feet, the sign area of such signs shall not exceed 12 square feet, and the sign shall not exceed six feet in overall height.
   c. At a single key decision making location within the parking lot, if one parking lot directory sign is not large enough to accommodate the essential directional information, two such signs may be placed side by side.
   d. The letters and numbers on the signs shall not exceed five inches in height with each tenant/occupant listing to be limited to the same color, size, and shape, and
   e. Such signs shall be architecturally compatible with the principal building.

(2) *Wall signs.*

With the exception of individual medical offices, each separate principal medical use within a building shall be allowed one wall sign. Such wall signs shall be limited to the side of a building which fronts upon a public street or faces upon a customer parking area. The permitted sign area shall be as provided for in this chapter.

Due to its unique safety related characteristics, an emergency room shall be allowed one wall sign for each building wall approach to the emergency room

portion of the building.  The permitted sign area shall be as provided for in this chapter.

*Section 11 of the existing sign ordinance provides for signage for churches and other places of worship.  Since these signs are now provided for in the remainder of this chapter, Section 11 has been deleted.*



31

**RESOLUTION PC-20-02**

## FARRAGUT MUNICIPAL PLANNING COMMISSION

**A RESOLUTION TO APPROVE AN AMENDMENT TO CHAPTER 109-SIGNS, OF THE CODE OF ORDINANCES OF THE TOWN OF FARRAGUT, TO REPLACE THE EXISTING SIGN ORDINANCE WITH A NEW SIGN ORDINANCE**

**WHEREAS**, the <u>Tennessee Code Annotated</u>, Section 13-4-201et seq, provides that the Municipal Planning Commission shall make and adopt a general plan for the physical development of the municipality; and

**WHEREAS**, the Farragut Municipal Planning Commission has adopted various elements of a zoning plan as an element of the general plan for physical development; and

**WHEREAS**, a public hearing was held on this request on June 18, 2020;

**NOW, THEREFORE, BE IT RESOLVED** that the Farragut Municipal Planning Commission hereby recommends approval to the Farragut Board of Mayor and Aldermen of an ordinance, amending Chapter 109 - Signs, by replacing it in its entirety with Ordinance 20-04.

ADOPTED this 18th day of June 2020.

_____
Rita Holladay, Chairman

_____
Rose Ann Kile, Secretary

ORDINANCE:               20-04
PREPARED BY:             Shipley
REQUESTED BY:            **Town of Farragut**
CERTIFIED BY FMPC:       **June 18, 2020**
PUBLIC HEARING:          _____
PUBLISHED IN:            _____
DATE:                    _____
1ST READING:             _____
2ND READING:             _____
PUBLISHED IN:            _____
DATE:                    _____


**AN ORDINANCE TO AMEND THE CODE OF ORDINANCES OF THE TOWN OF FARRAGUT TENNESSEE, PURSUANT TO AUTHORITY GRANTED BY SECTION 6-2-201, TENNESSEE CODE ANNOTATED, BY AMENDING CHAPTER 109 – SIGNS, TO REPLACE THE EXISTING SIGN ORDINANCE WITH A NEW ORDINANCE**

**WHEREAS,** the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, wishes to amend Chapter 109 - Signs, of the Code of Ordinances of the Town of Farragut, to replace the existing Sign Ordinance with a new Sign Ordinance.

**NOW, THEREFORE, BE IT ORDAINED** by the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, that Chapter 109 – Signs, of the Code of Ordinances of the Town of Farragut, is hereby amended as follows:

**SECTION 1.**

The Code of Ordinances of the Town of Farragut, Chapter 109 – Signs, is amended by deleting it in its entirety and substituting in lieu thereof the following:

**Chapter 109 – Signs.**

**Section 109-1.  Authority.**

This chapter shall be known as the "Sign Ordinance of the Town of Farragut, Tennessee." This chapter is adopted under the authority granted by T.C.A. § 6-2-201.

**Section 109-2.  Purpose, Intent, and General Scope.**

(a) The purpose and intent of this chapter is the following:

1

(1) Regulate the number, location, size, type, illumination, and other physical characteristics of signs within the Town in order to promote the public health, safety and welfare.

(2) Maintain, enhance, and improve the aesthetic environment of the Town by preventing visual clutter.

(3) Improve the visual appearance of the Town while providing for effective means of communication, consistent with constitutional guarantees.

(4) Avoid signage that is a threat to safety due to its placement and other physical characteristics.

(5) Ensure the safe construction and maintenance of signs, and

(6) Support businesses in the Town by providing for fair and consistent sign allocations and enforcement of the sign regulations set forth herein.

(b) This ordinance is not intended to regulate the message on any sign, any building design, any display not defined as a sign, or any sign which cannot be viewed from outside a building.

## Section 109-3. Provisions declared to be minimum requirements.

The provisions of this chapter are considered to be minimum requirements. Wherever there is a discrepancy between the minimum standards noted in this chapter and those contained in any other lawfully adopted regulation or ordinance of the town, the strictest standard shall apply.

## Section 109-4. Severability.

If any section, subsection, sentence, clause, or phrase of this chapter is for any reason held to be invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this ordinance.

## Section 109-5. Substitution.

Signs containing noncommercial speech are permitted anywhere that advertising or business signs are permitted, subject to the same regulations applicable to such signs.

## Section 109-6. Definitions.

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

*Abandoned sign* means any sign, including its supporting structure, erected in conjunction with a particular use, for which the use has been discontinued for a period

2

of 90 days or more, or a lawfully erected temporary sign for which the time period allowed for display of the sign has expired.

*Architectural compatibility* means visual harmony and consistency with regard to color, building/sign materials, style, mounting, and illumination.

*Athletic field* means a piece of land designed, approved, and dedicated for playing a game.

*Banner sign* means any sign of flexible lightweight material that allows movement caused by wind. A flag, as defined herein, shall not be considered a banner sign.

*Changeable copy sign* means any sign where letters or numbers displayed on the sign are designed to be changed frequently to display different messages.

*Dilapidated sign* means a sign that is in a bad, unsafe, or unsightly condition due to neglect or misuse.

*Flag* means a fabric sign of a non-commercial nature with a distinctive color and design that is used as an emblem, standard, decoration, or symbol and that is hoisted on a permanent freestanding flagpole or mounted with a pole attached to a building.

*Freestanding sign* means a sign that is either anchored in the ground or secured so that it is not subject to being moved by wind and that is independent of any building.

*Freestanding building frontage sign* means a non-illuminated sign of a solid material with copy that is meant to be readable only to a pedestrian and that is placed near the front of a building.

*Gas pump signs* means permanent signs, including Federally required safety information, adhered to a gas pump island and reviewed through a sign permit process.

*Ground-mounted sign* means a sign erected on a freestanding frame and not attached to any building. Such signs may be two-sided, provided that both sides cannot be seen simultaneously from any point. Such signs have a solid base with no exposed poles.

*Interior accessory freestanding sign* means a sign permitted interior to a development and not meant to be readable from a public street, public access easement, or adjacent property.

*Interstate/interchange pole sign* means a sign permitted near the interstate interchange as stipulated in this ordinance.

*Legibility* means how easy a sign is to read. This is based on the characteristics of letters, numbers, and characters that make it possible to differentiate one from another.

*Manual on Uniform Traffic Control Devices (MUTCD)* means the manual produced by the Federal Highway Administration that addresses three specific types

of signs:  guide, warning, and directional.  The manual includes minimum size, height, and placement standards to achieve readability and prevent traffic accidents.

*Non-commercial* means not naming, advertising, or calling attention to a business or commercial product, service, or activity.

*Normal maintenance* means replacing lights, painting, staining, repairing a damaged element of a sign, or replacing a sign face that has faded over time with exposure to the elements with an identical sign face.  Normal maintenance shall not include any other modifications to a sign.

*Peripheral accessory freestanding sign* means a sign permitted near the entrance and exit points to a development.

*Permanent ground mounted subdivision sign* means a permanent sign permitted near the entrance to a subdivision.

*Permanent parcel sign* means a wall mounted sign permitted on a principal dwelling unit.

*Portable sign means* a sign not permanently attached to the ground or a building and is easily removable using ordinary hand tools.

*Primary permanent ground mounted sign* means the primary sign permitted for a single-use or multiple use non-residential development.

*Primary permanent wall mounted sign* means the primary wall sign for a development or tenant.

*Prohibited sign* means any sign not specifically permitted in this ordinance or that is not compliant with the applicable provisions of this ordinance.

*Projecting sign* means a sign, other than a wall mounted sign, which is affixed to and projects from a building, wall, or support structure such as a column, forming an angle between said building or wall and the face of the sign.

*Public access easement* means a recorded access easement that runs with the land and that provides direct two-way public access to at least two parcels.

*Roof sign* means any sign attached to a building which projects in part or in whole above the top edge of a building wall.

*Sandwich board sign* means a freestanding temporary sign, with no moving parts or lights, displayed outside a business during business hours. It is not intended as permanent business signage.

*Sign* means any letter, number, figure, symbol, trademark, graphic, logo, design, or device mounted or otherwise placed and intended to be visible from outside of a building, used to attract attention in order to advertise, identify, announce, notify, direct, or communicate. Sculptures, artwork, and architectural accents shall not generally be considered a sign unless they would otherwise be used as outlined in this definition.

4

*Sign area* means the entire face of a sign, including the advertising surface and any framing, trim, or molding but not including the supporting structure.

*Snipe sign* means a sign affixed to trees, utility poles, light poles, fences, or other objects.

*Temporary* means related to an event or activity that has a limited amount of time.

*Temporary freestanding subdivision entrance sign* means a sign permitted on a temporary basis near the entrance to a subdivision.

*Temporary parcel sign* means a sign permitted on a parcel for a temporary event or activity.

*Temporary freestanding subdivision sign* means a sign permitted on a temporary basis for a subdivision.

*Under-canopy sign* means a sign that is hung perpendicular to a building under a canopy which projects over the public entrances into a building.

*Visibility obstruction* means a sign that by virtue of its placement has created a visibility obstruction harmful to the public safety.

*Wall sign* means a sign attached parallel to and projecting not more than 12 inches from the wall of a building and does not project in part or in whole above the top edge of a building wall.

*Window sign* means a sign that is painted on, attached to, or suspended directly behind or in front of a window or the glass portion of the door.

