

# FARRAGUT BOARD OF MAYOR AND ALDERMEN
## Farragut Town Hall
## 11408 Municipal Center Drive

**AGENDA**
**August 24, 2023**

**BMA WORKSHOP**
**Property Maintenance**
**5:00 PM**

**BEER BOARD MEETING**
**5:50 PM**

**BMA MEETING**
**6:00 PM**

I. **Roll Call**
II. **Approval of Agenda**
III. **Approval of Minutes**
    **A.** August 10, 2023

IV. **Mayor's Report**
V. **Ordinances**
    **A. Public Hearing and Second Reading**
        **1.** Ordinance 23-11, an ordinance to amend the Farragut Municipal Code, Appendix A- Zoning, Chapter 3, Section XX., Community Service District (S-1), to require a concept layout plan in association with a rezoning request to S-1 (Town of Farragut, Applicant)
    **B. First Reading**
        **1.** Ordinance 23-13, Ordinance to amend the Capital Investment Program Budget for Fiscal Year 2023-2024, passed by Ordinance 23-07

VI. **Business Items**
    **A.** Approval of a Special Event Permit for St. John Newmann Catholic Church & Schools Mustang Miles 5K Event

*It is the policy of the Town of Farragut not to discriminate on the basis of race, color, natural origin, gender, gender identity, sexual orientation, age, religion, disability or veteran status pursuant to Title VI of the Civil Rights Act of 1964, Public Law 93-112 and 101-336 in its hiring, employment practices and programs. To request accommodations due to disabilities, please call 865-966-7057 in advance of the meeting.*

    **B.** Approval of Resolution R-2023-07, Amended FY2024 Fee Resolution
    **C.** Approval of amendment of to the rental agreement for temporary modular office space from VESTA Modular for Town Hall Renovations
    **D.** Approval of Change Order No. 1, Contract 2022-07, Town of Farragut ATMS Project.
    **E.** Rejection of bids for Contract No. 2023-15, Security Gates at McFee Park

**VII.**   **Town Administrator's Report**
**VIII.**  **Town Attorney's Report**
**IX.**    **Citizens Forum**

**This meeting can be viewed live on the Farragut YouTube Channel and the Town of Farragut website [www.townoffarragut.org/livestream](http://www.townoffarragut.org/livestream).**
**The meeting will be held at the Farragut Town Hall, 11408 Municipal Center Drive**

<span style="color:red">**The Board of Mayor and Aldermen welcomes and invites Farragut residents to participate in public meetings.**</span>

At the end of each business meeting, there will be time reserved for public comment under the Citizen Forum agenda item. If you are interested in speaking, please fill out a blue comment card and turn it in to the Town Recorder or staff member. This time is set aside specifically for comments on items that are <u>not</u> on the Board of Mayor and Aldermen regular agenda for the meeting. Each speaker will be given five (5) minutes to speak on his/her topic.

During the regular agenda portion of the meeting there may be an allowance for public comment for each agenda item. The Mayor may recognize individuals for public comment based on the following guidelines.

1. The Mayor shall maintain and control the meeting to provide a professional and objective environment;
2. Any Farragut resident interested in speaking should fill out a blue comment card stating which agenda item they would like to comment on and turn in to the Town Recorder or a staff member;
3. Speakers shall come to the podium and identify themselves by name and street address;
4. Public comment shall be limited to five (5) minutes per individual. Time for public comment may be amended at the discretion of the Mayor. Time is not transferable to other speakers;
5. Speakers should strive to avoid redundancy; each speaker should have their own original viewpoint;
6. Comments shall address issues, not individuals or personalities;
7. Comments may support or oppose issues or measures, but the motives of those with differing views shall not be questioned or attacked;
8. Personal attacks and malicious comments shall not be tolerated;
9. An applicant, and/or their representative(s), for an item on the regular agenda shall be afforded the time necessary to present their request and respond to questions. The five (5) minute limitation shall not apply. However, the Mayor may ask an applicant to stay on point in order to facilitate the efficiency of the meeting.

Each speaker will be asked if they can agree to abide by the Comment Protocol. If so, please be prepared to speak when your name is called.

| REPORT TO THE BOARD OF MAYOR AND ALDERMEN WORKSHOP |
|:---:|

**PREPARED BY:**     **Holley Marlowe, Code Enforcement Officer**

**SUBJECT:**          **Workshop to consider Ordinance 23-12**

**INTRODUCTION:** This amendment deletes Articles 1 and 2 of the Farragut Municipal Code, Chapter 14, Nuisance and Property Maintenance ordinance, and replaces it with the language included below to provide updates and additional definitions. The updated articles also enhance the language of specific sections and provide clarification to achieve more efficient and effective enforcement. The Town attorney has reviewed and supports the proposed changes.

**BACKGROUND**: The Board adopted the 20-02 Ordinance amending Chapter 14, Nuisances and Property Maintenance, on February 13, 2020, to allow a greater degree of clarity and consistency in our enforcement approach. The proposed amendments to Chapter 14 stem from real world application of the provisions and address issues that have adversely affected the effective enforcement of this chapter.

**DISCUSSION:** Included in this packet is a summary sheet of the proposed changes, a clean copy of Ordinance 23-12, and a version of Chapter 14, Articles 1 and 2 which highlights the proposed changes and their evolution.

Some questions to keep in mind while reviewing the changes:
- Are there any property maintenance concerns you have in the Town that will not be addressed by this update?
- Are any of the ordinances too strict, or too lenient?

Some of the more notable changes are as follows:

**Article 1.**
Section 14-5 Definitions.
- Add the 2018 International Property Maintenance Code (IPMC) definition for "Approved", "Brush", and "Code Official."
- The definition of "Garbage" "and "Rubbish" are combined into one all-encompassing term "Garbage."
- Update the definition of "Junk," "Major Recreational Equipment," and "Weeds."

**Article 2**.
**Division 2- Exterior Property Areas**

- **Section 14-33 Weeds**
  Update section to clarify what the Town considers weeds. The update allows flexibility for areas that are considered natural undisturbed areas such as sinkholes, buffer areas, riparian zones, and the like.
- **Section 14-37 Accessory Structures**
  Add "storage buildings" and "swimming pools" for clarity and ease of enforcement as these are accessory structures the Town commonly receives complaints about.
- **Section 14-39 Garbage Junk, Litter, and Containers**

1

Update section to clarify the difference between garbage and shipping/storage containers and note when it is acceptable to temporarily have a garbage or shipping/storage container on a property within the Town.

- **Section 14-40 Brush and Tree Debris**
  Add section to effectively enforce the removal of brush and tree debris which is a common complaint in the Town.

**Division 3 - Vehicles, Trailers, and Major Recreational Equipment**

- Amend the title of the section to remove "Motor".
- **Section 14-52 Vehicles, Trailers, and Major Recreational Equipment**
  Update language to encompass residential and non-residential properties and to provide clarity on acceptable parking and condition of vehicles, trailers, and major recreational equipment within the Town.

Case 3:23-cv-00402-TRM-JEM   Document 6-54   Filed 11/11/23   Page 4 of 107   PageID #: 2427

**Property Maintenance Ordinance**

**Overview of Proposed Changes**

## Sec. 14-5 Definitions

**Add:** Approved, Approved Natural Area, Brush, Code Official, Rodent Harborage, Shipping/ Storage Container, Tree Debris

**Modify:** Garbage, Junk, Litter, Major Recreational Equipment, Weeds

**Delete:** Private Premises, Refuse, Rubbish

## Sec. 14-30 Sanitation and Safety

This title is being updated to include the term "safety" to better represent the language in the ordinance.

## Sec. 14-33 Weeds

This section is being updated in conjunction with the weeds definition to clarify what the Town considers weeds. The update allows flexibility for areas that are considered natural areas such as sink holes, buffer areas, riparian zones, and the like.

## Sec. 14-34 Rodent Harborage

This update combines "A" and "B" into one statement for ease of understanding.

## Sec. 14-37 Accessory Structures

Adding Storage buildings and swimming pools because they are some of the most common accessory structure complaints the Town gets.

## Sec. 14-39 Garbage, Junk, Litter and Containers

Update provides clarity on what areas must be kept clear of garbage, junk, and litter, removes the term "rubbish" and corrects "refrigerators" to "Appliances" to encompass all appliances that may be an attractive nuisance.

This section is also broken down into additional subsections to clarify Containers (garbage and storage/shipping) what they are, when/where they are allowed.

## Sec. 14-40 Brush and Tree Debris

This section is being added because the Town often receives complaints involving brush and tree debris that are difficult to enforce under the current ordinance, because brush and wood are defined as litter or junk. The added section would help clarify that an accumulation of tree debris or brush is a violation. This is due to the risk of brush fire, being a place for rodent and vermin habitation, along with being unsightly when accumulated.

3

## Sec. 14-52 Vehicles, Trailers, and Major Recreational Equipment

Changes to this section add trailers and major recreational equipment to the vehicles required to operable/ registered if parked/ stored on a property. It also provides clarification on what an approved surface is. We have had issues where citizens believe an approved surface of one paver under each tire is sufficient.

Clarification on requirements for the appropriate storage of major recreational equipment is being added to prevent people from using such equipment as living quarters or for other accessory uses.

A subsection is also being added to this section to address overparking in approved parking lots.

## Sec. 14-64 Exterior of Structures

Adding language to notate a **"Building permit may be required"** because it can be confusing for a citizen to receive a notice of violation that has a deadline to repair an unsafe condition, often if they receive the notice, they try to repair it quickly to avoid a citation to municipal court. Adding this phrase may prevent unpermitted repairs from being completed and additional fines or permit fees from being assessed.

**Areas in Red strikethrough reflect language to be removed.**
**Areas in Blue reflect language to be added.**
**Areas in Green are a brief explanation of the amendments.**

| | |
|---|---|
| **ORDINANCE:** | 23-12 |
| **PREPARED BY:** | Marlowe |
| **REQUESTED BY:** | Staff |
| **1ST READING:** | |
| **2ND READING:** | |
| **PUBLISHED IN:** | _____ |
| **DATE:** | _____ |

## AN ORDINANCE TO AMEND CHAPTER 14, NUISANCES AND PROPERTY MAINTENANCE, OF THE FARRAGUT MUNICIPAL CODE:

**WHEREAS,** The Board of Mayor and Aldermen of the Town of Farragut, Tennessee, wishes to amend Chapter 14, Nuisances and Property Maintenance, of the Farragut Municipal Code,

**NOW, THEREFORE, BE IT ORDAINED** by the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, that the Farragut Municipal Code is hereby amended as follows:

**SECTION 1.**

The Farragut Municipal Code, Chapter 14, Nuisances and Property Maintenance, is amended by deleting the chapter in its entirety and substituting the following in lieu thereof:

**Chapter 14- NUISANCES & PROPERTY MAINTENANCE**

**ARTICLE 1- General**

**Sec. 14-1. Scope**

The provisions of this chapter shall specify ~~govern~~ the minimum conditions and govern the responsibilities of persons for the maintenance of structures, equipment, and exterior property, both residential and commercial.

*{Language updated for clarification}*

**Sec. 14-2. Responsibility**

The owner or occupant of the premises shall maintain the structures and exterior property in compliance with the requirements of this chapter. A person shall not occupy as owner-occupant or permit another person to occupy premises that are not in a sanitary and safe condition and that do not comply with the requirements of

5

this chapter. Occupants of a dwelling unit are responsible for keeping in a clean, sanitary, and safe condition that part of the dwelling unit or premises they occupy and control.

### Sec. 14-3. Vacant structures and land

Vacant structures and premises thereof or vacant land shall be maintained in a clean, safe, secure, and sanitary condition as provided herein so as not to cause a blighting problem or adversely affect public health or safety.

### Sec. 14-4. Violation

Any person who shall violate a provision of this chapter, or fail to comply therewith, or with any of the requirements thereof, may be prosecuted within the limits provided by local laws. Each day that a violation continues shall be deemed a separate offense *and subject to a separate penalty*.

*{Added to clarify that each offense is subject to a separate penalty.}*

### Sec. 14-5. Definitions

For the purposes of this chapter, the following terms, phrases, words, and their derivations shall have the meanings given herein:

***Approved*** means acceptable to the code official.

*{This definition is being added to coincide with the already adopted International Property Maintenance Code and to clarify enforcement of Chapter 14.}*

***Approved Natural Areas*** means an area that may include, but not necessarily be limited to, open space lots where physical improvements (other than linear pedestrian/bicycle facilities) are not planned, detention basins, major platted drainage areas, sinkholes, farms with agricultural uses (as defined in the Farragut Zoning Ordinance), buffer strips, forested areas, wetlands, areas that include conservation easements, and other similar areas as determined by the Town code enforcement officer.

*{This definition is being added to coincide with the Weeds ordinance Chapter 14, Sec 14-33 to clarify what areas do not require regular mowing.}*

***Brush*** means woody material, whether dead or alive, that has been trimmed or fallen from trees, shrubs, or bushes.

*{This definition is being added to clearly define what the town considers brush. Currently brush is only listed as a component of the junk definition, which can be very confusing to citizens when they receive a notice of violation for junk, and it is actually a brush pile. Brush is a property maintenance issue because it creates rodent harborage and poses a fire threat.}*

***Code Official*** means the official who is charged with the administration and enforcement of this code, or any duly authorized representative as designated by the town administrator.

*{This definition is being added to coincide with the already adopted International Property Maintenance Code and to clarify enforcement of Chapter 14.}*

***Dwelling or Dwelling Unit*** means any building or structure, or part thereof, used and occupied for human occupation or use or intended to be used, and includes any outhouses and appurtenances belonging thereto or usually enjoyed therewith.

***Front Yard*** means the space between the public right of way or street and the nearest projection of a residential dwelling.

***Garbage*** means putrescible animal and vegetable wastes resulting from the handling, preparation, cooking and consumption of food.

***Garbage*** means wasted or spoiled food and other refuse from a kitchen or household, putrescible, and non-putrescible solid wastes (except body wastes), both combustible and non-combustible wastes, such as paper, wrappings, cigarettes, cardboard, tin cans, glass, bedding, crockery, rubbish, street cleanings, dead animals, abandoned vehicles, solid market and industrial wastes, and similar materials.

*{The updated "garbage" definition combines the definitions of Garbage, Rubbish, and Refuse because they are all similar in nature and are typically interchangeable terms.}*

***Inoperable Vehicle*** means a vehicle that cannot be driven upon the public streets for reason including but not limited to being neglected, unlicensed, wrecked, abandoned, in a state of disrepair or deterioration, or incapable of being moved under its own power.

***Junk*** means any accumulation of items including but not limited to; scrap, waste, reclaimable material, or debris, whether or not stored, for sale or in the process of being dismantled, destroyed, processed, salvaged, stored, baled, disposed, or other use or disposition. Unregistered or inoperable vehicles, tires, vehicle parts, equipment, equipment parts. Paper, cardboard, rags, metal, glass, building materials, household appliances, machinery, machinery parts, brush, wood, lumber, and other similar items shall constitute junk.

***Junk*** means any accumulation of items including, but not limited to, scrap, waste, reclaimable material, debris, unregistered or inoperable vehicles, tires, vehicle parts, equipment parts. paper, plastic, plastic bags, cardboard, rags, metal, glass, building materials, household appliances, furniture, machinery, machinery parts, brush, wood, lumber, and other similar items whether or not being stored, for sale or in the process of being dismantled, destroyed, processed, salvaged, stored, baled, disposed, or any other use or disposition.

*{Updating the junk definition by rearranging verbiage for clarity, adding unregistered or inoperable vehicles, and to remove the phrase "shall constitute junk."}*

***Litter*** means "garbage," "refuse," or "junk", and "rubbish" as defined herein and all other waste materials which, if thrown or deposited as herein prohibited, tends to create a danger to public health, safety, and welfare.

*{Update to this definition removes "refuse" and "rubbish" as their definitions have been combined with garbage.}*

***Major Recreational Equipment*** means boats, boat trailers, travel trailers, tent trailers, pick-up campers, or coaches (designed to be mounted on automotive vehicles), motorized dwellings, all-terrain vehicles (ATV), jet skis, and the like.

7

*{Updating definition to include "all-terrain vehicles" and "jet skis" because they are also considered major recreational equipment.}*

**Newspaper** means any newspaper of general circulation as defined by general law, any newspaper duly entered with the post office department of the United States, in accordance with federal statute or regulation, and any newspaper filed and recorded with any recording officer as provided by general law; and, in addition thereto, shall mean and include any periodical or current magazine regularly published with not less than four issues per year, and sold to the public.

**Nuisance** means the existence within the corporate limits of the Town of conditions which violate the provisions of this chapter, and which endanger the public health, safety, or welfare.

**Park** means a park, reservation, playground, beach, recreation center or any other public area in the Town, owned or used by the Town and devoted to active or passive recreation.

~~**Private premises** means any dwelling, house, building, or other structure, designed or used either wholly or in part for private residential purposes, whether inhabited or temporarily or continuously uninhabited or vacant, and shall include any yard, grounds, walk, driveway, porch, steps, vestibule, or mailbox belonging or appurtenant to such dwelling, house, building, or other structure.~~

*{Removing definition because the term is not used in this chapter}.*

**Public place** means any and all streets, sidewalks, boulevards, alleys or other public ways and any and all public parks, squares, spaces, grounds, and buildings.

~~**Refuse** means all putrescible and non-putrescible solid wastes (except body wastes), including garbage, rubbish, street cleanings, dead animals, abandoned vehicles, and solid market and industrial wastes.~~

*{Removing definition because it has been combined with "Garbage" definition.}*

~~**Rubbish** means non-putrescible solid wastes consisting of both combustible and noncombustible wastes, such as paper, wrappings, cigarettes, cardboard, tin cans, glass, bedding, crockery and similar materials.~~

*{Removing definition because it has been combined with "Garbage" definition.}*

**Rodent harborage** means any condition which provides shelter or protection for rodents, or which favors their habitation, multiplication, and/or continued existence.

*{Adding definition to clarify what the Town considers rodent harborage.}*

**Shipping/Storage container** means any container which exceeds 100 gallons (13.37 cubic feet) in capacity originally designed for or used in the packaging, shipping, storing, movement or transportation of freight, articles, goods, or commodities and/or originally designed for or capable of being mounted or moved by rail, truck, or ship by means of being mounted on a chassis or similar transport device.

*{Adding definition to clarify what the Town considers a Shipping/Storage container. The addition of this definition will coincide with the addition of section 14-40 to allow ease of enforcement for unsightly/undesired storage containers.}*

**Tenant** means a person, corporation, partnership, or group, whether or not the legal owner of record, occupying a building or portion thereof as a unit.

**Tree debris** means all parts of a tree that has been cut down or has fallen naturally, and include, but is not limited to, trunk, roots, branches, and foliage.

8

*{This definition provides additional clarity and separates the definition of tree debris from brush. Tree debris would encompass trees that have fallen and remnants of trees that have been cut but not fully removed from a property. Debris is currently considered part of the junk definition and therefore considered litter which has proven difficult to enforce, because citizens do not commonly consider tree debris to be litter.}*

**Vehicle** means every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, including devices used exclusively upon stationary rails or tracks.

***Weeds** means any plant or plant residue not cultivated for agricultural purposes or human consumption.*

**Weeds** means any plant or plant residue which is kept in an unmanaged or overgrown condition.

*{This definition removes agricultural purposes and adds unmanaged or overgrown condition. The definition will coincide with the updated sec 14-33 to help manage the enforcement of removal of unsightly and hazardous weeds.}*

**Secs. 14-6 – 14-16. Reserved**

**ARTICLE 2. Property Maintenance**

**Division 1- General**

**Sec. 14-17. Authority**

This article is adopted under general authority granted in T.C.A § 6-2-201(22), (23) and (25), under the specific statutory authorities set forth herein.

**Sec. 14-18. Administration**

The Town Administrator or his/her designee shall have authority to administer and enforce the provisions of this article.

**Secs. 14-19 – 14-29. Reserved**

**Division 2- Exterior Property Areas**

**Sec. 14-30. Sanitation and Safety**

Exterior property and premises shall be maintained in a clean, safe, and sanitary condition. The occupant shall keep that part of the exterior property that such occupant occupies or controls in a clean and sanitary condition.

*{Adding "and Safety" to title, because it can be confusing when a notice of violation lists "sanitation", but the issue is actually a safety concern.}*

**Sec. 14-31. Grading and drainage**

9

Premises shall be graded and maintained to prevent the erosion of soil and to prevent the accumulation of stagnant water thereon, or within any structure located thereon. Approved retention areas and reservoirs shall not be considered a violation of this section.

## Sec.14-32. Sidewalks and driveways

Sidewalks, walkways, walking trails, greenways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions.

## Sec. 14-33. Weeds

No owner, or agent of such owner of any lot, place or area within one hundred (100) feet of an occupied building which building is located within in the Town, shall permit on such lot, place or area, or upon any sidewalk, driveway, trail, greenway or path abutting the same, any weeds, grass, or deleterious, unhealthful growths, or noxious matter, that may be growing, lying, or located thereon to exceed a height of twelve (12) inches. This section does not apply to the owner or operator of an operating farm.

No owner, occupant or agent of any property, lot, tract, or parcel of land (improved or unimproved) within the Town, shall  maintain such property, including swale or retention areas, sidewalks, greenway paths, waterways, or right of ways abutting such property, in such a manner that there is an accumulation or untended growth of weeds, grass, undergrowth, deleterious or unhealthful growths, or other dead or living plant life that may be growing, lying, or located thereon to exceed a height of twelve (12) inches. This section does not apply to the owner or operator of an operating farm or an approved natural area.

*{This section is being updated in conjunction with the weeds definition to clarify what the Town considers weeds. The update allows flexibility for areas that are considered natural areas such as sink holes, buffer areas, riparian zones, and the like.}*

## Sec. 14-34. Rodent Harborage

(A) Structures and exterior property shall be kept free from rodent harborage and infestation.

(B) The owner or occupant of any property or structure shall be responsible for pest elimination.

Structures and exterior property shall be kept free from rodent harborage and infestation. The owner or occupant of any property or structure shall be responsible for pest elimination.

*{This update combines "A" and "B" into one statement for ease of understanding.}*

## Sec. 14-35. Pest Elimination

Structures shall be kept free from insect and rodent infestation. Structures in which insects or rodents are found shall be promptly exterminated by approved processes that will not be injurious to human health. After pest elimination, proper precautions shall be taken to prevent re-infestation.

*{Moved Pest Elimination up from sec. 14-40 to follow rodent harborage because the two are similar in nature.}*

## Sec. 14-36. Exhaust vents

Pipes, ducts, conductors, fans, or blowers shall not discharge gases, steam, vapor, hot air, grease, smoke, odors, or other gaseous or particulate wastes directly on abutting or adjacent public or private property or that of another tenant.

## Sec. 14-37. Accessory Structures

Accessory structures, including storage buildings, detached garages, fences, walls, swimming pools and other such structures shall be maintained structurally sound and in good repair.

*{This update adds two accessory structures, storage buildings and swimming pools, to the ordinance because the Town frequently receives complaints about these specific types of accessory structures.}*

## Sec. 14-38. Defacement of property

(A) A person shall not willfully or wantonly damage, mutilate, or deface any exterior surface of any structure or building on any private or public property by placing thereon any marking, carving or graffiti.

(B) It shall be the responsibility of the owner to restore said surface to an approved state of maintenance and repair.

A person shall not willfully or wantonly damage, mutilate, or deface any exterior surface of any structure or building on any private or public property by placing thereon any marking, carving or graffiti. It shall be the responsibility of the owner to restore said surface to an approved state of maintenance and repair.

*{This update combines "A" and "B" into one statement for ease of understanding.}*

## Sec. 14-39. Rubbish, garbage, junk, litter, and storage containers (Portable On-demand Storage Containers)

## Sec. 14-39 Garbage, Junk, Litter, and Containers

(A) *Accumulation of rubbish, garbage, junk, and litter.* Exterior property and premise, and the interior of every structure, shall be free from any accumulation of rubbish, garbage, junk, and litter.

**(A)** *Accumulation of garbage, junk, and litter.* Exterior property and premises shall be kept free from any visible accumulation of garbage, junk, and/or litter.

