# KRAMER RAYSON LLP
ATTORNEYS AT LAW

POST OFFICE BOX 629
KNOXVILLE, TENNESSEE
37901-0629

FOUNDED 1948

Telephone Extension: 126
Email: tomhale@kramer-rayson.com

JOHN T. JOHNSON, JR.
WARREN L. GOOCH
EDWARD G. PHILLIPS
THOMAS M. HALE
JACKSON G. KRAMER
BEECHER A. BARTLETT, JR.
JOHN C. BURGIN, JR.
CHARLES M. FINN
ROBERT A. CRAWFORD
JOHN E. WINTERS
ROBERT L. BOWMAN
STEVEN E. KRAMER
SHANNON COLEMAN EGLE
KATE E. TUCKER
BETSY J. BECK
WILLIAM J. CARVER
GEORGE R. ARRANTS, JR.
BRANDON L. MORROW
BRYCE E. FITZGERALD
NATHANIEL D. MOORE
CAMILLE H. SANDERS
ERICA D. GREEN
ANDREW M. HALE
LUCAS M. FISHMAN
JAMES T. SNODGRASS
KATHERINE R. OVERTON

OF COUNSEL
WAYNE R. KRAMER
LESLIE L. SHIELDS

OFFICES

FIRST HORIZON PLAZA
SUITE 2500
800 SOUTH GAY STREET
KNOXVILLE, TENNESSEE 37929
TELEPHONE 865 525-5134
TELECOPIER 865 522-5723

105 DONNER DRIVE
SUITE A
OAK RIDGE, TENNESSEE 37830
TELEPHONE 865 220-5134
TELECOPIER 865 220-5132

R.R. KRAMER (1888-1966)
E.H. RAYSON (1923-2017)

September 6, 2023

Ms. Allison Myers
Town Recorder
Town of Farragut
11408 Municipal Center Drive
Farragut, Tennessee 37934

*Via Hand Delivery*

Re: Real Estate Purchase and Donation Agreement between Timothy C. Scott and Todd M. Scott and the Town of Farragut

Dear Allison:

Enclosed herewith is the original of the above-referenced document that has now been signed by the two parties as well as Tennessee Valley Title Insurance Co. which is acting as escrow agent under the Agreement.

Please retain this in the Town's files.

Yours truly,

Thomas M. Hale

TMH/mat
Enclosure

cc: Dennis Ragsdale w- enclosure (via email)
David Smoak w- enclosure (via email)

# REAL ESTATE PURCHASE AND DONATION AGREEMENT

**THIS PURCHASE AGREEMENT** is made and entered into as of the 30th day of August, 2023, by and between TIMOTHY C. SCOTT and TODD M. SCOTT (collectively "Seller") and THE TOWN OF FARRAGUT, a municipal corporation organized and existing under the laws of the State of Tennessee ("Purchaser").

RECITALS:

Seller owns certain property in Farragut, Knox County, Tennessee which is identified on Knox County Tax Map 162, Parcels 24.02 and 24.03 and identified as "Seller Parcel" on Exhibit A attached hereto (the "Seller Parcel"). Purchaser desires to acquire approximately 55 acres of such property, and Seller has agreed to donate approximately 15 acres to Purchaser in a simultaneous closing on the terms and conditions set forth herein.

In consideration of the promises hereinafter contained, the parties hereby agree as follows:

## ARTICLE ONE

### PROPERTY; EASEMENT

Subject to the terms, conditions and provisions set forth below, (a) Seller agrees to sell and convey to Purchaser, and Purchaser agrees to buy from Seller all of Seller's right, title and interest in approximately 55 acres of the Seller Parcel substantially as shown as "55 acres" on Exhibit A hereto with the final boundaries to be determined by the Survey and the Plat to be delivered under Section 5.2, together with all improvements thereon, and all easements, rights and appurtenances thereto (the "Purchase Tract"), and (b) Seller agrees to donate approximately 15 acres of the Seller Parcel to Purchaser substantially as shown as "15 acres" on Exhibit A hereto with the final boundaries to be determined by the Plat to be delivered under Section 5.2, together with all improvements thereon, and all easement rights and appurtenances thereto (the "Donation Tract") (the Purchase Tract and the Donation Tract being collectively referred to herein as the "Property"). The portion of the Seller Parcel to be retained by Seller shall be referred to herein as the "Retained Tract."