## Section 109.7. Administration.

(a) *Sign administrator to enforce chapter.* The Town administrator or his/her designee shall act as the sign administrator and shall enforce and carry out all provisions of this chapter. In the event there is a question concerning the general intent or meaning of any provision of this chapter, the sign administrator shall have the authority to make such administrative decisions and interpretations. Administrative interpretation shall in no way be construed as permitting or granting an exception to the provisions of this chapter. When the definition of a sign or an issue concerning architectural compatibility, illumination, or some unique physical characteristic of a sign are questioned by the sign administrator, the sign administrator may consult with the Visual Resources Review Board about such question.

(b) *Application and permit process.* Unless otherwise provided by this chapter, permits are required for all types of signs. It shall be unlawful for any person, agency, firm, or corporation to erect, structurally repair (other than normal maintenance), replace, alter, relocate, change the panels of, change the

5

establishment being advertised on a sign, as defined in this chapter, without first obtaining a permit to do so from the Town.

(1) *General application requirements and fees.* Applicants shall submit a completed sign application and the required fee to the Town prior to commencing any work on installation of a new or replacement sign. The required fee is per the schedule approved by the Town Board of Mayor and Aldermen. Per the approved fee schedule, an additional penalty fee shall be paid if work is commenced prior to receiving a permit from the Town. Government or government sponsored entities are waived from the fee requirement.

(2) *Application required for each sign.* A separate application must be completed and submitted for each new or replacement sign.

(3) *Wall mounted sign application reviews.* Wall sign applications shall be reviewed by the sign administrator for conformance with the requirements. The sign administrator shall approve or deny the application within 15 working days of submittal. When architectural compatibility, illumination, or some unique physical characteristic of a sign are questioned by the sign administrator, the sign administrator may consult with the Visual Resources Review Board about such matter.

(4) *Wall mounted sign application submittal requirements.* All wall sign applications shall include the following:

    a. A dimensioned schematic drawing of the building showing the proposed sign location.
    b. A photograph of the businesses located on either side which demonstrates the color, material, and illumination of these adjacent signs.
    c. The width of the building wall or lease space upon which the sign is to be mounted.
    d. A dimensioned colored drawing (or simulated photograph) of the sign showing the copy on the sign face, and
    e. An indication of how the sign is to be mounted and illuminated.

(5) *Ground-mounted sign application reviews.* Ground-mounted sign applications shall be reviewed by the Visual Resources Review Board for conformance with the requirements of this chapter and any overlapping regulations, including the Architectural Design Standards, as amended, prior to the issuance of a sign permit.

(6) *Ground-mounted sign submittal deadlines.* Ground-mounted sign applications shall be submitted in accordance with the deadlines established by the Town for the meeting at which the ground mounted sign is to be considered by the Visual Resources Review Board.

6

(7) *Ground-mounted sign coordination with site and landscape plans.* As part of a site plan and landscape plan review process with the Planning Commission and Visual Resources Review Board, applicants for new developments or redevelopments shall take into account anticipated locations for ground mounted signs. These should be shown on both the site and landscape plans in order to help lessen conflicts with landscaping, utilities, and other site development components.

(8) *Ground-mounted sign application submittal requirements.* All ground-mounted sign applications shall be accompanied by complete sets of plans which include the following:

   a. A dimensioned site plan of the parcel showing the proposed sign location in relation to property lines and platted easements.
   b. A proposed landscaping plan for the area around the sign base.
   c. A detail of the sign lighting, including lighting placement, type, and lumens.
   d. A detail of the materials and colors used for the sign structure.
   e. A dimensioned colored drawing of the sign showing the copy on the sign face, height and length of the sign face and sign structure, overall height of the sign, and size of the address numbers required at the top of the sign.
   f. Information that may be requested by the sign administrator to help verify compliance with the Architectural Design Standards, and
   g. An acknowledgment that an as-built survey may be required by the sign administrator to verify compliance with applicable provisions associated with ground-mounted signs.

(9) *Expiration of sign permits.* A sign permit shall become null and void if installation of the sign has not been initiated within 180 days of issuance. If work authorized by such permit is suspended or abandoned for 180 days any time after the work has been initiated, the sign permit shall be void and a new permit shall be first obtained to resume work. After a permit expires, a partially completed sign structure must be removed within 30 days if no new permit is issued.

(10) *Changes to an approved sign permit.* A new permit may be required, as determined by the sign administrator, where changes have been made to an approved sign that would alter the physical characteristics of the sign.

(11) *Temporary parcel sign application reviews.* Temporary parcel signs provided for in Section 109-12 (c)(2) and 109-12 (d)(2) and that are restricted to a total of 40 calendar days per year shall be permitted through a Town of Farragut Temporary Sign Permit Application. The application shall cover a ten-day period and an applicant is permitted to apply for four applications per

7

calendar year. Each application shall be reviewed and approved by the sign administrator and shall include the following:

    a. Verification that the entity has a valid Certificate of Occupancy.
    b. An indication of the dates when the sign will be installed and removed.
    c. A dimensioned drawing showing the height and length of the sign face and the overall height of the sign.
    d. A verification that the material used is a minimum of ten millimeters (.39 inches) in thickness and will be supported by metal t-posts.
    e. A verification that the sign will be set back at least 20 feet from the back of the public street curb or edge of street where curbing is not provided.
    f. An acknowledgment that banners, pennants, streamers, and similar flexible or wind activated signs shall not be used.

(c) *Text amendment process.* Amendments to the text of this chapter shall first be reviewed by the Visual Resources Review Board and the Town Municipal Planning Commission with recommendations regarding the proposed change forwarded to the Town Board of Mayor and Aldermen.

## Section 109-8. Enforcement.

(a) *Sign enforcement process.* Noncompliance with this chapter shall be deemed a violation. When the sign administrator finds violations of the provisions of this chapter, the administrator shall document such findings and take the appropriate action to correct said violations. A citation to municipal court may be issued to the owner, agent, or employee for violations of this chapter.

(b) *Separate offense.* Each day a violation continues shall be considered a separate offense. The owner or tenant of any building, sign, premises, or sign thereon, and any architect, builder, contractor, agent, or other person who commits, or participates in, assists in, or maintains any violation hereunder may be found responsible for a separate offense. Nothing herein contained shall prevent the town from taking such lawful action as is necessary to prevent or remedy any violation of this article.

## Section 109-9. Appeals.

(a) The Town Board of Zoning Appeals shall have the following responsibilities:

    (1) *Interpretations/General Appeals.* To hear and decide appeals where it is alleged by the appellant that there is an error in any order, requirement, permit, decision, or refusal made by the sign administrator and/or the Visual Resources Review Board in the carrying out or enforcement of any provision of this chapter, and

Case 3:23-cv-00402-TRM-JEM   Document 6-23   Filed 11/11/23   Page 74 of 156   PageID #: 891

(2) *Variances.* To authorize, upon an appeal relating to said property, a variance from such strict application so as to relieve such difficulties or hardship. Variances shall not be granted to allow a larger sign or a sign which is otherwise not permitted in this chapter. Variances shall be granted only whereby special physical characteristics of the lot, parcel, or tract exist, that the strict application of the provisions of this chapter would deprive the applicant of an otherwise permitted sign.

(b) Appeals procedure.

(1) *Denial required.* After a written denial of a sign permit from the sign administrator, a party may make an application for an interpretation or a variance.

(2) *General application requirements and fees.* The application shall be submitted to the Town in accordance with the deadlines established by the Town for the meeting at which the application is to be considered by the Board of Zoning Appeals. The required fee associated with the application is per the schedule approved by the Town Board of Mayor and Aldermen. The Board of Zoning Appeals shall consider and decide all appeals within 30 days of first hearing the appeal, and

(3) *Minutes.* The minutes of the Board of Zoning Appeals shall fully set forth such circumstances or conditions warranting the granting of a variance.

## Section 109-10. Legal nonconforming signs.

(a) *Definition.* Existing signs which were legally in existence prior to the adoption of the ordinance from which this chapter is derived which do not conform to the specific provisions of this article are declared legal nonconforming signs.

(b) *Continuance.* Any legal nonconforming sign may be continued in operation and maintenance after the effective date of the ordinance from which this chapter is derived, provided:

(1) The sign is not relocated or replaced.

(2) The structure or size of the sign is not altered in any way except toward compliance with this chapter.

(3) No new or additional signs are added to the premises, and

(4) Other than changing the text of changeable copy signs or normal maintenance, no other existing permanent signs are changed or replaced on the premises.

(c) *Maintenance/damage/deterioration.* A legal nonconforming sign is subject to all requirements of this chapter regarding safety, maintenance, and repair. However, if the sign suffers more than 50 percent damage or deterioration, as based on a certified appraisal, it must be brought into conformance with this chapter or removed.

9

**Section 109-11.  General restrictions.**

(a) All signs erected, replaced, reconstructed, expanded, or relocated on any property within the Town shall conform with the provisions of this section.

(1) *Signs not requiring permits.*  The following types of signs are exempted from permit requirements but must be in conformance with all other requirements of this chapter:

   a. Signs authorized in accordance with the Manual of Uniform Traffic Control Devices (MUTCD), as amended.
   b. Signs placed by or on behalf of a governmental entity.
   c. Street or address identification numbers/letters as stipulated in the adopted building and/or fire code.
   d. Permanent parcel signs.
   e. Signs governing campaigns, as provided for in TCA, Title 2, Chapter 7, Section 143.  Tennessee Freedom of Speech Act.
   f. Temporary signs of any kind, unless a permitting process is specifically required in association with specific events, programs, or community objectives promoted by the Town of Farragut.
   g. Flags, and
   h. Window signs.

(2) *Prohibited signs.* The following types of signs are prohibited within the Town:

   a. Abandoned or dilapidated signs, which shall be removed by the property owner or responsible entity.
   b. Any sign placed on public property or right-of-way without the written consent of the public authority having jurisdiction over the property.
   c. Any sign which bears or contains statements, or words of an obscene, pornographic, or immoral character, as defined by the United States Supreme Court.
   d. Any signs with flashing, chasing, pulsating, twinkling, dancing, scintillating, and/or oscillating lights or any other rotating, revolving, or otherwise moving part or the appearance of moving parts or motion.  This includes individuals holding signs not otherwise provided for in accordance with the United States Constitution.
   e. Off-premises signs, unless required by and in accordance with the MUTCD or placed by or authorized on behalf of or by a governmental entity.
   f. Off-premises outdoor advertising (billboards).
   g. Banners, feather flags, pennants, ribbons, festoons, buntings, streamers, spinners, balloons, or other types of lighter-than-air or wind-activated signs and attention getting devices.
   h. Advertisement displays hung internal in an automobile service bay where such display is visible from a street or a public access easement.