*{This update provides clarity for the areas of a premises that should be kept clear of garbage, junk, and litter.*

*"Property" refers to the entirety of the land, buildings, structures, equipment, etc., owned by the landowner. "Premises" refers to only that portion of the property and/or components of it that are the subject of the lease.*

**(B)** Disposal of ~~Rubbish~~ Garbage, Junk, and Litter

   **(1)** Every occupant of a structure shall dispose of all ~~rubbish,~~ garbage, junk, and litter in a clean and sanitary manner by placing such materials in approved containers

   **(2)** *Storage facilities.* The owner of every occupied premises shall supply approved containers for ~~rubbish,~~ garbage, junk, and litter and the owner of the premises shall be responsible for the removal of such materials.

**(3)** *Refrigerators*. *Appliances.* ~~Refrigerators~~ Appliances and similar equipment not in operation shall not be discarded, abandoned, or stored on premises.

*{Updating to encompass all appliances because refrigerators are not the only appliances that can be dangerous or unsightly if they are present on a premises.*

*Removing the term "rubbish" from this section for consistency}*

~~(C) Containers~~

~~(1) The operator of every establishment producing garbage shall provide, and at all times cause to be utilized, approved leakproof containers provided with close-fitting covers for the storage of such materials until removed from the premises for disposal.~~

~~(2) Every occupant of a residential dwelling unit shall provide, and at all times utilize, a leakproof container provided with a close-fitting cover for the storage of materials until removed from the premises for disposal. Such containers shall not exceed a capacity of one hundred (100) gallons.~~

~~(3) An owner or occupant of a residential dwelling unit may temporarily store a garbage or rubbish container on the premises that exceeds a capacity of one hundred (100) gallons under the following conditions:~~

~~(a) For a period of not more than thirty (30) consecutive days; or~~

~~(b) While in possession of a valid and active building permit issued by the Town~~

~~(4) Such containers provided for in Sec. 14-39C (3a) or Sec. 14-39C (3b) shall not be placed on public streets, sidewalks, walking trails, stormwater drainage facilities, or public property.~~

**(C) Containers**

**(1)** No owner, occupant, or agent of any property, including any lot, tract, or parcel of land (improved or unimproved) within the Town is permitted to utilize a container which exceeds a capacity of one hundred (100) gallons (13.37 cubic feet) as a dwelling, for any accessory use, building, or structure or for any agricultural use, building or structure; unless:

**a)** The container is used in accordance with Sec. 14-39C (2c) or 14-39C (3a) as provided for in sections 14-39C (2c) or 14-39C (3a) of this chapter; or

**b)** The container has been properly engineered for such use and meets all zoning and building code requirements.

**(2) Garbage Containers** -

**(a)** The operator of every establishment producing garbage shall provide, and at all times cause to be utilized, approved leakproof containers with close-fitting covers for the storage of such materials until removed from the premises for disposal.

12

**(b)** Every occupant of a residential dwelling unit shall provide, and at all times utilize, a leakproof container with a close-fitting cover for the storage of materials until removed from the premises for disposal. Such containers shall not exceed a capacity of one hundred (100) gallons (13.37 cubic feet).

**(c)** An owner or occupant of a property within the Town may temporarily store a garbage container on the premises that exceeds a capacity of one hundred (100) gallons (13.37 cubic feet) under the following conditions:

**(1)** For a period not more than thirty (30) consecutive days; or

**(2)** While in possession of a valid and active building permit issued by the Town.

**(3) Shipping/Storage Containers**

**(a)** An owner or occupant of a residential dwelling unit may temporarily utilize a shipping/storage container on the premises that exceeds a capacity of one hundred (100) gallons (13.37 cubic feet) under the following conditions:

**(1)** For a period of not more than thirty (30) consecutive days; or

**(2)** While in possession of a valid and active building permit issued by the Town

**(4)** Such containers provided for in Sec. 14-40C (2c) or Sec. 14-40C (3a) shall not be placed on public streets, sidewalks, walking trails, stormwater drainage facilities, or public property.

*{This section is being replaced and broken down to clarify the difference between shipping/ storage containers and garbage containers.}*

**(D) Litter**

**(1)** *Litter in public places*. No person shall throw or deposit litter in or upon any street, sidewalk, or other public place within the Town except in public receptacles, in private receptacles for collection, or in official dumps.

**(2)** *Obstruction of drainage ditches, swales, etc*. It shall be a violation of this division for any person to place yard clippings, leaves, wood or ~~rubbish~~ garbage in any drainage ditch, swale, culvert, or other storm water drainage way.

*{Removing "rubbish" replacing with garbage for consistency throughout the chapter.}*

**(3)** *Depositing litter or leaves and grass clippings into gutters or on sidewalks prohibited.* No person shall sweep into or deposit in any gutter, street, or other public place within the Town the accumulation of litter, yard clippings, leaves, wood, mulch or ~~rubbish~~ garbage from any building, lot, or public or private sidewalk or driveway. Persons owning or occupying property shall keep the sidewalk in front of their premises free of litter and yard clippings.

*{Removing "rubbish" replacing with garbage for consistency throughout the chapter.}*

13

**(4) _Litter thrown by persons in vehicles._** No person, while a driver or passenger in a vehicle, shall throw or deposit litter upon any street or other public place within the Town, or upon private property.

**(5) _Truck loads causing litter._** No person shall drive or move any truck or other vehicle within the Town unless such vehicle is so constructed or loaded as to prevent any load, contents, or litter from being blown or deposited upon any street, alley, or other public place.

**(6) _Litter in parks_.** No person shall throw or deposit litter in any park within the Town except in public receptacles. Where public receptacles are not provided, all such litter shall be carried away from the park by the person responsible for its presence and properly disposed of elsewhere as provided herein.

**(7) _Litter in lakes and fountains._** No person shall throw or deposit litter in any fountain, pond, lake, stream, bay or any other body of water in a park or elsewhere within the Town.

**(8) _Litter on private property_.** No person shall throw or deposit litter on any occupied or open or vacant private property of another within the Town and no person shall throw or deposit ashes, yard clippings, leaves and/or wood on any occupied or open or vacant private property of another within the Town without permission of the owner of such property.

_{Section 14-39 (D) "Litter" was formerly Section 14-34 Litter. Moved to subsection of 14-39 because the section covers Garbage, Junk, Litter, and Containers}_

Sec. 14-40. Pest Elimination

Structures shall be kept free from insect and rodent infestation. Structures in which insects or rodents are found shall be promptly exterminated by approved processes that will not be injurious to human health. After pest elimination, proper precautions shall be taken to prevent re-infestation.

### Sec 14-40 – Brush and Tree Debris

No owner, occupant, or agent of any property, including any lot, tract, or parcel of land (improved or unimproved) in this Town shall maintain such property, including swale or retention areas, sidewalks, greenway paths, waterways, or right of ways abutting such property, in such a manner that there is any accumulation of brush or tree debris on such property for a period exceeding ten (10) days.

_{The Town receives complaints involving brush and tree debris that are difficult to enforce under the current ordinance, because brush and wood are defined as litter or junk. The added section would help clarify that an accumulation of tree debris or brush is a violation. This is due to risk of brush fire, being a place for rodent and vermin habitation, along with being unsightly when accumulated.}_

**Secs. 14-41 – 14-51. Reserved**

**Division 3- ~~Motor~~ Vehicles, Trailers, and Major Recreational Equipment**

**Sec. 14-52. ~~Motor~~ Vehicles, Trailers, and Major Recreational Equipment**

14

*{Removing term "motor" to match definition and vehicle related ordinances.}*

**(A)** Except as provided for in other regulations, inoperable or unregistered vehicles, trailers, or major recreational equipment, shall not be parked, kept, or stored on any premises, and vehicles shall not at any time be in a state of major disassembly, disrepair, or in the process of being stripped or dismantled.

*{Adding "trailers and major recreational equipment" to this section because when they are inoperable or unregistered, they can become an attractive nuisance for children or vagrants.}*

**(B)** Painting of vehicles is prohibited unless conducted inside an approved spray booth.

**(C)** A vehicle of any type is permitted to undergo major overhaul, including body work, provided that such work is performed inside a structure or similarly enclosed area designed and approved for such purposes.

**(D)** ~~In residential areas,~~ Vehicles, trailers, and major recreational equipment shall be parked or stored only on approved surfaces, including but not limited to, concrete, asphalt, or paver stones. The approved surface area must exceed the length and width of the vehicle, trailer, or major recreational equipment to be parked upon it. Placing pavers, concrete, or asphalt under only the tires of the vehicle, trailer or major recreation equipment does not meet compliance of this section.

*{Removing "residential areas" from this area because this is a commonly reported issue in areas other than residential. This also adds clarity for the expectations of an approved area in which these items are being stored.}*

~~(E) No major recreational equipment or trailers shall be parked or stored in any front yard of any lot in a residential district. However, such equipment may park on residential premises for a period not to exceed twenty-four (24) hours during loading or unloading. No such equipment shall be used for living, sleeping, or housekeeping purposes when parked or stored on a residential lot or in any location not approved for such use.~~

**(E)** No major recreational equipment or trailers shall be parked or stored in a front yard within any residential zoning district, except where such equipment or trailer is parked on an approved surface for loading and/or unloading for a period not to exceed 48 hours.

  **(1)** All major recreational equipment or trailers parked or stored on any property, other than during loading and/or unloading as described above, shall meet the following requirements:

    **A)** All such equipment and trailers must be maintained in a clean, safe, and sanitary condition, must not be significantly damaged or continuously under repair, and all tires must remain inflated.

    **B)** All major recreational equipment requiring registration must be registered to an owner of the property.

    **C)** All pop-outs, extensions, stairs and awnings and similar appurtenances must be closed.

    **D)** All hookups, including but not limited to sewer, water, electrical, cable must be disconnected.

15

**(2)** No major recreational equipment or trailers shall be used for any use, including but not limited to living, sleeping, or housekeeping purposes when parked or stored on any lot or location not approved by the Town for such use.

**(3)** No major recreational equipment or trailers shall be parked or stored on any public street, greenway, trail, walking path or public property.

*{This section is being deleted and restructured to clarify the requirements for major recreational equipment and trailers and to improve enforcement when such equipment appears to be used for living, sleeping, housekeeping, and other prohibited uses. The timeframe for loading/ unloading is being increased to 48 hours to allow a more reasonable timeframe for citizens to load/ unload their major recreational equipment}*

~~**(F)** No major recreational equipment or trailers shall be parked or stored on any public street, greenway, trail, walking path, or public property.~~

*{This section has been moved to become subsection (E3) for better flow because it pertains to major recreational equipment}*

**(F)** In approved parking lots, the parking of vehicles, trailers, and major recreational equipment shall only be permitted within designated parking spaces. The property owner or agent shall not permit parking of vehicles, trailers, or recreational equipment outside of designated parking spaces and is responsible for ensuring parking compliance.

*{The addition of this section is intended to prevent parking that prohibits the safe flow of traffic through approved parking lots.}*

**Secs. 14-53 – 14-63. Reserved**

**Division 4 - Exterior of Structures**

**Sec. 14-64. Exterior of Structures**

**(A)** *General Conditions*. The exterior of a structure shall be maintained in good repair, structurally sound, and sanitary so as not to pose a threat to the public health, safety, or welfare.

**(B)** *Unsafe Conditions*. The following conditions shall be determined as unsafe and shall be repaired or replaced to comply with the International Building Code or the International Existing Building Code as required for existing buildings (building permit may be required):

*{Adding "Building permit may be required" because it can be confusing for a citizen to receive a notice of violation that has a deadline to repair an unsafe condition, often if they receive the notice, they try to repair it quickly to avoid a citation to municipal court. Adding this phrase may prevent unpermitted repairs from being completed and additional fines or permit fees from being assessed.}*

16

**(1)** The nominal strength of any structural member is exceeded by nominal loads, the load effects, or the required strength.

**(2)** The anchorage of the floor or roof to walls or columns, and of walls and columns to foundations is not capable of resisting all nominal loads or load effects.

**(3)** Structures or components thereof that have reached their limit state.

**(4)** Siding and masonry joints including joints between the building envelope and the perimeter of windows, doors and skylights are not maintained, weather resistant or watertight.

**(5)** Structural members that have evidence of deterioration or that are not capable of safely supporting all nominal loads and load effects.

**(6)** Foundation systems that are not firmly supported by footings, are not plumb and free from open cracks and breaks, are not properly anchored or not capable of supporting all nominal loads and resisting all load effects.

**(7)** Exterior walls that are not anchored to supporting and supported elements are not plumb and free of holes, cracks or breaks and loose or rotting materials, are not properly anchored or are not capable of supporting all nominal loads and resisting all load effects.

**(8)** Roofing or roofing components that have defects that admit rain, roof surfaces with inadequate drainage, or any portion of the roof framing that is not in good repair with signs of deterioration, fatigue, or without proper anchorage and incapable of supporting all nominal loads and resisting all load effects.

**(9)** Flooring and flooring components with defects that affect serviceability or flooring components that show signs of deterioration or fatigue, or not properly anchored or are incapable of supporting all nominal loads and resisting all load effects.

**(10)** Veneer, cornices, belt courses, corbels, trim, wall facings and similar decorative features not properly anchored or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(11)** Overhang extensions or projections including, but not limited to, trash chutes, canopies, marquees, signs, awnings, fire escapes, standpipes and exhaust ducts not properly anchored or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(12)** Exterior stairs, decks, porches, balconies, and all similar appurtenances attached thereto, including guards and handrails, are not structurally sound, not properly anchored or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(13)** Chimneys, cooling towers, smokestacks, and similar appurtenances not structurally sound or not properly anchored, or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(14)** *Protective treatment.* Exterior surfaces, including but not limited to, doors, door and window frames, cornices, porches, trim, balconies, decks, and fences, shall be maintained in good condition.

17

Exterior wood surfaces, other than decay-resistant woods, shall be protected from the elements and decay by painting or other protective covering or treatment. Peeling, flaking and chipped paint shall be eliminated, and surfaces repainted. Siding and masonry joints, as well as those between the building envelope and the perimeter of windows, doors, and skylights, shall be maintained weather resistant and watertight. Metal surfaces subject to rust or corrosion shall be coated to inhibit such rust and corrosion, and surfaces with rust or corrosion shall be stabilized and coated to inhibit future rust and corrosion. Oxidation stains shall be removed from exterior surfaces. Surfaces designed for stabilization by oxidation are exempt from this requirement.

**(15)** *Premises identification***.** Buildings shall have approved address numbers placed in a position to be plainly legible and visible from the street or road fronting the property. These numbers shall contrast with their background. Address numbers shall be Arabic numerals or alphabet letters. Numbers shall not be less than four (4) inches in height with a minimum stroke width of one half (0.5) inches.

**(16)** *Structural Members***.** Structural members shall be maintained free from deterioration and shall be capable of safely supporting the imposed dead and live loads.

**(17)** *Foundation walls*. Foundation walls shall be maintained plumb and free from open cracks and breaks and shall be kept in such condition so as to prevent the entry of rodents and other pests.

**(18)** *Exterior Walls***.** Exterior walls shall be free from holes, breaks, and loose rotting materials, and maintained weatherproof and properly surface coated where required to prevent deterioration.

**(19)** *Roofs and drainage***.** The roof and flashing shall be sound, tight, and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall not be discharged in a manner that creates a public nuisance.

**(20)** *Decorative features*. Cornices, belt courses, corbels, terra cotta trim, wall facings and similar decorative features shall be maintained in good repair with proper anchorage and in a safe condition.

**(21)** *Overhang extensions***.** Overhang extensions including, but not limited to, canopies, marquees, signs, metal awnings, fire escapes, standpipes and exhaust ducts shall be maintained in good repair and be properly anchored so as to be kept in sound condition. Where required, all exposed surfaces of metal or wood shall be protected from the elements and against decay, or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**(22)** *Stairways, decks, porches, and balconies***.** Every exterior stairway, deck, porch and balcony, and all appurtenances attached thereto, shall be maintained structurally sound, in good repair, with proper anchorage and capable of supporting the imposed loads.

**(23)** *Chimneys and towers***.** Chimneys, cooling towers, smokestacks, and similar appurtenances shall be maintained structurally safe and sound, and in good repair. Exposed faces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**(24) Handrails and guards**

18

**(a)** Every handrail and guard shall be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition.

**(b)** Every exterior and interior flight of stairs having more than four risers shall have on one side of the stair and every open portion of a stair, landing, balcony, porch, deck, ramp, or other walking surface that is more than thirty (30) inches above the floor or grade below shall have guards.

**(c)** Handrails shall be not less than thirty (30) inches in height or more than forty-two (42) inches in height measured vertically above the nosing of the tread or above the finished floor of the landing or walking surfaces.

**(d)** Guards shall not be less than thirty (30) inches in height above the floor of the landing, balcony, porch, deck, ramp, or other walking surface.

**(25)** *Window, skylight, and door frames*. Every window, skylight, door, and frame shall be kept in sound condition, good repair, and weather tight.

**(a)** Glazing

Glazing materials shall be maintained free from cracks and holes.

**(b)** Openable windows

Every window, other than a fixed window, shall be easily openable and capable of being held in position by window hardware.

**(26)** *Insect Screens*. Every door, window and other outside opening required for ventilation of habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged, or stored shall be supplied with approved tightly fitting screens of minimum sixteen (16) mesh per inch, and every screen door used for insect control shall have a self-closing device in good working condition.

**(27)** *Doors*. Exterior doors, door assemblies, operator systems if provided, and hardware shall be maintained in good condition. Locks at all entrances to dwelling units shall tightly secure the door. Locks on means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge, or effort, except where the door hardware conforms to that permitted in the International Building Code.

**(28)** *Basement Hatchways*. Every basement hatchway shall be maintained to prevent the entrance of rodents, rain, and surface drainage water.

**(29)** *Guards for basement windows*. Every basement window that is openable shall be supplied with rodent shields, storm windows or other approved protection against the entry of rodents.

**(30)** *Building Security*. Doors, windows, or hatchways for dwelling units shall be provided with devices designed to provide security for the occupants and property within.

19

(a) *Doors.* Doors providing access to a dwelling unit that is rented, leased, or let shall be equipped with a deadbolt lock designed to be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort and shall have a minimum lock throw of one (1) inch. Such deadbolt locks shall be installed according to the manufacturer's specifications and maintained in good working order. For the purpose of this section, a sliding bolt shall not be considered an acceptable deadbolt lock.

(b) *Windows.* Operable windows located in whole or in part within 6 feet above ground level or walking surface below that provide access to a dwelling unit that is rented, leased, or let shall be equipped with a window sash locking device.

(c) *Basement hatchways*. Basement hatchways that provide access to a dwelling unit that is rented, leased, or let shall be equipped with devices that secure the units from unauthorized entry.

**(31)** *Gates*. Exterior gates, gate assemblies, operator systems if provided, and hardware shall be maintained in good condition. Latches at all entrances shall tightly secure the gates.

(C) *Demolition.* Demolition of unsafe conditions shall be permitted in lieu of repair where approved by the public officer or his/her designee.


**Secs. 14-65 – 14-75. Reserved**


**Division 5. Enforcement**

**Sec. 14-76. Enforcement**

**(A)** *Complaint.* A complaint about any violation of the provisions of this article may be reported to the Town office by any person observing the violation. The complainant shall identify himself/herself to the Town office prior to any action being taken by the Town Administrator or his/her designee.

**(B)** *Notice of Violation.* Once a complaint is received, the Town Administrator or his/her designee is hereby authorized and empowered to investigate the complaint and, if the complaint is found by the Town Administrator or his/her designee to be a condition that is a violation of this article, then, and in the discretion of the Town Administrator or his/her designee, a citation and summons to municipal court may be issued, or a written notice may be sent to the owner or agent of such owner of any such lot, place, or area within the Town to repair, abate, destroy, and/or remove any such nuisances or unsafe conditions on such owner's property, or upon the sidewalk abutting same. Such notice may be served personally upon the owner or his/her agent, occupant, or tenant, may be mailed regular first class, or certified, or registered mail to the owner or occupant at his/her last known address, or as otherwise authorized by the laws of The State of Tennessee.

Nothing in this section or part shall preclude the Town Administrator or his/her designee from issuing a citation or summons to municipal court immediately upon investigation and verification that a violation of this article exists.

20

**(C) Action for noncompliance.**

**(1)** Upon either the Town Administrator's or his/her designee's election to issue a citation and summons to municipal court, or the failure, neglect, or refusal of any owner or agent to repair, abate, destroy and/or remove such nuisances or unsafe conditions located upon such owner's property, or upon the sidewalk or street abutting same, within the time frame specified according to the notice provided for in subsection (B) of this section, or in the event the same is returned in the mail to the Town because of inability to make delivery thereof, provided the same was properly addressed to the last known address of such owner, or agent, a citation or summons to municipal court may be issued to the owner or agent so notified for violation of this article.

Nothing in this section or part shall preclude the Town Administrator or his/her designee from issuing a citation or summons to municipal court immediately upon investigation and verification that a violation of this article exists.

**(2)** If the owner or agent is found by the municipal court to have violated this article and shall fail to remedy such conditions within ten (10) consecutive days of the date of the conviction, or, if the finding of a violation of this article is timely appealed to the Knox County Circuit Court, upon an order from Knox County Circuit Court finding a violation of this article becomes final, if the owner or agent fails to remedy such conditions within ten (10) consecutive days of the date the Knox County Circuit Court Order becoming final, unless the finding of a violation has been appealed to the Knox County Circuit Court, the Town Administrator or his/her designee is authorized to take such action as is necessary to remedy the conditions and abate the nuisance. Upon completion of such work, the reasonable cost thereof, including the cost for inspections, notifications, and other incidental and administrative costs in connection therewith, shall be paid by the owner or agent of said property and said costs shall be billed to the owner or agent of said property. If the bill is not fully paid within sixty (60) days after the date of said bill, the total amount of the bill shall be certified by the town recorder and collected in the manner provided by law.

*{This information is being added to clarify the appeal process}*

**Secs. 14-77 – Sec. 14-87. Reserved**

**SECTION 2.**

This ordinance shall take effect from and after its final passage and publication, the public welfare requiring it.

_____

Ron Williams, Mayor

_____

21

Allison Myers, Town Recorder

# Clean Copy

| | |
|---|---|
| **ORDINANCE:** | **23-12** |
| **PREPARED BY:** | **Marlowe** |
| **REQUESTED BY:** | **Staff** |
| **1ST READING:** | |
| **2ND READING:** | |
| **PUBLISHED IN:** | _____ |
| **DATE:** | _____ |

## AN ORDINANCE TO AMEND CHAPTER 14, NUISANCES AND PROPERTY MAINTENANCE, OF THE FARRAGUT MUNICIPAL CODE:

**WHEREAS,** The Board of Mayor and Aldermen of the Town of Farragut, Tennessee, wishes to amend Chapter 14, Nuisances and Property Maintenance, of the Farragut Municipal Code,

**NOW, THEREFORE, BE IT ORDAINED** by the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, that the Farragut Municipal Code is hereby amended as follows:

**SECTION 1.**

The Farragut Municipal Code, Chapter 14, Nuisances and Property Maintenance, is amended by deleting the chapter in its entirety and substituting the following in lieu thereof:

**Chapter 14- NUISANCES & PROPERTY MAINTENANCE**

**ARTICLE 1- General**

**Sec. 14-1. Scope**

The provisions of this chapter shall specify the minimum conditions and govern the responsibilities of persons for the maintenance of structures, equipment, and exterior property, both residential and commercial.

**Sec. 14-2. Responsibility**

The owner or occupant of the premises shall maintain the structures and exterior property in compliance with the requirements of this chapter. A person shall not occupy as owner-occupant or permit another person to occupy premises that are not in a sanitary and safe condition and that do not comply with the requirements of this chapter. Occupants of a dwelling unit are responsible for keeping in a clean, sanitary, and safe condition that part of the dwelling unit or premises they occupy and control.

**Sec. 14-3. Vacant structures and land**

Case 3:23-cv-00402-TRM-JEM   Document 6-54   Filed 11/11/23   Page 25 of 107   PageID #: 2448

Vacant structures and premises thereof or vacant land shall be maintained in a clean, safe, secure, and sanitary condition as provided herein so as not to cause a blighting problem or adversely affect public health or safety.