As additional consideration, (a) Purchaser shall grant to Seller an easement for access to McFee Road from the Retained Tract and (b) Purchaser shall agree to certain restrictions on the

Donation Tract all to be provided in easements, covenants and restrictions executed by Purchaser and Seller at Closing, as defined below (the "ECR"). The parties shall in good faith negotiate and agree upon the form of the ECR based on the terms described in Section 4.2 below during the Inspection Period as defined below.

## ARTICLE TWO

## REPRESENTATIONS, WARRANTIES AND COVENANTS

**Section 2.1.** To induce the Purchaser to enter into this Agreement, Seller makes the representations, warranties and covenants hereinafter contained in addition to the representations, warranties and covenants elsewhere contained in this Agreement, each of which is material to and is relied upon by Purchaser. Seller represents, warrants and covenants as follows:

(a) <u>Title to Property</u>. Seller is the sole owner of good, fee simple, marketable title to all of the Property, subject to (i) real property taxes for 2023 and subsequent years, and (ii) easements, covenants and restrictions of record in the Register's Office for Knox County, Tennessee.

(b) <u>Hazardous Materials</u>. Although Seller has conducted no investigations or environmental studies of the property, Seller has no actual knowledge of the presence of any contaminants on the property in forms or concentrations which violate applicable environmental laws or regulations. The property has been used for agricultural purposes before and after Seller's acquisition.

(c) <u>Not a Foreign Person</u>. The Seller is not a "Foreign Person" as defined in the Internal Revenue Service Code Withholding Section.

(d) <u>No Liens</u>. Except for real property taxes for 2023 and subsequent years and any easements, covenants and restrictions of record, there are no liens, claims, actions, suits or proceedings (including, without limitation, any condemnation or similar proceeding) relating to the Property or the transaction contemplated by this Agreement or any pending or to the best of Seller's knowledge, threatened liens, claims, actions, suits or proceedings (including, without limitation, any condemnation or similar proceeding) against Seller or the Property.

(e) <u>Leases</u>. There are currently no leases or occupancy agreements in effect with respect to any portion of the Property

except a year-to-year lease which can be terminated as of December 31 of each year. Seller will give notice of termination to the tenant upon the expiration of the Inspection Period if Purchaser has not exercised its right to terminate this Agreement.

(f) <u>Status of Seller</u>. Seller has the full and unrestricted authority to enter into and carry out the terms of this Agreement and the person signing this Agreement on behalf of Seller has the authority to do so.

**Section 2.2:** <u>Purchaser's Representations</u>. Purchaser represents and warrants to Seller that neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with or will result in the breach of any of the terms, conditions, or provisions of any agreement or instrument to which Purchaser is a party or by which Purchaser or any of Purchaser's assets is bound.

**Section 2.3:** <u>Survival</u>. All of the representations, warranties and agreements of the parties set forth in Sections 2.1 and 2.2 and elsewhere in this Agreement shall be true upon the execution of this Agreement in all material respects, shall be deemed to be repeated at and as of the Closing Date (except as set forth in written notice delivered from one party to the other prior to the Closing Date, provided that if there is a material adverse change in the representations, warranties and agreements of Seller, Purchaser may terminate this Agreement and receive a refund of the Earnest Money). However, all representations, warranties and covenants contained in this Agreement shall expire and terminate six (6) months after the Closing Date.

### ARTICLE THREE

### PURCHASE PRICE

The purchase price (the "Purchase Price") to be paid by Purchaser for all of the Purchase Tract shall be One Hundred Thousand Dollars ($100,000.00) per acre based on the Survey described in Section 5.2. The Purchase Price shall be payable as follows:

(a) Within five (5) business days after execution of this Agreement, Purchaser shall deposit the sum of Fifteen Thousand Dollars ($15,000.00) (such deposit and any additional funds

DBR 2023\Scott, Tim C.\Farragut
8248-002 Real Estate Purchase and Donation Agreement

3

Case 3:23-cv-00402-TRM-JEM   Document 6-55   Filed 11/11/23   Page 4 of 19   PageID #: 2534

deposited under Section 4.3 shall be referred to herein as the "Earnest Money") with Tennessee Valley Title Insurance Co. (the "Escrow Agent") which shall be paid to Seller and applied to the Purchase Price at Closing;

(b) At Closing, Purchaser shall deliver to Seller the balance of the Purchase Price, subject to credit for the Earnest Money and any adjustments provided herein, immediately available funds.

(c) The parties agree that the value of the Donation Tract is One Hundred Thousand Dollars ($100,000.00) per acre.