10

i. Bollard covers, tire stack covers, and similar signs.
j. Portable signs that do not comply with the location, size, or use restrictions of this chapter.
k. Search lights.
l. Signs attached to, suspended from, or painted on any vehicle or similar mobile structure which is regularly parked or situated on any street, parking lot, or private property when one of the purposes of so locating such vehicle or similar mobile structure is to display, demonstrate, advertise, or attract the attention of the public.
m. Signs imitating or resembling official traffic or government signs or signals.
n. Roof signs, or signs extending beyond the main roof line, provided that signs may be mounted on an architectural feature extending beyond the roof line if such feature is fully enclosed and considered an integral part of the occupied space, such as an atrium or high ceiling.
o. Snipe signs, and
p. All other signs not specifically permitted or that are not a lawful nonconforming sign.

(3) *Criteria in determining sign area.*
    a. Ground Mounted and Other Non-Wall Mounted Signs.
        (1) The sign area for all ground mounted (and other non-wall mounted) signs shall include and encompass the entire sign face, framing, trim, and associated moldings. The area shall not include the supporting sign structure.
        (2) For a sign with two parallel faces, only the area of a single face shall be considered. If the faces of a sign are not parallel, then the total sign area shall be the sum of the areas of the individual, non-parallel faces.
        (3) Where a ground mounted sign is mounted on a larger ornamental wall structure, such as on a subdivision entrance wall feature, its area shall be measured in the same fashion as a wall mounted sign (see part b. below).

    b. Wall Mounted Signs.
        (1) For cabinet type/style signs, the sign area shall include the external perimeter of the entire cabinet measured to include all sign elements, including any internal spaces where such sign includes cut-out areas.
        (2) For signs that include channel letters and/or other individual elements (letters, logos, etc.) mounted on raceways or directly on a wall, the sign area shall be measured by drawing an imaginary single, regular geometric shape of a rectangle, circle, or equilateral triangle around and encompassing all sign elements. The text and other graphics (sign elements) do not have to be physically, visually, or topically related, or physically connected to be included in the measured area.

11

(3) For window signs, the sign area shall be calculated separately for each window sign and, for each sign, shall include all background, framing, or other supporting material that forms the physical extent of the sign.

(4) *Criteria in determining sign height for ground-mounted signs.* Unless provided for otherwise in this chapter, the sign height shall be measured by the vertical dimension from the ground level at the base of the sign, including the supporting structure, to the top most point of the sign and/or its associated framing/support, exclusive of the additional 18 inches permitted to accommodate address numbers. Unless otherwise specified in this chapter, if the ground level at the base of the sign is lower than the adjacent street grade, the height shall be computed from the adjacent street grade, excluding elevated bridges or interchanges.

(5) *Criteria in determining setback for ground-mounted and pole signs.* The setback shall be measured from the farthest most protrusion of the sign to the nearest point of a property line. All signs shall be located outside of the visibility triangle. For the purposes of this article, the interstate highway right-of-way shall be considered a side or rear lot line.

(6) *Construction specifications.* All signs shall be installed in compliance with all building and fire codes adopted by the Town. All electrical service to ground-mounted and pole signs shall be under ground. Any lighting of signs shall be installed to prevent any glare upon adjoining properties or rights-of-way.

(7) *Sign maintenance and removal.*
   a. All signs shall be properly maintained. Exposed surfaces shall be clean and painted if paint is required. Defective parts shall be replaced. The sign administrator shall have the right to order the repair or removal of any sign which is defective, damaged, or substantially deteriorated.
   b. When any sign is removed, all structural components shall be removed with the sign and such removal shall be in compliance with all building and fire codes adopted by the Town. All structural components of ground-mounted and pole signs shall be removed to ground level. The structural components of all other signs, including painted wall signs, shall be removed back to the original building configuration. All visual remains of the sign shall be removed.

## Section 109-12. Sign regulations by land use and/or zoning districts.

All signs shall comply with the following regulations. Any sign that is not specifically permitted shall be prohibited.

12

(a) *Signs permitted in all zoning districts*. The following signs are permitted in all zoning districts subject to compliance with all applicable provisions of this chapter or other applicable Town regulations, standards, or requirements:

(1) Flags.

(2) Signs authorized in accordance with the Manual of Uniform Traffic Control Devices (MUTCD), as amended.

(3) Signs governing campaigns, as provided for in TCA, Title 2, Chapter 7, Section 143. Tennessee Freedom of Speech Act.

(4) Signs placed by or on behalf of a governmental entity.

(5) Street or address identification numbers/letters as stipulated in the adopted building and/or fire code.

(6) Temporary parcel sign, and

(7) Temporary signs specifically authorized by the Town to promote specific events, programs, or community objectives.

(b) *Signs permitted on land for residential uses*. The following signs are permitted on land used for residential purposes. Recreational facilities developed as part of a residential development shall also follow these regulations*:*

(1) *Permanent ground mounted subdivision sign.* Once a preliminary plat or a site plan has been approved in relation to a subdivision, a permanent ground mounted subdivision sign shall be permitted as follows:

    a. *Sign area.* A subdivision is permitted a total of 40 square feet per single-family or multi-family development entrance, with either one ground-mounted sign not to exceed 40 square feet or two ground mounted signs not to exceed 20 square feet each.

    b. *Sign placement.* Such signs and the structures/walls on which they are affixed shall be out of any platted drainage or utility easements and shall be set back a minimum of ten feet from any front property line(s) and five feet from any side or rear property line. Such signs and the structures/walls on which they are affixed shall be located on either a platted open space lot or within a platted sign easement. Any signs or structures proposed within the public right of way as part of a streetscape plan submittal, shall be recommended for approval by the Planning Commission and Visual Resources Review Board before being presented to the Board of Mayor and Aldermen for approval.

    c. *Sign height.* Permanent freestanding subdivision signs, excluding the supporting structure, shall not exceed six feet in height.

    d. *Sign illumination.* If such sign or its supporting structures are to be illuminated, external illumination shall be used and such illumination shall be directed only onto the sign face. Each individual light fixture shall not exceed 850 lumens per fixture and shall be shielded so that no glare is created, and

13

e. *Sign landscaping.* Each sign shall be landscaped with at least six shrubs that are a minimum of 12 inches in height and/or an evenly distributed area of seasonal or perennial flowers with such area being not less than 50 square feet. All qualifying landscaping shall be within seven feet of the sign base.

(2) *Temporary freestanding subdivision entrance sign.* One hard surface (minimum of one inch in thickness) non-illuminated temporary sign is permitted per public street entrance into a new subdivision development, provided the following criteria are met:

a. The sign shall not exceed 32 square feet.
b. The sign shall not exceed ten feet in overall height.
c. The sign shall be set back a minimum of 20 feet from the back of street curb.
d. The sign shall not be erected until a preliminary plat or site plan has been approved, and
e. The sign shall be removed within 15 days of the installation of the permanent freestanding subdivision sign.

(3) *Temporary freestanding subdivision sign.* One hard surface (minimum of one inch in thickness) non-illuminated temporary sign is permitted per new subdivision development provided the following criteria are met:

a. The sign shall not exceed 32 square feet.
b. The sign shall not exceed ten feet in overall height.
c. The sign shall be set back a minimum of 20 feet from the back of street curb.
d. The sign shall not be erected until a preliminary plat or site plan has been approved, and
e. The sign shall be removed when at least 75% of the units/lots within the development, as based on the approved preliminary plat, have received Certificates of Occupancy.

(4) *Permanent parcel sign.* Each individual house lot shall be permitted one non-illuminated permanent wall mounted sign not to exceed two square feet.

(5) *Temporary parcel sign.* Each individual house lot shall be permitted one temporary parcel sign not to exceed six square feet in area and six feet in overall height. This may include a sign where the owner consents and the property is being offered for sale or lease. A temporary parcel sign shall be removed within two days of the termination of the event/activity for which the sign was used. Where the termination of an event/activity is questioned by the sign administrator, the burden shall be on the sign holder to verify that the event/activity has not terminated.

14

(6) *Flag.* Each single-family house lot with an occupied dwelling unit shall be permitted one freestanding flagpole not to exceed 25 feet in height with up to two flags not to exceed 15 square feet each being permitted on such pole. The flagpole shall meet the setbacks that apply to the principal building (the dwelling unit).

In lieu of a freestanding flagpole, one house mounted flagpole shall be permitted provided the pole does not exceed six feet in length and the flag does not exceed 15 square feet.

(7) *Subdivision exit sign.* One non-illuminated ground-mounted sign not to exceed six square feet in size and four feet in height shall be permitted per single-family or multi-family development entrance. Such sign shall be placed at the rear of the permanent subdivision sign so that it is only visible to vehicles exiting the development.

Where a single-family or multi-family development does not have a permanent subdivision sign at its egress point or because of the setback or angle of the permanent subdivision sign is such that the message area would not be readable; one non-illuminated single-faced freestanding homeowner association notification sign shall be permitted per egress point. Such freestanding sign shall be set back a minimum of five feet from all property lines and shall be located on property which is part of the subdivision and which is zoned the same as the subdivision.

Where such sign is proposed on property which is not owned by the homeowners' association, an appropriate easement shall be recorded as a condition for approval of the sign. Such signs shall be landscaped per this chapter and the sign face shall be oriented so that it is only visible to vehicles exiting the development. The back of the sign face shall be constructed of material which is non-reflective and the sign shall be generally compatible with other entrance features in the immediate area.