## Sec. 14-4. Violation

Any person who shall violate a provision of this chapter, or fail to comply therewith, or with any of the requirements thereof, may be prosecuted within the limits provided by local laws. Each day that a violation continues shall be deemed a separate offense and subject to a separate penalty.

## Sec. 14-5. Definitions

For the purposes of this chapter, the following terms, phrases, words, and their derivations shall have the meanings given herein:

*Approved* means acceptable to the code official.

*Approved Natural Areas* means an area that may include, but not necessarily be limited to, open space lots where physical improvements (other than linear pedestrian/bicycle facilities) are not planned, detention basins, major platted drainage areas, sinkholes, farms with agricultural uses (as defined in the Farragut Zoning Ordinance), buffer strips, forested areas, wetlands, areas that include conservation easements, and other similar areas as determined by the Town code enforcement officer.

*Brush* means woody material, whether dead or alive, that has been trimmed or fallen from trees, shrubs, or bushes.

*Code Official* means the official who is charged with the administration and enforcement of this code, or any duly authorized representative as designated by the town administrator.

*Dwelling or Dwelling Unit* means any building or structure, or part thereof, used and occupied for human occupation or use or intended to be used, and includes any outhouses and appurtenances belonging thereto or usually enjoyed therewith.

*Front Yard* means the space between the public right of way or street and the nearest projection of a residential dwelling.

*Garbage* means wasted or spoiled food and other refuse from a kitchen or household, putrescible, and non-putrescible solid wastes (except body wastes), both combustible and non-combustible wastes, such as paper, wrappings, cigarettes, cardboard, tin cans, glass, bedding, crockery, rubbish, street cleanings, dead animals, abandoned vehicles, solid market and industrial wastes, and similar materials.

*Inoperable Vehicle* means a vehicle that cannot be driven upon the public streets for reason including but not limited to being neglected, unlicensed, wrecked, abandoned, in a state of disrepair or deterioration, or incapable of being moved under its own power.

*Junk* means any accumulation of items including, but not limited to, scrap, waste, reclaimable material, debris, unregistered or inoperable vehicles, tires, vehicle parts, equipment parts. paper, plastic, plastic bags, cardboard, rags, metal, glass, building materials, household appliances, furniture, machinery, machinery parts, brush, wood, lumber, and other similar items whether or not being stored, for sale or in the process of being dismantled, destroyed, processed, salvaged, stored, baled, disposed, or any other use or disposition.

24

*Litter* means "garbage," or "junk" as defined herein and all other waste materials which, if thrown or deposited as herein prohibited, tends to create a danger to public health, safety, and welfare.

*Major Recreational Equipment* means boats, boat trailers, travel trailers, tent trailers, pick-up campers, or coaches (designed to be mounted on automotive vehicles), motorized dwellings, all-terrain vehicles (ATV), jet skis, and the like.

*Newspaper* means any newspaper of general circulation as defined by general law, any newspaper duly entered with the post office department of the United States, in accordance with federal statute or regulation, and any newspaper filed and recorded with any recording officer as provided by general law; and, in addition thereto, shall mean and include any periodical or current magazine regularly published with not less than four issues per year, and sold to the public.

*Nuisance* means the existence within the corporate limits of the Town of conditions which violate the provisions of this chapter, and which endanger the public health, safety, or welfare.

*Park* means a park, reservation, playground, beach, recreation center or any other public area in the Town, owned or used by the Town and devoted to active or passive recreation.

*Public place* means any and all streets, sidewalks, boulevards, alleys or other public ways and any and all public parks, squares, spaces, grounds, and buildings.

*Rodent harborage* means any condition which provides shelter or protection for rodents, or which favors their habitation, multiplication, and/or continued existence.

*Shipping/Storage container* means any container which exceeds 100 gallons (13.37 cubic feet) in capacity originally designed for or used in the packaging, shipping, storing, movement or transportation of freight, articles, goods, or commodities and/or originally designed for or capable of being mounted or moved by rail, truck, or ship by means of being mounted on a chassis or similar transport device.

*Tenant* means a person, corporation, partnership, or group, whether or not the legal owner of record, occupying a building or portion thereof as a unit.

*Tree debris* means all parts of a tree that has been cut down or has fallen naturally, and include, but is not limited to, trunk, roots, branches, and foliage.

*Vehicle* means every device in, upon, or by which any person or property is or may be transported or drawn upon a highway, including devices used exclusively upon stationary rails or tracks.

**Weeds** means any plant or plant residue which is kept in an unmanaged or overgrown condition.


**Secs. 14-6 – 14-16. Reserved**


**ARTICLE 2. Property Maintenance**

**Division 1- General**

**Sec. 14-17. Authority**

This article is adopted under general authority granted in T.C.A § 6-2-201(22), (23) and (25), under the specific statutory authorities set forth herein.

## Sec. 14-18. Administration

The Town Administrator or his/her designee shall have authority to administer and enforce the provisions of this article.

## Secs. 14-19 – 14-29. Reserved

## Division 2- Exterior Property Areas

## Sec. 14-30. Sanitation and Safety

Exterior property and premises shall be maintained in a clean, safe, and sanitary condition. The occupant shall keep that part of the exterior property that such occupant occupies or controls in a clean and sanitary condition.

## Sec. 14-31. Grading and drainage

Premises shall be graded and maintained to prevent the erosion of soil and to prevent the accumulation of stagnant water thereon, or within any structure located thereon. Approved retention areas and reservoirs shall not be considered a violation of this section.

## Sec.14-32. Sidewalks and driveways

Sidewalks, walkways, walking trails, greenways, stairs, driveways, parking spaces and similar areas shall be kept in a proper state of repair, and maintained free from hazardous conditions.

## Sec. 14-33. Weeds

No owner, occupant or agent of any property, lot, tract, or parcel of land (improved or unimproved) within the Town, shall  maintain such property, including swale or retention areas, sidewalks, greenway paths, waterways, or right of ways abutting such property, in such a manner that there is an accumulation or untended growth of weeds, grass, undergrowth, deleterious or unhealthful growths, or other dead or living plant life that may be growing, lying, or located thereon to exceed a height of twelve (12) inches. This section does not apply to the owner or operator of an operating farm or an approved natural area.

## Sec. 14-34. Rodent Harborage

Structures and exterior property shall be kept free from rodent harborage and infestation. The owner or occupant of any property or structure shall be responsible for pest elimination.

## Sec. 14-35. Pest Elimination

Structures shall be kept free from insect and rodent infestation. Structures in which insects or rodents are found shall be promptly exterminated by approved processes that will not be injurious to human health. After pest elimination, proper precautions shall be taken to prevent re-infestation.

### Sec. 14-36. Exhaust vents

Pipes, ducts, conductors, fans, or blowers shall not discharge gases, steam, vapor, hot air, grease, smoke, odors, or other gaseous or particulate wastes directly on abutting or adjacent public or private property or that of another tenant.

### Sec. 14-37. Accessory Structures

Accessory structures, including storage buildings, detached garages, fences, walls, swimming pools and other such structures shall be maintained structurally sound and in good repair.

### Sec. 14-38. Defacement of property

A person shall not willfully or wantonly damage, mutilate, or deface any exterior surface of any structure or building on any private or public property by placing thereon any marking, carving or graffiti. It shall be the responsibility of the owner to restore said surface to an approved state of maintenance and repair.

### Sec. 14-39 Garbage, Junk, Litter, and Containers

**(A)** *Accumulation of garbage, junk, and litter*. Exterior property and premises shall be kept free from any visible accumulation of garbage, junk, and/or litter.

**(B) Disposal of Garbage, Junk, and Litter**

> **(1)** Every occupant of a structure shall dispose of all garbage, junk, and litter in a clean and sanitary manner by placing such materials in approved containers
>
> **(2)** *Storage facilities*. The owner of every occupied premises shall supply approved containers for garbage, junk, and litter and the owner of the premises shall be responsible for the removal of such materials.
>
> **(3)** *Appliances.* Appliances and similar equipment not in operation shall not be discarded, abandoned, or stored on premises.

**(C)  Containers**

> **(1)** No owner, occupant, or agent of any property, including any lot, tract, or parcel of land (improved or unimproved) within the Town is permitted to utilize a container which exceeds a capacity of one hundred (100) gallons (13.37 cubic feet) as a dwelling, for any accessory use, building, or structure or for any agricultural use, building or structure; unless:

27

**a)** The container is used in accordance with Sec. 14-39C (2c) or 14-39C (3a) as provided for in sections 14-39C (2c) or 14-39C (3a) of this chapter; or

**b)** The container has been properly engineered for such use and meets all zoning and building code requirements.

**(2) Garbage Containers -**

**(a)** The operator of every establishment producing garbage shall provide, and at all times cause to be utilized, approved leakproof containers with close-fitting covers for the storage of such materials until removed from the premises for disposal.

**(b)** Every occupant of a residential dwelling unit shall provide, and at all times utilize, a leakproof container with a close-fitting cover for the storage of materials until removed from the premises for disposal. Such containers shall not exceed a capacity of one hundred (100) gallons (13.37 cubic feet).

**(c)** An owner or occupant of a property within the Town may temporarily store a garbage container on the premises that exceeds a capacity of one hundred (100) gallons (13.37 cubic feet) under the following conditions:

**(1)** For a period not more than thirty (30) consecutive days; or

**(2)** While in possession of a valid and active building permit issued by the Town.

**(3) Shipping/Storage Containers**

**(a)** An owner or occupant of a residential dwelling unit may temporarily utilize a shipping/storage container on the premises that exceeds a capacity of one hundred (100) gallons (13.37 cubic feet) under the following conditions:

**(1)** For a period of not more than thirty (30) consecutive days; or

**(2)** While in possession of a valid and active building permit issued by the Town

**(4)** Such containers provided for in Sec. 14-40C (2c) or Sec. 14-40C (3a) shall not be placed on public streets, sidewalks, walking trails, stormwater drainage facilities, or public property.

**(D) Litter**

**(1)** *Litter in public places***.** No person shall throw or deposit litter in or upon any street, sidewalk, or other public place within the Town except in public receptacles, in private receptacles for collection, or in official dumps.

28

**(2)** *Obstruction of drainage ditches, swales, etc*. It shall be a violation of this division for any person to place yard clippings, leaves, wood or garbage in any drainage ditch, swale, culvert, or other storm water drainage way.

**(3)** *Depositing litter or leaves and grass clippings into gutters or on sidewalks prohibited*. No person shall sweep into or deposit in any gutter, street, or other public place within the Town the accumulation of litter, yard clippings, leaves, wood, mulch or garbage from any building, lot, or public or private sidewalk or driveway. Persons owning or occupying property shall keep the sidewalk in front of their premises free of litter and yard clippings.

**(4)** *Litter thrown by persons in vehicles.* No person, while a driver or passenger in a vehicle, shall throw or deposit litter upon any street or other public place within the Town, or upon private property.

**(5)** *Truck loads causing litter.* No person shall drive or move any truck or other vehicle within the Town unless such vehicle is so constructed or loaded as to prevent any load, contents, or litter from being blown or deposited upon any street, alley, or other public place.

**(6)** *Litter in parks*. No person shall throw or deposit litter in any park within the Town except in public receptacles. Where public receptacles are not provided, all such litter shall be carried away from the park by the person responsible for its presence and properly disposed of elsewhere as provided herein.

**(7)** *Litter in lakes and fountains.* No person shall throw or deposit litter in any fountain, pond, lake, stream, bay or any other body of water in a park or elsewhere within the Town.

**(8)** *Litter on private property*. No person shall throw or deposit litter on any occupied or open or vacant private property of another within the Town and no person shall throw or deposit ashes, yard clippings, leaves and/or wood on any occupied or open or vacant private property of another within the Town without permission of the owner of such property.

## Sec 14-40 – Brush and Tree Debris

No owner, occupant, or agent of any property, including any lot, tract, or parcel of land (improved or unimproved) in this Town shall maintain such property, including swale or retention areas, sidewalks, greenway paths, waterways, or right of ways abutting such property, in such a manner that there is any accumulation of brush or tree debris on such property for a period exceeding ten (10) days.

## Secs. 14-41 – 14-51. Reserved

## Division 3- Vehicles, Trailers, and Major Recreational Equipment

## Sec. 14-52. Vehicles, Trailers, and Major Recreational Equipment

**(A)** Except as provided for in other regulations, inoperable or unregistered vehicles, trailers, or major recreational equipment, shall not be parked, kept, or stored on any premises, and vehicles shall not at any time be in a state of major disassembly, disrepair, or in the process of being stripped or dismantled.

**(B)** Painting of vehicles is prohibited unless conducted inside an approved spray booth.

**(C)** A vehicle of any type is permitted to undergo major overhaul, including body work, provided that such work is performed inside a structure or similarly enclosed area designed and approved for such purposes.

**(D)** Vehicles, trailers, and major recreational equipment shall be parked or stored only on approved surfaces, including but not limited to, concrete, asphalt, or paver stones. The approved surface area must exceed the length and width of the vehicle, trailer, or major recreational equipment to be parked upon it. Placing pavers, concrete, or asphalt under only the tires of the vehicle, trailer or major recreation equipment does not meet compliance of this section.

**(E)** No major recreational equipment or trailers shall be parked or stored in a front yard within any residential zoning district, except where such equipment or trailer is parked on an approved surface for loading and/or unloading for a period not to exceed 48 hours.

> **(1)** All major recreational equipment or trailers parked or stored on any property, other than during loading and/or unloading as described above, shall meet the following requirements:
>
> > **A)** All such equipment and trailers must be maintained in a clean, safe, and sanitary condition, must not be significantly damaged or continuously under repair, and all tires must remain inflated.
> >
> > **B)** All major recreational equipment requiring registration must be registered to an owner of the property.
> >
> > **C)** All pop-outs, extensions, stairs and awnings and similar appurtenances must be closed.
> >
> > **D)** All hookups, including but not limited to sewer, water, electrical, cable must be disconnected.
>
> **(2)** No major recreational equipment or trailers shall be used for any use, including but not limited to living, sleeping, or housekeeping purposes when parked or stored on any lot or location not approved by the Town for such use.
>
> **(3)** No major recreational equipment or trailers shall be parked or stored on any public street, greenway, trail, walking path or public property.

**(F)** In approved parking lots, the parking of vehicles, trailers, and major recreational equipment shall only be permitted within designated parking spaces. The property owner or agent shall not permit parking of vehicles, trailers, or recreational equipment outside of designated parking spaces and is responsible for ensuring parking compliance.

**Secs. 14-53 – 14-63. Reserved**

**Division 4 - Exterior of Structures**

**Sec. 14-64. Exterior of Structures**

**(A)** *General Conditions*. The exterior of a structure shall be maintained in good repair, structurally sound, and sanitary so as not to pose a threat to the public health, safety, or welfare.

**(B)** *Unsafe Conditions*. The following conditions shall be determined as unsafe and shall be repaired or replaced to comply with the International Building Code or the International Existing Building Code as required for existing buildings (building permit may be required):

 **(1)** The nominal strength of any structural member is exceeded by nominal loads, the load effects, or the required strength.

 **(2)** The anchorage of the floor or roof to walls or columns, and of walls and columns to foundations is not capable of resisting all nominal loads or load effects.

 **(3)** Structures or components thereof that have reached their limit state.

 **(4)** Siding and masonry joints including joints between the building envelope and the perimeter of windows, doors and skylights are not maintained, weather resistant or watertight.

 **(5)** Structural members that have evidence of deterioration or that are not capable of safely supporting all nominal loads and load effects.

 **(6)** Foundation systems that are not firmly supported by footings, are not plumb and free from open cracks and breaks, are not properly anchored or not capable of supporting all nominal loads and resisting all load effects.

 **(7)** Exterior walls that are not anchored to supporting and supported elements are not plumb and free of holes, cracks or breaks and loose or rotting materials, are not properly anchored or are not capable of supporting all nominal loads and resisting all load effects.

 **(8)** Roofing or roofing components that have defects that admit rain, roof surfaces with inadequate drainage, or any portion of the roof framing that is not in good repair with signs of deterioration, fatigue, or without proper anchorage and incapable of supporting all nominal loads and resisting all load effects.

 **(9)** Flooring and flooring components with defects that affect serviceability or flooring components that show signs of deterioration or fatigue, or not properly anchored or are incapable of supporting all nominal loads and resisting all load effects.

 **(10)** Veneer, cornices, belt courses, corbels, trim, wall facings and similar decorative features not properly anchored or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

31

**(11)** Overhang extensions or projections including, but not limited to, trash chutes, canopies, marquees, signs, awnings, fire escapes, standpipes and exhaust ducts not properly anchored or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(12)** Exterior stairs, decks, porches, balconies, and all similar appurtenances attached thereto, including guards and handrails, are not structurally sound, not properly anchored or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(13)** Chimneys, cooling towers, smokestacks, and similar appurtenances not structurally sound or not properly anchored, or that are anchored with connections not capable of supporting all nominal loads and resisting all load effects.

**(14)** *Protective treatment.* Exterior surfaces, including but not limited to, doors, door and window frames, cornices, porches, trim, balconies, decks, and fences, shall be maintained in good condition. Exterior wood surfaces, other than decay-resistant woods, shall be protected from the elements and decay by painting or other protective covering or treatment. Peeling, flaking and chipped paint shall be eliminated, and surfaces repainted. Siding and masonry joints, as well as those between the building envelope and the perimeter of windows, doors, and skylights, shall be maintained weather resistant and watertight. Metal surfaces subject to rust or corrosion shall be coated to inhibit such rust and corrosion, and surfaces with rust or corrosion shall be stabilized and coated to inhibit future rust and corrosion. Oxidation stains shall be removed from exterior surfaces. Surfaces designed for stabilization by oxidation are exempt from this requirement.

**(15)** *Premises identification.* Buildings shall have approved address numbers placed in a position to be plainly legible and visible from the street or road fronting the property. These numbers shall contrast with their background. Address numbers shall be Arabic numerals or alphabet letters. Numbers shall not be less than four (4) inches in height with a minimum stroke width of one half (0.5) inches.

**(16)** *Structural Members.* Structural members shall be maintained free from deterioration and shall be capable of safely supporting the imposed dead and live loads.

**(17)** *Foundation walls*. Foundation walls shall be maintained plumb and free from open cracks and breaks and shall be kept in such condition so as to prevent the entry of rodents and other pests.

**(18)** *Exterior Walls.* Exterior walls shall be free from holes, breaks, and loose rotting materials, and maintained weatherproof and properly surface coated where required to prevent deterioration.

**(19)** *Roofs and drainage.* The roof and flashing shall be sound, tight, and not have defects that admit rain. Roof drainage shall be adequate to prevent dampness or deterioration in the walls or interior portion of the structure. Roof drains, gutters and downspouts shall be maintained in good repair and free from obstructions. Roof water shall not be discharged in a manner that creates a public nuisance.

**(20)** *Decorative features*. Cornices, belt courses, corbels, terra cotta trim, wall facings and similar decorative features shall be maintained in good repair with proper anchorage and in a safe condition.

**(21)** *Overhang extensions.* Overhang extensions including, but not limited to, canopies, marquees, signs, metal awnings, fire escapes, standpipes and exhaust ducts shall be maintained in good repair and

32

be properly anchored so as to be kept in sound condition. Where required, all exposed surfaces of metal or wood shall be protected from the elements and against decay, or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**(22)** *Stairways, decks, porches, and balconies.* Every exterior stairway, deck, porch and balcony, and all appurtenances attached thereto, shall be maintained structurally sound, in good repair, with proper anchorage and capable of supporting the imposed loads.

**(23)** *Chimneys and towers.* Chimneys, cooling towers, smokestacks, and similar appurtenances shall be maintained structurally safe and sound, and in good repair. Exposed faces of metal or wood shall be protected from the elements and against decay or rust by periodic application of weather-coating materials, such as paint or similar surface treatment.

**(24) Handrails and guards**

**(a)** Every handrail and guard shall be firmly fastened and capable of supporting normally imposed loads and shall be maintained in good condition.

**(b)** Every exterior and interior flight of stairs having more than four risers shall have on one side of the stair and every open portion of a stair, landing, balcony, porch, deck, ramp, or other walking surface that is more than thirty (30) inches above the floor or grade below shall have guards.

**(c)** Handrails shall be not less than thirty (30) inches in height or more than forty-two (42) inches in height measured vertically above the nosing of the tread or above the finished floor of the landing or walking surfaces.

**(d)** Guards shall not be less than thirty (30) inches in height above the floor of the landing, balcony, porch, deck, ramp, or other walking surface.

**(25)** *Window, skylight, and door frames.* Every window, skylight, door, and frame shall be kept in sound condition, good repair, and weather tight.

**(a)** Glazing

Glazing materials shall be maintained free from cracks and holes.

**(b)** Openable windows

Every window, other than a fixed window, shall be easily openable and capable of being held in position by window hardware.

**(26)** *Insect Screens.* Every door, window and other outside opening required for ventilation of habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged, or stored shall be supplied with approved tightly fitting screens of minimum sixteen (16) mesh per inch, and every screen door used for insect control shall have a self-closing device in good working condition.

33

**(27)** *Doors.* Exterior doors, door assemblies, operator systems if provided, and hardware shall be maintained in good condition. Locks at all entrances to dwelling units shall tightly secure the door. Locks on means of egress doors shall be readily openable from the side from which egress is to be made without the need for keys, special knowledge, or effort, except where the door hardware conforms to that permitted in the International Building Code.

**(28)** *Basement Hatchways*. Every basement hatchway shall be maintained to prevent the entrance of rodents, rain, and surface drainage water.

**(29)** *Guards for basement windows.* Every basement window that is openable shall be supplied with rodent shields, storm windows or other approved protection against the entry of rodents.

**(30)** *Building Security.* Doors, windows, or hatchways for dwelling units shall be provided with devices designed to provide security for the occupants and property within.

**(a)** *Doors.* Doors providing access to a dwelling unit that is rented, leased, or let shall be equipped with a deadbolt lock designed to be readily openable from the side from which egress is to be made without the need for keys, special knowledge or effort and shall have a minimum lock throw of one (1) inch. Such deadbolt locks shall be installed according to the manufacturer's specifications and maintained in good working order. For the purpose of this section, a sliding bolt shall not be considered an acceptable deadbolt lock.

**(b)** *Windows.* Operable windows located in whole or in part within 6 feet above ground level or walking surface below that provide access to a dwelling unit that is rented, leased, or let shall be equipped with a window sash locking device.

**(c)** *Basement hatchways*. Basement hatchways that provide access to a dwelling unit that is rented, leased, or let shall be equipped with devices that secure the units from unauthorized entry.

**(31)** *Gates*. Exterior gates, gate assemblies, operator systems if provided, and hardware shall be maintained in good condition. Latches at all entrances shall tightly secure the gates.

**(C)** *Demolition.* Demolition of unsafe conditions shall be permitted in lieu of repair where approved by the public officer or his/her designee.

**Secs. 14-65 – 14-75. Reserved**

**Division 5. Enforcement**

**Sec. 14-76. Enforcement**

34

**(A) *Complaint.*** A complaint about any violation of the provisions of this article may be reported to the Town office by any person observing the violation. The complainant shall identify himself/herself to the Town office prior to any action being taken by the Town Administrator or his/her designee.

**(B) *Notice of Violation.*** Once a complaint is received, the Town Administrator or his/her designee is hereby authorized and empowered to investigate the complaint and, if the complaint is found by the Town Administrator or his/her designee to be a condition that is a violation of this article, then, and in the discretion of the Town Administrator or his/her designee, a citation and summons to municipal court may be issued, or a written notice may be sent to the owner or agent of such owner of any such lot, place, or area within the Town to repair, abate, destroy, and/or remove any such nuisances or unsafe conditions on such owner's property, or upon the sidewalk abutting same. Such notice may be served personally upon the owner or his/her agent, occupant, or tenant, may be mailed regular first class, or certified, or registered mail to the owner or occupant at his/her last known address, or as otherwise authorized by the laws of The State of Tennessee.