## ARTICLE FOUR

## PRE-CLOSING EXAMINATIONS, INSPECTIONS, STUDIES AND TESTS

**Section 4.1. Physical Tests and Studies.** Within seven (7) business days after the execution of this Agreement, Seller will deliver to Purchaser copies of any title insurance policies, surveys, environmental reports, geotechnical reports and real estate tax bills, related to the Property which are available to Seller. Purchaser and its representatives shall have the right, at Purchaser's sole cost, expense and risk, to conduct such physical tests and studies of the Property and obtain such samples thereof as the Purchaser may deem appropriate, including without limitation intended, soils tests, groundwater tests, waste water system tests and inspections, engineering inspections, hazardous substances tests and inspections and air quality tests. Purchaser shall promptly repair any damage to the Property which may result from the exercise of Purchaser's rights under this Section 4.1 to the condition substantially similar to that as of the date hereof and shall, to the extent permitted by law, indemnify and save Seller harmless from and against any claims relating to personal injury, property damage and mechanics liens arising from Purchaser's activities under this Section 4.1, except claims, costs, expenses and liabilities arising out of the discovery of, or the non-negligent, accidental or inadvertent release of, any hazardous substances or waste resulting from the investigations (unless such hazardous substances or waste are brought onto the Property by Purchaser or Purchaser's agents, employees, consultants or contractors). The foregoing indemnity shall survive Closing or the termination of this Agreement.

**Section 4.2.** <u>Easements with Covenants and Restrictions.</u> During the Inspection Period as defined in Section 4.3, the parties shall negotiate in good faith and approve such ECR and related documents in recordable form, and with terms that shall run with the land and bind the Purchaser, and any of Purchaser's successors and assigns, (i) from using the Donation Tract, or any part thereof for the development of any commercial or residential use or purpose, but limiting such use to governmental conservation or park purposes, except that any building constructed for use in connection with such purposes shall not exceed a footprint greater than 6,000 square feet or a maximum total square footage of all buildings on the Donation Tract of 12,000 square feet, and (ii) requiring the Purchaser to (a) plant and maintain landscape screening along the westerly boundary of the Donation Tract to serve as a buffer between the Donation Tract and the Retained Tract that shall be in compliance with the Purchaser's regulations governing landscaped buffers and (b) provide an easement at least fifty (50) feet in width for ingress and egress from McFee Road, over and across the Purchase Tract and the Donation Tract, to the Retained Tract (the "Access Easement "), the location of which shall be subject to change at the election of the Purchaser to fit with or accommodate the needs of the access approved in the initial Master Plan approved for the Purchaser's use of the Property. After such initial Master Plan is approved, the location of the Access Easement shall not be further changed without the prior written consent of the owner of the Retained Tract, which consent shall not be unreasonably withheld if such changes do not materially adversely affect the access of the Retained Tract to McFee Road and do not materially increase the cost of constructing the driveway from the Retained Tract. The road and any related improvements constructed in the Access Easement (the "Road Improvements") shall comply with the Purchaser's regulations for a public road. When the Purchaser develops and constructs the public park on the Property, Purchaser shall construct the Road Improvements in the Access Easement at its expense to the point reasonably determined by the Purchaser as required to provide access for such park improvement to McFee Road. The owner of the Retained Tract may, at its option and expense, construct the Road Improvements in the Access Easement to connect to the Road Improvements constructed by Purchaser, or in the event that Purchaser has not constructed any Road Improvements, the owner of the Retained Tract may construct the Road Improvements through the entire Access Easement to McFee Road at its expense. Upon completion, the Road Improvements shall be maintained by the Purchaser as a public road.

**Section 4.3.** <u>Right to Terminate.</u> The parties acknowledge that, following their execution of a letter of intent dated as of June 22, 2023, the Purchaser, with Seller's consent, commenced its inspection of the Property, including, but not limited to, surveying, engineering and other inspections of the Property. Purchaser shall have the right to terminate this Agreement for any reason or for no reason without any liability or obligation under this Agreement, by notice given to the Seller during the period commencing on the date of execution of this Agreement and ending sixty (60) days after the date of this Agreement (as such may be extended by Purchaser, the "Inspection Period"), provided that Purchaser may extend the Inspection Period for an additional thirty (30) days by delivering written notice of extension to Purchaser and additional Earnest Money of Ten Thousand Dollars ($10,000.00) to Escrow Agent prior to the expiration of the initial Inspection Period. If Purchaser does not terminate this Agreement as provided in this Section 4.3, the Earnest Money shall be non-refundable except in the event of a material breach of Seller's obligations or termination under Section 7.2.