(c) *Signs permitted for developments being used for single-use non-residential purposes, including freestanding churches and schools*, are as follows:

(1) *Primary permanent ground mounted sign.* Unless provided for otherwise in this chapter, one primary permanent ground mounted sign shall be permitted provided the following criteria are met:

a. *Sign area and setback determination.* The sign area is based on its setback from the front property line. The minimum setback from a front property line is ten feet with the maximum permitted sign face area being 20 square feet. For each additional foot that the sign is set back from the ten-foot

15

minimum, the sign face area may be increased by two square feet with the maximum sign face area being 40 square feet at a 20-foot setback. Sign structures shall also be outside of any platted easements and at least ten feet from any side or rear property line.

b. *Corner lot.* If a property accesses two different public streets, a primary permanent ground mounted sign shall be permitted for each street provided the signs are at least 150 feet apart, as measured from a straight line connecting the closest points of each sign structure. Each sign shall face, in a perpendicular manner, the nearest public street from which the access is provided.

c. *Signs on same frontage.* If a property fronts the same public street for at least 400 feet, a second primary permanent ground-mounted sign shall be permitted along such frontage provided the structure of such sign is at least 350 feet from the structure of the other sign permitted along the same frontage.

d. *Height Determination.* Permitted sign height is based on the setback from the front property line. Unless otherwise provided for in Section 109-11. (4), where the sign is set back the minimum of ten feet from the front property line, the maximum permitted height shall be six feet. Beyond this point, two inches of increased allowable sign height shall be permitted for each additional one foot of setback from the front property line up to a maximum of 7.66 feet (92 inches) in overall height (exclusive of addressing) at a 20-foot setback from the front property line.

e. *Addressing.* An additional 18 inches of overall sign height is permitted to enclose or otherwise provide for address numbers. Address numbers shall be at the top of the sign and shall be eight inches in number height. Where a property abuts two public streets and has a sign facing each street, the address numbers shall be required on the sign that is perpendicular to the street with the assigned address.

f. *Landscaping.* Each sign shall be landscaped with at least six shrubs that are a minimum of 12 inches in height and/or an evenly distributed area of seasonal or perennial flowers with such area being not less than 50 square feet. All qualifying landscaping shall be within seven feet of the sign base. Ground-mounted sign placement and site landscaping shall be coordinated to the greatest extent possible as part of the site plan and landscape plan review processes. Landscaping proposed around a ground mounted sign shall also be specifically evaluated in terms of ensuring that the copy on a sign face is not obstructed.

g. *Illumination.* If external illumination is used, such illumination shall be directed only onto the sign face and shall be shielded so that no glare is created. Each individual light fixture shall not exceed 850 lumens per fixture, and

h. *Sign base and architectural compatibility.* Each new primary permanent ground mounted sign, regardless of permitted height and sign face area,

shall have a minimum two-foot above grade base below the sign face. The sign base shall be solid with no exposed poles. The base and other elements of the support structure of the sign shall be constructed of material that is compatible with the primary exterior material(s) used on the principal building(s).

(2) *Temporary parcel sign.* Unless provided for otherwise in this chapter, one temporary parcel sign shall be permitted for the development provided the following criteria are met:

    a. Such sign does not exceed 20 square feet in area and six feet in overall height and is placed at least 20 feet from the back of the public street curb or edge of street where curbing is not provided. Temporary parcel signs shall be a minimum of ten millimeters (.39 inches) in thickness and supported by metal t-posts. Banners, pennants, streamers, and similar flexible or wind activated signs shall not be permitted.

    b. A temporary parcel sign shall be permitted for no more than 40 calendar days per year with such time tracked through a temporary sign permitting process. During any period when a parcel is offered for sale or property within the parcel is offered for lease, one additional temporary parcel sign shall be permitted on the parcel. Such additional sign shall not be subject to the 40-day limitation but shall be subject to all other physical requirements associated with temporary parcel signs and shall be removed within two days of the termination of the event/activity for which the sign was used. Where the termination of an event/activity is questioned by the sign administrator, the burden shall be on the sign holder to verify that the event/activity has not terminated.

(3) *Primary permanent wall mounted sign.* Unless provided for otherwise in this chapter, each principle building shall be permitted one wall mounted sign which may be installed on any single building elevation subject to the following criteria:

    a. *Sign area.* The sign area, unless provided for otherwise in this chapter, shall be based on the width of the building wall (same horizontal plane) on which the sign is to be mounted with one square foot of sign area being permitted for each one linear foot of building width, as measured from exterior wall edge to exterior wall edge. Such signs shall not exceed 350 square feet, unless provided for otherwise in this chapter.

    b. *Corner lot.* Where a principle building directly faces more than one public street or public access easement that provides access to the property, one wall mounted sign shall be permitted for up to two frontages. One of the

permitted signs shall be limited to .75 square feet of sign area for each one (1) linear foot of building wall on which the sign is to be mounted.

c. *Buildings exceeding 300 linear feet of wall length.* If a building has more than 300 linear feet of wall length, there shall be a maximum of one sign per principal building entrance. Such signs shall be located within the entrance vicinity. One additional sign may be located anywhere on the building wall. All such signs shall be spaced a minimum of 50 feet apart. Each sign shall be calculated separately with the total sign area of all signs combined not exceeding a ratio of one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted. No individual sign shall exceed 350 square feet. Such signage shall be limited to one wall.

d. *Developments with no paved surfaces in front yard.* If a building has no paved surfaces located in the front yard between the building and the street, one wall mounted sign shall be permitted on the side of the building which fronts upon a public street(s) and one wall mounted sign shall be permitted on the side of the building which faces upon a customer parking area. One of the permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted. In the case of a corner lot, the owner is permitted a total of two wall mounted signs. The owner may choose between placing the sign on any two of the three qualifying elevations. One of the two permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

e. *Developments abutting the Interstate.* Within the C-2, Regional Commercial District, one wall mounted sign shall be permitted on the building elevation that faces the interstate, provided such elevation is at least 100 linear feet in length. Such building elevation is permitted one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted not to exceed 350 square feet, and

f. *Compatibility.* All wall signs shall be architecturally compatible with the principal building and shall be consistent in terms of sign material, general color, mounting style, and illumination with the other signs on the same building.

(4) *Interior accessory freestanding sign.* For each public street or public access easement that provides direct access to the property, one interior accessory freestanding sign shall be permitted provided the following criteria are met:

a. Such sign shall not exceed six square feet in sign area and four feet in overall height.

Case 3:23-cv-00402-TRM-JEM   Document 6-23   Filed 11/11/23   Page 84 of 156   PageID #: 901

b. Such sign shall be at least 60 feet from any property line.
c. Such sign shall be at least five feet from any parking lot or accessway curb.
d. Such sign shall not create a visibility obstruction, and
e. Such sign shall have a base constructed of material that is compatible with the primary exterior material used on the principal building(s).

(5) *Peripheral accessory freestanding sign*. For each public street or public access easement that provides direct access to the property, one peripheral accessory freestanding sign shall be permitted provided the following criteria are met:

a. Such sign shall not exceed two square feet in sign area and 30 inches in overall height.
b. Such sign shall have a base that is architecturally compatible with the building it is associated with, and
c. Such sign shall be at least 15 feet from the back of the public street/access easement curb and at least five feet from any parking lot or accessway curb.

(6) *Window sign*. On each first-floor building elevation, window signage shall be permitted provided the following criteria are met:

a. Window signage shall not exceed 25% of the total window area of a building elevation or 20 square feet (as measured by the cumulative total of all window signs on the same building elevation), whichever is less, and
b. Up to six square feet of window signage may be internally illuminated but shall not have any moving, blinking, or flashing message.

(7) *Freestanding building frontage sign*. Along one building elevation, one non-illuminated freestanding building frontage sign shall be permitted, provided the following criteria are met:

a. Such sign shall be placed within 10 feet of the building.
b. Such sign shall not obstruct pedestrian facilities.
c. Such sign shall not interfere with or cause the removal of landscaping.
d. Such sign shall not exceed six square feet in sign area and four feet in overall height.
e. Such sign shall only be readable by pedestrians at the building frontage of the development.
f. Such sign shall be removed during non-business hours, and
g. Such sign shall be of a solid (non-flexible) material, such as a sandwich board sign. Banners, pennants, streamers and similar flexible or wind activated signs shall not be permitted.

19

(8) *Interstate/interchange pole sign*.   Establishments located within the C-2 Regional Commercial District shall be permitted one internally illuminated interchange pole sign, subject to the following criteria:

    a. The existing lot of record (at the time of this ordinance adoption) for the establishment shall be located within 200 feet of the right of way of the Campbell Station Road/I40 Interchange.

    b. Such sign shall not exceed 400 square feet.

    c. Such sign shall be set back a minimum of 20 feet from the front property line and ten feet from the side and rear property lines.

    d. Such sign shall have a maximum of two sides provided both sides cannot be seen simultaneously from any point, and

    e. The maximum height for such sign relative to mean sea level shall be 1,030 feet or 60 feet above the centerline elevation of the interstate road at the point nearest the sign, whichever is less.  A certified survey which verifies the sign height shall be submitted to the sign administrator within ten days after the sign is installed.

(9) *Athletic fields*.  Athletic field signage on non-government property shall not be visible from public rights of ways and adjacent properties.

(10) *Flag*.  Two flags shall be permitted on one freestanding flagpole per 400 feet of property frontage on a public street.  Such flags shall not individually exceed 25 square feet in size and 25 feet in mounted height.  Flag poles shall meet the setback requirements for principal buildings in the corresponding zoning district.

In lieu of a freestanding flagpole, one building mounted flagpole shall be permitted on the principal building provided the pole does not exceed six feet in length and the flag does not exceed 15 square feet.

(d) *Signs permitted on land for multiple use buildings or multiple building complexes for commercial purposes, offices, or government facilities.* The following signs are permitted on land used for multiple use buildings (including schools and churches with multiple buildings) used for commercial purposes, offices, or government facilities or land used for multiple building complexes used for commercial purposes, offices, or government facilities:

(1) *Primary permanent ground mounted sign*.  Unless provided for otherwise in this chapter, one primary permanent ground mounted sign is permitted provided the following criteria are met:

20

a. *Sign area and setback determination.* The sign area is based on its setback from the front property line. Signs with only one entity represented on the sign face shall be subject to the provisions for primary permanent ground mounted signs that govern freestanding establishments in Section 109-12 (c)(1).

   i. Where a building has more than one tenant and more than one entity represented on the sign face, the minimum setback from a front property line is ten feet with the maximum permitted sign face area being 20 square feet. Beyond this minimum, for each additional one foot the sign is set back from the ten foot minimum setback, the sign face area may be increased by four square feet up to a maximum permitted sign face area of 60 square feet at the 20 foot setback from the front property line.

   ii. Where a development fronts the same public street for at least 400 feet, the above provided 60 square foot sign may be substituted with two smaller signs along this 400 feet of street frontage. Each smaller sign shall not exceed 40 square feet and shall be at least 150 feet apart, as measured from a straight line connecting the closest points of each sign structure. Such signs shall be set back a minimum of 15 feet from the front property line. This sign option shall be permitted for each 60 square foot sign that would otherwise qualify for the property based on its public street frontage.

   iii. In addition to the setback from the front property line, all primary permanent ground-mounted signs and the structures on which they are mounted shall be placed outside of any platted easements and set back at least ten feet from any side or rear property line.

   iv. An applicant may use the allocated sign face area to distribute tenant listings in any manner desired, provided the sign administrator and the Visual Resources Review Board approve the arrangement in terms of its legibility, compatibility, and general appearance. As a general guide, the outer dimension of an individual tenant panel should be at least eight inches in height to provide for the space necessary to improve legibility.

b. *Corner lot.* If a property accesses two different public streets, a primary permanent ground mounted sign shall be permitted for each street provided the signs are at least 150 feet apart, as measured from a straight line connecting the closest points of each sign structure. Each sign shall face, in a perpendicular manner, the nearest public street from which the access is provided.