Nothing in this section or part shall preclude the Town Administrator or his/her designee from issuing a citation or summons to municipal court immediately upon investigation and verification that a violation of this article exists.

**(C) Action for noncompliance.**

    **(1)** Upon either the Town Administrator's or his/her designee's election to issue a citation and summons to municipal court, or the failure, neglect, or refusal of any owner or agent to repair, abate, destroy and/or remove such nuisances or unsafe conditions located upon such owner's property, or upon the sidewalk or street abutting same, within the time frame specified according to the notice provided for in subsection (B) of this section, or in the event the same is returned in the mail to the Town because of inability to make delivery thereof, provided the same was properly addressed to the last known address of such owner, or agent, a citation or summons to municipal court may be issued to the owner or agent so notified for violation of this article.

    Nothing in this section or part shall preclude the Town Administrator or his/her designee from issuing a citation or summons to municipal court immediately upon investigation and verification that a violation of this article exists.

    **(2)** If the owner or agent is found by the municipal court to have violated this article and shall fail to remedy such conditions within ten (10) consecutive days of the date of the conviction, or, if the finding of a violation of this article is timely appealed to the Knox County Circuit Court, upon an order from Knox County Circuit Court finding a violation of this article becomes final, if the owner or agent fails to remedy such conditions within ten (10) consecutive days of the date the Knox County Circuit Court Order becoming final the Town Administrator or his/her designee is authorized to take such action as is necessary to remedy the conditions and abate the nuisance. Upon completion of such work, the reasonable cost thereof, including the cost for inspections, notifications, and other incidental and administrative costs in connection therewith, shall be paid by the owner or agent of said property and said costs shall be billed to the owner or agent of said property. If the bill is not fully paid within sixty (60) days after the date of said bill, the total amount of the bill shall be certified by the town recorder and collected in the manner provided by law.

**Secs. 14-77 – Sec. 14-87. Reserved**

**SECTION 2.**

This ordinance shall take effect from and after its final passage and publication, the public welfare requiring it.

_____

Ron Williams, Mayor

_____

Allison Myers, Town Recorder



# FARRAGUT BEER BOARD
August 24, 2023
5:50 PM

I.  Approval of Minutes
    A. March 9, 2023

II. Beer Permit
    A. Approval of Class 6, Special Occasion beer permit for St. John Newmann Church Harvesting for Him Fall Festival
    B. Approval of Class 6, Special Occasion beer permit for Alzheimer's Tennessee/ Mind Yer P's & Q's Oktoberfest Event

**11408 MUNICIPAL CENTER DRIVE | FARRAGUT, TN 37934 | 865.966.7057 |**
**WWW.TOWNOFFARRAGUT.ORG**

*It is the policy of the Town of Farragut not to discriminate on the basis of race, color, national origin, age, sex, or disability pursuant to Title VI of the civil Rights Act of 1964, Public Law 93-112 and 101-336 in its hiring, employment practices and programs. To request accommodations due to disabilities, please call 865-966-7057 in advance of the meeting.*



# FARRAGUT BEER BOARD
## MARCH 9, 2023
## 5:50 PM

Motion was made to approve the minutes of February 9, 2023, as presented. Moved by Vice-Mayor Povlin, seconded by Alderman Meyer; voting yes; Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer and White; no nays; motion passed.

**Beer Permit**

**Approval of Class 7, Brewpub, beer permit for 35 North LLC, 11321 Kingston Pike**

Motion was made to approve the Class 7, Brewpub, beer permit for 35 North LLC, 11321 Kingston Pike. Moved by Vice-Mayor Povlin, seconded by Alderman Meyer; voting yes; Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer and White; no nays; motion passed.

**Approval of Class 1, On-Premise, beer permit for Elkmont Station, 103 S. Campbell Station Road**

Motion was made to approve the Class 1, On-Premise, beer permit for Elkmont Station, 103 S. Campbell Station Road. Moved by Vice-Mayor Povlin, seconded by Alderman Meyer; voting yes; Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer and White; no nays; motion passed.

**Approval of Class 6, Special Occasion beer permit for Rural Area Medical's Southern Tequila & Taco Festival**

Motion was made to approve the Class 6, Special Occasion beer permit for Rural Area Medical's Southern Tequila & Taco Festival. Moved by Vice-Mayor Povlin, seconded by Mayor Williams; voting yes; Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer and White; no nays; motion passed.

_____

Drew Burnette, Chairman


_____

Allison Myers, Town Recorder

**11408 MUNICIPAL CENTER DRIVE | FARRAGUT, TN 37934 | 865.966.7057 |**
**WWW.TOWNOFFARRAGUT.ORG**

*It is the policy of the Town of Farragut not to discriminate on the basis of race, color, national origin, age, sex, or disability pursuant to Title VI of the civil Rights Act of 1964, Public Law 93-112 and 101-336 in its hiring, employment practices and programs. To request accommodations due to disabilities, please call 865-966-7057 in advance of the meeting.*

# REPORT TO THE BEER BOARD

**PREPARED BY:  Allison Myers, Town Recorder**

**SUBJECT:** Approval of a special occasion beer permit for the St. John Neumann "Harvesting for Him" event, October 22, 2023

---

**DISCUSSION:**

The St. John Neumann Catholic Church is planning a "Harvesting for Him" event and is requesting a special event beer permit.  The Town's Municipal Code governing special occasion beer permits is below.

*Sec. 8-212. - Special occasion beer permit.*

The special occasion beer permit request shall be made on such form as the board shall prescribe and/or furnish and shall be accompanied by a non-refundable application fee of one hundred dollars ($100.00).

(1) The beer board is authorized to issue a special occasion beer permit to bona fide charitable or nonprofit organizations for special events.

(2) The special occasion beer permit shall not be issued for longer than one (1) forty-eight-hour period, unless otherwise specified by the beer board, subject to the limitations on the hours, imposed by law.

(3) The application for the special occasion beer permit shall state whether the applicant is a charitable or nonprofit organization, include documents showing evidence of the type of organization, and state the location of the premise upon which alcoholic beverages shall be served and the purpose for the request of the license.

(4) For purposes of this section:

Bona fide charitable or nonprofit organization means any corporation or other legal entity which has been recognized as exempt from federal taxes under section 501(c) of the Internal Revenue Code.

(5) No charitable or nonprofit organization possessing a special occasion beer permit shall purchase, for sale or distribution, beer from any source other than a licensee as provided pursuant to state law.

(6) Failure of the special occasion permittee to abide by the conditions of the permit and all laws of the State of Tennessee and the Town of Farragut will result in a denial of a special occasion beer permit for the sale of beer for a period of two (2) years.

The St. John Neumann Catholic Church is a nonprofit organization and is requesting the permit for October 22, 2023.

**RECOMMENDATION BY:**

Allison Myers, Town Recorder, for approval.

**PROPOSED MOTION:**

Motion to approve the special occasion beer permit for the St. John Neumann "Harvesting for Him" event, October 22, 2023.

**BOARD ACTION:**

**MOTION BY:** _____ **SECONDED BY:** _____

# APPLICATION FOR BEER PERMIT

## STATE OF TENNESSEE

## TOWN OF FARRAGUT



*PAID 100.⁰⁰ 8/2/23*

I hereby make application for a permit to sell, store, manufacture, or distribute Beer under the provisions of Tennessee Code Annotated Section 57-5-101 et seq. and base my application upon the answers to the following questions:

1. Reason for application: New Business _____ New Ownership _____ Name Change _____ Other ✓

2. Type of permit requested, please circle all that apply:

   Class 1 On-Premise          Class 2 On-Premise, Other

   Class 3 On-Premise, Hotel/Motel     Class 4 On-Premise, Tavern

   Class 5 Off-Premise          (Class 6, Special Occasion)

3. Name of Applicant(s) (Owner(s) of Business) ST. JOHN NEUMANN CATHOLIC CHURCH

4. Type of applicant (check one):
   Person _____ Firm _____ Corporation _____ Joint-Stock Company _____ Syndicate _____ Other ✓

5. List all persons, firms, corporations, joint-stock companies, syndicates, or associations having at least a 5% ownership interest in the business: N/A

6. Applicant's present home address: KNOXVILLE, TN 37923

7. Date of Birth 10/03/75    Home Telephone Number 865-696-1182
   Business Telephone Number SAME    Social Security Number _____

8. Representative Email Address: pwade@sjnknox.org

9. Under what name will the business operate? N/A

10. Business address 633 ST. JOHN CT  KNOXVILLE, TN 37934
    Business Telephone number 865-777-0077

11. Specify the identity, email and physical address of the person to receive annual privilege tax notices and any other communication from the Town:

N/A

12. Information of any manager, other than the applicant:
Name: FR. JOE REED (PASTOR) Birth Date: 7/22/74
Address: 633 ST. JOHN CT. KNOXVILLE, TN 37934
Phone Number: 865-966-4540

13. Has any person having at least a 5% ownership interest, any of the managers, or any other employee of the business, been convicted of any violation of the beer or alcoholic beverage laws or any crime within the last ten (10) years: ____Yes ___✓No. If yes, give particulars of each charge, court, and date convicted.

14. Have you or your organization ever had a Beer Permit revoked, suspended, or denied in the State of Tennessee? NO If so, specify, where, when, and why:

15. Name and address of property owner, if other than the business owner:

16. What is the name and address of the Church (or other place of worship) nearest to your business?
OURS (SJN)

17. What is the name and address of the school nearest to your business?
OURS (SJN)

18. Special Occasion Event Name: HARVESTING FOR HIM FALL FESTIVAL
Location of the special occasion event: ST. JOHN NEUMANN (633 ST. JOHN CT.)
Event Date & Times: OCT. 22ND 1:30-3:30 PM
Representative name & phone number: PATRICK WADE 865-696-1182
Have you received a special event permit to hold the event in the Town of Farragut? YES

19. Tennessee Sales Tax Number: NON-PROFIT TAX ID: 62-1007428

20. Town of Farragut Business License Number N/A

I certify that I am knowledgeable of the laws prohibiting the sale of beer to minors and that this application contains true information to the best of my knowledge and belief.

I understand that this application is subject to the Tennessee Public Records Act and shall be open for inspection and reproduction by any citizen. Tennessee Code Annotated 10-7-503.

I understand that by submitting this application, a background investigation shall be conducted and any and any and all documents related to my request shall become public records.

I understand that the applicant or representative must be present at the beer board meeting in which the permit will be discussed.

_____
Signature of Applicant/Owner (or authorized Corporate Official)

Sworn to and subscribed before me this ___8___ day of ___August___ 20___

_____
Notary Public
My Commission Expires: _____4-30-2025_____

Notice: A non-refundable $250 fee must accompany this application. Any applicant making false statement in this application shall forfeit his/her permit and shall not be eligible to receive any permit for a period of ten years.

A privilege tax of $100 is imposed on the business of selling, distributing, storing or manufacturing beer in this state effective January 1, 1994 and each successive January 1. Any holder of a beer permit issued after January 1, 1994 shall pay a pro rata portion of this annual tax when the permit is issued.

| FOR OFFICE USE ONLY |
|---|
| Application is hereby:  Approved _____     Denied _____ |
| On this date: _____, 20__ |
| _____          _____ <br> Beer Board Chairman                              Town Recorder |

## REPORT TO THE BEER BOARD

**PREPARED BY:  Allison Myers, Town Recorder**

**SUBJECT: Approval of Class 6 Permit for Alzheimer's Tennessee/ Mind Yer P's & Q's Oktoberfest Event**

**DISCUSSION:**

Mind Yer P's & Q's is hosting an Octoberfest Event benefitting the Alzheimer's Tennessee organization.  The Town's Municipal Code governing special occasion beer permits is below.

**Sec. 8-212. - Special occasion beer permit.**

The special occasion beer permit request shall be made on such form as the board shall prescribe and/or furnish and shall be accompanied by a non-refundable application fee of one hundred dollars ($100.00).

(1)  The beer board is authorized to issue a special occasion beer permit to bona fide charitable or nonprofit organizations for special events.

(2)  The special occasion beer permit shall not be issued for longer than one (1) forty-eight-hour period, unless otherwise specified by the beer board, subject to the limitations on the hours, imposed by law.

(3)  The application for the special occasion beer permit shall state whether the applicant is a charitable or nonprofit organization, include documents showing evidence of the type of organization, and state the location of the premise upon which alcoholic beverages shall be served and the purpose for the request of the license.

(4)  For purposes of this section:

Bona fide charitable or nonprofit organization means any corporation or other legal entity which has been recognized as exempt from federal taxes under section 501(c) of the Internal Revenue Code.

(5)  No charitable or nonprofit organization possessing a special occasion beer permit shall purchase, for sale or distribution, beer from any source other than a licensee as provided pursuant to state law.

(6)  Failure of the special occasion permittee to abide by the conditions of the permit and all laws of the State of Tennessee and the Town of Farragut will result in a denial of a special occasion beer permit for the sale of beer for a period of two (2) years.

The Alzheimer's Tennessee organization is a nonprofit organization and is requesting the permit for September 29-October 1, 2023.

**RECOMMENDATION BY:**

Allison Myers, Town Recorder, for approval.

**PROPOSED MOTION:**

Motion to approve the special occasion beer permit for Alzheimer's Tennessee Oktoberfest Event, September 29-October 1, 2023.

**BOARD ACTION:**

**MOTION BY:** _____     **SECONDED BY:** _____

# APPLICATION FOR BEER PERMIT

## STATE OF TENNESSEE

## TOWN OF FARRAGUT

I hereby make application for a permit to sell, store, manufacture, or distribute Beer under the provisions of Tennessee Code Annotated Section 57-5-101 et seq. and base my application upon the answers to the following questions:

1. Reason for application: New Business _____ New Ownership _____ Name Change _____ Other ✔
2. Type of permit requested, please circle all that apply:

   Class 1 On-Premise        Class 2 On-Premise, Other

   Class 3 On-Premise, Hotel/Motel    Class 4 On-Premise, Tavern

   Class 5 Off-Premise        (Class 6, Special Occasion)

3. Name of Applicant(s) (Owner(s) of Business) _Alzheimer's Tennessee_
   _+ Mind Yer P's + Q's_

4. Type of applicant (check one):
   Person _____ Firm _____ Corporation _____ Joint-Stock Company _____ Syndicate _____ Other ✔
5. List all persons, firms, corporations, joint-stock companies, syndicates, or associations having at least a 5% ownership interest in the business:

6. Applicant's present home address: _12430 Comblain Rd., Knoxville, TN 37934_
7. Date of Birth _12/02/1977_    Home Telephone Number _____
   Business Telephone Number _____    Social Security Number _____
8. Representative Email Address: _Kay.watson @ TNalz.org_
9. Under what name will the business operate? _Oktoberfest_
10. Business address _5801 Kingston Pike, Knoxville, TN 37919_
    Business Telephone number _865 - 544 - 6288_

11. Specify the identity, email and physical address of the person to receive annual privilege tax notices and any other communication from the Town:

_____

_____

12. Information of any manager, other than the applicant:

Name: _____ Birth Date: _____

Address: _____

Phone Number:_____

13. Has any person having at least a 5% ownership interest, any of the managers, or any other employee of the business, been convicted of any violation of the beer or alcoholic beverage laws or any crime within the last ten (10) years: ____Yes ____No. If yes, give particulars of each charge, court, and date convicted.

_____

_____

14. Have you or your organization ever had a Beer Permit revoked, suspended, or denied in the State of Tennessee? _____ If so, specify, where, when, and why:

_____

_____

15. Name and address of property owner, if other than the business owner:

_____

16. What is the name and address of the Church (or other place of worship) nearest to your business?

_____

17. What is the name and address of the school nearest to your business?

_____

18. Special Occasion Event Name: _Oktoberfest_

Location of the special occasion event: _Mindyer Ps+Qs/ Renaissance Center Frontlawn_

Event Date & Times: _Friday, Sept 29; Sat, Sept 30; Monday, Oct. 1, 2023_

Representative name & phone number: _Kay Watson (865) 384 3500 + Simon Mungan_

Have you received a special event permit to hold the event in the Town of Farragut? _Yes_

19. Tennessee Sales Tax Number: _Alzheimers Tennessee 208 228 2496_

20. Town of Farragut Business License Number _____

I certify that I am knowledgeable of the laws prohibiting the sale of beer to minors and that this application contains true information to the best of my knowledge and belief.

I understand that this application is subject to the Tennessee Public Records Act and shall be open for inspection and reproduction by any citizen. Tennessee Code Annotated 10-7-503.

I understand that by submitting this application, a background investigation shall be conducted and any and any and all documents related to my request shall become public records.

I understand that the applicant or representative must be present at the beer board meeting in which the permit will be discussed.

_____

Signature of Applicant/Owner (or authorized Corporate Official)

Sworn to and subscribed before me this __10__ day of __August__ , 20 __23__

_____

Notary Public

My Commission Expires: __My Commission Expires October 7, 2024__

Notice: A non-refundable $250 fee must accompany this application. Any applicant making false statement in this application shall forfeit his/her permit and shall not be eligible to receive any permit for a period of ten years.

A privilege tax of $100 is imposed on the business of selling, distributing, storing or manufacturing beer in this state effective January 1, 1994 and each successive January 1. Any holder of a beer permit issued after January 1, 1994 shall pay a pro rata portion of this annual tax when the permit is issued.

---

## FOR OFFICE USE ONLY

Application is hereby: Approved _____ Denied _____

On this date: _____ , 20___

_____          _____
Beer Board Chairman                                    Town Recorder

# BMA MEETING MINUTES
## August 10, 2023

## BMA Meeting

**Roll Call**

      Mayor Williams called the meeting to order at 6:00 PM. Roll Call for attendance: Alderman Burnette, yes; Alderman Meyer, yes; Vice-Mayor Povlin, yes; Alderman White, yes; Mayor Williams, yes; In additional to staff and member of the press.

**Approval of Agenda**

      Motion was made to approve the agenda as presented. Moved by Vice-Mayor Povlin, seconded by Alderman Burnette, voting yes, Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer, and White; no nays; motion passed.

**Approval of Minutes**

      Motion was made to approve the minutes of July 27, 2023, as presented. Moved by Alderman Meyer, seconded by Vice-Mayor Povlin, voting yes, Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer, and White; no nays; motion passed.

**Mayor's Report**

      Mayor Williams thanked the Public Works crew for the cleanup efforts after the latest storm. He also announced that Dog Daze will be Friday, August 11-13, 2023.

      Vice-Mayor Povlin announced there would be a Comprehensive Land Use Plan Update meeting to hear from citizens about future plans on August 31, 2023

**Ordinances**

**First Reading**

**Ordinance 23-11**, an ordinance to amend the Farragut Municipal Code, Appendix A- Zoning, Chapter 3, Section XX., Community Service District (S-1), to require a concept layout plan in association with a rezoning request to S-1 (Town of Farragut, Applicant).

      Motion was made to approve Ordinance 23-11 on first reading. Moved by Vice-Mayor Povlin, seconded by Alderman Meyer; roll call vote: Alderman Burnette, yes; Alderman Meyer, yes; Vice-Mayor Povlin, yes; Alderman White, yes; Mayor Williams, yes; motion passed.

## Business Items

**Approval of a Parking, Sidewalk and Construction agreement between the Town of Farragut and Faith Lutheran Church**.

Motion was made to approve the Parking, Sidewalk and Construction easement agreement between the Town of Farragut and Faith Lutheran Church located at 225 Jamestown Blvd. Moved by Vice-Mayor Povlin, seconded by Alderman Meyer, voting yes, Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer, and White; no nays; motion passed.

**Approval of Professional Services Contract with Kimley-Horn and Associates for Engineering services for the implementation of fiber optic cable connecting all Farragut Parks and Facilities**

Motion was made to approve the Professional Services Contract with Kimley-Horn and Associates for Engineering services for the implementation of fiber optic cable connecting all Farragut Parks and Facilities in the amount of $281,000. Moved by Alderman Meyer, seconded by Vice-Mayor Povlin, voting yes, Mayor Williams, Vice-Mayor Povlin, Aldermen Burnette, Meyer, and White; no nays; motion passed.

**Discussion and recommendation of a closure plan for the eastern temporary access to Kingston Pike for First Baptist Concord, located at 11704 Kingston Pike**

Alderman White stated a Point of Order concerning the memo for this agenda item and the ownership of the old Bellaire Drive. Alderman White stated that the BMA should not be discussing the new entrance to the church since it has not been presented to the Farragut Municipal Planning Commission. Mr. White requested Tom Hale's, Town Attorney, opinion. Mayor Williams ruled against the point of order and proceeded with discussions.

The following spoke about the agenda item:
Jeanne Brykalski, Crestview Drive
Ken Youngblood, 12816 Farmgate Lane
Jim Vandersteeg, 12009 Rivanna Lane
Terry DeLaney, 145 Fountain Road
Tony Poole, 500 Glen Abbey
Paul Standifer, 318 Eisenhower Street
Neil Koonce, 10560 Leadenhall Gardens Way
Judy Forrester, 11020 Farragut Hills Blvd.
David Heatherly, 12811 Stahl Drive
Stephanie Brown, 12208 Oakmont Circle
Taylor Forrester, 1111 N. Northshore Drive
Mary Ellen Branan, 212 Battery Hill Circle

After much discussion a motion was made to approve the closure of the eastern temporary access from First Baptist Concord to Kingston Pike on December 31, 2024, or the date at which he Town of Farragut approves the newly constructed access across from Russgate Boulevard. Moved by Alderman Burnette, seconded by Vice-Mayor Povlin; Roll Call Vote: Alderman Burnette, yes; Alderman Meyer, yes; Vice-Mayor Povlin, yes; Alderman White, no; Mayor Williams, yes; motion passed.

## Town Administrator's Report

David Smoak, Town Administrator, thanked the Public Works department for the clean up after the storm and the water line break.

The meeting adjourned at 8:00 PM.

_____
Ron Williams, Mayor

_____
Allison Myers, Town Recorder

---

## REPORT TO THE BOARD OF MAYOR AND ALDERMEN

---

**PREPARED BY:**   Mark Shipley, Community Development Director

**SUBJECT:**   Ordinance 23-11, an ordinance on second reading to amend the Farragut Municipal Code, Appendix A- Zoning, Chapter 3, Section XX., Community Service District (S-1), to require a concept layout plan in association with a rezoning request to S-1 (Town of Farragut, Applicant)

---

**BACKGROUND AND DISCUSSION:** During review with the Planning Commission, the staff noted that the idea for a concept plan in association with a rezoning to the S-1 Zoning District came about given that the S-1 District provides for a variety of institutional uses with a varying degree of scale and potential impact. The S-1 is also intended as a transitional district between commercial properties and lower density residential. Thus, by having a concept plan required before a property is rezoned, the community will understand how the affected area is to be developed. This would help add a layer of protection and predictability before a change is made that would provide for the uses permitted in the S-1 District.

Staff also noted that concept plans are currently required for rezoning requests to the Town Center District (TCD), Planned Commercial Development District (PCD), and most recently the Open Space Mixed Residential Overlay District (OSMR). In fact, much of the language in Ordinance 23-11 is consistent with the language that was developed for the concept plan requirement in the OSMR District. This includes the same general level of information required and a clear delineation between minor vs. major changes to a "concept layout plan." The language related to the requested zoning district reverting to the prior zoning district should a major change not be approved, was developed in consultation with the Town Attorney.

**RECOMMENDATION:** The Planning Commission was in support of the requirement for a concept plan in association with a rezoning to the S-1 Zoning District given the uses permitted in the district and the district being a transitional district. Other than one minor clarification concerning site plans being reviewed by the Planning Commission, which is now reflected in Ordinance 23-11, the Planning Commission unanimously recommended approval of Ordinance 23-11 at their meeting on July 20, 2023. At the Board of Mayor and Aldermen meeting on August 10, 2023, Ordinance 23-11 was approved unanimously on first reading. There have been no changes to Ordinance 23-11 since the first reading and Community Development Director, Mark Shipley, recommends approval of Ordinance 23-11 on second reading.