**Section 4.4.** <u>As Is</u>. Purchaser acknowledges and agrees that Purchaser has a full right of inspection with respect to the Property and will have full opportunity to satisfy itself as to the condition of the Property and agrees that, except as otherwise expressly set forth herein, or in the documents to be executed and delivered by Seller at Closing, Seller has not made and will not make any representations or warranties, express or implied, pertaining to the Property, its condition, suitability for a particular purpose, or any other matters whatsoever, and that Purchaser will be relying solely on its own inspections and investigations with respect to the Property, its condition, suitability for a particular purpose, and all other matters whatsoever. IN ADDITION, PURCHASER ACKNOWLEDGES AND AGREES THAT THE PROPERTY IS BEING PURCHASED AND WILL BE CONVEYED "AS IS, WHERE IS," WITH ALL FAULTS AND DEFECTS, WHETHER PATENT OR LATENT, AS OF THE CLOSING DATE; PROVIDED, HOWEVER, SELLER SHALL NOT BE RELIEVED FROM ANY LIABILITY SELLER MAY HAVE TO PURCHASER UNDER THE SPECIFIC TERMS OF THIS AGREEMENT IF ANY WARRANTY MADE BY SELLER IN THIS AGREEMENT OR ANY OF THE CLOSING DOCUMENTS IS UNTRUE IN ANY MATERIAL RESPECT, SUBJECT TO THE LIMITATIONS CONTAINED HEREIN.

## ARTICLE FIVE

## SURVEY, TITLE, HAZARDOUS SUBSTANCE REPORT, ACCESS

**Section 5.1. <u>Title Insurance Commitment/Policy</u>.** No later than fifteen (15) days before the expiration of the Inspection Period, Purchaser may obtain, at Purchaser's option and expense, and deliver to Seller, a current title insurance commitment (the "Commitment") for an extended coverage policy of title insurance (the "Title Policy"), on an ALTA Form acceptable to Purchaser from a title insurance company acceptable to Purchaser (the "Title Insurance Company"), in the amount of the Purchase Price, insuring Purchaser as the owner of fee simple title to the Property subject only to the Permitted Encumbrances (as defined in Section 5.4).

**Section 5.2. <u>Survey; Plat</u>.** Within seven (7) business days after the date of this Agreement, Seller shall deliver to Purchaser a copy of Seller's most recent survey of the Property. Before the expiration of the initial Inspection Period, the Purchaser shall obtain, at Purchaser's expense, a survey of the Property, including the boundaries of the Purchase Tract and the Donation Tract (the "Survey") and a subdivision plat that complies with applicable subdivision regulations (the "Plat"). The Plat and the Survey shall be delivered to Seller no later than fifteen (15) days prior to the expiration of the initial Inspection Period, and Seller shall notify Purchaser of any objections within ten (10) days after such delivery. The Survey and the Plat, as approved by the parties, will establish the boundaries and acreage of the Property (including the boundaries of the Purchase Tract and the Donation Tract), provided that such boundaries are substantially as shown on <u>Exhibit A</u>. Upon the parties' approval of the Survey, a copy of such Survey shall be substituted for <u>Exhibit A</u> to this Agreement. The Purchase Price shall be adjusted based on the actual acreage shown on the Survey as approved by Seller and Purchaser.

**Section 5.3. <u>Hazardous Materials Report</u>.** Purchaser may, at Purchaser's option and expense, obtain on or before the expiration of the Inspection Period, a Phase I Environmental Survey (the "Environmental Survey") of the Property, and if necessary, a Phase II Environmental Survey. The Environmental Survey shall be addressed to both Seller and Purchaser, and a copy of the Environmental Survey shall be delivered to Seller.

**Section 5.4. <u>Purchaser's Objections</u>.** If the Purchaser has any objection to the Commitment, the Survey or the Environmental Report, or the state of title or facts reflected in the Commitment, the Purchaser shall give the Seller written notice (the "Objection Notice") of such objection at least ten (10) days before the expiration of the Inspection Period. The Seller shall have the right, but not the obligation, (i) to cure any title defect or