21

c. *Signs on same frontage*. If a property fronts the same public street for at least 400 feet, a second primary permanent ground-mounted sign shall be permitted along such frontage, provided the structure of such sign is at least 350 feet from the structure of the other sign permitted along the same frontage.

    i. Should a development qualify, as provided for in Subsection a. ii., above, for two smaller primary permanent ground-mounted signs in lieu of one larger 60 square foot primary permanent ground-mounted sign, each 400 feet of public street frontage may have two smaller signs, provided these smaller signs are at least 150 feet apart. Should an owner with the qualifying frontage mix a 60 square foot sign with two smaller 40 square foot signs, the sign nearest the 60 square foot sign shall be at least 350 feet from such sign.

d. *Height Determination*. Permitted sign height is based on the setback from the front property line. Unless otherwise provided for in Section 109-11. (4), where the sign is set back the minimum of ten feet from the front property line, the maximum permitted height shall be six feet. Beyond this point, a sign with more than one tenant shall be permitted two inches of increased allowable sign height for each additional one foot of setback from the front property line up to a maximum of 7.66 feet (92 inches) in overall height (exclusive of addressing) at a 20-foot setback from the front property line.

e. *Addressing*. An additional 18 inches of overall sign height is permitted to enclose or otherwise provide for address numbers. Address numbers shall be at the top of the sign and shall be eight inches in number height. Where a property abuts two public streets and has a sign facing each street, the address numbers shall be required on the sign that is perpendicular to the street with the assigned address.

f. *Landscaping*. Each sign shall be landscaped with at least six shrubs that are a minimum of 12 inches in height and/or an evenly distributed area of seasonal or perennial flowers with such area being not less than 50 square feet. All qualifying landscaping shall be within seven feet of the sign base. The placement of landscaping should be evaluated as part of the sign permit review process to ensure that selected landscaping will not block the sign message.

g. *Illumination*. If external illumination is used, such illumination shall be directed only onto the sign face and shall be shielded so that no glare is created. Each individual light fixture shall not exceed 850 lumens per fixture.

h. *Sign base and architectural compatibility*. Each new primary permanent ground mounted sign, regardless of permitted height and sign face area, shall have a minimum two-foot above grade base below the sign face. The sign base shall be solid with no exposed poles. The base and other elements

of the support structure of the sign shall be constructed of material that is compatible with the primary exterior material(s) used on the principal building(s), and

i. *Legibility.* All written and numerical information included on a multiple tenant permanent ground mounted sign shall be legible for a person driving the posted speed limit on the corresponding street. Individual letters or figures used within a logo or emblem are not required to be legible. However, the logo or emblem, as a whole, must be legible. The background color shall be consistent on all tenant panels so that the sign in its entirety has a general cohesion and no single tenant panel appears out of place.

(2) *Temporary parcel sign.* Unless provided for otherwise in this chapter, each tenant is permitted one temporary parcel sign provided the following criteria are met:

a. Such sign does not exceed 20 square feet in area and six feet in overall height and is placed at least 20 feet from the back of the public street curb or edge of street where curbing is not provided. Temporary parcel signs shall be a minimum of ten millimeters (.39 inches) in thickness and supported by metal t-posts. Banners, pennants, streamers, and similar flexible or wind activated signs shall not be permitted.

b. A temporary parcel sign shall be permitted for no more than 40 calendar days per year with such time tracked through a temporary sign permitting process. During any period when a parcel is offered for sale or property within the parcel is offered for lease, one additional temporary parcel sign shall be permitted for the entire development (not each tenant). Window signage may be used for individual tenant spaces for lease. Such additional sign shall not be subject to the 40-day limitation but shall be subject to all other physical requirements associated with temporary parcel signs and shall be removed within two days of the termination of the event/activity for which the sign was used. Where the termination of an event/activity is questioned by the sign administrator, the burden shall be on the sign holder to verify that the event/activity has not terminated.

(3) *Primary permanent wall mounted sign.* Unless provided for otherwise in this chapter, each separate use within a building which has its own separate and exclusive exterior public entrance to the building shall be permitted one wall mounted sign provided the following criteria are met:

a. *Sign area.* The sign area shall be based on the width of the tenant space on the exterior building wall (same horizontal plane) on which the sign is to be mounted with one square foot of sign area being permitted for each one linear foot of tenant space width as measured from the centers of the

23

exterior wall where the tenant separations occur. If a tenant is on the end of the building, the recognized tenant space would terminate at the end of the building. Such signs shall not exceed 350 square feet, unless provided for otherwise in this chapter. Such wall mounted sign shall be limited to the side of a building which fronts upon a public street/public access easement, faces upon a customer parking area, faces upon a pedestrian mall, or is the point of the principal public access into the establishment.

b. *Corner lot.* Where a tenant directly faces more than one public street or public access easement that provides access to the property, one wall mounted sign shall be permitted for up to two frontages. One of the permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

c. *Tenant space exceeding 300 linear feet.* If an individual tenant has more than 300 linear feet of building wall of lease space, there shall be a maximum of one sign per principal building entrance. Such signs shall be located within the entrance vicinity. One additional sign may be located anywhere on the building wall. All such signs shall be spaced a minimum of 50 feet apart. Each sign shall be calculated separately with the total sign area of all signs combined not exceeding a ratio of one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted. No individual sign shall exceed 350 square feet. Such signage shall be limited to one wall.

d. *Development with no paved surfaces in front yard.* If a building has no paved surfaces located in the front yard between the building and the street, an individual tenant space which is located in the building and fronts upon a public street and faces upon a customer parking area shall be permitted one wall mounted sign on the side of the building which fronts upon a public street(s) and one wall mounted sign on the side of the building which faces upon a customer parking area. One of the permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

In the case of a corner lot, the owner is permitted a total of two wall mounted signs. The owner may choose between placing the sign on any two of the three qualifying elevations. One of the two permitted signs shall be limited to .75 square feet of sign area for each one linear foot of building wall on which the sign is to be mounted.

e. *Shared entrance building.* With the exception of the O-1-3 and O-1-5 Zoning Districts, a building with multiple uses that all share the public exterior entrances into the building shall be allowed to distribute wall mounted signage from an overall square footage determined by applying one square foot of sign area for each linear foot of building wall on which the sign(s) is(are) to be mounted. Such signs may be calculated separately

24

provided the cumulative total square footage of all signs does not exceed the overall square footage permitted. Such signs shall be limited to the side of the building which fronts a public street or faces upon a customer parking area and shall be compatible in terms of sign material, general color, mounting style, and illumination;

f. *Pedestrian mall.* In the case where a building has a pedestrian mall, the property owner may opt for a different wall signage alternative. When a wall has a pedestrian mall access, each separate use which faces upon such wall shall be permitted one wall sign not to exceed 25 square feet. In addition, each separate use which faces upon the pedestrian mall shall be permitted one wall sign not to exceed 25 square feet with the total signage for mall uses not to exceed 100 square feet. In no case shall a use have more than one sign. Such signs shall be placed on the wall that has the pedestrian mall access and which fronts upon a public street or faces upon a customer parking area. The maximum sign area allowed on such wall shall be one square foot per linear foot of building wall length;

g. *Development abutting the interstate.* Within the C-2, Regional Commercial District, one wall mounted sign shall be permitted on the building elevation that faces the interstate, provided the individual tenant space has at least 100 linear feet of building wall abutting the interstate. Such building elevation is permitted one square foot of sign area for each one linear foot of building wall on which the sign is to be mounted not to exceed 350 square feet; and

h. *Compatibility.* Wall mounted signage within a multiple tenant development shall be compatible in terms of sign material, general color, mounting style, and illumination. Where a center has an existing mixture of different types of signs, the property owner shall submit to the sign administrator and the VRRB a plan for ensuring compatibility as individual tenant signs transition. The objective is that over time the center will have wall mounted signs that are compatible with each other.

(4) *Interior accessory freestanding sign.* For each public street or public access easement that provides direct access to the property, one interior accessory freestanding sign shall be permitted, provided the following criteria are met:

a. Such sign shall not exceed 12 square feet in sign area and six feet in overall height.

b. Such sign shall be at least 60 feet from any property line.

c. Such sign shall be at least five feet from any parking lot or accessway curb.

d. Such sign shall not create a visibility obstruction, and

25

e. Such sign shall have a base constructed of material that is compatible with the primary exterior material used on the principal building(s).

(5) *Peripheral accessory freestanding sign*. For each public street or public access easement that provides direct access to the property, one peripheral accessory freestanding sign shall be permitted provided the following criteria are met:

a. Such sign shall not exceed two square feet in sign area and 30 inches in overall height.
b. Such sign shall have a base that is architecturally compatible with the building it is associated with, and
c. Such sign shall be at least 15 feet from the back of the public street/access easement curb and at least five feet from any parking lot or accessway curb.

(6) *Window sign.* On each first-floor building elevation, window signage shall be permitted provided the following criteria are met:

a. Window signage shall not exceed 25% of the total window area of an individual tenant or 20 square feet (as measured by the cumulative total of all window signs on the same lease space elevation), whichever is less, and
b. Up to six square feet of window signage may be internally illuminated but shall not have any moving, blinking, or flashing message.