**BOARD ACTION:**

**MOTION BY:**_____ **SECONDED BY:**_____

| VOTE/TOTAL | WILLIAMS | MEYER | WHITE | POVLIN | BURNETTE |
|---|---|---|---|---|---|
| YES | _____ | _____ | _____ | _____ | _____ |
| NO | _____ | _____ | _____ | _____ | _____ |
| ABSTAIN | _____ | _____ | _____ | _____ | _____ |

| ORDINANCE: | 23-11 |
|---|---|
| PREPARED BY: | Shipley |
| REQUESTED BY: | Town of Farragut |
| CERTIFIED BY FMPC: | July 20, 2023 |
| PUBLIC HEARING: | _____ |
| PUBLISHED IN: | _____ |
| DATE: | _____ |
| 1ST READING: | _____ |
| 2ND READING: | _____ |
| PUBLISHED IN: | _____ |
| DATE: | _____ |

**AN ORDINANCE TO AMEND THE TEXT OF THE FARRAGUT ZONING ORDINANCE, ORDINANCE 86-16, AS AMENDED, PURSUANT TO AUTHORITY GRANTED BY SECTION 13-4-201, TENNESSEE CODE ANNOTATED, BY AMENDING THE FARRAGUT MUNICIPAL CODE, APPENDIX A., ZONING, CHAPTER 3., SECTION XX., COMMUNITY SERVICE DISTRICT (S-1), TO PROVIDE FOR A CONCEPT LAYOUT PLAN AS PART OF A REZONING REQUEST TO S-1**

**WHEREAS,** the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, wishes to amend Chapter 3., Section XX., Community Service District (S-1) of the Farragut Zoning Ordinance, Ordinance 86-16.

**NOW, THEREFORE, BE IT ORDAINED** by the Board of Mayor and Aldermen of the Town of Farragut, Tennessee, that the Farragut Zoning Ordinance is hereby amended by adding Subsection C., "Application of the district" and re-numbering afterwards as follows:

**SECTION 1.**

C.   *Application of the district.*

    1.   Given the potential scale of buildings permitted within the S-1 District and its ability to serve as a transitional district to abutting lower density residential, any application for rezoning to S-1 shall include a Concept Layout Plan that clearly addresses the plan of development for the proposed rezoning area. This plan would generally show the location of all proposed permitted uses and structures, transportation networks, public and private open-space or transition areas, and environmentally sensitive areas. The plan shall be prepared by a Tennessee licensed engineer or landscape architect, and/or a physical planner with comparable education, background, and experience. At a minimum, the concept plan shall be prepared at a scale of not less than 1" = 100', laid-out for printing on sheets of 24 inches by 36 inches, and shall include the following information:

        a.   A title block which specifically indicates that this plan is for rezoning application purposes and contains "conceptual information" which is "not intended for construction purposes."

b.  Location map, property address(s), tax map and parcel number(s), graphic scale, approximate north arrow, map legend, and preparation and revision date information.

c.  The names, addresses, and contact information for the property owners, representatives, and professionals involved in the plan. The professional seal of the individual principally responsible for preparing the plan shall also be affixed.

d.  Property boundaries, acreage of the property in question, existing zoning, the approximate location of existing utilities expected to service the property and an indication of their availability and capacity to do so, and the locations and widths of any rights-of-way providing access to the property.

e.  Sufficient information on the existing development within 150 feet from the boundaries of the subject property to indicate their relationships with the proposed development related to land uses, lot lines, open space corridors, vehicular and pedestrian circulation systems, environmentally sensitive areas, and other unique natural features of the landscape.

f.  A site inventory of the natural features on the property from readily available information including the topography (KGIS), the general locations and acreage of tree covered areas, and the approximate location and extent of all other environmentally sensitive areas on the site including but not limited to springs, streams, and water courses, identified floodplains and flood hazard areas, wetlands, slopes more than fifteen (15) percent, surface depressions, sinkholes and caves, and known endangered species habitat. The inventory will help to determine those areas that should be preserved and those that may be most appropriate for development. This inventory should be discussed with the Town staff prior to finalizing the Concept Layout Plan. The inventory should demonstrate that the Town's adopted land use related documents, such as the Tree Protection Ordinance, the Sinkhole Ordinance, the Stormwater Ordinance, and other adopted documents that may be applicable to the proposed development have been referenced.

    The site inventory should be used to establish potential building locations that would minimize site grading and preserve to the greatest extent possible the natural topography, especially where tree covered areas exist. The road and trail systems would then be connected through the development and to abutting properties. The maximum slope created for a proposed development shall not be greater than 2.5:1 (run/rise.

g.  The general location and use(s) within all proposed buildings.

h.  The footprint area and overall height of proposed buildings.

i.  The general location and type of transitional area to be used consistent with the S-1 requirements.

j.  The proposed location and approximate grade of streets, sidewalks, and shared-use paths (also referred to in the Subdivision Regulations as bike paths) and how

these proposed transportation elements will be connected to both the existing transportation systems and adjacent properties. The location and distances between any existing intersecting roadways and driveways and those being proposed shall also be shown.

k. A signed statement by the owner/applicant that they are aware of the Town's development requirements and standards and that they will be required to meet all applicable standards during development.

2. It is understood that a Concept Layout Plan is based on readily available information and that some modifications are possible as more detailed evaluation is completed for the site plan submittal process. Since a rezoning to the S-1 district requires a Concept Layout Plan namely to establish the location, scale (height and footprint area), and uses within proposed buildings and other improvements, should changes be necessary to the Concept Layout Plan as more detailed analyses are conducted, it is necessary to establish what would constitute a major vs. a minor change. Major changes, as identified during the site plan review process with the Planning Commission, shall require a re-review and approval from the Board of Mayor and Aldermen and would include any of the following:

a. Uses are different from the Concept Layout Plan.

b. Building footprints are more than 10% larger than those shown on the Concept Layout Plan.

c. Building heights are more than five feet higher than those shown on the Concept Layout Plan.

d. Buildings are more than ten feet closer to the boundary of a property that is zoned residential.

Minor changes are those that would generally be associated with the site plan review process and that would not functionally alter the general composition, scale, or arrangement of buildings and other improvements shown on the Concept Layout Plan. These changes may be approved by the Planning Commission as part of the site plan review process and would not be required to have additional review and approval from the Board of Mayor and Aldermen.

3. Consistent with the foregoing distinction between major changes and minor changes to the Concept Layout Plan, an initial rezoning to S-1 by the Farragut Board of Mayor and Aldermen is conditioned upon there being no major changes to the Concept Layout Plan before the approval by the Planning Commission of the site plan for the proposed development. In the event major changes, as defined herein, to the Concept Layout Plan or the site plan are proposed after the conditional rezoning of the property by the Farragut Board of Mayor and Aldermen, then the proposed major changes must be submitted for approval by the Farragut Board of Mayor and Aldermen.

When a major change to a Concept Layout Plan or a site plan, based thereon, has not been approved by the Farragut Board of Mayor and Aldermen, then the condition

precedent to the rezoning to S-1 has not occurred. Thus, the rezoning to S-1 has not been accomplished.

D.  *Minimum development requirements.*

    1.  The property must directly access a street that is classified on the Major Road Plan as a collector or arterial.

    2.  A site plan and landscape plan for the development shall be submitted as regulated in Chapter 4.

    3.  The approved plan shall be in compliance with the Farragut Comprehensive Land Use Plan, the Pedestrian and Bicycle Plan, the Architectural Design Standards, and all other adopted plans and ordinances of the Town of Farragut, as amended.

E.  *Area regulations.*

    1.  *Setback requirements.*

        a.  *Front yard.* All structures, including parking lots, shall be set back a minimum of 20 feet from the nearest point of any right-of-way. This excludes signage (which would be subject to the provisions in the sign ordinance), detention basin structures (if associated with a low impact development measure), and/or non-roofed structures that provide for pedestrian engagement with the public street (such as outdoor patios, pedestrian facilities, sitting areas, public art). With the exception of linear pedestrian facilities that connect to similar facilities in the right of way, no structures shall encroach into the public right of way and/or platted utility easements.

           Service areas and their associated structures (e.g., dumpsters, loading areas, utility buildings) shall be located to the side or rear of a building so as to minimize visual impacts from the street and foster a more pedestrian friendly streetscape.

        b.  *Side and rear yards.* Unless provided for otherwise in this ordinance, where an adjacent property is zoned residential and/or agriculture, all principal buildings that are positioned along a side or rear property line shall be set back a minimum of 50 feet from the nearest side or rear property line(s).

           Where an adjacent property is zoned non-residential and/or non-agriculture, all structures shall be set back a minimum of 25 feet from the nearest side or rear property line(s).

        c.  *Accessory structures.* Unless specified otherwise in this ordinance, where an adjacent property is zoned residential and/or agriculture, all accessory structures, excluding fences, pedestrian facilities, signage, and structures associated with low impact development stormwater measures, shall be set back a minimum of 50 feet from the nearest side or rear property line. Mechanical units five tons or greater, dumpsters, and other service areas shall be set back a minimum of 100 feet from all side or rear property lines where the abutting property is zoned residential and/or agriculture.

    2.  *Transition areas.*

a. Unless specified otherwise in this ordinance, where an abutting property is zoned residential and/or agriculture, a transition area of at least 50 feet in width shall be provided. The intent of a transition area is to provide for a visually appealing interface to an abutting residential area that will serve to establish protection for but also context appropriate integration with the surrounding plan of development. Transition areas shall accommodate the connectivity requirements of this district. This will result in some modest breaks in the transition element. As provided for in this district, transition areas shall include, at a minimum, any one of the following or a combination thereof:

1. A landscaped low impact development stormwater management area, such as a rain garden(s), bioswale(s), or naturalized areas with existing and/or new tree plantings that, in total, consume the full depth of the transition area. At a minimum, such an area shall include a plant unit count that equals the count required for a 35-foot buffer strip, as provided for in Chapter 4 of this ordinance. Under this option, the arrangement of plant material may include more flexibility than a traditional buffer strip planting, provided this arrangement best promotes the intended stormwater function of the low impact development measure(s);

2. A heavily landscaped pocket park area designed for passive use and that is approved as part of a site and landscape plan as an equivalent to other natural transition measures provided for in this subsection. Such area could serve as a shared amenity between a use in this district and an abutting residential neighborhood;

3. A traditional planted buffer strip area that complies with the 35-foot buffer strip plantings provided for in Chapter 4 of this ordinance;

4. An existing tree covered area that consumes largely the full depth of the transition area and where the existing tree count within such area clearly exceeds the plant unit count and minimum tree sizes for a 35-foot buffer strip per 100 linear feet;

5. Where freestanding attached and detached independent and catered living residential buildings are proposed around the periphery of a senior living community that abuts property zoned residential and/or agriculture, such buildings may be proposed as the transitional element. In order to qualify as such, buildings shall be generally consistent with the predominant size, scale, height, and arrangement of residential structures that abut that portion of the senior living community. Where the abutting property is undeveloped and zoned residential and/or agriculture and transitional buildings are proposed along this interface in the senior living community, the size, scale, height, and arrangement of residential structures shall be reviewed as part of the concept plan that is required for the senior living community.

   As part of the analysis of appropriateness of the transitional buildings along the undeveloped properties, the planning commission shall consider the surrounding context and the overall concept plan proposed by the applicant.

Buildings proposed for transitional elements shall comply with the setbacks, platted building envelopes, and landscape planting required in association with a senior living community. These specific provisions are addressed in Chapter 4 of this ordinance.

Where a development combines different transition elements these shall be considered as part of the Concept Layout Plan and then reflected on the site and landscape plans. Such an approach must clearly fulfill the intent of the transition area provision. Existing tree covered areas within transitions shall be protected. Exceptions would apply for the removal of invasive exotic plant material and context appropriate pedestrian and/or vehicular connections and utilities adjacent to such improvements that bisect the transition area in a generally perpendicular manner.

Transition areas shall not be required for developments that abut properties that are not zoned residential and/or agriculture.

F. *Streetscape and outdoor open space.* As part of a site plan review, a context appropriate active and interconnected streetscape with visually appealing and functional public spaces is encouraged. Some specific design objectives would be as follows:

1. Locate and orient outdoor open space (e.g., plazas, courtyards, patios, outdoor seating and benches, small park spaces or landscaped features) to provide a focal point to be actively used.

2. Provide landscape enhancements (e.g., bioswales, rain gardens, planters, flower gardens) to add visual interest, screen parking areas, and complement outdoor open spaces.

G. *Connectivity.* Development shall provide for context appropriate pedestrian and vehicular connectivity. This shall include providing connections within the property and to abutting properties, pedestrian connections into the development from the public street(s), and the construction of pedestrian facilities along the public street(s) frontages.

H. *Low Impact Development.* Development shall incorporate a minimum of one of the following Low Impact Development (LID) practices into the design:

1. Twenty-five percent of the parking lot being constructed with permeable pavers;

2. Stormwater runoff draining to rain gardens;

3. A building(s) being constructed with a vegetated roof, commonly referred to as a green roof;

4. Stormwater draining to bioswales/bioretention facilities; or

5. Rainwater being harvested for irrigation or gray water uses.

I. *Maximum lot coverage.* Total lot coverage: 60 percent, except as provided for elsewhere in this ordinance.

J.   *Land area.* Minimum lot size of three acres, except as provided for elsewhere in this ordinance.

K.   *Height.* No principal building shall exceed 2½ stories or 35 feet in height, except as provided for elsewhere in this ordinance. No accessory structure shall exceed 15 feet in height, except as provided for elsewhere in this ordinance.

L.   Parking, as regulated in Chapter 4.

M.   Lighting, as regulated in Chapter 4.


**SECTION 2.**

       This ordinance shall take effect from and after its final passage and publication, the public welfare requiring it.


_____
Ron Williams, Mayor


_____
Allison Myers, Town Recorder


Certified to the Farragut Board of Mayor and Aldermen this _____ day of _____, 2023, with approval recommended.


_____
Scott Russ, Chairman


_____
Shannon Preston, Secretary

**NOTE:**     Language in <span style="color:red">red</span> shows changes from existing language

Language in <span style="color:blue">blue</span> shows additional language recommended by the Planning Commission

## Sec. XX. Community service district (S-1).

A.   *General description.* Consistent with adopted plans and policies of the Town, this district is intended primarily to provide for the development of community and public types uses. This district is also intended as a transitional district to lower density residential by providing for low impact quasi-institutional/residential uses that have minimal traffic demands. Key to this district is continuity in general building and site development form.

B.   *Permitted principal and accessory uses and structures.* Property and buildings in the Community Service District (S-1) shall be used only for the following purposes:

1.   Assisted-care living facilities.

2.   Cemeteries and historical monuments.

3.   Churches and other places of worship.

4.   Community facilities.

5.   Cultural activities.

6.   Independent living and care facility.

7.   Nursing homes.

8.   Parks.

9.   Schools, public and private.

10.  Senior living community.

11.  Utility uses.

C.   *Application of the district.*

1.   Given the potential scale of buildings permitted within the S-1 District and its ability to serve as a transitional district to abutting lower density residential, any application for rezoning to S-1 shall include a Concept Layout Plan that clearly addresses the plan of development for the proposed rezoning area. This plan would generally show the location of all proposed permitted uses and structures, transportation networks, public and private open-space or transition areas, and environmentally sensitive areas. The plan shall be prepared by a Tennessee licensed engineer or landscape architect, and/or a physical planner with comparable education, background, and experience. At a minimum, the concept plan shall be prepared at a scale of not less than 1" = 100', laid-out for printing on sheets of 24 inches by 36 inches, and shall include the following information:

a.   A title block which specifically indicates that this plan is for rezoning application purposes and contains "conceptual information" which is "not intended for construction purposes."

b.   Location map, property address(s), tax map and parcel number(s), graphic scale, approximate north arrow, map legend, and preparation and revision date information.

c.   The names, addresses, and contact information for the property owners, representatives, and professionals involved in the plan. The professional seal of the individual principally responsible for preparing the plan shall also be affixed.

d. Property boundaries, acreage of the property in question, existing zoning, the approximate location of existing utilities expected to service the property and an indication of their availability and capacity to do so, and the locations and widths of any rights-of-way providing access to the property.

e. Sufficient information on the existing development within 150 feet from the boundaries of the subject property to indicate their relationships with the proposed development related to land uses, lot lines, open space corridors, vehicular and pedestrian circulation systems, environmentally sensitive areas, and other unique natural features of the landscape.

f. A site inventory of the natural features on the property from readily available information including the topography (KGIS), the general locations and acreage of tree covered areas, and the approximate location and extent of all other environmentally sensitive areas on the site including but not limited to springs, streams, and water courses, identified floodplains and flood hazard areas, wetlands, slopes more than fifteen (15) percent, surface depressions, sinkholes and caves, and known endangered species habitat. The inventory will help to determine those areas that should be preserved and those that may be most appropriate for development. This inventory should be discussed with the Town staff prior to finalizing the Concept Master Plan. The inventory should demonstrate that the Town's adopted land use related documents, such as the Tree Protection Ordinance, the Sinkhole Ordinance, the Stormwater Ordinance, and other adopted documents that may be applicable to the proposed development have been referenced.

The site inventory should be used to establish potential building locations that would minimize site grading and preserve to the greatest extent possible the natural topography, especially where tree covered areas exist. The road and trail systems would then be connected through the development and to abutting properties. The maximum slope created for a proposed development shall not be greater than 2.5:1 (run/rise).

g. The general location and use(s) within all proposed buildings.

h. The footprint area and overall height of proposed buildings.

i. The general location and type of transitional area to be used consistent with the S-1 requirements.

j. The proposed location and approximate grade of streets, sidewalks, and shared-use paths (also referred to in the Subdivision Regulations as bike paths) and how these proposed transportation elements will be connected to both the existing transportation systems and adjacent properties. The location and distances between any existing intersecting roadways and driveways and those being proposed shall also be shown.

k. A signed statement by the owner/applicant that they are aware of the Town's development requirements and standards and that they will be required to meet all applicable standards during development.

2. It is understood that a Concept Layout Plan is based on readily available information and that some modifications are possible as more detailed evaluation is completed for the site plan submittal process. Since a rezoning to the S-1 district requires a Concept Layout Plan namely to establish the location, scale (height and footprint area), and uses within proposed buildings and other improvements, should changes be necessary to the Concept Layout Plan as more detailed analyses are conducted, it is necessary to establish what would constitute a major vs. a minor change. Major changes, as identified during the site plan review process with the Planning Commission, shall require a re-review and approval from the Board of Mayor and Aldermen and would include any of the following:

a. Uses are different from the Concept Layout Plan.

Created: 2023-03-12 19:54:37 [EST]

b.  Building footprints are more than 10% larger than those shown on the Concept Layout Plan.

c.  Building heights are more than five feet higher than those shown on the Concept Layout Plan.

d.  Buildings are more than ten feet closer to the boundary of a property that is zoned residential.

Minor changes are those that would generally be associated with the site plan review process and that would not functionally alter the general composition, scale, or arrangement of buildings and other improvements shown on the Concept Layout Plan. These changes may be approved by the Planning Commission as part of the site plan review process and would not be required to have additional review and approval from the Board of Mayor and Aldermen.

3.  Consistent with the foregoing distinction between major changes and minor changes to the Concept Layout Plan, an initial rezoning to S-1 by the Farragut Board of Mayor and Aldermen is conditioned upon there being no major changes to the Concept Layout Plan before the approval by the Planning Commission of the site plan for the proposed development. In the event major changes, as defined herein, to the Concept Layout Plan or the site plan are proposed after the conditional rezoning of the property by the Farragut Board of Mayor and Aldermen, then the proposed major changes must be submitted for approval by the Farragut Board of Mayor and Aldermen.

When a major change to a Concept Layout Plan or a site plan, based thereon, has not been approved by the Farragut Board of Mayor and Aldermen, then the condition precedent to the rezoning to S-1 has not occurred. Thus, the rezoning to S-1 has not been accomplished.

C̶D.  *Minimum development requirements.*

1.  The property must directly access a street that is classified on the Major Road Plan as a collector or arterial.

2.  A site plan and landscape plan for the development shall be submitted as regulated in Chapter 4.

3.  The approved plan shall be in compliance with the Farragut Comprehensive Land Use Plan, the Pedestrian and Bicycle Plan, the Architectural Design Standards, and all other adopted plans and ordinances of the Town of Farragut, as amended.

4.  ~~Prior to site plan submittal, the applicant shall conduct a site inventory of the natural features on the property so as to determine those areas that should be preserved and those that may be most appropriate for development. This inventory should be discussed with the Town staff prior to finalizing plans for review. The inventory should demonstrate that the Town's adopted land use related documents, such as the Tree Protection Ordinance, the Sinkhole Ordinance, the Stormwater Ordinance, and other adopted documents that may be applicable to the proposed development have been referenced.~~

~~From the site inventory, a sketch plan is required in consultation with the Town staff with the first step in the preparation of such plan being the establishment of potential building locations that would minimize site grading and preserve to the greatest extent possible the natural topography, especially where tree covered areas exist. The road and trail systems would then be connected through the development and to abutting properties. The maximum slope created as a result of a proposed development shall not be greater than 2.5:1 (run/rise).~~

D̶E.  *Area regulations.*

1.  *Setback requirements.*

a.  *Front yard.* All structures, including parking lots, shall be set back a minimum of 20 feet from the nearest point of any right-of-way. This excludes signage (which would be subject to the

provisions in the sign ordinance), detention basin structures (if associated with a low impact development measure), and/or non-roofed structures that provide for pedestrian engagement with the public street (such as outdoor patios, pedestrian facilities, sitting areas, public art). With the exception of linear pedestrian facilities that connect to similar facilities in the right of way, no structures shall encroach into the public right of way and/or platted utility easements.

Service areas and their associated structures (e.g., dumpsters, loading areas, utility buildings) shall be located to the side or rear of a building so as to minimize visual impacts from the street and foster a more pedestrian friendly streetscape.

b.  *Side and rear yards.* Unless provided for otherwise in this ordinance, where an adjacent property is zoned residential and/or agriculture, all principal buildings that are positioned along a side or rear property line shall be set back a minimum of 50 feet from the nearest side or rear property line(s).

Where an adjacent property is zoned non-residential and/or non-agriculture, all structures shall be set back a minimum of 25 feet from the nearest side or rear property line(s).

c.  *Accessory structures.* Unless specified otherwise in this ordinance, where an adjacent property is zoned residential and/or agriculture, all accessory structures, excluding fences, pedestrian facilities, signage, and structures associated with low impact development stormwater measures, shall be set back a minimum of 50 feet from the nearest side or rear property line. Mechanical units five tons or greater, dumpsters, and other service areas shall be set back a minimum of 100 feet from all side or rear property lines where the abutting property is zoned residential and/or agriculture.

2.  *Transition areas.*

a.  Unless specified otherwise in this ordinance, where an abutting property is zoned residential and/or agriculture, a transition area of at least 50 feet in width shall be provided. The intent of a transition area is to provide for a visually appealing interface to an abutting residential area that will serve to establish protection for but also context appropriate integration with the surrounding plan of development. Transition areas shall accommodate the connectivity requirements of this district. This will result in some modest breaks in the transition element. As provided for in this district, transition areas shall include, at a minimum, any one of the following or a combination thereof:

1.  A landscaped low impact development stormwater management area, such as a rain garden(s), bioswale(s), or naturalized areas with existing and/or new tree plantings that, in total, consume the full depth of the transition area. At a minimum, such an area shall include a plant unit count that equals the count required for a 35-foot buffer strip, as provided for in Chapter 4 of this ordinance. Under this option, the arrangement of plant material may include more flexibility than a traditional buffer strip planting, provided this arrangement best promotes the intended stormwater function of the low impact development measure(s);

2.  A heavily landscaped pocket park area designed for passive use and that is approved as part of a site and landscape plan as an equivalent to other natural transition measures provided for in this subsection. Such area could serve as a shared amenity between a use in this district and an abutting residential neighborhood;

3.  A traditional planted buffer strip area that complies with the 35-foot buffer strip plantings provided for in Chapter 4 of this ordinance;

Created: 2023-03-12 19:54:37 [EST]

4. An existing tree covered area that consumes largely the full depth of the transition area and where the existing tree count within such area clearly exceeds the plant unit count and minimum tree sizes for a 35-foot buffer strip per 100 linear feet;

5. Where freestanding attached and detached independent and catered living residential buildings are proposed around the periphery of a senior living community that abuts property zoned residential and/or agriculture, such buildings may be proposed as the transitional element. In order to qualify as such, buildings shall be generally consistent with the predominant size, scale, height, and arrangement of residential structures that abut that portion of the senior living community. Where the abutting property is undeveloped and zoned residential and/or agriculture and transitional buildings are proposed along this interface in the senior living community, the size, scale, height, and arrangement of residential structures shall be reviewed as part of the concept plan that is required for the senior living community.