eliminate any exception in the Commitment to which the Purchaser objects; (ii) to correct any state of facts shown on the Survey to which Purchaser has objected; or (iii) to address the conditions disclosed in the Environmental Report in a manner satisfactory to Purchaser. Seller shall notify Purchaser if Seller is unable or unwilling to take the remedial action within ten (10) days. If the Seller is unable or unwilling to cure or eliminate or correct as requested in an Objection Notice, within ten (10) days after the Objection Notice is given, the Purchaser shall elect to either (i) waive such defects, exceptions or state of facts and accept title to the Property subject to such defects, exceptions or state of facts without reduction of the Purchase Price (except that Purchaser shall be entitled to satisfy any monetary liens or encumbrances out of the Purchase Price at Closing) or (ii) terminate this Agreement whereupon, the parties shall have no further rights or obligations hereunder. Should Purchaser elect to accept title, survey and environmental conditions based upon the above-noted reports, the Purchaser shall notify the Seller in writing of such acceptance. Purchaser's failure to give such notice to Seller within thirty (30) days after the Objection Notice has been given shall be deemed to be an election by Purchaser to terminate this Agreement. All matters of title and survey to which Purchaser fails to object within the time period specified above, and all such matters to which the Purchaser has objected, but has waived such objections under clause (i) of the third preceding sentence, shall be deemed to be "Permitted Encumbrances."

## ARTICLE SIX

### CLOSING

**Section 6.1.** Closing Date. The consummation of the purchase and sale of the Property herein contemplated (such consummation being herein referred to as the "Closing" and the date thereof being referred to as the "Closing Date") shall take place on or before the earlier of twenty (20) days after the expiration of the Inspection Period as it may be extended, or November 15, 2023. Purchaser may, at its option, waive any conditions to Closing and close at any time with at least five (5) business days prior written notice of the Closing Date.

**Section 6.2. Place of Closing**. The Closing shall take place in Knox County, Tennessee in such manner (including exchange of documents via the mail), as may be designated by Purchaser in the notice given under Section 6.1 or as mutually agreed upon by Seller and Purchaser.

**Section 6.3. Mutual Conditions to Closing.** The Closing shall include a simultaneous purchase of the Purchase Tract, conveyance of the Donation Tract and execution of the ECR. The Purchaser's obligation to close the purchase of the Purchase Tract is subject to the condition that Seller shall simultaneously donate and convey the Donation Tract as provided herein. The Seller's obligation to donate and convey the Donation Tract is subject to the condition that Purchaser shall simultaneously purchase the Purchase Tract and execute the ECR.

## ARTICLE SEVEN

### CONSUMMATION OF SALE AND CONDITIONS TO CLOSING

The Closing shall be consummated as follows:

**Section 7.1. Seller's Deliveries and Conditions to Purchaser's Obligations.** Seller shall deliver to Purchaser at the Closing the following documents dated as of the Closing Date, the delivery, content and accuracy of which shall be a condition to Purchaser's obligation to consummate the purchase and sale herein contemplated:

(a) **Deed(s).** Special warranty deed(s), in form and substance reasonably satisfactory to Purchaser, with full special or limited covenants of title, in recordable form duly executed by the Seller and conveying the Purchase Tract and the Donation Tract to Purchaser good, fee simple; and

(b) **Owner's Affidavit.** An Affidavit in form satisfactory to the Title Insurance Company, stating that all bills have been paid for any improvements to the Property and sufficient to allow the Title Insurance Company to remove any "standard" exceptions contained in the Commitment;

(c) **Authority of Seller.** Documentation (including resolutions, if applicable) in form and substance satisfactory to Purchaser evidencing the fact that Seller has the full and unrestricted lawful power to enter into and carry out the terms of this Agreement and execute and deliver the documents described herein; and

(d) **Non-Foreign Statement.** A sworn statement that Seller is not a "foreign person" or a non-resident alien as defined by the Internal Revenue Code and the regulations promulgated thereunder in the form required by Treas. Regs. Section 1445; and

(e) **Releases**. Releases of any deeds of trust or liens on the Property.

(f) **ECR**. The ECR.

Section 7.2. **Further Conditions to Purchaser's Obligations**. The following conditions must occur and/or be satisfied as an additional condition precedent to Purchaser's obligation to consummate the purchase and sale herein contemplated (unless waived by Purchaser) and if such conditions are not met to the satisfaction of Purchaser, the Purchaser may terminate this Agreement:

(a) Purchaser shall be able to obtain, at Purchaser's cost, the Title Policy as described in Section 5.1;

(b) There shall be no condemnation or eminent domain proceedings pending or threatened against the Property or any part thereof and neither party shall have received any notice, written or oral, of the desire of any public authority or other entity to take or use the Property or any part thereof.