(7) *Freestanding building frontage sign – Mixed-Use Town Center and Mixed-Use Neighborhood*. Due to its emphasis on the pedestrian, within the Mixed-Use Town Center and Mixed-Use Neighborhood land use areas, each tenant within a multiple tenant development shall be permitted one non-illuminated freestanding building frontage pedestrian-oriented sign, provided the following criteria are met:
a. Such sign shall be placed within ten feet of the building.
b. Such sign shall not obstruct pedestrian facilities and shall only be permitted where the sidewalk along a frontage is at least eight feet in width.
c. Such sign shall not interfere with or cause the removal of landscaping.
d. Such sign shall not exceed six square feet in sign area and four feet in overall height.
e. Such sign shall only be readable by pedestrians at the multiple tenant development.
f. Such sign shall be removed during non-business hours, and

26

g. Such sign shall be of a solid (non-flexible) material, such as a sandwich board sign. Banners, pennants, streamers and similar flexible or wind activated signs shall not be permitted.

(8) *Projecting sign – Mixed-Use Town Center and Mixed-Use Neighborhood*. Due to its emphasis on the pedestrian, within the Mixed-Use Town Center and Mixed-Use Neighborhood land use areas, an individual tenant may be permitted one non-illuminated projecting sign near the principal entrance not to exceed four square feet in size. Such sign shall comply with adopted building code clearance requirements and shall be hung perpendicular to the building.

(9) *Under canopy sign*. When the roof of a building is extended as a canopy over the public entrances in the building, one non-illuminated sign per principal entrance shall be permitted. Such signs shall not exceed four square feet in size, shall comply with adopted building code clearance requirements, and shall be hung perpendicular to the building.

(10) *Athletic fields*. Athletic field signage on non-government property shall not be visible from public rights of ways and adjacent properties.

(11) *Flag*. Two flags shall be permitted on one freestanding flagpole per 400 feet of property frontage on a public street. Such flags shall not individually exceed 25 square feet in size and 25 feet in mounted height. Flag poles shall meet the setback requirements for principal buildings in the corresponding zoning district.

In lieu of a freestanding flagpole, one building mounted flagpole shall be permitted on the principal building provided the pole does not exceed six feet in length and the flag does not exceed 15 square feet.

(e) *Wall signs in the Office District, Three Stories (O-1-3) and Office District, Five Stories (O-1-5); shared entrance building.*

(1) A building with multiple uses that all share the public exterior entrances into the building and that has more than 225 feet of building wall facing a public street shall be permitted four wall signs. Each sign shall be roughly proportional in size and general appearance. Such signs may be calculated separately provided the cumulative total square footage of all four signs shall not exceed one square foot of sign area for each linear foot of building wall which faces a public street. The cumulative square footage of all four wall signs shall not exceed 350 square feet. Such wall signs shall be limited to two on the side of a building which fronts upon a public street and shall be a minimum of 50 feet apart. Building elevations that do not face a public street shall be limited to one wall sign per elevation and shall be centered on said elevation, and

27

(2) All such wall signs shall be architecturally compatible with the principal structure and shall be consistent in terms of style, color, and illumination with the other signs in the complex. All wall signage shall be limited to two colors on all building elevations.

(f) *Signs permitted on land for banks and other lending institutions.* In addition to the applicable regulations above, the following additional signs are permitted on land used for banks and other lending institutions:

(1) *Automatic teller machines.* One sign which shall not exceed two square feet in sign area, and which is posted at the machine. One sign, which shall not exceed two square feet in sign area, and which is posted above the drive-thru lane on the overhead canopy, and

(2) *Drive-thru teller lanes.* One sign which shall not exceed two square feet in sign area, and which is posted at the service window. One sign which shall not exceed two square feet in sign area per drive-thru lane, and which is posted above the lane on the overhead canopy.

(g) *Signs permitted on land for theaters.* In addition to the applicable regulations above, the following additional signs are permitted on land used for theaters:

(1) *Marquee sign.* A marquee sign shall be limited to the side of the theater building with the principal public entrance. Such sign shall not exceed one square foot of sign area for each linear foot of building wall on which the sign is to be mounted, not to exceed 350 square feet, and

(2) *Poster case signs.* One poster case sign is permitted per movie screen or stage, which shall each not exceed 16 square feet in sign area, including frames. Illumination shall be in such a manner as to light the poster for readability only. Poster case signs shall be used in lieu of any temporary window signs. Such signs shall be mounted on the building wall with the principal public entrance.

(h) *Signs permitted on land for other businesses with drive-thru windows.* In addition to the applicable regulations above, the following additional signs are permitted on land used for other businesses with drive-thru windows:

(1) *Wall signs.* One sign per drive-thru lane which shall not exceed two square feet in sign area, and which shall be posted at the ordering point. One sign per drive-thru lane which shall not to exceed two square feet in sign area, and which shall be posted at the pick-up point, and

(2) *Canopy signs.* One sign per drive-thru lane which shall not exceed two square feet in sign area, and which shall be posted above the lane on the overhead canopy.

(i) *Signs permitted on land for restaurants with drive-thru windows.* In addition to the applicable regulations above, the following additional signs are permitted on land used for restaurants with drive-thru windows:

Case 3:23-cv-00402-TRM-JEM   Document 6-23   Filed 11/11/23   Page 94 of 156   PageID #: 911

Menu board signs (outside of the Mixed-Use Town Center land use area):

(1) *Generally.* One sign per drive-thru lane which shall not exceed 30 square feet in sign area and six feet in overall height, and

(2) *Order box signs.* One sign per drive-thru lane which shall not exceed one square foot in sign area and 30 inches in overall height.

(j) *Signs permitted for gasoline stations/convenience stores.* For the purposes of this chapter, gasoline service stations/convenience stores shall be considered single-use non-residential and such sign regulations shall apply. If such establishments also have a restaurant with a drive-thru window, such drive-thru window sign regulations shall apply. In addition to these signs, the following additional signs are permitted:

(1) *Canopy signs.* Two signs which shall each not exceed nine square feet in sign area, and which shall be posted on two different sides of the canopy over the gas pumps.

(2) *Gas pump signs.* Any number of signs calculated separately, and which shall not exceed a cumulative sign area of eight square feet per side of each gas pump island. Only one sign permit shall be required for all the gas pump islands on the site.

(3) *Car wash signs.* In addition to the wall signs permitted elsewhere in this chapter, one additional wall sign shall be permitted on the wall of the vehicle entrance at a car wash. Such wall sign shall be permitted one square foot of sign area for each linear foot of building wall on which the sign is to be mounted, and

(4) *Car wash order box signs.* One sign per car wash entrance which shall not exceed one square foot in sign area and 30 inches in overall height.

(k) *Signs permitted on land for large medical campuses on tracts of land ten acres or larger.* For the purposes of this chapter, large medical campuses shall be considered multiple use/multiple building complexes. In addition to the applicable regulations provided for in association with multiple use/multiple building complexes, the following additional signs are permitted on land used for large medical campuses located on tracts of land larger than ten acres:

(1) *Parking lot directory signs.* Parking lot directory signs shall be located at key decision-making locations within the parking lot in relation to building entrances. The physical layout of the campus shall determine the total number of signs needed. Such signs are not intended to be legible from adjacent streets and shall meet the following criteria:

a. Such signs shall be set back a minimum of 35 feet from side and rear property lines, 60 feet from front property lines, and five feet from the edge of driveway pavement.

29

    b. The entire sign structure shall not exceed 30 square feet, the sign area of such signs shall not exceed 12 square feet, and the sign shall not exceed six feet in overall height.

    c. At a single key decision making location within the parking lot, if one parking lot directory sign is not large enough to accommodate the essential directional information, two such signs may be placed side by side.

    d. The letters and numbers on the signs shall not exceed five inches in height with each tenant/occupant listing to be limited to the same color, size, and shape, and

    e. Such signs shall be architecturally compatible with the principal building.

(2) *Wall signs.*

With the exception of individual medical offices, each separate principal medical use within a building shall be allowed one wall sign. Such wall signs shall be limited to the side of a building which fronts upon a public street or faces upon a customer parking area. The permitted sign area shall be as provided for in this chapter.

Due to its unique safety related characteristics, an emergency room shall be allowed one wall sign for each building wall approach to the emergency room portion of the building. The permitted sign area shall be as provided for in this chapter.


**SECTION 2.**

This ordinance shall take effect from and after its final passage and publication, the public welfare requiring it.


_____
Ron Williams, Mayor


_____
Allison Myers, Town Recorder



Certified to the Farragut Board of Mayor and Aldermen this _____ day of _____, 2020, with approval recommended.



_____
Rita Holladay, Chairman

30

_____
Rose Ann Kile, Secretary

**FARRAGUT MUNICIPAL PLANNING COMMISSION**

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**    Mark Shipley, Community Development Director

**SUBJECT:**    Discussion on a request to amend Appendix A – Zoning, Chapter 3., Specific District Regulations, Section XII., General Commercial District (C-1), B., 3., as it relates to the outdoor display and or storage of general farm implements and lawn care equipment, riding lawn mowers, and related accessories (Farragut Lawn and Tractor, Applicant)

**INTRODUCTION AND BACKGROUND:**  As background to this item, when the current building was constructed for the Farragut Lawn and Tractor business at 13131 Kingston Pike, the Town worked with the property owner, Wayne Davis, to develop language in the Zoning Ordinance that would address the unique display and storage needs for retail outlets that sell general farm implements and lawn care equipment.  This language was included under the "Permitted principal and accessory uses and structures (Non-Mixed-Use Town Center) section of the General Commercial District (C-1).  The specific language is as follows:

3.    Retail outlets for the sale of general farm implements and lawn care equipment such as tractors (less than 10,000 pounds), riding lawn mowers, and related accessories.

    a.    The outdoor display and/or storage of such implements and equipment shall be permitted provided the following development criteria are met:

        (1)    The outdoor storage and/or display of the implements and/or equipment shall lie behind a straight line running from side lot line to side lot line that coincides with the rear wall of the principal building located on the property;

        (2)    The equipment and/or implements to be stored and/or displayed outdoors must be removed from the crate or cartons and displayed and/or stored in such a way as to allow for viewing and inspection, but so as not to prevent passage on sidewalks, walkways, or other vehicle ways;

        (3)    Such businesses necessarily involve the use of outdoor areas on the premises for the unloading, uncrating, positioning and repositioning of items that are often larger and more cumbersome than most retailers handle. The temporary use of outdoor areas of the premises for such purposes during hours of operation shall not be a violation of this ordinance; and

        (4)    Such businesses necessarily utilize packaging that is to be destroyed or reused. Such packaging materials shall be stored in areas on the premises to which access shall be restricted by means of a physical barrier such as an opaque fence or similar to a dumpster enclosure and shall comply with Chapter 4, Section I.B. of this ordinance.

    b.    The outdoor display of merchandise, except as provided for above, is permitted provided such merchandise is displayed in a permanent, covered porch. Such covered porch shall be

attached to the principal building and shall meet all setback requirements of the principal building.