As part of the analysis of appropriateness of the transitional buildings along the undeveloped properties, the planning commission shall consider the surrounding context and the overall concept plan proposed by the applicant. Buildings proposed for transitional elements shall comply with the setbacks, platted building envelopes, and landscape planting required in association with a senior living community. These specific provisions are addressed in Chapter 4 of this ordinance.

Where a development combines different transition elements these shall be considered as part of the Concept Layout Plan sketch plan or, as applicable, concept plan and then reflected on the site and landscape plans. Such an approach must clearly fulfill the intent of the transition area provision. Existing tree covered areas within transitions shall be protected. Exceptions would apply for the removal of invasive exotic plant material and context appropriate pedestrian and/or vehicular connections and utilities adjacent to such improvements that bisect the transition area in a generally perpendicular manner.

Transition areas shall not be required for developments that abut properties that are not zoned residential and/or agriculture.

EF. *Streetscape and outdoor open space.* As part of a site plan review, a context appropriate active and interconnected streetscape with visually appealing and functional public spaces is encouraged. Some specific design objectives would be as follows:

1. Locate and orient outdoor open space (e.g., plazas, courtyards, patios, outdoor seating and benches, small park spaces or landscaped features) to provide a focal point to be actively used.

2. Provide landscape enhancements (e.g., bioswales, rain gardens, planters, flower gardens) to add visual interest, screen parking areas, and complement outdoor open spaces.

FG. *Connectivity.* Development shall provide for context appropriate pedestrian and vehicular connectivity. This shall include providing connections within the property and to abutting properties, pedestrian connections into the development from the public street(s), and the construction of pedestrian facilities along the public street(s) frontages.

GH. *Low Impact Development.* Development shall incorporate a minimum of one of the following Low Impact Development (LID) practices into the design:

1. Twenty-five percent of the parking lot being constructed with permeable pavers;

2. Stormwater runoff draining to rain gardens;

3. A building(s) being constructed with a vegetated roof, commonly referred to as a green roof;

Created: 2023-03-12 19:54:37 [EST]

Case 3:23-cv-00402-TRM-JEM   Document 6-54   Filed 11/11/23   Page 65 of 107   PageID #: 2488

4.      Stormwater draining to bioswales/bioretention facilities; or

5.      Rainwater being harvested for irrigation or gray water uses.

~~H~~I.    *Maximum lot coverage.* Total lot coverage: 60 percent, except as provided for elsewhere in this ordinance.

~~I~~J.    *Land area.* Minimum lot size of three acres, except as provided for elsewhere in this ordinance.

~~J~~K.    *Height.* No principal building shall exceed 2½ stories or 35 feet in height, except as provided for elsewhere in this ordinance. No accessory structure shall exceed 15 feet in height, except as provided for elsewhere in this ordinance.

~~K~~L.    *[Parking.]* Parking, as regulated in Chapter 4.

~~L~~M.    *[Lighting.]* Lighting, as regulated in Chapter 4.

~~(Ord. No. 86-16, 4-1986; Ord. of 2-2006; Ord. No. 16-05, § 1, 3-24-2016)~~

Case 3:23-cv-00402-TRM-JEM    Document 6-54    Filed 11/11/23    Page 66 of 107    PageID #: 2489

## REPORT TO THE BOARD OF MAYOR AND ALDERMEN

**PREPARED BY: Allison Myers, Town Recorder/Treasurer**

**SUBJECT: Ordinance 23-13**, Ordinance to amend the Capital Investment Program Budget for Fiscal Year 2023-2024, passed by Ordinance 23-07

---

**INTRODUCTION:**

The purpose of this agenda item is to approve Ordinance 23-13 on first reading to amend the Fiscal Year 2024 Capital Investment Program Budget.

**DISCUSSION:**

The **Capital Investment Program** will be amended by increasing the appropriated expenditures from $17,267,500 to $23,125,681, an increase of $5,858,181 for the CMAQ Town-Wide Signal System Upgrade. This amendment is needed to budget for the expenditure in the current fiscal year.

The expenditure for the CMAQ project was budgeted in previous fiscal years. The original project budget was $6,810,000 which included the Town of Farragut appropriating $100,000 for ADA improvements and $100,000 for the estimated cost of the fiber strand upgrade to the project. An additional $15,000 is needed from CIP reserves to completely fund the fiber strand upgrade. The amended budget for the CMAQ project will be $6,825,000. The Town's cost share is $215,000 of the overall project with the remaining $6,610,000 being 100% funded through the Congestion Mitigation Air Quality grant.

**FINANCIAL SECTION: Capital Investment Program**

| Account Number: 310-43985-9060 | | |
|---|---|---|
| **FY2024 Budget** | **Requested Amendment** | **FY2024 Amended Budget** |
| $17,267,500 | $5,858,181 | $23,125,681 |
| **Approved By**: _A. Myers_____ | | |

**RECOMMENDATION BY:** Allison Myers, Town Recorder/Treasurer, for approval.

**PROPOSED MOTION:** Motion to approve Ordinance 23-13 on first reading.

**BOARD ACTION:**

**MOTION BY:** _____  **SECONDED BY:** _____

| VOTE/TOTAL | BURNETTE | MEYER | POVLIN | WHITE | WILLIAMS |
|---|---|---|---|---|---|
| YES | _____ | _____ | _____ | _____ | _____ |
| NO | _____ | _____ | _____ | _____ | _____ |
| ABSTAIN | _____ | _____ | _____ | _____ | _____ |

| ORDINANCE | 23-13 |
|---|---|
| PREPARED BY | Myers |
| 1ST READING | August 24, 2023 |
| 2nd READING | September 14, 2023 |
| PUBLISHED IN | Shopper News Farragut |
| DATE | |

## AN ORDINANCE OF THE TOWN OF FARRAGUT, TENNESSEE AMENDING THE FISCAL YEAR 2023-2024 CAPITAL INVESTMENT PROGRAM BUDGET, PASSED BY ORDINANCE 23-07

**WHEREAS**, the Town of Farragut adopted the fiscal year 2023-24 budget by passage of Ordinance Number 23-07 on June 8, 2023; and

**WHEREAS**, pursuant to the Tennessee State Constitution, Section 24 of Article II, no public money shall be expended except pursuant to appropriations made by law; and

**WHEREAS**, expenses for the Capital Investment Fund will be greater than budgeted; and

**NOW THEREFORE** BE IT ORDAINED BY THE BOARD OF MAYOR AND ALDERMEN OF THE TOWN OF FARRAGUT, TENNESSEE THAT CHANGES BE MADE TO THE FISCAL YEAR 2023-2024 BUDGET AS FOLLOWS:

SECTION 1. Ordinance 23-07 is hereby amended by:

The **Capital Investment Program** will be amended by increasing the appropriated expenditures from $17,267,500 to $23,125,681, an increase of $5,858,181. The $5,858,181 increase has been budgeted in previous fiscal years for the CMAQ project. An additional $15,000 is needed for the project and will be funded from the Capital Investment Fund balance. Most of the expenditures will be made in FY24.

The original project budget is $6,810,000 which includes $100,000 for ADA upgrades and $100,000 for the estimated cost of the fiber strand upgrade to the project. An additional $15,000 is requested for the fiber strand upgrade. The amended budget for the CMAQ project will be $6,825,000. The Town is responsible for $215,000 of the project with the remaining $6,610,000 being 100% funded through the Congestion Mitigation Air Quality grant.

SECTION 2. The Board of Mayor and Aldermen authorizes the Town Recorder to make said changes in the accounting system.

SECTION 3. This ordinance shall take effect after its final passage and publication, the public welfare requiring it.

_____

Ron Williams, Mayor

_____

Allison Myers, Town Recorder

# REPORT TO THE BOARD OF MAYOR AND ALDERMEN

**PREPARED BY:** Allison Myers, Treasurer/Town Recorder

**SUBJECT:** Approval of Special Event Permit for St. John Neumann Catholic Church and School Mustang Miles 5K Event

---

**INTRODUCTION:** St. John Neumann Catholic Church and School are requesting a special event permit for the Mustang Miles 5K race. The 5K event is open to the public beginning at 8:00 AM on October 21, 2023. The start and finish area will be located at the St. John Neumann Church, 625 St. John Ct.

**DISCUSSION:** This event will include the use of the Town of Farragut greenways.

**RECOMMENDATION BY:** Allison Myers, Treasurer/Town Recorder

**PROPOSED MOTION:** Approve the event application involving the Town's greenway for the St. John Neumann Catholic Church and School 5K race.

**MOTION BY:**_____ **SECONDED BY:**_____

| VOTE/TOTAL | WILLIAMS | MEYER | WHITE | POVLIN | BURNETTE |
|---|---|---|---|---|---|
| YES | _____ | _____ | _____ | _____ | _____ |
| NO | _____ | _____ | _____ | _____ | _____ |
| ABSTAIN | _____ | _____ | _____ | _____ | _____ |

# Farragut
## Special Event Permit Application
BP-2022-486

Submitted by Patrick Wade
pwade@sjnknox.org
(865) 696-1182

Address of Proposed Work: **625 ST JOHN CT**

City: **FARRAGUT** State: **TN** Zip: **37934**

# Contact Information

## Applicant's Contact Information

Title:                First Name: **Patrick**            Last Name: **Wade**            Suffix:

Business Name: **St. John Neumann Catholic Church**

Mailing Address: **625 St. John Ct**

City: **Knoxville**              State: **TN**                    Zip: **37934**

Email Address: **pwade@sjnknox.org**

Cell Phone:        Work Phone:        Home Phone: **(865) 696-1182**

## Contractor's Contact Information

Title:                First Name: **Patrick**            Last Name: **Wade**            Suffix:

Business Name: **St. John Neumann Catholic Church**

Mailing Address: **625 St. John Ct**

City: **Knoxville**              State: **TN**                    Zip: **37934**

Email Address: **pwade@sjnknox.org**

Cell Phone: **(865) 696-1182**        Work Phone:        Home Phone:

## Property Owner's Contact Information

Title:                    First Name: **St. John          Last Name: **Church**          Suffix:
                          Neumann Catholic**

Business Name: **St. John Neumann Catholic Church**

Mailing Address: **625 St. John Ct**

City: **Knoxville**          State: **TN**                    Zip: **37934**

Email Address: **pwade@sjnknox.org**

Cell Phone: **(865) 696-1182**          Work Phone:          Home Phone:

## Application Questionnaire (* denotes required question)

## Special Event

**Will any Public Parks/Facilities be used in your          No
event? ***
Please note that use of any public parks/facilities must be
approved by the Farragut Parks and Recreation Department
prior to applying for this permit. Please call 865-966-7057 for
approval before proceeding with this permit.

**Start Date of Event ***          ~~10/1/2022~~ 10/21/23

**Name of Event ***          St. John Neumann Catholic Church and School
                            Mustang Miles

**Type of Event ***          Race

**Brief Description of Event ***          St. John Neumann Catholic Church and School
                                        5K. Any proceeds will benefit the church and
                                        school. We will have proof of insurance from
                                        our provider.

**Is event private or open to the public? ***          Open to the public



You can complete this application and view application updates online at
MyGovernmentOnline.org

Case 3:23-cv-00402-TRM-JEM   Document 6-54   Filed 11/11/23   Page 71 of 107   PageID #: 2494

**Is food being served?**

**Will you have portable Sanitary Facilities?**

**Will you have a solid waste dumpster?**

**Will there be any temporary structures/stages?**
Upload Location in File Upload Section.

**Will you need Temporary Power?**
PROVIDE LOCATION DRAWING IN FILE UPLOAD SECTION.

**Will you have any other Air Supported Structures?**
UPLOAD LOCATION DRAWING IN FILE UPLOAD SECTION.

**Will you need any public street closures?**
Please Note: Any public street closures must go before Board of Mayor and Aldermen for approval

**Where are the parking areas located?**
INCLUDE DRAWING IN FILE UPLOAD SECTION.

**If this event is a parade/sporting event, where is the route, staging, and disbanding areas?**
UPLOAD DRAWING IN FILE UPLOAD SECTION

**In case of Rainout, state cancellation date and time:**
(EXAMPLE-EVENT IS AT 2:00PM ON SATURDAY, RAINOUT CANCELLATION IS AT 1:00 PM SATURDAY OR POSTPONEMENT IS UNTIL 4:00 PM)

**Will there be music, live or otherwise?**


Case 3:23-cv-00402-TRM-JEM   Document 6-54   Filed 11/11/23   Page 72 of 107   PageID #: 2495

**Will you have Security/Police Officers at your event?**
Please note: The Town of Farragut does not provide Security or Police Officers.

**Will you have any Emergency Medical Personnel/Apparatus On-Site?**
Please Note: The Town of Farragut does not provide Emergency Medical Personnel/Apparatus.

**Will you have any Fire Officers/Apparatus at your event?**

**Will you have Tents?**
If Yes, please list tents in order from largest to smallest.

**Will you have Bounce Houses?**

**Have you applied for an insurance certificate of general liability insurance? \***   No
Naming the Town of Farragut, its employees and agents as additionally insured.

**I hereby understand and agree that approval of event permit is contingent upon receipt of copy of insurance.**   Patrick Wade
Please Provide a Full Name Signature.

**Do you want this event advertised on VisitFarragut.org?**

**Will there be any animals at the event?**

**Will alcoholic beverages be served? \***   No

**How many people do you expect?**



**A Signed Letter of Approval from Property Owner must be uploaded in the document uploads section.**

**End Date of Event**                    10/1/2022  10/22/23

**Event Start Time**                     8:00 AM

**Event End Time**                       12:00 PM

**Event Setup Time**                     7:00 AM

**Event Teardown Time**                  12:30 PM

---

# Documents Uploaded

The following documents are attached to the Application.

**Site Plan**                            proposed course map sjn 5k 625 st. john ct.pdf



# REPORT TO THE BOARD OF MAYOR AND ALDERMEN

**PREPARED BY:  Ron Oestreich, Park and Rec Director and Lauren Cox, Park Manager**

**SUBJECT:  Approval of Resolution R-2023-07, Amended FY2024 Fee Resolution**

**BACKGROUND:** Recently, the Parks & Recreation Department have experienced park pavilion renters (mainly at McFee Park) leaving behind excessive trash.  Staff have also experienced several sports groups leaving trash behind after field use.  This has resulted in overtime costs, as the Park Attendant teams are required to clean the parks, sports fields, and pavilions before the end of each shift.  Several instances, staff remained at the park, cleaning excessive trash until well after midnight.

**DISCUSSION:**   Due to these ongoing situations, staff brought this issue to the Parks & Athletics Council at the August 8, 2023, meeting.  The council voted to recommend the changes to the rental regulations for pavilion rentals at McFee Park.  The staff is further recommending changes to the Fees Resolution to encompass excessive trash situations in all parks.

- o   <u>First Trash violation</u>: A written warning and/or a $100 fine will be charged to the renter/organization. The renter/organization will not be allowed to use the fields until the fine is paid.

- o   <u>Second Trash Violation</u>: A $100 fine and 30-day suspension (without a refund of fees) to the renter organization. The renter/organization will not be allowed to rent a pavilion or rent/use fields or to until after the 30-day suspension and the fine is paid.

- o   <u>Third Trash Violation</u>: The renter/organization's contract will be canceled, and the organization will be banned from using any Town of Farragut field in the future.

**RECOMMENDATION BY:**  Ron Oestreich, Parks and Rec Director and Lauren Cox, Park Manager for approval.

**PROPOSED MOTION:** Approve Resolution R-2023-07, Amended FY2024 Fee Resolution to include an excessive trash fee for Parks, Pavilions, and Sports Fields.

**BOARD ACTION:**

**MOTION BY:**_____ **SECONDED BY:**_____

| <u>VOTE/TOTAL</u> | <u>BURNETTE</u> | <u>MEYER</u> | <u>POVLIN</u> | <u>WHITE</u> | <u>WILLIAMS</u> |
|---|---|---|---|---|---|
| YES | _____ | _____ | _____ | _____ | _____ |
| NO | _____ | _____ | _____ | _____ | _____ |
| ABSTAIN | _____ | _____ | _____ | _____ | _____ |



# TOWN OF FARRAGUT

## RESOLUTION R-2023-07

**WHEREAS,** the Board of Mayor and Aldermen desires to establish a general fee schedule for Fiscal Year 2024, setting the necessary fees for all Town services and collection of Town accounts and expenditures, including but not limited to application, filing, license and permit fees; and

**WHEREAS,** it is the desire of the board to amended the FY24 Fee Schedule, adopted May 25, 2023, to include an Excessive Trash Fee.

**NOW, THEREFORE BE IT RESOLVED** by the Town of Farragut Board of Mayor and Aldermen, that all fees are hereby adopted as listed on the attached schedule.

This Resolution is duly adopted by the Board of Mayor and Aldermen of the Town of Farragut on this 24th day of August 2023.

_____

Ron Williams, Mayor

_____

Allison Myers, Town Recorder

# Excessive Trash Fee

The excess trash that renters are leaving behind at McFee Park is costing the Town in overtime dollars. Evening and weekend park & recreation staff are responsible for litter pick-up and restroom cleaning. Staff are scheduled daily to 10:30 p.m. but have had to stay on the clock to clean pavilions until after midnight.

Reservations at McFee Park with 45+ attendees are given 65 gallon rolling trash cans in addition to the trashcans placed around each pavilion.

**Large Pavilion:** Seats 200 at 17 tables

- 4 – 35-gallon stationary trashcans
- 1 – additional 65-gallon trashcan for parties over 45 people

**Small Pavilion:** Seats 126 at 13 tables

- 3 – 35-gallon stationary trashcans
- 2 - 35-gallon stationary trashcans in proximity
- 1 – additional 65-gallon trashcan for parties over 45 people

**Great Lawn Pavilion:** Seats 150 with rental chairs – Can seat up to 250 if rental provides additional seating.

- 4 – 35-gallon stationary trashcans
- 6 - 35-gallon stationary trashcans in proximity
- 1 – additional 65-gallon trashcan for parties over 45 people
- 2 – additional 65-gallon trashcans for parties over 200 people

**Staff Recommendation:**

**Rented pavilions must be left free of refuse and trash must be placed in trashcans or dumpster at the park**.

Penalty for Violation: A $100 fine for trash not contained in provided trashcans will be charged to the renter. The renter will not be able to rent a park or pavilion until the fine is paid.



| FY2024 Fee Schedule | | Revised August 2023 |
|---|---|---|
| | | |
| | | **Approved Fee** |
| **Administration** | | |
| Beer Permit | | $250 |
| Beer Permit Privilege Tax/Annual Renewal Fee | | $100 |
| Retail Liquor Store Application | | $300 |
| Liquor Privilege Tax | | |
| | Private Club | $300 |
| | Hotel & Motel | $1,000 |
| | Restaurants, according to seating | |
| | 75-125 seats | $600 |
| | 126-175 seats | $750 |
| | 176-225 seats | $800 |
| | 226-275 seats | $900 |
| | 276 seats & over | $1,000 |
| Wine Only Privilege Tax | | $120 |
| Solicitation Permit | | $15 |
| | | |
| Records Request/Copies | Black & White 8 1/2 X 11 | $0.15 |
| (see Section 1-307 of Farragut Municipal Code) | Color 8 1/2 X 11 or 8 1/2 X 14 | $0.50 |
| | Color 36 X 24 | $5 |
| | Larger copies | Cost of production |
| | Labor to fill request | Charges based on employee hourly rate and time to fulfill request |
| Notary Service | $0 for Farragut residents | $10 per stamp/signature |
| Credit Card Fee | | 2% transaction fee |
| | | |
| **Engineering** | | |
| **Drainage Fee** | | |
| | Commercial/Office Development | $0.03 per square foot of impervious surface |
| | Residential Development | $40 per subdivision lot |

| Community Development | | Approved Fee |
|---|---|---|
| **General** | | |
| | Illegal Parking (in fire lanes) | $25 |
| | Special Events Permit | $25 |
| | Home Occupation | $50 |
| | Local Contractor Licensing Fee | $100 |
| | Mobile Food Vendor Fire Safety Permit/per year | $100 |
| | Zoning Letter | $25 |
| **Building Permits** | Permit valuation shall include total value of work, including labor and materials, for which the permit is being issued | |
| | **Total Valuation:** | |
| | $1,000 and less | $35.00 minimum |
| | $1,001 to $50,000 | $35.00 for the first $1,000, plus $6.50 for each additional thousand or fraction thereof, to and including $50,000 |
| | $50,001 to $100,000 | $340 for the first $50,000, plus $5.25 for each additional thousand or fraction thereof, to and including $100,000 |
| | $100,001 to $500,000 | $600 for the first $100,000, plus $4.00 for each additional thousand or fraction thereof, to and including $500,000 |
| | $500,001 and up | $2,260 for the first $500,000, plus $2.60 for each additional thousand or fraction thereof |
| **Plumbing Permits** | | $35, plus $5.00 for each fixture |
| **Gas Permits** | | $35 for first tap, plus $5.00 for each additional tap |

| | | |
|---|---|---|
| **Mechanical Permits-Commercial** | | $35 for first $1,000, per total value of installation, plus $5.00 for each additional thousand or fraction thereof |
| **Mechanical Permits-Residential** | | $35, plus $35 per each unit |
| **Plumbing, Gas, Mechanical Local License** | | $100.00 |
| **Swimming Pool Permits** | Public and Private Pool | Per total value of construction |
| **Demolition Permits (for demolition of any building or structure)** | | $100 |
| **Moving Permits (for moving any building or structure)** | | $100 |
| **Re-Inspections** | | $50 for 1st re-inspection and $100 for 2nd re-inspection and $200 for re-inspections of the same failure beyond the 2nd re-inspection |
| **Commencing Work Without a Permit** | | Fee will be double the calculated building permit fee |
| **Building Permit Application Extensions** | | $100 with up to 90 days as the maximum extension |
| **Building Permit Extensions** | | $100 with up to 180 days as the maximum extension |
| **Temporary Certificate of Occupancy** | Residential-30 day maximum | $100 |
| **Temporary Certificate of Occupancy** | Non-residential-30 day maximum | $200 |
| **Plan Reviews** | Commercial | Fee is one half of the calculated Building Permit Fee, which is to be paid at the time of plan submittal. |
| **Re-submittal Plan Reviews** | Commercial | $250 after the initial submittal and one correction submittal |
| **Re-submittal Plan Reviews** | Residential | $50 after the initial submittal and one correction submittal |
| **Fire Prevention** | | |
| | Fire Sprinkler System Permit | $0.02 per square foot or $100 (whichever is greater) |
| | Fire Alarm System Permit | $0.02 per square foot or $100 (whichever is greater) |
| | Modifications to existing fire alarm or sprinkler systems if work does not exceed $1,000; if does exceed $1,000, refer to Fire Alarm or Sprinkler System Permit fee | $50 |
| | All other permits | $100 |

| | | |
|---|---|---|
| **Fire Prevention Plan Resubmittal** | | $100 after the second submittal |
| **Concept Plans, Subdivision Plats and Subdivision Variances** | | |
| | Concept Plan | $100 |
| | Preliminary Plat | $100 plus $25/lot |
| | Final Plat | $100 plus $25/lot |
| | Variance Request | $300 |
| **Site Plans (small acreage/building size)** | Less than 3 acres or proposed gross square footage of building space is less than 10,000 square feet | $100 |
| **Site Plans (large acreage/building size)** | More than 3 acres or proposed gross square footage of building space is more than 10,000 square feet | $200 |
| **Landscape Plans** | | $50 |
| **Zoning Ordinance & Subdivision Regulations Text Amendments** | Amend text | $300 |
| **Zoning Map Amendments** | Amend map | $300 |
| **Board of Zoning Appeals - Variance Request** | | $300 |
| **Board of Zoning Appeals - Special Exception, Use on Review, or Interpretation Request** | | $100 |
| **Comprehensive Land Use Plan Amendments** | Amend text or map | $300 |
| **Municipal Code Text Amendments** | | $300 |
| **Municipal Code Variance (Non- Board of Zoning Appeals)** | | $300 |