(c) Seller shall have complied, in all material respects, with all covenants and provisions required by this Agreement to be complied with by Seller before, on, or as of the Closing Date;

(d) The representations and warranties of Seller in this Agreement shall be true and correct in all material respects on and as of the Closing Date.

Section 7.3. **Purchaser's Other Deliveries**. At the Closing, Purchaser shall deliver to Seller the balance of the Purchase Price. In addition, Purchaser shall execute and deliver the ECR.

Section 7.4. **Title Insurance Premiums; Documentary Transfer Fees and Taxes; Survey Cost**. Purchaser shall pay all state transfer fees and taxes and recording costs imposed on or in connection with the conveyance of the Property. Purchaser shall pay all premiums and other costs associated with the Title Policy and the Commitment, and the costs of the Survey and the Plat. Seller and Purchaser shall each pay ½ of the cost of any closing escrow fee.

Section 7.5. **Real Estate Commission**. Seller and Purchaser each warrant to the other that no broker or agent has been engaged by it

in connection with the negotiation and/or consummation of this Agreement, and each hereby indemnifies and holds the other harmless from and against any and all claims of any broker or agent so claiming.

**Section 7.6. Costs of the Parties**. All costs or expenses of performance of obligations hereunder and the consummation of the transactions contemplated herein which have not been specifically assumed by either party under the terms hereof shall be borne by the party incurring such cost or expense.

## ARTICLE EIGHT

## CLOSING ADJUSTMENTS AND APPORTIONMENTS.

All of the items of income and expense related to the Property, including, without limitation, ad valorem taxes payable for the tax year in which the closing takes place, shall be apportioned or adjusted between the Seller and the Purchaser. All apportionments and adjustments shall be made as of 11:59 P.M. on the Closing Date, except those items which are not susceptible of determination on the Closing Date, which shall be apportioned or adjusted after the Closing, but computed as of the Closing Date. To the extent that the apportionments and adjustments at the Closing are not based upon final figures or there are any errors or omissions in the calculation or determination thereof, promptly after notice of such final figures or errors or omissions, the Parties shall readjust or reapportion and make the payment required as a result thereof. At Closing, Seller shall pay greenbelt or rollback taxes due in connection with the sale of the Property, if any. Seller and Purchaser shall cooperate as may be reasonably appropriate to mitigate the applicable rollback taxes to the extent consistent with Purchaser's intended use of the Property.

## ARTICLE NINE

## DEFAULT; REMEDIES ON DEFAULT

**Section 9.1. Default; Liquidated Damages**. Purchaser and Seller acknowledge that it would be extremely impracticable and difficult to ascertain the actual damage which would be suffered by Seller if Purchaser fails to consummate the purchase and sale contemplated herein (for any reason other than Seller's failure, refusal or inability to perform any of Seller's covenants and agreements hereunder or the failure of any other of the conditions to Purchaser's obligation to close hereunder). Based on all those

considerations, Purchaser and Seller have agreed that the damage to Seller would reasonably be expected to amount to the Earnest Money.

Accordingly, provided that Purchaser has not terminated this Agreement as allowed by Section 4.3 and if Seller has performed its covenants and agreements hereunder but Purchaser has breached its covenants and agreements hereunder and has failed, refused or is unable to consummate the purchase and sale contemplated herein by the Closing Date, then Escrow Agent shall pay the Earnest Money to Seller as full and complete liquidated damages. Upon Seller's receipt of such payment, as above provided, no party to this Agreement shall have any liability to any other party to this Agreement; and this Agreement shall in its entirety be deemed null, void and of no further force and effect, provided that the indemnities set forth in Article 2 and Section 4.1 shall survive. In that regard, Seller may recover from Purchaser any Earnest Money which Purchaser has failed to deliver to Escrow Agent in accordance with the terms of this Agreement.

If Seller has breached any of its covenants and/or agreements under this Agreement and/or has failed, refused or is unable to consummate the purchase and sale contemplated herein by the Closing Date, (a) Purchaser shall be entitled to seek and obtain specific performance, (b) the Escrow Agent, upon the request of Purchaser, shall return the Earnest Money to Purchaser and (c) the Purchaser shall be entitled to recover from Seller its actual out-of-pocket costs and expenses up to a maximum of Twenty Five Thousand Dollars ($25,000.00).