**DISCUSSION:**  Though this language was developed in consultation with the applicant, the issue has been that, for some time, the applicant has not complied with the adopted requirements.  The photographs included with this item demonstrate how merchandise is being displayed frequently in areas that are not permitted for such use.  The only area where display is permitted in front of the rear wall of the principal building is the covered display portion of the building that extends toward Kingston Pike in front of the main portion of the building.  This portion of the building was specifically constructed for display.

In response to the unapproved storage and display, staff sent the applicant a violation notice and asked that this be discontinued or a citation to municipal court would be issued.  The applicant is now requesting to amend some of the language that is currently in place so that display may occur in front of the rear wall of the principal building.  The applicant is also asking that the temporary use of the premises for unloading, uncrating, positioning and repositioning, demonstrating and displaying equipment larger and more cumbersome than most retailers handle not be a violation of the ordinance.

**RECOMMENDATION:**  Staff does not support the applicant's requested amendment.  A long-standing aspect of the Town's Zoning Ordinance has been to ensure that outdoor storage/display is contained in an approved area so that it is not randomly scattered over the premises.  When Gander Mountain was located on Parkside Drive, their outdoor storage/display was in an area designed and approved for such use.

The applicant claims that some of the storage is incidental to unloading and unpackaging products.  While there may be a transitional element to the placement of the equipment, it is very clear that products are being used for advertising purposes and display and are completely uncontrolled in terms of placement.  There has even been equipment placed on the sidewalk that connects the building to the sidewalk along Kingston Pike.  The sign in the back of the gator that can be seen on some of the photographs is an additional indication of how the equipment is being used to attract attention.  This is also a violation of the Sign Ordinance.

This business is located at a gateway area to the Town and, in addition to being consistent with similar uses and Town provisions concerning storage and display, having the front yard full of farm and lawn equipment may not be the image one would want as you enter or leave the Town.

# Farragut
## Zoning/Municipal Code Text Amendments
2020-81-CT

Submitted by Wayne Davis
JDVOL1@TDS.NET
(865) 966-6576

Address of Proposed Work: **13131 KINGSTON PIKE**

City: **KNOXVILLE** State: **TN** Zip: **37934**

## Contact Information

### Applicant's Contact Information

Title:                    First Name: **Wayne**          Last Name: **Davis**          Suffix:

Business Name: **Farragut Lawn and Tractor**

Mailing Address: **13131 KINGSTON PIKE**

City: **KNOXVILLE**          State: **TN**                    Zip: **37934**

Email Address: **JDVOL1@TDS.NET**

Cell Phone: **(865) 414-5313**       Work Phone: **(865) 675-6576**       Home Phone: **(865) 675-4240**

### Owner's Contact Information

Title:                    First Name: **Wayne**          Last Name: **Davis**          Suffix:

Business Name: **Farragut Lawn and Tractor**

Mailing Address:

City:                    State: **TN**                    Zip:

Email Address: **JDVOL1@TDS.NET**

Cell Phone:       Work Phone:       Home Phone: **(865) 966-6576**

# Application Questionnaire (* denotes required question)

---

## Ordinance Text Amendment

**Project Name** *                         <u>13131 Kingston Pike</u>

**CHANGE REQUESTED** *                      <u>3.a.(1) Remove "and/or display" to read: "The</u>
Amend Zoning Ordinance, Sign Ordinance, or Municipal Code   <u>outdoor storage of implements and/ or</u>
text as follows:                            <u>equipment shall ---".</u>
                                            <u>3.a.(3)  Change to read: " Such businesses</u>
                                            <u>necessarily involve the use of outdoor areas</u>
                                            <u>on the premises for the unloading, uncrating,</u>
                                            <u>positioning and repositioning, demonstrating</u>
                                            <u>and displaying equipment larger and more</u>
                                            <u>cumbersome than most retailers handle.  The</u>
                                            <u>temporary use of outdoor areas of the</u>
                                            <u>premises for such purposes shall not be a</u>
                                            <u>violation of this ordnance."</u>

**Application Acknowledgement** *           <u>Wayne Davis,</u>
I HEREBY CERTIFY THAT THE ABOVE INFORMATION IS   <u>FLTInc. dba Farragut Lawn and Tractor</u>
ACCURATE AND COMPLETE AND I AM THE APPLICANT OR THE
LEGAL REPRESENTATIVE OF THE APPLICANT FOR THIS PROJECT.
enter your full name to acknowledge.

**Proposed Amendment Necessity** *          <u>Reflects routine daily activities that are</u>
The proposed amendment is necessary due to the following   <u>essential to providing safe, effective and</u>
changed or changing conditions: (be specific)   <u>responsive support for our customers during</u>
                                            <u>business hours: equipment demonstration,</u>
                                            <u>evaluation, and test operations;  moving</u>
                                            <u>tractors/ equipment from and repositioning to</u>
                                            <u>storage areas.  Removes confusion from</u>
                                            <u>terms: "storage (permanent)" and "temporary"</u>
                                            <u>activities: demonstration, evaluation, and</u>
                                            <u>display".</u>

---



# Documents Uploaded

The following documents are attached to the
Application.

You can complete this application and view application updates online at
MyGovernmentOnline.org

MGO
MY
Government**Online**
CREATED BY GOVERNMENT FOR GOVERNMENT

Printed 6/11/2020                    Page 3 of 3

Case 3:23-cv-00402-TRM-JEM   Document 6-23   Filed 11/11/23   Page 102 of 156   PageID #:
919





Case 3:23-cv-00402-TRM-JEM   Document 6-23   Filed 11/11/23   Page 104 of 156   PageID #: 921







Covered Display Area

Farragut Lawn and Tractor

Knoxville - Knox County - KUB Geographic Information System

# REPORT TO THE FARRAGUT MUNICIPAL PLANNING COMMISSION

**PREPARED BY:**     Mark Shipley, Community Development Director

**SUBJECT:**     Discussion on the development of an aesthetic plan for new vertical utility infrastructure within public rights of ways (Town of Farragut, Applicant)

**INTRODUCTION AND BACKGROUND:**  This agenda item will involve a detailed Power Point presentation addressing the following:

- ✓  What is an aesthetic plan?
- ✓  What would be Town-specific goals for an aesthetic plan?
- ✓  What does the Town currently have in place that would constitute an aesthetic plan?
- ✓  What could be some enhancements to what is in place?
- ✓  What are some of the assumptions concerning enhancements to an aesthetic plan?
- ✓  What are some typical utility types in the Town?
- ✓  What could be some aesthetic requirements for the different utility types?
- ✓  What are other considerations?

Staff has discussed the key elements of the presentation with the Town Attorney.  Included with the packet is the Power Point presentation that will be reviewed by staff.



# TOWN OF FARRAGUT
## AESTHETIC PLAN DEVELOPMENT DISCUSSION

# June 18, 2020

# What is an aesthetic plan?

In relation to small wireless facilities within the public rights of ways, T.C.A., Section 13-24-402 defines an aesthetic plan as:

"*Aesthetic plan*" means any publicly available written resolution, regulation, policy, site plan, or approved plat establishing generally applicable aesthetic requirements within the authority or designated area within the authority. An aesthetic plan may include a provision that limits the plan's application to construction or deployment that occurs after adoption of the aesthetic plan. For purposes of this part, such a limitation is not discriminatory as long as all construction or deployment occurring after adoption, regardless of the entity constructing or deploying, is subject to the aesthetic plan;



# What would be Town-specific goals for an aesthetic plan?

✓ Enhance Town's long standing commitment to the appearance of the public rights of ways

✓ Minimize visual clutter associated with new vertical utility structures in the public rights of ways

✓ Promote consistency and compatibility with new vertical utility structures

✓ Protect developed properties from the impacts of new vertical utility structures

✓ Envision future technologies to try to provide for minimum visual impact and disruption



# What does the Town currently have that would constitute an "aesthetic plan" in relation to utility infrastructure within public rights of ways?

- ✓ *T.C.A. 13-4-104*:   The Town has historically complied with this provision which requires Planning Commission review and approval of new utilities

- ✓ *Subdivision Regulations*:   Article IV. Required Improvements, 6.  Installation of Utilities.  Requires all utilities to be placed underground

- ✓ *Architectural Design Standards*:  Service Areas and Utilities.  Install new utility service systems underground and bury all existing above ground services when renovating



*Zoning Ordinance*:    Current provisions in Chapter 4., Section III., Antennas and Towers, including:

- ✓ Pre-application filing meeting to assess use of existing vertical structures where available
- ✓ A statement as to whether the proposed small cell structure is the least obtrusive and whether any alternatives with fewer aesthetic impacts have been exhausted
- ✓ Prioritizing replacement poles that will accommodate stealth technology
- ✓ Small cell support structures should try to co-locate when possible
- ✓ Where utilities are underground, all structures shall be underground except for antenna which shall include stealth technology
- ✓ Where utilities are overhead, stealth technology should be applied appropriate for the location and context
- ✓ Includes placement hierarchy for streets and zoning/land use
- ✓ Evaluation criteria – dealing with visual impact, degree of stealth technology, integration with existing structures



# Additional Options to Enhance an Aesthetic Plan for Utilities within the Public Rights of Ways

✓ Adopt a separate Aesthetic Plan section of the Municipal Code or a resolution that would govern all new utilities with a vertical component

✓ Review existing provisions that address aesthetics to more specifically focus on vertical utility infrastructure

✓ What is the void this would help fill?