| Signs | | |
|---|---|---|
| | Permanent Signs (non individual tenant panel) | $100 |
| | Temporary Signs | $25 |
| | Sign Fees for Tenant Panel Addition or Modification to Tenant Panel on Existing Ground Mounted Sign | $50 |
| | Signs Erected or Modified Without a Permit | Double the sign permit fee |
| **Sign expiration extension of 180 days** | | |
| | Permanent Signs (non individual tenant panel) | $100 |
| | Tenant Panel Sign | $50 |
| | | |
| **Everett Road Corridor Fee** | | Ordinance 14-19 |
| | | |

| Parks & Recreation | | Approved Fee |
|---|---|---|
| **Facility** | | |
| **Picnic/Pavilions Rental** | Essex (AP); Burnside (CSP) | $25 half day/ $40 full day |
| | Hartford & Saratoga (AP); Longstreet (CSP) | $45 half day/$80 full day |
| | McFee Small | $85 half day/$125 full day (Monday through Thursday) |
| | McFee Small | $100 half day/$150 full day (Fri, Sat, Sun & Holidays) |
| | McFee Large | $95 half day/$145 full day (Monday through Thursday) |
| | McFee Large | $120 half day/$175 full day (Fri, Sat, Sun & Holidays) |
| | McFee Great Lawn and Great Lawn Pavilion- | see McFee Park Fees section |
| | Town Hall Park Pavilion | $25 half day/ $40 full day |
| | Anchor Park Restroom Pavilion | $25 half day/ $40 full day |
| | | |
| **Athletic** | Fields (Diamond & Rectangular) Grass | $25 per hour.  Tournament Fees:  1/2 day $100  All Day $200 |
| | Fields (Synthetic Turf) | $50 per hour |
| | Competitive, Recreational & Intermediate Volleyball Fees | $165 per team |
| | McFee Tennis | $10 per court for 1 hour |
| | McFee Pickleball | $5 per court for - 1 hour |
| | McFee Basketball | $10 per court for 1 hour |
| **Park Usage Fee for Non-Town Programs (Does not include any facility i.e. pavilions, etc.)** | Professional photographers, fitness classes, trainers, Etc. | $100 Annual Permit Fee |
| **For-Profit/Park Usage Fee** | Professional Photographers, For profit classes, Trainers, Etc. | $100 Annual Permit Fee |
| **Tournament/Camp/Clinic Usage Fee** | Grass Field/Volleyball Complex | $85 half day/$150 full day |
| | Synthetic Turf Field | $300 half day/$600 full day |
| | Tennis (2)/Pickleball (4) | $200 full day |
| | Tennis (4)/Pickleball (8) | $400 full day |

| | | |
|---|---|---|
| **Tournament Deposit (Refundable)** | | $500 |
| **Vendor Fee-Tournament** | Per Vendor | $20 per day |
| **Special Event Park Use Fee - Founders Park** | | $200 per 4 hours; $50 per hour for each additional hour |
| **Excessive Trash** | | |
| | First Trash Violation | A written warning and/or a $100 fine will be charged to the renter/organization. The renter/organization will not be allowed to use the fields until the fine is paid. |
| | Second Trash Violation | $100 fine and 30-day suspension (without a refund of fees) to the renter organization. The renter/organization will not be allowed to rent a pavilion or rent/use fields or to until after the 30-day suspension and the fine is paid. |
| | Third Trash Violation | The renter/organization's contract will be canceled, and the organization will be banned from using any Town of Farragut field in the future. |

# McFee Park Fees

**McFee Great Pavilion Only**

<u>1/2 day rental</u> - $100

<u>Full day rental</u>- $175

|  | **Non-Profit** | **For Profit/Social** |
|---|---|---|
| **McFee Great Lawn and Pavilion- 120 person max** | <u>1/2 day rental</u> - $400 | <u>1/2 day rental</u> - $500 |
|  | <u>Full day rental</u>- $600 | <u>Full day rental</u>- $700 |

**Additional Fees for half or full day rentals:**

| | |
|---|---|
| Electrical Fees | $100 |
| TOF Tables & Chair rental | $125 |
| Refunable Deposit | $250 |

**Other Fees:**

| | |
|---|---|
| Excessive Trash Fee | $100 |

| **Mayor Ralph McGill Plaza** | Non Profit | For Profit/Social | |
|---|---|---|---|
| 100 people or less | $300 | $400 | use of two grass lawns and sections of parking lot |
| 101 people or more | $450 | $600 | use of two grass lawns, parking lot, and can shut down entry roads – parking provided at the Farragut Community Center |
| Electrical Fee | $100 | $100 | |
| Trash Fee-100 people or less | $75 | $75 | |
| Trash Fee-101 people or more | Renter must provide for private trash service | | |
| Security Deposit (Refundable)-100 people or less | $300 | $300 | |
| Security Deposit (Refundable)-101 people or more | $500 | $500 | |
| Tent Permit/Fee | $50 | $50 | |
| Alcohol Fee | $100 | $250 (No sales) | |
| Alcohol Fee | | $500 (sales) | |
| Any event serving or selling alcohol must hire an officer (not security guard), must receive a Town of Farragut beer board event permit (beer only) and must receive a State of Tennessee alcohol event permit (wine and liquor) | | | |
| **Tourism Rental Rebate Plan (Hotel Incentive)** | | | |
| Rebate for rental fees for Farragut hotel use (20 or more rooms) | Rentals of athletic fields, courts, McGill Plaza, CC Gym, CC Assembly Hall | $2.55 per hotel night | |

| Community Center Fees | Non Profit - Reg Hours | Non-Profit - After Hours | For Profit/ Social - Reg Hours | For Profit/ Social - After Hours |
|---|---|---|---|---|
| **Classrooms** | | | | |
| Small (1 - 1/2 hour block) | $15 | $40 | $15 | $40 |
| Small ( 1 - 1/2 hour block) - Holiday Fee | | $50 | | $50 |
| Medium | $20 | $45 | $20 | $45 |
| Medium  ( 1 - 1/2 hour block) - Holiday Fee | | $55 | | $55 |
| Large | $25 | $50 | $25 | $50 |
| Large ( 1 - 1/2 hour block) - Holiday Fee | | $60 | | $60 |
| | | | | |
| **Gym** | | | | |
| Sports/Fitness (1 hour block) | $30 | $55 | $30 | $55 |
| Sports/Fitness (1 hour block) - Holiday Fee | | $75 | | $75 |
| Sports/Fitness - Setup Fee | $15 | $15 | $15 | $15 |
| Camp/Tournament (Half Day - 6 hours) | $150 | $275 | $150 | $275 |
| Camp Tournament  (Whole Day) | $325 | $600 | $325 | $600 |
| Camp/Tournament (Half Day - 6 hours) - Holiday Fee (20%) | | $330 | | $375 |
| Camp/Tournament (Whole Day) - Holiday Fee (20%) | | $720 | | $800 |
| Special Event (8 hours)* | $450 | $650 | $750 | $950 |
| Special Event (8 hours)* - Holiday Fee (20%) | | $780 | | $1,140 |
| Special Event Additional Hours (Per Hour) | $125 | $125 | $125 | $125 |
| Special Event Additional Hours (Per Hour) Holiday Fee (20%) | $150 | $150 | $150 | $150 |
| Refundable Damage Deposit | $250 | $250 | $250 | $250 |
| | | | | |
| **Assembly Hall  (Monday-Saturday)** | | | | |
| 8 Hour Rental** | $400 | $650 | $650 | $850 |
| Holiday Fee (20%) | | $780 | | $1,020 |
| Additional Hours (Per Hour) | $100 | $100 | $100 | $100 |
| Additional Hours (Per Hour) Holiday Fee (20%) | $120 | $120 | $120 | $120 |
| Alcohol Fee (No Sales) | $100 | $100 | $100 | $100 |
| Alcohol Fee (Sales) - For Profit Business Only (Not social) | | | $500 | $500 |
| Refundable Damage Deposit | $250 | $250 | $250 | $250 |

*Includes commercial kitchen
**Includes pre-function room and catering kitchen

| **Assembly Hall - Special Rates (Monday-Thursday)** | Non-Profit - After Hours | For Profit/ Social - After Hours | |
|---|---|---|---|
| 2 Hour Rental** | $150 | $200 | |
| Additional Hour | | $50 | |
| Additional Table/Chair Rental | | $10 | per table/8 chairs |
| Refundable Damage Deposit | | $100 | |

| **Assembly Hall - Special Rates (Sunday Only 1:00pm to 4:00pm)** | Non-Profit - After Hours | For Profit/ Social - After Hours | |
|---|---|---|---|
| 3 Hour Rental**   (Max of 40 attendees) | $300 | $300 | |
| Refundable Damage Deposit | $250 | $250 | |

| **Birthday Party Package** | | | |
|---|---|---|---|
| 2 Hour Rental - (Saturday) 1 hour gym, 1 hour class room | | $100 | |
| 3 Hour Rental - (Sunday)  2 hours gym, 1 hour class room | | $150 | |
| Additional Table/Chair Rental | | $10 | per table/8 chairs |
| Refundable Damage Deposit | | $100 | |

## REPORT TO THE BOARD OF MAYOR AND ALDERMEN

**PREPARED BY:  David Smoak, Town Administrator**

**SUBJECT:  Approval of amendment to the rental agreement for temporary modular office space from VESTA Modular for Town Hall Renovations.**

**INTRODUCTION:**  The purpose of this agenda item is to approve an amendment to the total cost of the rental agreement between VESTA Modular and the Town of Farragut for temporary modular office space for the Town Hall renovations.

**DISCUSSION:**  The Town of Farragut will be remodeling the Town Hall building starting in the fall of 2023. To expedite the construction of the project, all staff will relocate to office space within the existing Farragut Community Center or in a modular office space located at the Farragut Community Center. The Farragut Board of Mayor and Aldermen approved a rental agreement with VESTA Modular for temporary modular office space at the July 13, 2023 Board meeting.

Following the approval of the agreement, VESTA Modular informed Town staff that a Supplemental Administrative Fee was accidentally removed from the quote during one of the revisions. The Supplemental Administrative Fee is to cover personal property taxes for the modular office space.

The contract amount approved at the July 13, 2023 Board meeting was $131,745 for a 12-month lease period, with a month-to-month extension option at $5,975/month. The Supplemental Administrative Fee of $198.75/month, a total of $2,385 for the initial 12-month lease term. The new contract amount including the Supplemental Administrative Fee for the 12-month lease term is $134,130, with a month-to-month extension option at $6,173.75/month.

**FINANCIAL SECTION:**  FY2024 budget as adopted by the Board of Mayor and Aldermen on June 8, 2023

| Line Item: <u>ARPA FUND: 316-41810-9210</u> | | | |
|---|---|---|---|
| **<u>Total Budget</u>** | **<u>Contracted Amount</u>** | **<u>Encumbrances to Date</u>** | **<u>Remaining Amount</u>** |
| **<u>$2,500,000</u>** | **<u>$131,745</u>** | **<u>$2,358.35</u>** | **<u>$2,365,896.65</u>** |
| **Approved By**:_____ | | | |

**RECOMMENDATION BY:**  Town Administrator David Smoak for approval.

**PROPOSED MOTION:**  To approve the amendment to the rental agreement for temporary modular office space from VESTA Modular for Town Hall renovations.

**BOARD ACTION:**

**MOTION BY:** _____ **SECONDED BY:** _____

| VOTE/TOTAL | BURNETTE | MEYER | PINCHOK | POVLIN | WILLIAMS |
|:---:|:---:|:---:|:---:|:---:|:---:|
| YES | _____ | _____ | _____ | _____ | _____ |
| NO | _____ | _____ | _____ | _____ | _____ |
| ABSTAIN | _____ | _____ | _____ | _____ | _____ |

 

## Lease Quotation and Agreement

| | | | |
|---|---|---|---|
| Lessee Name: | Town of Farragut | Billing Address: | 11408 Municipal Center Drive |
| Contact Name: | Jenn Hatmaker | City/State/Zip: | Farragut, TN 37934-2830 |
| Email: | jhatmaker@townoffarrgut.org | Lessor Representative: | Brian Kelly |
| Phone: 865-966-7057    Mobile: | | Email: | brian.kelly@mobilemodular.com |
| Quotation Date: 5/25/23 | | Phone: | 615-410-1287 |

## Project Information

| | | | |
|---|---|---|---|
| Project Name: | Temp Office Space - Construction Project | Site Contact: | Jenn Hatmaker |
| Site Address: | 239 Jamestown Blvd | Phone: | 865-966-7057 |
| City/State/Zip: | Farrgut, TN 37934-2703 | Email: | jhatmaker@townoffarrgut.org |
| County: | Knox | PO Number: | |
| Lease Term(months): 12    Prevailing or Union Rates Included ☐ | | Estimated Delivery Date: | |

## Equipment and Services

| Equipment Description: | 36x60 | S/N: | See Above | Unit Number: | See Above |
|---|---|---|---|---|---|

| Description of Services: | Qty | Charge (US $) |
|---|---|---|
| Monthly Rental Rate:  $ 3,975.00 | 12 | $ 47,700.00 |
| Monthly Damage and Destruction Waiver Fee (if applicable*): | | $ 0.00 |
| Delivery: | | $ 1,000.00 |
| Installation (Block/Level/ 18 Anchors):    Translift Rental for Trailer Placement $975 Included in Install Number | | $ 20,085.00 |
| Estimated Teardown, Anchor Removal: | | $ 15,325.00 |
| Estimated Return: | | $ 6,400.00 |
| Supplemental Administrative Fee:  $ 198.75 | 12 | $ 2,385.00 |

## Accessories and Services

| | | Qty | Charge (US $) |
|---|---|---|---|
| Steps:  1  x $  65  ea. =  $ 65 /month | | 12 | $ 780.00 |
| Skirting Installation | $ 4,095.00 | 1 | $ 4,095.00 |
| Skirting Removal | $ 465.00 | 1 | $ 465.00 |
| ADA Ramp Monthly Rental | $ 360.00 | 12 | $ 4,320.00 |
| ADA Ramp Delivery/Installation | $ 1,937.50 | 1 | $ 1,937.50 |
| ADA Ramp Dismantle/Return | $ 1,937.50 | 1 | $ 1,937.50 |
| Furniture Monthly Rental | $ 1,575.00 | 12 | $ 18,900.00 |
| Furniture Delivery | $ 4,400.00 | 1 | $ 4,400.00 |
| Furniture Return | $ 4,400.00 | 1 | $ 4,400.00 |

| Estimated Equipment Insurance Value:  **$ 200,000**<br>Refer to Lease Terms and Conditions for applicable insurance requirements | Total Charges before Tax: | $ 134,130.00 |
|---|---|---|

* The Damage and Destruction Waiver option is subject to the terms and conditions set forth in the
Damage and Destruction Waiver, which is attached hereto and incorporated herein by reference.



| Clarifications and Additional Information |
|---|

- Quote is valid for 30 days.
- This Lease Quotation and Agreement is subject to the Scope of Work and Terms and Conditions set forth below.
- Prices quoted exclude all applicable sales and property taxes. Taxes payable by Lessee will be calculated at the applicable rate at the time of invoicing.
- Charges for return-related services specified herein are estimates only for all leases with initial Lease Terms 12 months or longer or if the Lease Term is extended past the expiration of the initial Lease Term. Actual charges for return-related services will be charged at Lessor's then-current rates for such services at the time the leased equipment is returned to Lessor.
- Lessee's site must be dry, compacted, level and accessible by normal truck delivery. Lessee will be responsible for all charges to dolly, crane, forklift, or otherwise. Unless otherwise specified, quotation excludes permits, ramp removal, stairs, foundation systems, foundation system removal, temporary power, skirting, skirting removal, engineering, taxes, or utility connections.
- Quotation is subject to equipment availability. Unless otherwise specified, equipment and related furnishings, finishes, accessories, and appliances provided are previously leased and materials, dimensions and specifications vary. Detailed specifications may be available upon request.
- Lessor reserves the right to substitute equal or better equipment prior to delivery without notice.
- This transaction is subject to Lessor's credit approval requirements. Security deposit and/or payment in advance may be required. To complete a credit application, please visit https://vestamodular.com/customer-credit-application/.
- Unless otherwise specified, prices do not include prevailing wages, Davis-Bacon wages, or other special or certified wages.

| SCOPE OF WORK | | | | |
|---|---|---|---|---|
| Note: the terms "Customer" and "Lessee" are used interchangeably. | | Lessee | Not Applicable | Lessor |
| 1. | Floor plan | | | X |
| 2. | Foundation Pad -minimum 2500 PSF recommended | X | | |
| 3. | Third party certification of drawings of building | | X | |
| 4. | Delivery to customers site | | | X |
| 5. | Site access including all weather road (Vesta Modular does not restore access wheel ruts and damaged grass, landscaping and trees) | X | | |
| 6. | Site leveling, compaction and drainage (note positive drainage is required from foundation pad) | X | | |
| 7. | Stake location (all four corners) and site plan showing building layout | X | | |
| 8. | Site utilities (electrical, water, sewer, and telcom including crawl space harnessing) | X | | |
| 9. | Provide pier (dry stack CMU) foundation plans (above grade only) | | X | |
| 10. | Permits and fees (other than delivery) | X | | |
| 11. | Set buildings on foundation pad provided by customer | | | X |
| 12. | Provide concrete piers (dry stacked piers using 8 x 8 x 16 CMU blocks) on precast concrete pads 16" x 16" x 4" or equal | | | X |
| 13. | Remove axles, tires and hitches (hitches removed and placed in crawl space on doublewide and larger installations only) | | | X |
| 14. | Provide temporary power for hand tools if required | X | | |

 

| 15. | Provide dumpster service for trash removal at the jobsite if required | X | | |
|-----|-----|:-:|:-:|:-:|
| 16. | Provide bathroom facilities at jobsite for setup crews if required | X | | |
| 17. | Anchor building – type of site (check one) Dirt__ Gravel __ Rock ___ Concrete __ | | | X |
| 18. | Install skirting to match siding – type | | X | |
| 19. | Install interior and exterior finishes | | | X |
| 20. | Weathertite roof | | | X |
| 21. | Site adjustment of all doors after setup (related to site settlement) | | | X |
| 22. | Level floor during setup | | | X |
| 23. | Supply/install electrical panel box (es) | | | X |
| 24. | Engineer, supply and install electrical distribution system, and sub feed to electrical panel box(es) | X | | |
| 25. | Supply/install transformer, if needed | X | | |
| 26. | Supply/install Step and Landings – Type | | | X |
| 27. | Broom sweep of interior floors– all other cleaning by customer | | | X |
| 28. | Supply/install awning/canopies | | X | |
| 29. | Hookup HVAC to electrical panel box or boxes (by factory) | | | X |
| 30. | Balance HVAC system | | X | |
| 31. | Supply/install miniblinds | X | | |
| 32. | Supply/install guttering and downspouts | X | | |
| 33. | Supply/install fire alarm system, if needed | X | | |
| 34. | Supply/install fire sprinkler system if required | X | | |
| 35. | Supply/install emergency lighting | X | | |
| 36. | Supply/install telephone J-boxes and computer J-boxes | X | | |
| 37. | Supply/install telephone and communication wiring | X | | |
| 38. | Connect power during set-up | X | | |



This Lease Quotation and Agreement is entered into by and between Lessor and Lessee effective as of the date signed by Lessee. This Lease Quotation and Agreement includes the terms and conditions set forth in the following two documents (collectively, the "Agreement"), each of which is incorporated herein by this reference:

1. **Lease Terms and Conditions** attached hereto; and

2. **Supplemental Lease Terms and Conditions** located at ([https://www.mobilemodular.com/contractterms](https://www.mobilemodular.com/contractterms)), as the same may be updated from time to time in the sole and absolute discretion of Lessor.

By signing below, Lessee: (1) acknowledges and agrees that it has received, read and understands the terms of this Agreement and agrees to be bound by the terms of this Agreement, including prices and specifications, and (2) instructs Lessor to make appropriate arrangements for the preparation and delivery of the Equipment identified herein. This Agreement may be executed in one or more counterparts (including through the use of electronic signatures), each of which shall be deemed an original and all of which shall constitute one and the same Agreement. Upon execution of this Agreement, Lessor shall generate a Lease Agreement Number, which shall be referenced on all Lessor invoices.

No document provided by Lessee, including, without limitation, Lessee's purchase orders, work orders, bills of lading, or forms for receipt or acknowledgment or authorization ("**Lessee Forms**"), nor the terms and conditions associated with such Lessee Forms, shall amend, modify, supplement, waive, or release any term or condition of this Agreement (or the Master Lease Agreement, as applicable) even if such Lessee Forms are signed by an agent or representative of Lessor. The terms and conditions of this Agreement (or the Master Lease Agreement, as applicable) shall prevail over any Lessee Forms, and any inconsistent or additional terms and conditions in Lessee Forms shall be deemed void *ab initio* and of no force or effect.

The individuals signing this Agreement affirm that they are duly authorized to execute this Agreement by and on behalf of the parties hereto.

**LESSOR:**

Vesta Housing Solutions, LLC

Signature: *Brian Kelly*

Name: Brian Kelly

Title: Branch Sales Manager

Date:

**LESSEE:**

Town of Farragut

Signature:

Name:

Title:

Date:



**LEASE TERMS AND CONDITIONS**

1. **LEASE**. Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the Equipment (as defined below). The lease of any Equipment is governed by the terms of this Agreement. The Equipment is and shall remain the personal property of Seller.

2. **TERMS**. All capitalized terms used and not otherwise defined herein, will have the meanings set forth in this Agreement. As used in this Agreement, the following definitions shall apply: "**Accessories**" shall mean any additions, attachments, or accessories to the modular buildings, or ancillary services, provided by Lessor to Lessee and identified in this Agreement; "**Equipment**" shall mean the modular buildings, Accessories, and/or Services identified in this Agreement, together with any replacements, repairs, additions, attachments or accessories hereafter rented to Lessee under this Agreement.

3. **PAYMENTS AND PRICE ADJUSTMENTS**. Lessee agrees to pay to Lessor each payment specified herein on a net invoice basis. Payment terms are net due upon receipt unless otherwise agreed upon in writing. All payments due from Lessee pursuant to this Agreement shall be made by Lessee without any abatement or setoff of any kind whatsoever arising from any cause whatsoever. Prices will be increased by Lessor for unknown circumstances or conditions, including, but not limited to, driver waiting time, special transport permits, difficult site conditions and/or increases in fuel prices.

4. **LEASE TERM; EARLY TERMINATION**. The Lease Term and Monthly Rent, each of which are specified in this Agreement, shall commence on the date the Equipment is delivered to the Site (the "Start Rent Date"), unless a different date is mutually agreed upon in writing, and shall continue thereafter for the number of months specified in this Agreement as the Lease Term. Lessee agrees to pay the Total Monthly Charges specified in this Agreement (as may be adjusted pursuant to Section 5 below) for each month during the Lease Term and any extensions thereof. A month is defined as thirty (30) calendar days; rent will be billed monthly unless otherwise specified in this Agreement (but rent shall be due and owing even in the absence of actual receipt by Lessee of an invoice or bill). In the event that Lessee terminates this Agreement prior to the expiration of the Lease Term, Lessor shall be entitled to charge an early termination fee, even if such termination occurs prior to delivery of the Equipment. Such fee shall be determined by Lessor, in its sole discretion, following the receipt of the termination request. Such early termination fee may include, but shall not be limited to, charges related to the preparation of the Equipment for delivery and/or the rental value of this Agreement. In no event shall any such early termination fee exceed the total value of this Agreement. Lessor shall not be liable to Lessee for any failure or delay in obtaining, delivering or setting up the Equipment. If Lessee delays delivery of the Equipment for any reason for thirty (30) days or longer from the original delivery date mutually agreed upon between both parties, Lessor may, in Lessor's sole discretion, charge Lessee a monthly storage fee equal to the Monthly Rent starting on the original delivery date, and/or terminate this Agreement, subject to the early termination provisions set forth above.