**Section 9.2.** **Termination**. In the event this Agreement is terminated for any reason, Purchaser shall deliver to Seller within ten (10) days after such termination all copies and originals of documents delivered by Seller to Purchaser before, on or after the date hereof with respect to the Property, together with all copies and originals of all surveys, engineering reports, inspection reports, cost estimates, site plans and all documentation obtained by or on behalf of Purchaser with respect to the Property. The foregoing requirement to deliver such documents, surveys, engineering reports, inspection reports, cost estimates, site plans and documentation shall survive such termination.

## ARTICLE TEN

## MISCELLANEOUS PROVISIONS

**Section 10.1. Entire Agreement**. This Agreement constitutes the entire agreement between the parties hereto with respect to the transactions contemplated herein, and it supersedes all prior understandings or agreements between the parties.

**Section 10.2. Binding Effect**. This Agreement shall be binding upon and inure to the benefit of the parties hereto, and their respective heirs, devisees, personal representatives, successors and assigns.

**Section 10.3. Waiver; Modification**. Failure by Purchaser or Seller to insist upon or enforce any of their rights shall not constitute a waiver thereof, and nothing shall constitute a waiver of Purchaser's rights to insist upon strict compliance with the provisions hereof. Either party hereto may waive the benefit of any provision or condition for its benefit contained in this Agreement. No oral modification hereof shall be binding upon the parties, and any modification shall be in writing and signed by the parties.

**Section 10.4. Governing Law**. This Agreement shall be governed by and construed under the laws of Tennessee.

**Section 10.5. Article Headings**. The article headings as herein used are for convenience of reference only and shall not be deemed to vary the content of this Agreement or the covenants, agreements, representations and warranties herein set forth or limit the provisions or scope of any Article.

**Section 10.6. Date Hereof**. For purposes of this Agreement, the date hereof shall mean the latest date of execution of this Agreement by all parties hereto.

**Section 10.7. Counterparts**. To facilitate execution, this Agreement may be executed in as many counterparts as may be required. All such counterparts shall collectively constitute a single agreement.

**Section 10.8. Time of Essence**. TIME IS OF THE ESSENCE OF THIS AGREEMENT.

**Section 10.9. Subsequent Documentation**. Seller and Purchaser agree that they will, at any time, prior to, at or after Closing,

duly execute and deliver to the other any additional documents and instruments which are customary and which must necessarily be executed in order to consummate the purchase and sale contemplated herein, and the failure of Purchaser or Seller to demand such documents or instruments at or before the Closing shall not alleviate the obligation of the parties to execute and deliver same at any time, upon the demand.

**Section 10.10. Assignment.** The Purchaser may assign the rights and delegate the duties assumed by it as a result hereof to a governmental entity which will perform Purchaser's obligations under this Agreement and the ECR (the "Permitted Assignee") but to no other person or entity. No further assignment of this Agreement shall be permitted by the Purchaser or the Permitted Assignee without Seller's prior written approval. Any such assignment or delegation shall release Purchaser from its liability to Seller under this Agreement. Upon the written assignment by Purchaser delivered to Seller, Seller agrees to accept the performance of the Permitted Assignee and to perform this Agreement for the benefit of Purchaser's Assignee. Seller may assign the rights and delegate the duties assumed by it as a result hereof without the prior written consent of the Purchaser, but such assignment or delegation shall not release or excuse the Seller from its liability to the Purchaser under this Agreement.

**Section 10.11. Tax-Deferred Exchange.** Notwithstanding any other provision of this Agreement to the contrary, the parties recognize that Seller may effect a tax-deferred exchange in connection with the conveyance of the Subject Property. Purchaser agrees to cooperate to the extent reasonably requested by Seller, in connection with the timing and terms of the conveyance described herein and to execute such additional instruments as may be reasonably requested by the Seller in connection with any such exchange and compliance with the applicable provisions of the Internal Revenue Code and the regulations thereunder. In addition, Purchaser acknowledges that Seller may assign its rights, but not its obligations, under this Agreement in connection with such an exchange to a Qualified Intermediary as provided in IRC Reg. 1.1031(k)-1(g)(4) on or before the Closing Date. However, Purchaser will not have any obligation to accept title to property to be exchanged for the Property in a tax-deferred exchange. To the extent necessary to complete its exchange, Seller agrees to use a Qualified Intermediary for the exchange of property. In the event that Seller elects to use a tax-deferred exchange, it shall reimburse any expenses incurred by the Purchaser as a result of such exchange and shall indemnify, defend and hold Purchaser

harmless from and against any and all liabilities incurred by the Purchaser as a result of its participation in such exchange that would not otherwise shall have occurred or be payable as a result of the sale described in this Agreement.