# Aesthetic Plan Enhancements

✓ A desire to more clearly define the concept of "Stealth Technology"

✓ A desire for more prescriptive requirements for new structures – eliminate subjectivity

✓ A desire to capitalize on what the Town can address, consistent with State law

    ✓ In a nondiscriminatory manner, the physical characteristics of a vertical structure and all of its components can be specified, provided the regulation does not effectively prohibit the utility's intended function



## Assumptions Regarding Aesthetic Plan Enhancements for Utilities within the Public Rights of Ways

- ✓ Town will continue reviewing utility projects through the Planning Commission, as provided for in T.C.A., Section 13-4-104
- ✓ Town cannot create provisions in violation of Federal or State Law
- ✓ Town will continue to require new utilities to be installed underground
- ✓ Due to their function, some new utilities will have a vertical component (e.g. pole with antenna or pole with street lighting)
- ✓ An aesthetic plan will primarily relate to new utilities that require a vertical component to function
- ✓ Town has existing overhead utility distribution line systems that pre-date the requirement for utilities to be underground
- ✓ A permitting process is required for the privilege of using the Town's property in the form of its rights of ways
- ✓ The aesthetic requirements will not address Subdivision Street Lights since they are frequently not within the right of way



# Given Assumptions – What are the Guiding Principles Related to Aesthetic Plan Enhancements?

- ✓ Limit the number and address the physical characteristics of new vertical utility infrastructure
- ✓ Evaluate utility needs and opportunities for sharing existing vertical utility infrastructure
- ✓ Control to the greatest extent possible the aesthetic impact of new installations – including underground installations in developed areas



# Given Assumptions - What Should be Prescribed?

✓ Type of pole and arrangement of equipment

✓ How the pole should be used – whether it has a dual function (e.g. telecommunications and lighting, two telecommunications providers, 4G and 5G)

✓ Dimensional parameters for new vertical utility structures

✓ Parameters appropriate for the type of vertical utility

✓ What types of vertical utilities do we currently have or may provide for and how should they be addressed in terms of an aesthetic standard?



# Typical Vertical Utility Types

❑ Type 1 - Existing utility poles with utility lines (may or may not have lighting)

❑ Type 2 – Existing utility pole with only street lighting

❑ Type 3 – Existing utility pole with street lighting and one other utility

❑ Type 4 – New freestanding pole for a single utility



# Type 1 - Existing Utility Poles with Utility Lines

✓ Includes distribution lines common along older local streets and arterial and collector streets

✓ May also include transmission lines in utility easements – not within public rights of ways

✓ Wooden poles are common for the shorter poles

✓ Steel poles are common for new poles or those associated with transmission lines

✓ Should be used, if possible, before requesting a Type 4 pole

✓ Generally from 30 to 50 feet in height with transmission lines being in excess of 50 feet










# Requirements for New Structures on Existing Type 1 Poles

✓ Shall comply with requirements of utility provider that owns the pole (including clearance, structural capacity, and other safety related provisions)

✓ Additional non-light fixture structures attached to the pole shall be shrouded with no new equipment generally protruding horizontally beyond any existing equipment mounted to the pole

✓ Dimensional parameters for shrouds shall be provided

✓ No additional ground mounted equipment shall be permitted

✓ An example of new structures mounted to a Type 1 Pole is the following:



# Aesthetic Objectives

✓Equipment is Shrouded

✓Equipment is Close to Pole

✓Additional bulk is minimized

✓Equipment is consistent between components






# Avoid Installations Similar to These





# Require Installations Similar to These

# Type 2 - Existing Utility Pole with only Street Lighting

- ✓ Typically steel
- ✓ Common along arterial streets where other utilities are underground (e.g. Parkside Drive and S. Campbell Station Road)
- ✓ Does not include private "Subdivision Street Lights"
- ✓ Should be used, if possible, before requesting a Type 4 pole
- ✓ Would likely have to be replaced to accommodate additional equipment
- ✓ Generally from 30 to 50 feet in height








# General Requirements Related to Type 2 Poles Used for New Vertical Utilities

- ✓ Shall comply with requirements of entity that that owns the pole (including location, height, clearance, structural capacity, and other safety related provisions)
- ✓ New structures on such poles would only be permitted for telecommunications due to the requirement for an antenna reception
- ✓ New structures shall be consistent from pole to pole along same street
- ✓ Only round, straight galvanized steel poles may be used to accommodate additional structures due to their structural characteristics and their capacity to conceal new equipment within the pole
- ✓ Any replacement pole shall match the existing color, designs, lighting fixtures, and lighting fixture height per the aesthetic plan
- ✓ All new equipment shall be housed internal to the pole and underground
- ✓ No new equipment shall be mounted to protrude from the exterior of the pole
- ✓ Conduit, wiring, and other hardware must be hidden from view








## Avoid New Equipment Protruding from the Pole
## Avoid Exposed Wiring and Creating Obstructions

---



# Components of Replacement Type 2 Poles

❑ Typical components on a replacement street light pole include:

- ✓ Foundation
- ✓ Equipment cabinet
- ✓ Upper pole
- ✓ Luminaire and mast arm
- ✓ Cantenna (antenna and all necessary equipment contained within a cylindrical shroud)
- ✓ Hardware and internally integrated electrical equipment



# Requirements Related to Components

- ✓ Each component shall have a smooth transition shroud
- ✓ Foundation shall be engineered for anticipated structures
- ✓ Dimensional limitations shall be provided for each component so that the bulk of the new vertical utility is minimized (e.g. an equipment cabinet may be limited to an outer diameter of 20 inches and an cantenna limited to an outer dimension of 16-19 inches)
- ✓ All fixed connections shall be hidden from view
- ✓ Only a luminaire consistent with the aesthetic plan or a traffic control sign shall protrude from the pole
- ✓ Some examples of acceptable poles…








# Required Aesthetic Standard for Replacement Poles or New Structures on Light Poles
## (luminaire placement may vary depending on existing street light installations)



# Type 3 - Existing Utility Pole with only Street Lighting and One Other Utility

- ✓ Typically steel
- ✓ Currently includes four poles in the Parkside Drive area (street light and telecommunications)
- ✓ Were originally Type 2 poles that were replaced to accommodate telecommunications structures along with the street light
- ✓ These existing installations do not follow aesthetic requirements proposed at this time
- ✓ New combination poles would be required to comply with the provisions noted for Type 2 poles
- ✓ Changes to existing Type 3 poles would require new structures to comply with the aesthetic requirements



# Existing Type 3 Poles – How are they noncompliant with proposed aesthetic requirements?

- × Existing Type 3 poles have cantenna that protrudes from the pole
- × Existing Type 3 poles do not comply with requirements for consistency between cantennas and other structures used on the poles
- × Light fixtures do not provide for cantenna mounting desired
- × Light fixture would need to be consistent with aesthetic plan
- × Existing Type 3 poles include the following in the Parkside Drive/Campbell Lakes Drive area..









   

## Avoid Antennas Protruding from the Pole and Avoid Incompatible Antenna Installations along the same street

# Required Aesthetic Standard for New or Replacement Poles
(luminaire placement may vary depending on existing street light installations)



# Type 4 – Freestanding Pole for New Vertical Utilities

✓ Last resort option – Type 1, 2, and 3 poles should be evaluated for use prior to proposing a Type 4 pole

✓ Applicant must demonstrate this is only option

✓ Would contribute to proliferation of vertical utility infrastructure

✓ These are "stand alone poles" for only one utility

✓ All requirements that were noted for Type 2 and 3 poles would apply to Type 4 poles (with the exception of luminaire related provisions)



# Required Aesthetic Standard for Type 4 Poles and Associated Structures



# Additional Aesthetic Requirements for Type 4 Poles

✓ Coordinate with and match the aesthetic characteristics of existing subdivision street lighting, when applicable

✓ Type 4 poles shall blend in with surroundings

✓ Type 4 poles shall have consistent placement, color, height and component dimensions

✓ Type 4 poles shall provide for at least dual technology or dual carriers (e.g. 4G and 5G or Verizon and AT&T)



# Placement Requirements for Type 4 Poles
## (Given they are New Poles in New Locations)

- ✓ Avoid creating obstructions
- ✓ Avoid hindering pedestrian travel
- ✓ Place pole in alignment with existing utility poles and streetlights, where applicable
- ✓ Replace any damaged infrastructure or landscaping to its original condition
- ✓ Locate so that the pole is at least 15 feet from the nearest tree canopy and ensure that no disturbance will occur within the critical root zone of any tree



# Additional Placement Requirements for Type 4 Vertical Utilities

- ✓ Poles should be placed in front of non-dwelling unit lots (open space lots) as an initial placement consideration
- ✓ Poles should be placed on or in-line with property lines separating adjoining lots
- ✓ Poles shall not be placed adjacent to the front plane of a building
- ✓ Poles shall not be placed in front of residences or businesses





Type 4 Poles Shall be Placed on or in line
with property lines separating adjoining lots

# Other Vertical Infrastructure
## *Subdivision Street Lights*

- ✓ Not required by the Town
- ✓ Decorative in nature and maintained by HOA's
- ✓ Limited to 16 feet in height
- ✓ Pole and fixture varies from subdivision to subdivision
- ✓ Many poles are not within the public rights of ways but rather utility easements - due to this, they are not to be covered by the aesthetic plan
- ✓ Located along local streets only
- ✓ Structurally not capable of additional equipment attachment





# Light Fixture Considerations

? Should different fixtures be prescribed for different streets?  Currently, Parkside Drive and S. Campbell Station Road are arterial streets with only Type 2 or Type 3 Utility Poles (all other utilities are underground)

? Should a different fixture be specified for land zoned residential vs. commercial/office?

? Should a different fixture be specified for the Mixed-Use Town Center, Mixed-Use Neighborhood, and Gateway Areas of Town?  As an example, Concord Road has new decorative fixtures – should something similar be extended to other corridors as roads are improved or street light systems are updated?  Some light fixture examples…



# Light Fixture Styles











# Required Aesthetic Standard Must Coordinate Light Fixture Style and Placement with Cantenna Placement



# What Do We Need to Do?

## Establish Vertical Infrastructure Specifications

- ✓ To eliminate subjectivity and ensure predictability and consistency, the aesthetic plan will need to specify pole dimensions, color, material, style, and dimensions for all equipment that may be visible on the pole

- ✓ This specification will apply consistently to all new vertical infrastructure (within the public rights of ways) that cannot be placed underground (namely lighting and telecommunications equipment)

- ✓ The specified pole will need to be able to accommodate street lighting and telecommunications since these will constitute virtually all new vertical utilities

- ✓ Decide on light fixture aesthetic requirements that can also provide for desired cantenna placement



# Questions?