5. **EXTENSION OF LEASE TERM**. Upon expiration of the initial Lease Term set forth in this Agreement, the lease of the Equipment shall automatically be extended on a month-to-month basis until the Equipment is returned to Lessor. This Agreement does not expire and the terms and conditions hereof shall remain in full force and effect for any extension of the Lease Term, unless otherwise agreed upon by Lessor and Lessee in writing. Lessor may periodically revise the Total Monthly Charges from those reflected in this Agreement if the lease of the Equipment is extended beyond the initial Lease Term. If the lease of the Equipment is extended beyond the initial Lease Term, Lessor may revise the charges for the Estimated


Return-Related Services from those specified in this Agreement to reflect Lessor's then-current market rates for such services.

6. **PREPARATION FOR REMOVAL OF THE EQUIPMENT**. Prior to the scheduled removal of the Equipment, Lessee shall, at a minimum: (a) provide clear access to the Equipment for Lessor to dismantle and remove the Equipment from the Site by industry-standard trucking methods; (b) disconnect all utilities; (c) remove all personal property of Lessee's from the Equipment; and (d) in the case of Equipment that includes plumbing, flush the plumbing lines clean and ensure that no foreign matter remains in any fixtures. Plumbing must be properly disconnected by Lessee at its sole cost and expense. Lessee will be responsible for costs of repair required by improper plumbing disconnection to the extent that the Equipment is damaged. Any components, parts or accessories supplied by Lessor must be returned with the Equipment. In the event that Lessee fails to meet the requirements herein, additional charges may be incurred by Lessee for additional labor, waiting time, or dry-runs in the event that Lessor is unable to return the Equipment as scheduled.

7. **RETURN OF EQUIPMENT**. Lessee must provide a minimum of thirty (30) days prior, written notice to Lessor when requesting to return the Equipment. Lessee is responsible for complying with the requirements set forth in the "Preparation for Removal of the Equipment" section of these Lease Terms and Conditions. Unless otherwise agreed upon by Lessor in writing, Lessee shall continue to be responsible for payment of the monthly charges set forth in this Agreement (as may be adjusted pursuant to Section 5 hereto) until return of the Equipment to Lessor is completed. The monthly charges will be prorated in one-half (1/2) month increments only. If the Equipment is returned within the first fifteen (15) days of the billing period, Lessee shall be responsible for paying half of the monthly charges; if Equipment is returned between the sixteenth (16th) and thirtieth (30th) days of the billing period, Lessee shall be responsible for paying the entire amount of the monthly charges. The estimated charges for return-related services reflected in this Agreement will be adjusted for any Lease Term longer than twelve (12) months or if the Lease is extended beyond the initial Lease Term, pursuant to Section 5.

8. **WARRANTIES; DISCLAIMER**. Lessor warrants to Lessee that the Equipment, when delivered and set up and under normal use and regular service and maintenance by Lessee, shall be free from major defects in materials and workmanship that prevent any normal use and operation. Accessories supplied by Lessor pursuant to this Agreement but not owned by Lessor shall not be subject to the foregoing warranty, but shall carry the applicable warranty of the Accessory owner, which Lessor hereby assigns to Lessee to the extent transferable. Lessor's liability under this warranty shall be limited to the replacement or repair of the defective Equipment (during Lessor's normal working hours), at Lessor's option; provided, however, that Lessee shall provide written notice of any failure or defect to Lessor within four (4) days after discovery, and within the applicable warranty period, and failure to provide such notice in a timely manner may result in a limitation of this warranty at Lessor's sole option. If Lessee does not grant clear, unobstructed access for any such repairs between 8:00 a.m. and 5:00 p.m., Monday through Friday, Lessee shall bear the cost of repair rates for labor at the applicable overtime rates. This warranty does not extend to any Equipment subjected to improper application, damaged by accident or abuse, or repaired or altered outside of Lessor's facilities without prior written authorization from Lessor. **THE EXPRESS WARRANTIES CONTAINED IN THIS AGREEMENT ARE LESSOR'S SOLE AND EXCLUSIVE WARRANTIES WITH RESPECT TO THE EQUIPMENT AND SERVICES, AND ARE IN LIEU OF AND EXCLUDE ALL OTHER WARRANTIES, GUARANTEES, PROMISES, AFFIRMATION OR REPRESENTATIONS OF ANY KIND, EXPRESSED OR IMPLIED, WHICH MAY BE DEEMED APPLICABLE TO THE EQUIPMENT OR SERVICES, INCLUDING WITHOUT LIMITATION, THE CONDITION OF THE EQUIPMENT, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, ANY WARRANTY AGAINST INFRINGEMENT OR AS TO TITLE, WARRANTIES ARISING FROM COURSE OF DEALING OR USAGE OR TRADE OR ANY OTHER MATTER. EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION, ALL EQUIPMENT AND SERVICES ARE BEING PROVIDED "AS IS", "WHERE IS, WITH ALL FAULTS". LESSOR SPECIFICALLY DISCLAIMS ANY WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST OR PRESENT, THERETO. LESSEE HAS SELECTED ALL EQUIPMENT FOR LESSEE'S INTENDED USE AND RECOGNIZES THAT LESSOR IS NOT A DESIGNER OR MANUFACTURER OF ANY EQUIPMENT.**



9. **TAXES**. Lessee agrees to be responsible for all charges, fees and taxes (local, state and federal) levied or assessed upon Lessee or Lessor relating to the ownership, leasing, rental, sale, possession, use or operation of the Equipment (including, without limitation, sales, use and personal property taxes); provided, however, that the foregoing obligation shall not apply to any local, state or federal income tax assessed against the Lessor as a result of this Agreement which shall continue to be the obligation of Lessor. Lessee shall pay all such taxes for which it is responsible to the appropriate taxing authorities or, if directed or invoiced by Lessor, pay such amounts to Lessor for remittance by Lessor to the appropriate taxing authorities.

10. **LOSS OR DAMAGE**. Upon delivery and until the Equipment is removed from the Site by Lessor or its authorized agent, Lessee assumes all risk of loss or damage to the Equipment. Should any Equipment damaged be capable of repair, the Equipment shall be repaired and restored to its condition existing prior to such damage, at Lessee's sole cost and expense. In the event any of the Equipment is damaged beyond repair or is lost, stolen or wholly destroyed, this Agreement shall cease and terminate as to such Equipment as of the date of the event, accident or occurrence causing such loss or destruction, and Lessee shall pay Lessor within forty-five (45) days thereafter, an amount equal to the full replacement value of the Equipment, which payment obligation shall survive the termination of this Agreement.

11. **INSURANCE**. Lessee shall procure and maintain, at its sole expense (including all premiums, deductibles and self-insured retentions), (i) property insurance covering the loss, theft, destruction, or damage to the Equipment in an amount not less than the full replacement value thereof (and with a deductible no higher than $25,000), naming Lessor as loss payee of the proceeds, and (ii) commercial general liability insurance (minimum of $1,000,000 per occurrence and $2,000,000 in the aggregate) (and with a deductible no higher than $25,000), naming Lessor and its designees as additional named insureds. Lessee's insurance shall be primary and non-contributory to any insurance maintained by Lessor or any other additional insureds or additional named insureds. The liability insurance policy shall contain coverage for all contractual indemnity obligations of Lessee set forth in this Agreement, cross-liability and waiver of subrogation provisions in favor of Lessor and any other additional insureds. All evidence of all required insurance shall be in a form reasonably acceptable to Lessor and with a company having an A.M. Best rating of A- (VII) or better, and shall not be subject to cancellation without thirty (30) days' prior written notice to Lessor. Lessee shall provide to Lessor insurance certificates and endorsements (including without limitation, additional insured and loss payee endorsements) evidencing compliance with the insurance requirements of this Agreement (including without limitation, the deductible amounts and waiver of subrogation) prior to delivery of the Equipment and shall maintain all required insurance coverage until the Equipment is returned to Lessee. Lessor will not and does not provide insurance for any of Lessee's personal property that may be in or on any Equipment.

12. **INDEMNIFICATION AND LIMITATION OF LIABILITY**.

(a) **LESSEE ON BEHALF OF ITSELF, ITS SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, VENDORS, SUBCONTRACTORS, AND AFFILIATES, AND THEIR RESPECTIVE REPRESENTATIVES, DIRECTORS, OFFICERS, MANAGERS, VENDORS, MEMBERS, SHAREHOLDERS, PARTNERS, CONTRACTORS, EMPLOYEES, AGENTS, AND ASSIGNS (EACH, A "LESSEE PARTY," AND COLLECTIVELY, THE "LESSEE PARTIES") SHALL INDEMNIFY, DEFEND, RELEASE, AND HOLD HARMLESS LESSOR, ITS SUCCESSORS, ASSIGNS, PARENTS, SUBSIDIARIES, VENDORS, CONTRACTORS, AND AFFILIATES, AND THEIR RESPECTIVE REPRESENTATIVES, DIRECTORS, OFFICERS, MANAGERS, VENDORS, MEMBERS, SHAREHOLDERS, PARTNERS, CONTRACTORS, EMPLOYEES, AGENTS, AND ASSIGNS (EACH A "LESSOR INDEMNIFIED PARTY," AND COLLECTIVELY, THE "LESSOR INDEMNIFIED PARTIES") FROM AND AGAINST ANY AND ALL LOSSES, FEES, COSTS, EXPENSES, CLAIMS, LIABILITIES, DAMAGES, PENALTIES, FINES, FORFEITURES, AND SUITS (INCLUDING COSTS OF DEFENSE, SETTLEMENT AND REASONABLE ATTORNEYS' FEES, ENVIRONMENTAL CONSULTANTS AND EXPERT WITNESS FEES AT TRIAL AND ON APPEAL) (COLLECTIVELY, "LOSSES") RELATING TO, ARISING OUT OF OR IN CONNECTION WITH: (1) ANY BREACH OR NON-FULFILLMENT OF ANY COVENANT, AGREEMENT, OR OBLIGATION TO BE PERFORMED BY LESSEE PURSUANT TO THIS AGREEMENT, OR ANY INACCURACY IN OR BREACH OF ANY OF THE REPRESENTATIONS OF LESSEE SET FORTH IN THIS AGREEMENT; (2) THE OCCURRENCE OF ANY EVENT SET FORTH IN SECTION 13; (3) THE SELECTION, USE, POSSESSION, DELIVERY, RENTING, LEASING, SUBLEASING, OPERATION, TRANSPORT, MAINTENANCE,**



CONDITION, REPAIR, REPLACEMENT, REPOSSESSION, RETURN OR STORAGE OF ANY EQUIPMENT OR ANY SERVICES; (4) ANY FAILURE BY ANY LESSEE PARTY TO COMPLY WITH ANY APPLICABLE LAW IN CONNECTION WITH ANY EQUIPMENT OR THE SERVICES OR THIS AGREEMENT; (5) ANY DEATH OR BODILY INJURY TO ANY PERSON OR DESTRUCTION OR DAMAGE TO ANY PROPERTY TO WHICH THE ACTS OR OMISSIONS OF A LESSEE PARTY CONTRIBUTED; OR (6) ANY NEGLIGENT OR INTENTIONAL ACT OR OMISSION OF ANY LESSEE PARTY FOR ANY ACTION RELATED TO OR ANY USE OF ANY EQUIPMENT. THIS INDEMNITY SHALL APPLY EVEN IF SAID LOSSES ARE OCCASIONED, BROUGHT ABOUT OR CAUSED BY THE CONCURRENT NEGLIGENCE OF ANY LESSOR INDEMNIFIED PARTY, UNLESS A COURT OF COMPETENT JURISDICTION SHOULD DETERMINE THAT THE LOSSES WERE PROXIMATELY CAUSED BY THE SOLE NEGLIGENCE OR WILLFUL ACTS OR OMISSIONS OF A LESSOR INDEMNIFIED PARTY. IF THE FOREGOING OBLIGATIONS ARE NOT ENFORCEABLE AGAINST LESSEE UNDER APPLICABLE LAW, LESSEE AGREES TO INDEMNIFY, DEFEND, RELEASE AND HOLD HARMLESS LESSOR INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL LOSSES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT OF THE ACTS OR OMISSIONS OF THE LESSEE PARTIES' NEGLIGENT OR WORSE CONDUCT. THIS INDEMNIFICATION SHALL SURVIVE THE EXPIRATION OR EARLIER TERMINATION OF THIS AGREEMENT.

(b) TO THE FULLEST EXTENT NOT PROHIBITED BY LAW, LESSOR'S LIABILITY, IF ANY, SHALL BE LIMITED TO THE VALUE OF RENTAL FEES AND ALL OTHER AMOUNTS PAID BY LESSEE AND RECEIVED BY LESSOR UNDER THIS AGREEMENT FOR THE EQUIPMENT AND/OR SERVICES, AND LESSOR SHALL HAVE NO LIABILITY TO LESSEE OR ANY THIRD-PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHETHER BASED ON CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE.

13. **EVENTS OF DEFAULT; REMEDIES**. Each of the following shall constitute an "Event of Default": (1) failure by Lessee to make any payment within ten (10) days after its due date; (2) failure by Lessee to perform any other obligation under this Agreement, and the continuance of such default for ten (10) days after written notice thereof by Lessor to Lessee; (3) any material misrepresentation or false statement of fact by Lessee; (4) the loss, theft, damage, destruction or the attempted sale or encumbrance by Lessee of any of the Equipment; or (5) Lessee's dissolution, termination of existence, discontinuance of business, insolvency, or the commencement of any bankruptcy proceedings by or against, Lessee. Lessee acknowledges that any Event of Default will substantially impair the lease value of the Equipment hereof. Upon the occurrence of any Event of Default, Lessor may, without notice, exercise one or more of the following remedies: (1) declare all unpaid payments under this Agreement to be immediately due and payable; (2) terminate this Agreement as to any or all items of the Equipment; (3) take possession of the Equipment wherever found, and for this purpose enter upon any premises of Lessee and remove the Equipment, without any liability to Lessee; (4) direct Lessee at its expense to promptly prepare the Equipment for pickup by Lessor; (5) proceed by appropriate action either in law or in equity to enforce performance by Lessee of the terms of this Agreement or to recover damages for the breach hereof, including attorneys' fees and any other expenses paid or incurred by Lessor in connection with the repossession of the Equipment; (6) apply the security deposit specified in this Agreement ("Security Deposit") to payment of Lessor's costs, expenses and attorney fees in enforcing the terms of this Agreement and to indemnify Lessor against any damages sustained by Lessor; and/or (7) recover the replacement cost of any Equipment which Lessor is unable to repossess.. Lessor's waiver of any Event of Default shall not constitute a waiver of any other Event of Default or of any term or condition of this Agreement. No right or remedy referred to herein is intended to be exclusive and each may be exercised concurrently or separately and from time to time. In the event of repossession, Lessee waives any bond posting requirement.

Lease Terms and Conditions, Rev. 05/25/2023

**AGENDA NUMBER <u>VI.D.</u>**               **MEETING DATE <u>August 24, 2023</u>**

| REPORT TO THE BOARD OF MAYOR AND ALDERMEN |
| :---: |

**PREPARED BY:  Darryl Smith, PE, Town Engineer**

**SUBJECT:  Approval of Change Order 1, Advanced Traffic Management System (ATMS) Project for Fiber Upgrade**

---

**INTRODUCTION:**  The purpose of this agenda item is approval of a Change Order to upgrade the fiber lines to be installed as part of the Advanced Traffic Management System (ATMS) project currently underway.

**BACKGROUND**:  A critical success factor identified during strategic planning sessions is "Building and Maintaining the Town's Infrastructure and Assets," which includes investment in technology to meet the demands of the town as it grows.  The ATMS project (currently under construction) includes installation of 72-count fiber optic lines to connect all 26 of the Town's traffic signals to a central control at Town Hall.  While the 72-count fiber allows room for additional services over these lines, the Board decided that 144-count lines will provide much more room for growth in the foreseeable future.  As these lines traverse Kingston Pike, Campbell Station Road and Parkside Drive within the town, they will serve as the "spine" for a network of lines that will connect to all the town's parks and properties.

Change Order 1 includes all increased costs involved with upgrading from the 72- to 144-count fiber ($67,130.20), larger splice enclosures ($42,754.41) and fiber strand storage boxes ($5,465.46), for a total cost of $115,350.07.

**FINANCIAL SECTION:**

**Project**: CMAQ 310-43985-9060

| <u>Amended Budget</u> | <u>Change Order Amount</u> | <u>Expenditures to Date</u> | <u>Remaining Amount</u> |
| :---: | :---: | :---: | :---: |
| $6,825,000 | $115,350.07 | $967,169 | $5,742,480.93 |

**Approved By**:_____A. Myers_____

**RECOMMENDATION BY:**  Darryl Smith, PE, Town Engineer for approval.

**PROPOSED MOTION:**  Approval of Change Order 1, ATMS project, to increase the size of fiber for future services.

**BOARD ACTION:**

**MOTION BY:**_____ **SECONDED BY:**_____

| VOTE/TOTAL | WILLIAMS | POVLIN | MEYER | BURNETTE | WHITE |
| :---: | :---: | :---: | :---: | :---: | :---: |
| **YES** | _____ | _____ | _____ | _____ | _____ |
| **NO** | _____ | _____ | _____ | _____ | _____ |
| **ABSTAIN** | _____ | _____ | _____ | _____ | _____ |



## Supplemental Agreement and/or Request for Construction Change
## Change Order Request #01

| | | | |
|---|---|---|---|
| Project Title/Termini: | Town of Farragut ATMS Phase 1 | | |
| Owner: | The Town of Farragut | PIN: | 125462 |
| Address: | 11408 Municipal Center Dr | State Project No.: | 47LPLM-F3-144 |
| | Farragut, TN | Federal Project No.: | CM-9109(178) |
| | 37934 | Contract No.: | 2022-07 |
| County: | KNOX | | |

*Whereas,* we The Town of Farragut with Travelers Casualty and Surety of America, as a Surety, entered into a contract with Progression Electric, LLC, on 11/10/2022, for the construction by said Contractor of the above designated contract; and *Whereas,* certain items of construction encountered, are not covered by the original contract, we desire to submit the following additional items of construction to be performed by the Contractor and paid by the Owner at the price(s) scheduled therefore below:

The purpose of this Change Order is to:

The Town of Farragut desires an increase in the fiber strand count from 72 - 144 to support the growing network infrastructure since the inception of the project. The Town of Farragut is intending this change order to be a "Betterment cost" and will be paid with Town funding. Compensation from TDOT will not be pursued. The increase in fiber strand count results in increaded cost of other items associated with the size and count of the fiber cable. A larger fiber aerial splice enclosure will be required due to the increased fiber count, as well as a larger fiber optic strand storage unit.

As a result of this Change Order, contract time shall:

☒ Not Change,  ☐ Increase by _____ days, ☐ Decrease by _____ days

      Original Construction Completion Time:  540 days  (Date: 6/26/2024)

| | |
|---|---|
| Original Contract Amount: | $4,876,836.18 |
| Approved Change Orders: | $0 |
| Current Change Order: | $115,350.07 |
| Pending Change Orders: | $0 |
| Total Change Orders:: | $115,350.07 |

Contract Completion Time with Change Orders:  540 days  (Date: 6/26/2024)


**TN TDOT**
Department of
Transportation

Bond #107660862
Local Government Guidelines Form 8-30
March 9, 2018

## Supplemental Agreement and/or Request for Construction Change
## Change Order Request # 01

Unit prices listed below include labor, materials, profit, overhead, and incidentals necessary to complete this work. A separate attached spreadsheet with the same information may be used in lieu of the table below.

| Item No. | Description | Unit | Current/ Pending Quantities | Revised Quantities | QTY Over + QTY Under - | Contract Price | Net Amount Due Change |
|---|---|---|---|---|---|---|---|
| 725-02.79 | FIBER SPLICE ENCLOSURE (AERIAL OR UNDERGROUND) | EA | 29 | 0 | -29 | $573.71 | $-16,637.59 |
| 725-02.80 | FIBER SPLICE ENCLOSURE (AERIAL OR UNDERGROUND) | EA | 0 | 29 | 29 | $2048.00 | $59,392.00 |
| 725-23.10 | FIBER OPTIC CABLE (72 F) | EA | 56890 | 0 | -56890 | $1.67 | $-95,006.30 |
| 725-23.16 | FIBER OPTIC CABLE (144 F) | LF | 0 | 56890 | 56890 | $2.85 | $162,136.50 |
| 790-06.44 | FIBER OPTIC STRAND STORAGE | EA | 14 | 0 | -14 | $253.61 | $-3,550.54 |
| 790-06.45 | FIBER OPTIC STRAND STORAGE | EA | 0 | 14 | 14 | $644.00 | $9,016.00 |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |
| | | | | | | $ | $ |

Now, Therefore, We, The Town of Farragut Contractors, and Travelers Casualty and Surety of America, Surety, hereby agree to the Supplemental Agreement consisting of the above mentioned items and prices, and agree that this Supplemental Agreement is hereby made a part of the original contract and will be performed by this Contractor in accordance with specifications thereof, and that the original contract remain in full force and effect, except insofar as specifically modified by this Supplemental Agreement.

Recommended for Approval

Engineer/CEI (Signature)          Date   8/2/23

Approved          By:

Contractor (Signature)          Date   7-21-23

**TN** **TDOT**
Department of
Transportation

Local Government Guidelines Form 8-30
March 9, 2018

Travelers Casualty and Surety Company of America

By: _Catherine L. McMillan_ _____     7/21/2023

Surety (Signature)                                      Date

By: Darryl W. Smith _____     _____

Owner (Signature)                                      Date

Approved for
Eligibility     By:

APPROVED
By Edie Rakus at 3:04 pm, Jul 14, 2023 _____     _____

Local Programs (Signature)                             Date



ATMS Phase 1 Project Map

Knoxville - Knox County - KUB Geographic Information System

OVERHEAD FIBER
UNDERGROUND FIBER

KGIS Copyright - 2020

Printed: 12/1/2020 at 5:04:04 PM

0    1,950    3,900    7,800
ft

KGIS makes no representation or warranty as to the accuracy of his map and its information nor to its fitness for use. Any user of this map product accepts the same AS IS ,WITH ALL FAULTS, and assumes all responsibility for the use thereof, and futher covenants and agrees to hold KGIS harmless from any and all damage, loss, or liability arising from any use of this map product.

**AGENDA NUMBER: <u>VI.E.</u>**                    **MEETING DATE: <u>August 24, 2023</u>**

---

| REPORT TO THE BOARD OF MAYOR AND ALDERMEN |
|:---:|

**PREPARED BY:  Allison Myers, Finance Director/Town Recorder**

**SUBJECT:  Rejection of Bids for Contract #2023-07: Security Gates at McFee Park**

---

**INTRODUCTION:**  The purpose of this agenda item is to reject the one (1) bid the Town received for Contract #2023-07 Security Gates at McFee Park.

**DISCUSSION:** On August 15, 2023, the Parks and Recreation department opened bids from one (1) contractor for security gates at McFee Park, Jones Electronic Services. The budget for the McFee gates is $70,000. Due to the bid received being 37% over budget, staff would ask the Board of Mayor and Aldermen to reject the bid received from Jones Electronic Services.

**BID TABULATIONS:**

| BIDDER | BID | BID PRICE |
|---|---|---|
| **VENDOR:**<br>**Jones Electronic Services** | <u>**Supply and installation of gates at the North &**</u><br><u>**South entrances of McFee Park:**</u> | **$95,944** |

**RECOMMENDATION BY:**  Allison Myers, Finance Director/Town Recorder for approval.

**PROPOSED MOTION:**  To reject the bid for Contract #2023-15 Security Gates at McFee Park, opened on August 15, 2023.

**BOARD ACTION:**

**MOTION BY:** _____     **SECONDED BY:** _____

| <u>VOTE / TOTAL</u> | Williams | Povlin | White | Meyer | Burnette |
|---|---|---|---|---|---|
| **YES** | _____ | _____ | _____ | _____ | _____ |
| **NO** | _____ | _____ | _____ | _____ | _____ |
| **ABSTAIN** | _____ | _____ | _____ | _____ | _____ |