**Section 10.12. <u>Acceptance; Date Hereof</u>**. If Purchaser causes a signed original of this Agreement to be delivered to Seller or its agent, such delivery shall be considered to be an offer by Purchaser. Such offer shall expire at 5:00 p.m. Eastern Time on August 31, 2023 (the "Expiration Time") unless an original or copy signed by Seller is delivered to the Purchaser at the address for the Purchaser set forth in Article 11 prior to the Expiration Time. For purposes of this Agreement, the date hereof shall mean the latest date of execution of this Agreement by all parties hereto.

<u>**ARTICLE ELEVEN**</u>

<u>**NOTICES**</u>

All notices, requests, consents and other communications hereunder shall be in writing and shall be personally delivered or mailed by first class registered or certified mail, return receipt requested, postage prepaid:

(a) If to Seller:   Timothy C. Scott
                    9529 Turnbridge Lane
                    Knoxville, TN 37922

    with copy to:   Dennis B. Ragsdale
                    Long, Ragsdale & Waters, P.C.
                    1111 N. Northshore Dr., Suite S-700
                    Knoxville, TN 37919

or to such other address as may have been furnished to Seller in writing by Purchaser.

(b) If to Purchaser: David Smoak, Town Administrator
                     Town of Farragut
                     11408 Municipal Center Drive
                     Farragut, TN 37934

DBR 2023\Scott, Tim C.\Farragut
8248-002 Real Estate Purchase and Donation Agreement

Case 3:23-cv-00402-TRM-JEM   Document 6-55   Filed 11/11/23   Page 16 of 19   PageID #: 2546

      with copy to:       Thomas M. Hale
                                Kramer Rayson LLP
                                800 S. Gay Street
                                Suite 2500
                                Knoxville, TN 37929-9702
                                Email: tomhale@kramer-rayson.com

or to such other address as may have been furnished to Purchaser in writing by Seller.

Any such notice, request, consent or other communication shall be deemed to be sufficiently given or served for all purposes when presented personally or when sent by national recognized overnight courier service or by registered or certified U.S. Mail, postage prepaid, to any party hereto at the address set forth above or at such other address as any party shall subsequently designate in writing. Notwithstanding the foregoing, no change of address from the addresses set forth above shall be effective until notice of such change of address is actually received by the parties to whom said notice has been sent.

## ARTICLE TWELVE

## ESCROW AGENT

Escrow Agent shall serve as Escrow Agent hereunder without remuneration other than reimbursement of out-of-pocket expenses to be paid by Seller. Escrow Agent shall have the right to disburse the Earnest Money to Purchaser or Seller upon written notice from the parties. The parties hereto hereby acknowledge that the Escrow Agent shall have no liability to any party on account of its failure to disburse the Earnest Money; and, in the event of any dispute as to who is entitled to receive the Earnest Money and interest earned thereon, if any, Escrow Agent shall have the right to retain the funds and disburse them in accordance with the final order of a court of competent jurisdiction or to deposit the Earnest Money with said court, pending a final decision of such controversy. The parties hereto further agree that Escrow Agent shall not be liable for failure of any depository of the Earnest Money and shall only be otherwise liable in the event of its gross negligence or willful misconduct. If the Purchaser furnishes its taxpayer identification number, Escrow Agent shall keep all Earnest Money in an escrow account and any interest shall be credited to Purchaser and applied against the Purchase Price.

**IN WITNESS WHEREOF,** the parties have hereunto set their hands and seals as of the day and year first above written.

WITNESSES:                          "PURCHASER":

                                    TOWN OF FARRAGUT

_[signature: Allison Myers]_        By: _[signature: Mayor Ron Williams]_
                                         Ron Williams, Mayor


WITNESSES:                          "SELLER":

_[signature]_                       _[signature]_
                                    TIMOTHY C. SCOTT

_[signature]_                       _[signature]_
                                    TODD M. SCOTT


The undersigned has executed this Agreement solely to confirm its acceptance of the duties of Escrow Agent as set forth herein this _1_ day of _September_, 2023.

_____              TENNESSEE VALLEY TITLE INSURANCE CO.

                                    By: _[signature]_
                                    Its: _VP_

DBR 2023\Scott, Tim C.\Farragut
8248-002 Real Estate Purchase and Donation Agreement

EXHIBIT A



DBR 2023\Scott, Tim C.\Farragut
8248-002 Real Estate Purchase and Donation Agreement